**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                 )
TRUSTEES OF BOSTON UNIVERSITY,   )
          Plaintiff,             )
                                 )  Consolidated Civil Action No.
          v.                     )  12-11935-PBS
                                 )
EVERLIGHT ELECTRONICS CO., LTD.,)
et al.,                          )
          Defendants.            )
_____)
                                 )
TRUSTEES OF BOSTON UNIVERSITY,   )
          Plaintiff,             )
                                 )  Civil Action No. 12-12326-PBS
          v.                     )
                                 )
EPISTAR CORPORATION, et al.,     )
          Defendants.            )
_____)
                                 )
TRUSTEES OF BOSTON UNIVERSITY,   )
          Plaintiff,             )
                                 )  Civil Action No. 12-12330-PBS
          v.                     )
                                 )
LITE-ON INC., et al.,            )
          Defendants.            )
_____)
```

**MEMORANDUM AND ORDER**

October 23, 2015

Saris, C.J.

Plaintiff Trustees of Boston University (BU) has filed suit against Defendants Epistar Corporation, Everlight Electronics Co., Ltd., and Lite-On, Inc., alleging infringement of U.S. Patent No. 5,686,738 ("the '738 patent"). Before the Court is defendants' Daubert motion in limine to exclude certain opinions

1

and testimony of BU's damages expert, Alan Ratliff, related to his reasonable royalty rate calculation (Docket No. 1416). The defendants argue that Mr. Ratliff makes three critical errors in his expert report on damages that render his opinion on the reasonable royalty rate unreliable under Federal Rules of Evidence 702 and 703, and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). The defendants specifically allege that Mr. Ratliff (1) commits basic math and reasoning errors in adjusting the royalty rate in the BU-Cree exclusive license from 1% to 4% for the non-exclusive hypothetical license; (2) erroneously relies on commission payments from Everlight and Lite-On to their U.S. sales agent as support for his hypothetical 4% rate; and (3) opines on legal issues outside his area of expertise, including which of defendants' sales should be considered U.S. sales and whether Epistar had notice of the '738 patent in 2005. The Court **ALLOWS** the motion in part and **DENIES** the motion in part for the reasons that follow.

I.   **The Hypothetical Negotiation Approach**

Under 35 U.S.C. § 284, upon finding for the claimant in a patent infringement case, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as

fixed by the court." 35 U.S.C. § 284. Here, the parties agree
that the hypothetical negotiation approach is the correct method
to use to determine the reasonable royalty in this case. "A
comprehensive (but unprioritized and often overlapping) list of
relevant factors for a reasonable royalty calculation appears in
Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.
Supp. 1116, 1120 (S.D.N.Y. 1970)." ResQNet.com, Inc. v. Lansa,
Inc., 594 F.3d 860, 869 (Fed. Cir. 2010). There are fifteen
factors, but two are particularly relevant to the present
dispute over Mr. Ratliff's determination of the royalty rate:
(1) the "royalties received by the patentee for the licensing of
the patent in suit, proving or tending to prove an established
royalty;" and (2) the "nature and scope of the license as
exclusive or non-exclusive; or as restricted or non-restricted
in terms of territory or with respect to whom the manufactured
product may be sold." Georgia-Pacific, 318 F. Supp. at 1120.

BU seeks to call Mr. Ratliff as an expert witness to
testify at trial regarding the most likely form of a
hypothetical license agreement between BU and the defendants.
Federal Rule of Evidence 702, which codified the Supreme Court's
holding in Daubert, governs the admissibility of expert
evidence. Under Daubert and Rule 702, district courts "are
charged with a 'gatekeeping role,' the objective of which is to
ensure that expert testimony admitted into evidence is both

3

reliable and relevant." <u>Sundance, Inc. v. DeMonte Fabricating Ltd.</u>, 550 F.3d 1356, 1360 (Fed. Cir. 2008) (quoting <u>Daubert</u>, 509 U.S. at 597); <u>see also</u> <u>Uniloc</u>, 632 F.3d at 1315. "While questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound." <u>Virnetx</u>, 767 F.3d at 1328.

## II.  Adjusting the Royalty Rate in the BU-Cree Exclusive License

The parties agree that "a hypothetical negotiation between BU and Epistar in early 2000 is an appropriate starting point" for determining the reasonable royalty in this case, and that the hypothetical license between BU and Epistar should be non-exclusive. Docket No. 1377, Ex. M, 41. The parties also all rely on a licensing agreement between BU and Cree Lighting Company (Cree) to support their determination of the reasonable royalty rate. However, the parties emphasize different features of the agreement and argue for different adjustments to best approximate what BU and Epistar "would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement." <u>Georgia-Pacific</u>, 318 F. Supp. at 1120.

BU first licensed the '738 patent to Cree in March 2001. In exchange for an exclusive license of the '738 patent, Cree agreed to (1) an upfront fee of $250,000, (2) a 2% running

4

royalty on net sales of Cree products that practice the '738
patent, (3) a minimum annual royalty payment of $25,000, and (4)
certain sublicense royalty lump-sum payments. In June 2002, BU
and Cree amended the license agreement. Under the amended
agreement, Cree paid an additional $250,000 upfront fee, and the
parties lowered the running royalty rate to 1%, increased the
minimum royalty obligation to $50,000 per year, and changed the
sublicense royalty arrangement so that Cree now had three
options for sharing any sublicense royalty with BU. Cree could
(1) pay BU a $500,000 lump-sum royalty for a new sublicense, (2)
pay BU a $250,000 lump-sum royalty plus a 0.5% running royalty
on sublicensee sales, or (3) pay BU a 1% running royalty on
sublicensee sales.

     The defendants argue that Mr. Ratliff makes three math and
reasoning errors in adjusting the BU-Cree license agreement to
derive the reasonable royalty rate for the hypothetical BU-
Epistar license. First, the defendants allege that Mr. Ratliff
simply adds the 2% running royalty on Cree sales from the
original 2001 agreement to the 1% running royalty on sublicensee
sales from the amended 2002 agreement to arrive at a 3%
effective running royalty rate for the hypothetical BU-Epistar
license. They argue that this is unreliable expert analysis
because Mr. Ratliff "cherry pick[s] the two best rates from the
different agreements" despite the fact that "the first rate—

Cree's 2%—was lowered in exchange for [BU's] 1% sublicensing rate." Docket No. 1416, at 8.

BU counters that Mr. Ratliff does not simply add these two rates, but instead interprets the overall licensing scheme under the amended BU-Cree agreement—including the upfront and minimum annual payments, the running royalty, and the sublicense fees—to be the "economic equivalent" of a 3% running royalty. Docket No. 1451, at 3-4. BU asserts that in amending the license agreement "BU traded a lower running royalty rate from Cree for additional upfront payments from sublicensees and increased minimum royalties from Cree." Id. at 3. Mr. Ratliff cites to internal BU documents leading up to the Cree license negotiation which "consistently reflect a target running royalty rate of 2%" in his expert report. Docket No. 1419, Ex. A, 48.

After a review of Mr. Ratliff's expert report, I find his approach sufficiently reliable to be admissible under the Federal Rules of Evidence and Daubert. Why Cree and BU lowered the original 2% running royalty to 1% in the amended agreement, and whether additional payments from Cree and the sublicensees make the licensing scheme the economic equivalent of a 3% running royalty, are factual questions that go to the weight of his testimony.

Second, the defendants contend that Mr. Ratliff contradicts basic principles of patent law and economics in opining that the

non-exclusive hypothetical BU-Epistar license could command a
higher royalty rate than the BU-Cree exclusive license because
an exclusive license provides the licensee with more rights and
benefits than a non-exclusive license. Mr. Ratliff bases this
opinion with respect to the value of non-exclusive and exclusive
licenses on his "own experience and surveys published in LES,"
which "reflect little or no difference in the semiconductor
industry between exclusive and nonexclusive rates, especially
where the licensee is incentivized and allowed to sublicense
(since that effectively opens the door to the whole market)."
Docket No. 1419, Ex. A, 37.

   As the defendants highlight, Mr. Ratliff does not provide
citations for any of the alleged surveys published in LES. Mr.
Ratliff further acknowledges in his report that "an exclusive
license would have a higher rate than a nonexclusive license
everything else being equal." Id. at 36. BU responds that the
defendants "have no *legal* support for their claim that reaching
a higher royalty rate for a non-exclusive license than for an
exclusive one is *per se* unreliable." Docket No. 1451, at 4. Yet,
BU bears the burden of showing that Mr. Ratliff's expert
testimony is reliable. The Court will not allow Mr. Ratliff to
testify that the non-exclusive hypothetical BU-Epistar license
would command a higher royalty rate based on surveys he has
reviewed because he has not provided citations to any such

surveys or demonstrated how they are related to the specific facts of this case.

Third, the defendants argue Mr. Ratliff's analysis is unreliable because he uses a 1.33 validity and infringement multiplier to increase the hypothetical reasonable royalty rate by 1%, but does not sufficiently tie this adjustment to the facts of the case. The parties agree that in the hypothetical license negotiation patent validity and infringement are assumed as a matter of law. See Lucent Techs., Inc. v, Gateway Inc., 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed."). However, they disagree over whether Cree admitted that the '738 patent was valid and infringed in the BU-Cree license, and thus also disagree over whether the hypothetical reasonable royalty rate should be adjusted accordingly.

Mr. Ratliff contends that Cree did not agree to the '738 patent's validity, or that it had infringed the patent, based on the absence of any language admitting to such in the license. He cites to a letter from BU's Interim Managing Director of the Office of Technology Development for the proposition that "Boston University would have expected higher royalty rates if there were no disputes . . . about the need for the technology, the Prospective Licensee's infringement of the '738 patent and the validity of the '738." Docket No. 1448, Ex. B.

The defendants argue that Cree did not contest the validity and infringement of the '738 patent at the time they entered into the license agreement because Cree approached BU for the patent, paid BU royalties on sales of one its GaN LED chips, and took the position that the '738 patent was valid in litigation with other parties. Whether or not there was a dispute over the '738 patent's validity and infringement, or BU believed there was such a dispute, is a factual issue that goes to the weight of Mr. Ratliff's testimony, not its admissibility.

The real problem is Mr. Ratliff's opinion that his experience on two other projects involving semiconductors and chip licensing supports the use of a 1% to 2% adjustment for validity and infringement. The defendants argue that the two projects Mr. Ratliff discusses are not sufficiently analogous to the facts of this case to support the rate adjustment. The Court agrees with the defendants.

As to the first project, Mr. Ratliff explains that International Rectifier "normally adjusted the royalty rate by 1% to 2% where it was required to provide a covenant not to sue a licensee on any other patents in IR's portfolio (upward adjustment) or where the licensee had a broad significant portfolio and offered a covenant to IR (downward)." Docket No. 1419, Ex. A, 38. Here, BU does not contend that the hypothetical BU-Epistar license would have included a covenant not to sue on

9

any other BU patents, and thus Mr. Ratliff's experience with the International Rectifier project is not sufficiently tied to the facts of this case to support his validity and infringement adjustment.

With respect to the second project, Mr. Ratliff discusses that after Opti obtained a verdict against Apple in a semiconductor patent dispute, the parties settled an appeal on validity and infringement grounds for just over 60% of the verdict amount. As the defendants point out, there "could be countless reasons why the parties arrive at a settlement of 60% of the jury verdict" beyond an adjustment to reflect the ongoing dispute over validity and infringement. Docket No. 1416, at 12. Thus, the Court will not allow Mr. Ratliff to rely on these examples in his expert testimony in support of the 1.33 validity and infringement multiplier.

The defendants also criticize Mr. Ratliff for his failure to cite scholarly articles he references that allegedly support his validity and infringement adjustment. Mr. Ratliff has since provided citations to these articles in his supplemental report.

## III. Commission Payments from Everlight and Lite-On to Their U.S. Sales Agents

The defendants argue that Mr. Ratliff errs in considering sales commission payments from Everlight and Lite-On to their U.S. manufacturer representatives in the range of 3% to 5% in

10

deriving the reasonable royalty rate. Mr. Ratliff states that "these commissions are at least relevant by analogy to a royalty for necessary technology because they reflect a fee rate the parties were willing to pay so that they would have the opportunity to make the subject sales." Docket No. 1419, Ex. A, 57. In Spectralytics, Inc. v. Cordis Corp., the Federal Circuit rejected a similar argument that a jury incorrectly based its award of a 5% royalty rate on evidence of a 5% sales commission on the accused products. 649 F.3d 1336, 1346 (Fed. Cir. 2011). The Spectralytics court explained that sales commissions are "not irrelevant" to the hypothetical negotiation because they "shed light" on what a party is "willing to pay to procure a business relationship." Id. Thus, it is not unreliable for Mr. Ratliff to analogize to the Everlight and Lite-On sales commissions in his determination of the reasonable royalty rate the parties would have agreed to in a hypothetical negotiation.[1]

## IV.  Legal Issues Outside Mr. Ratliff's Area of Expertise

Finally, the defendants argue that Mr. Ratliff's analysis is unreliable because he "asserts two opinions for which he is not an expert" and which do not call for expert opinion. Docket

---

[1] The defendants also argue that Mr. Ratliff analogizes to sales commissions for non-accused products. The Court cannot determine from the filings, the record, and Mr. Ratliff's expert report whether Mr. Ratliff refers to sales commissions for both accused and non-accused products, but Mr. Ratliff will only be permitted to testify about the sales commissions for accused products.

No. 1416, at 6. These two opinions are whether certain Everlight and Lite-On sales are U.S. sales under the design-win theory, and whether Epistar had notice of the '738 patent in 2005. BU has offered to stipulate that "Ratliff assumed the matters testified to regarding design win sales and observed evidence to support the assumption; and that notice to Epistar was a legal assumption he used and does not constitute expert opinion." Docket No. 1452, Ex. F. The Court finds that this stipulation would resolve the issue, and thus declines to address it further.

### ORDER

The defendant's motion in limine to exclude certain opinions and testimony of BU's damages expert, Alan Ratliff, related to his reasonable royalty rate calculation (Docket No. 1416) is **ALLOWED** in part and **DENIED** in part.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge