IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

TRUSTEES OF BOSTON UNIVERSITY, )
Plaintiff )
-VS- ) CA No. 12-11935-PBS
) Pages 5-1 - 5-259
EVERLIGHT ELECTRONICS CO., LTD., et al, )
Defendants )

**JURY TRIAL - DAY FIVE (REDACTED)**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES CHIEF DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts 02210
November 10, 2015, 8:38 p.m.

MARCIA PATRISSO
VALERIE O'HARA
LEE A. MARZILLI
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
(617)345-6787

A P P E A R A N C E S:

FOR THE PLAINTIFF:

MICHAEL W. SHORE, ESQ., CHRISTOPHER L. EVANS, ESQ., and ALFONSO GARCIA CHAN, ESQ., Shore Chan DePumpo, LLP, Bank of America Plaza, 901 Main Street, Suite 3300, Dallas, Texas, 75202.

ERIK PAUL BELT, ESQ., McCarter & English, LLP, 265 Franklin Street, Boston, Massachusetts, 02110.

FOR THE DEFENDANTS:

RICHARD C. VASQUEZ, ESQ., ERIC BENISEK, ESQ., JEFFREY T. LINDGREN, ESQ., STEPHEN STEINBERG, ESQ., and ROBERT McARTHUR, ESQ., Vasquez Benisek & Lindgren, LLP, 3685 Diablo Boulevard, Suite 300, Lafayette, California, 94549.

SUSAN G. L. GLOVSKY, ESQ., Hamilton Brook Smith & Reynolds, 155 Seaport Boulevard, Boston, Massachusetts, 02210.

I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JULIO GARCERAN | | | | |
| By Mr. Shore: | | | 5-35 | |
| By Mr. Vasquez: | | | | 5-45 |
| JOHN DAVID SMITH | | | | |
| By Mr. Evans: | 5-59 | | | |
| By Mr. McArthur: | | 5-68 | | |
| ALAN RATLIFF | | | | |
| By Mr. Shore: | 5-78 | | | |
| By Mr. Benisek: | | 5-187 | | |
| By Mr. Shore: | | | 5-231 | |
| By Mr. Benisek: | | | | 5-242 |
| MICHAEL LEBBY | | | | |
| By Mr. Shore: | 5-245 | | | |

| EXHIBITS | RECEIVED IN EVIDENCE |
|---|---|
| Plaintiff: | |
| 31, 33, 34, 98, 99, 101, 103, 225, 1560, 1578, 1579 | 5-18 |
| 193 | 5-60 |
| 57, 98, 126, 756-761, 766-769, 771-793, 803-862, 1571 | 5-118 |
| 1602, 1603, 1604 | 5-192 |
| 1452 | 5-247 |
| Defendant: | |
| 35 | 5-21 |

P R O C E E D I N G S

THE CLERK: All rise.

(The Court enters the courtroom at 8:38 a.m.)

THE CLERK: The United States District Court is now in session. You may all be seated.

THE COURT: You know, I read about the *Apple-Samsung* case and how insane it was, and they had three teams of lawyers and judges holding hearings in the middle of the night. I got a brief this morning at 3:30 in the morning. It's impossible for me to handle that level. I can't do it. I'm not going to have my law clerks up all night, I'm not going to be up all night. I don't expect your law associates to be up all night. So I'm doing right now a ban: No briefs after seven at night. No briefs after seven. There is a seven-to-seven free zone.

(Laughter.)

MR. VASQUEZ: On behalf of all the lawyers, thank you.

THE COURT: Okay? I read about that, right? I read about it and the complaints about how the judge would hold hearings -- now I understand it. Seven-to-seven free zone. Eat, sleep. I understand that you'll be preparing, but literally, I can't -- I personally -- this is selfish -- can't keep up with the volume of pleadings, okay? That's number one.

Number two, I don't understand the depositions and it's because there's too much for me to get to today. I can't do it. I'm not an ATM machine. I can't edit them by today.

So what I need -- so no depositions will be played today even if an expert goes on. I'm allowing him to rely on them, they're depositions under oath, and maybe I'll let one or two in. But I can't just read the snippets you gave me with the objections because I have to read the whole context. I don't know who's speaking, I don't know what it's about. I have to then go back and correlate the objections to the full deposition.

Let me be very clear: The reason I'm allowing the depositions is because importation is a violation if it's an infringing importation and use. At least there's an argument on use. But where I really feel plaintiffs are going overboard is I think the word "Apple" comes in every other word. And let's not try and shovel in the design-win theory internationally into the depositions. I haven't read them all so -- it's just too much.

And so I would like at this point -- this is the way I'm going to leave it, is your expert can rely on them but we're not going to play them because I didn't -- I just was there. It kept going and going and I was falling asleep. I can't. I don't understand them and I have to sit and read the whole deposition and then jump into the part that's objected to to understand it better.

MR. SHORE: Your Honor, I understand that completely but I need a little clarification. If we get to Dr. Lebby

today -- hopefully we will.

THE COURT: Lebby. I'm sorry. Did I say Ratliff?

MR. SHORE: Lebby. Yeah, Lebby. When we get to Lebby today, we do have small video cuts from depositions that he relies on. We're not going to play whole depositions.

THE COURT: It depends if they're objected to.

MR. SHORE: These cuts I don't think are objected to.

THE COURT: Well, then that's fine.

MR. SHORE: But the other thing about Apple, Apple -- Mr. Ratliff is not putting Apple in his numbers, but Apple is the person who they delivered literally hundreds of thousands of samples to in the United States.

THE COURT: That may be but it's literally every other word. I'm not -- just -- at least in the objections -- maybe that's the gist of the objections, which is why I saw them, I mean, to the extent that they're imported as samples for Apple, mention -- I don't even know who the people are speaking.

See, I -- you said simple, simple, simple. Well, it isn't because I don't have the whole deposition. So for me that's all I'm seeing, the objections. So I have to sit and go back and correlate the objections to the full text. I can't -- I'm not doing it and can't do it in the 24 hours you all gave me. So that's not done.

MR. SHORE: So again, as I said --

THE COURT: If it's unobjected to, he can rely on it.

If it's objected to, cut it out.

MR. EVANS: Your Honor, what would you like us to submit to make this easier for you to rule on? Do you want us to put the whole transcripts with the objections --

THE COURT: What would really be helpful to me -- so here. Don't kill another tree because I just asked my law clerks to print out --

Is this all of them? Is this what you -- I'm not sure.

Well, why don't we do this: What would be useful -- I may have left it upstairs.

Is that what you just printed?

LAW CLERK: Yes, this is the full transcript.

THE COURT: So they printed the whole thing. So what I had to do -- what I have to do is sit here, the whole thing, and go back and figure out what's being objected to, and then there were lines and it looks like a spiderweb. And I can't quite figure out -- all of them aren't objections. Some of them seem to say something else like --

MR. EVANS: It's kind of like a red line.

THE COURT: I don't understand, like can you come up here and just explain -- I don't even understand what it means.

(Discussion at sidebar and out of the hearing of the public:)

MR. EVANS: So what happened is -- our understanding

was you wanted the transcript with the objections side by side. This is the best way we could do that. And it's not ideal, but it's basically like a red line of changes. So these we're talking about -- oh, they highlighted this text, so that's showing up here.

THE COURT: But those aren't objections.

MR. Evans: Those aren't objections. But we can't have the objection show up unless we also show these like highlighted line things. It's just the way the PDF program --

MR. SHORE: You could ignore these.

THE COURT: I could ignore these?

Then what's objected to, just the shaded --

MR. EVANS: Just the parts that are highlighted.

THE COURT: Just the shaded?

MR. STEINBERG: That's correct.

There are some, though, where the objection will relate to a few different pages of art, maybe a page or two of highlighted texts.

MR. EVANS: It will say that at the top. It will say, "This objection applies to the next" blank -- like pages blank through blank. So there's one objection for like a bunch of pages.

THE COURT: Okay. So literally would you low tech this?

MR. EVANS: Sure, yes. Gladly.

THE COURT: Here's a Highlighter and here are the depositions and have someone -- maybe it's already shaded. I see, it's already shaded.

MR. SHORE: So here what you'll see is you'll see the objection is to the shaded part and it will tell you in the objection how far --

THE COURT: But you see, this involves my editing it, of how many pages? It involves my editing it because there's sometimes I'm going to agree and sometimes I'm going to disagree and it is going to take me forever. Let me say it will not be done.

MR. EVANS: Would you like the full transcript with the objections in it or do you want just the cut we want to play?

THE COURT: Oh, this isn't the full transcript you want to play?

MR. EVANS: No, no, this is the full we want to play.

MR. SHORE: Wait. Hang on.

For instance, this is Mr. Anderson's deposition. And you go through Mr. Anderson's deposition --

MR. EVANS: The objections aren't in there. They're not in this version. This is the full cut of what we want to play.

MR. STEINBERG: The objections aren't in there.

MR. EVANS: The objections are a separate document.

We can combine the documents --

THE COURT: And while I am -- on balance don't have a problem, I didn't understand this was so extensive so that the defendants' objection is well placed. You can't just do a dump. I'm allowing the expert to rely on it. I thought these were going to be little things.

MR. STEINBERG: It's over 200 pages of total testimony.

THE COURT: Yes, I may well under 403 exclude some of it. Let me just be clear, the expert, Mr. Lebby, can rely on it.

MR. STEINBERG: That's fine, your Honor. We don't dispute that.

THE COURT: So why don't you take a couple of representative -- I'm not going to do this dump with the jury. They can't possibly read all of this. I didn't realize it was so extensive.

MR. SHORE: Your Honor, if you can take a look at this, there's one objection in this entire deposition.

THE COURT: Let me say this: There are two separate issues. One is, can I get through it on the objection; the second is whether or not I'm going to allow a dump of this number of transcripts.

Now, you may want to play a couple. Are there two that you want to play that I can focus on?

MR. VASQUEZ: That was our understanding of what they were going to do last week --

MR. SHORE: We only want to play an excerpt.

MR. STEINBERG: That was our understanding of what they were going to do as of last week.

THE REPORTER: Wait, wait, wait. Only one at a time.

MR. EVANS: The only thing we want to play is some excerpts during Mr. Lebby's testimony that support what he's saying just to show what testimony he specifically relied on. They're ten-second clips.

THE COURT: And I may allow that. Are those objected to?

MR. STEINBERG: I don't know which ones they're planning to play during his exam, whether they're objected to or not. I just know the full set.

THE COURT: Why don't we do this: You have a thousand people sitting here. Why don't you tell them specifically what you're planning on playing, you then go back and see if you object. The specific snippets. And I'm not sure I'm going to allow all of these depositions in but I certainly will allow Dr. Lebby to talk in general about what they are discussing. So -- and then there may be one or two depositions, like the full depositions of those points, that I'll allow in, but this is too much to put in. It's too much.

MR. SHORE: Again, it's only 80 pages.

THE COURT: It's not only 80 pages; it's single space, small print.

So let me -- I couldn't get through it last night. I'm only one human being. And I now understand what happened in the *Apple-Samsung* litigation because it's -- a district court judge is not a law firm. And so I have a wiretap I have to do this afternoon at some point --

You need to find out when it is because I said I had to do that last night as well.

So you will tell them exactly what snippets you're going to play, you're going to tell me if you object.

And that's going to happen when?

MR. EVANS: I'll do it during testimony -- during lunchtime or during the break.

MR. SHORE: And, your Honor, they can't object to something now that they didn't object to --

THE COURT: Oh, absolutely. Absolutely.

MR. STEINBERG: That's fine. I need to know which snippets --

THE COURT: And in general, they are -- they, BU, is fully appropriate to discuss importation and use. That's part of the infringing claim. And so I don't know what other objections there are. I do understand that the word "Apple" is used a thousand times. But I mean, if that's one of the customers, then it can be used. I mean, they can refer to --

MR. BENISEK: Apple is not a customer in this case, your Honor. Apple is not a customer in this case. There's not a U.S. sale.

MR. SHORE: They are the entity for whom samples are being imported and the entity to whom samples are being delivered for use in the United States to qualify.

THE COURT: And that fact can be put in but not a hundred times.

MR. EVANS: So can I clarify one further thing?

THE COURT: Yeah.

MR. EVANS: There's kind of two tranches of depositions. That's the manufacturers' reps. And there's like seven corporate representatives that is a total of one hour of testimony when combined that we would like to play. That's a separate set of deposition cuts. And those are depositions --

THE COURT: You're going to play them. You're going to use one hour of your time.

MR. EVANS: Right. But they still have outstanding objections to them.

THE COURT: Well, that's an issue --

MR. EVANS: They're included in here. Now, the next thing --

MR. SHORE: Some of them are only --

MR. STEINBERG: That is Exhibit B.

MR. EVANS: That's Exhibit B. Exhibit A is pretty

short.

MR. SHORE: And some of these are only four minutes long.

THE COURT: It doesn't matter. I have to read it. I have to read it. And I need to have five or six hours that I don't have to sit and go through them. That was why we went through that whole pretrial order.

MR. EVANS: I was going to suggest that I could get you those -- just those ones, which is going to be like a tiny little stack. We could get them to you today, like this afternoon, and then you could have them to look at maybe over Thursday or Wednesday.

THE COURT: Well, that's possible. That's possible. If not, we're going to do a placeholder and you'll have to play them at the end when I get to them out of order. That's what's going to have to happen.

MR. SHORE: So this is the manufacturers' reps.

LAW CLERK: But that doesn't have the objections in it, correct?

MR. STEINBERG: Correct.

MR. SHORE: But just to let you know for your sake, these are the ones -- no, not the manufacturers. These are the corporate representatives.

MR. EVANS: It's actually shorter than that now too. We'll get you the shortest versions we have. And I'll get

those ready for you --

THE COURT: And then what you're going to do is just highlight what's objected to. Just highlight that. And then I can actually go through: Allowed, denied, allowed, denied, just in the margin like that instead of having to cross.

MR. STEINBERG: So if you can get us what you're actually going to play, or you actually want to play from the corporate representatives --

MR. EVANS: We have sent that to you but let's --

THE COURT: You two will work. But I think I'm rethinking my let everything go in because when I started looking at it, it's too extensive. Anyway, we have a lot to do this morning.

MR. SHORE: Just for clarity --

THE COURT: This is Mr. Shore.

MR. SHORE: Just for clarity, the corporate representatives is what Dr. Lebby relies upon.

THE COURT: Okay.

MR. EVANS: Manufacturing.

MR. SHORE: Manufacturing. I'm glad these guys are here. The manufacturers' representative is what Dr. Lebby is going to rely on.

THE COURT: And you're going to show them what's going to be played?

MR. SHORE: We're going to show them snippets of what

is going to be played. The corporate representatives actually is a shorter version than this, is going to be -- a shorter version than this. It's one hour and seven minutes of total testimony.

THE COURT: Now, I'm going to give these back to you and what you're going to do -- someone is going to do, a paralegal or someone -- is going to just highlight what's objected to.

MR. EVANS: Do you want us to just write in the margins the objections?

THE COURT: Yes. Nothing high tech, no spiderwebs. Just what's objected to.

MR. STEINBERG: Now, these ones haven't changed. Is that right?

MR. EVANS: Well, let me make sure that we --

THE COURT: Where's the other Highlighter?

THE CLERK: I gave it to you.

THE COURT: Here the federal government gives you low tech, okay? Just highlight what's objected to.

THE CLERK: Do you want two different-colored Highlighters?

MR. STEINBERG: Your Honor, there's one other issue --

THE COURT REPORTER: Wait. One at a time, please.

THE COURT: Wait. Can I back up and say there are three separate court reporters because we're going full days

and there's daily copy, so not all the court reporters know you, and that's why we have to make sure that she can see who you are.

MR. STEINBERG: I understand, your Honor.

So the -- this was the corrected version of the deposition designations with objections. I mistakenly filed that Docket No. 1541, a version that included a small piece of testimony from Men Kuo that relates to licenses to third party -- with third parties.

THE COURT: I saw that.

MR. STEINBERG: Two of them have raised confidentiality concerns and would like us to ask that that testimony be sealed and that if there are agreements -- although it's voluminous in the Philips agreement that you ruled yesterday are not really comparable. But if those agreements do eventually come into evidence, we would like to seal the courtroom.

THE COURT: I didn't rule anything wasn't comparable. He just didn't remember what was in there.

MR. SHORE: Thank you.

MR. STEINBERG: I apologize if I --

THE COURT: Excuse me?

MR. VASQUEZ: The agreements didn't come in, but general counsel have basically specifically notified us that if it gets there, we need to do --

THE COURT: Yeah, we'll seal them.

MR. STEINBERG: For right now I'm wondering if we can have Docket 1541 removed since that was the one --

THE COURT: What's 1541?

MR. SHORE: 1541 --

MR. STEINBERG: 1541 was -- excuse me, Mr. Shore.

1541 was the full set of their designations, but it mistakenly included a little bit of testimony from Men Kuo.

THE COURT: I'm not going to seal the whole thing, just that portion of it. Just redact it.

MR. STEINBERG: So 1542 is essentially the redacted version.

THE COURT: Fine. I seal 1541.

MR. SHORE: We don't have any objections at all.

THE CLERK: Is that on the docket, 1541?

MR. STEINBERG: Correct.

THE CLERK: So you want 1541 deleted, and 1542 replaces it?

MR. STEINBERG: Yes.

(In open court:)

THE COURT: So let's go back out here and talk about their objections to various things coming in today. Is that right?

MR. SHORE: Yes, your Honor.

As a preliminary matter, we need to move into the

record some of the exhibits from yesterday.

THE COURT: Well, Maryellen just walked out.

THE CLERK: No, I'm back. I was checking on the jury. I'm right here.

MR. SHORE: Your Honor, Boston University will move into the record PTX 31, 33, 34, 98, 99, 101, 103, 225, 1560, 1578 and 1579. All of those are PTX numbers.

THE COURT: Have you had time to check it?

MR. VASQUEZ: No, we did. I want one clarification.

MR. STEINBERG: Is that consistent with the list you went over?

THE CLERK: We went over it this morning.

THE COURT: I'll tell you what. I'm not going to hold you to it. Let me know by the break whether that's consistent with everything that you've agreed on.

(Plaintiff's Exhibit Nos. PTX 31, 33, 34, 98, 99, 101, 103, 225, 1560, 1578 and 1579 received into evidence.)

THE CLERK: And, Defense, you have to clear up 35, remember?

MR. STEINBERG: Yes. So, your Honor, Ms. Molloy asked us to clear up that we had offered PTX 35 yesterday. That's Plaintiff's Exhibit 35. That was objected to and your Honor said you were going to consider it.

THE COURT: I don't have any memory about what PTX --

MR. SHORE: That's the PowerPoint presentation that

the attorney -- hang on a second.

To remind the Court, that's the PowerPoint presentation that Everlight's lawyers prepared that we objected that they waived or said they were not going to assert an advice-of-counsel defense.

THE COURT: Right. And that's what I reserved on.

MR. STEINBERG: Right. So Ms. Molloy just wanted us to put on the record that that exhibit was marked as A. She wanted us to get that clarified so that's all I'm doing right now.

(Plaintiff's Exhibit No. 35 received for identification.)

THE COURT: The jury is here. Is there any exhibit that's about to come up that I need to worry about that's going to come up?

MR. SHORE: I don't believe in Mr. Garceran's redirect there are, but in the subsequent witnesses there are several.

THE COURT: What are the issues?

MR. SHORE: That's their objection.

THE COURT: You objected to a boatload of documents.

MR. STEINBERG: There was one more issue to --

THE COURT: You know, I got the jury here so we need to deal right now with the -- with any of the exhibits that are going to be objected to.

MR. STEINBERG: I understand, your Honor. I just

wanted to ask that we could move in DTX 5. This was used during the exam of Dr. Moustakas and there was no objection at that time, but it was not formally admitted.

THE COURT: Fine.

MR. SHORE: I don't remember what it was.

THE COURT: What's DTX 35? People don't remember this by heart.

MR. STEINBERG: It's one of the articles by Dr. Moustakas.

THE COURT: Fine, I allowed in the article by Moustakas.

(Defense Exhibit No. DTX 35 received into evidence.)

THE COURT: What are you objecting to at this point?

MR. BENISEK: Your Honor, I think we have cross-objections to demonstratives, and some of them are coming up for --

THE COURT: Yeah, but when am I going to do it?

MR. BENISEK: We could do it right now.

THE COURT: Yes, at least the key ones. Let's go.

MR. SHORE: Well, I can go first because we only objected to two, so...

THE COURT: Two of what?

MR. SHORE: Two of their exhibits that they claim -- I believe they're going to try to use in cross-examining Mr. Ratliff. But we only --

THE COURT: Let's go to the direct first.
MR. SHORE: I'm saying we only have two, so...
THE COURT: Yeah, but you come much later on the cross.
So what are the ones that are going to be used on direct? We printed them, so just show them up on the screen.
MR. BENISEK: Your Honor, in light of what we talked about because --
THE COURT: Yes, I sustained the objection to that. I saw that. Big Google. That looks like something out of a -- sustained. No.
MR. SHORE: These are people they delivered samples to.
THE COURT: No. No, that looks like -- that's a -- it's not an exhibit.
MR. BENISEK: Okay. Your Honor, the second one is.
MR. SHORE: It's a demonstrative.
THE COURT: But it's not going to come in. That is used to inflame the huge number of -- yes, right. Under 403.
What's the next one?
MR. BENISEK: It's a demonstrative for Mr. Ratliff, Number 21. And our issue with it is at the very bottom it has a sum of 340 million in sales. That's worldwide sales. We think that is 403 -- 402-403.
MR. SHORE: I'm trying to figure out where he is.

THE COURT: Why is worldwide sales relevant here?

MR. EVANS: Your Honor, this goes to commercial success. What it says on the top: Commercial success popularity. So the worldwide sales show that this particular invention had tremendous commercial success. That's all it's being used for.

MR. SHORE: It's validity. It's actually one of the factors to consider in validity.

MR. BENISEK: Not for enablement, you Honor. That would be for obviousness. That's one of the factors for obviousness.

MR. SHORE: That's not true.

THE COURT: I'll allow this in but you have to put "worldwide," and then I'm going to give a cautionary instruction that the only thing that's relevant here is what the sales are within the United States.

MR. SHORE: That's fine.

THE CLERK: What exhibit number is it?

MR. BENISEK: It's Plaintiff's Demonstrative Slide No. 21.

THE COURT: But you're going to put it on before you show it to them "worldwide sales"? "Worldwide."

MR. SHORE: Yes.

THE COURT: What's the next one?

MR. BENISEK: The next one is Plaintiff's

Demonstrative Slide No. 27 entitled "Other considerations commissions." Now, your Honor, the issue here is we filed *Daubert* on this and you reserved in part because you weren't sure what --

THE COURT: Denied. You can put in the commissions.

MR. BENISEK: Well, your Honor, I just want to make clear, these are commissions on all sales, not just --

THE COURT: All GaN?

MR. EVANS: Domestic sales, your Honor.

THE COURT: Excuse me. All what sales? It says domestic sales.

MR. BENISEK: Right. Domestic sales for any type of product: So GaN, non-GaN, package, you name it.

THE COURT: Is that so?

MR. SHORE: No, your Honor. These are the sales that would go to them for selling GaN products. I'm sorry. Excuse me. Excuse me.

THE COURT: Excuse me. Then it's a disputed issue of fact. I'll allow it in but you'll have to prove up that it's GaN sales. If it includes GaN sales, I'll allow it.

MR. EVANS: Yes, it does.

THE COURT: All right. What's the next one?

MR. BENISEK: Your Honor, the next one is PTX 110.

THE COURT: Do you have that up there?

(Pause.)

THE COURT: What's this?

MR. SHORE: Yeah, the PTX 110, your Honor, is a license agreement between the Epistar Corporation and an individual professor. And it goes into -- it comes in in the deposition of Men Kuo that we have submitted. And the context of it will be clear, but it shows that what -- the types of things they consider when entering into license agreements and that this particular license agreement, the amount of life left on the patent was less than six months --

MR. BENISEK: Past --

MR. SHORE: Excuse me. Let me finish.

THE COURT: Let him finish the sentence.

MR. SHORE: The amount of life left on the patent was

consider profitability, they didn't consider anything. They just were willing to pay whatever they needed to pay to get it over with. And that goes to the overall licensing strategy and the way Epistar considers licenses around close to the time or near the time of the license agreement in this case. So it goes to the licensing practices of Epistar.

MR. BENISEK: May I, your Honor?

THE COURT: Yes.

MR. BENISEK: First off, no foundation through Dr. Piner that would allow for any comparative. He did not testify

to it and did not lay a foundation on the technology.

Two, this is 2008. This is eight years after.

THE COURT: If it doesn't have anything to do with GaN technology, I'm excluding it.

MR. SHORE: But, your Honor, there are no licenses with Epistar that only deal with GaN technology. That's not how licensing is done. And this goes to their licensing practices --

THE COURT: It has nothing to do with --

MR. SHORE: It has everything to do with how they approach licensing, and it has everything to do with how Epistar deals with individual inventors --

THE COURT: I'll let you ask about it with their people, whether that's representative, and put it in, but I have no foundation that this is analogous at all.

MR. SHORE: That's where we come in, we come in with their people.

THE COURT: With their people, not through your expert.

MR. SHORE: No, our expert doesn't --

THE COURT: All right. So what am I doing this for?

MR. BENISEK: That's an exhibit they had listed for today.

THE COURT: All right. All right. Then that's a mistake.

MR. BENISEK: PTX 206. This is an exhibit from Mr. Ratliff's report. Your Honor, this is just hearsay and argument. I don't know what they think -- what this can come in for as a --

THE COURT: Is it a demonstrative?

MR. SHORE: It's a chart from his report showing the range of reasonable royalties.

THE COURT: You can put it up as a demonstrative. It's not an exhibit.

MR. BENISEK: That's fine, your Honor. It can be a demonstrative.

THE COURT: All right. So what's the next one?

MR. BENISEK: So sustained as to --

THE COURT: It's not going to be admitted. It's a demonstrative.

MR. BENISEK: Thank you. Thank you.

Same for PTX 207. We're fine if it's a demonstrative but we object --

THE COURT: Sure.

MR. STEINBERG: PTX 111 is our discovery responses. I just want to make clear we would want the objections removed. We think that's prejudicial, to have the objections go to the jury. They can just redact them.

MR. SHORE: I've never seen that done before. If you have a big giant blank -- I guess we can do that.

THE COURT: You don't have to do it right now. Put it up. They're not going to notice it. You'll just focus on the chart and then you'll eliminate the objections when we give it to -- when we bring it in to them.

MR. VASQUEZ: Your Honor, do you want us to direct our tech to only blow up the portion of the --

THE COURT: Yeah.

MR. BENISEK: Your Honor, next one is PTX 749, which is an IMS Research --

THE COURT: I thought you all were supposed to confer about these in advance.

MR. BENISEK: We try, your Honor.

THE COURT: Did you confer on that one?

MR. BENISEK: We might not have gotten to these last ones. It was a list of 50 of --

THE COURT: I get it. But the jury is now out there.

MR. BENISEK: This one is straightforward. It's an outside research report. It's complete hearsay. I'm not sure how Mr. Ratliff is going to have this admitted into evidence.

MR. SHORE: Your Honor, this is the exact kind of report that every semiconductor company in the world subscribes to, relies upon. It's the exact type of thing an expert would rely upon for market data.

THE COURT: The objection is sustained in terms of its admissibility but he could rely on it. As we all know, experts

in federal court can rely on hearsay if it's the kind of hearsay that people in the field rely on. So he can rely on it, he can cite from it, but it doesn't get admitted in as an exhibit.

MR. SHORE: We can publish it as something he relied upon, we just can't put it into evidence?

THE COURT: I don't know how you want to do it. You can ask him to read from it, you can put the thing on the screen, but you can't admit it because it's hearsay.

MR. BENISEK: Make it a demonstrative. I'm fine.

THE COURT: Whatever. Go ahead.

MR. BENISEK: Your Honor, same thing, PTX 1438, research report offered for evidence.

THE COURT: Yes.

MR. BENISEK: Same thing --

MR. SHORE: Hang on.

THE COURT: Hang on.

It's true for all the research reports. They're all hearsay but they could all be relied upon and put up on the screen as something the expert relied on.

MR. SHORE: So that would be 1444, 1445 --

THE COURT: You know, I have a jury sitting out there. Is there anything else that's --

MR. SHORE: We still have -- I think we have a demonstrative of the statute talking about importation and use

being -- they've objected to that.

MR. BENISEK: It's withdrawn.

THE COURT: Yeah, you can't object to a statute. Okay. What's the next one?

MR. BENISEK: So we have a few more PTX, your Honor. PTX 1571 looks to be -- I want to confirm this -- Mr. Ratliff's CV.

THE COURT: Yes, of course.

MR. BENISEK: Oh, no. It's more than that, your Honor. I'm sorry. It is a document he relies on but then it goes into actual -- same type of stuff.

MR. SHORE: No, it does not, your Honor. What it has --

THE COURT: Do you know what? I'm not doing this now. I have a jury sitting out there. A CV comes in.

MR. BENISEK: Yeah, I know, but there are financial exhibits in the back that we're objecting to as hearsay that's attached to the CV.

MR. VASQUEZ: They want to tear this off and --

THE COURT: That's a financial exhibit.

MR. BENISEK: If it is meant to have the CV, that's fine, but it's an exhibit to his report.

MR. SHORE: Okay. We'll limit it to his CV --

THE COURT: You know, this is exactly the kind of thing you need to confer on. So you all need to meet because

you're not filing anything after seven o'clock. You need to have a phone call and go through it. There are hundreds of lawyers in both of your -- all of your firms. Just don't waste the jury's time on this.

MR. VASQUEZ: Your Honor, it's irrelevant but there's only seven or eight in our firm.

MR. SHORE: And there's only six in our firm.

THE COURT: Do you want to know how many there are in mine?

MR. SHORE: Please, your Honor. You gave them 15.

THE COURT: Go. Go.

MR. SHORE: I've only got two.

They've got two exhibits I believe they're going to try to use in the cross-examination of Mr. Ratliff: One are data sheets and the other are statements where they're trying to cross-examine him on the inclusion of non-blue LEDs in his royalty base, which is exactly what the Court said they could not do. So they're trying --

THE COURT: What I said is they couldn't disparage him as being incompetent. That's what I said. I didn't say they couldn't cross; I said I would put this to the jury as to -- and so that's different. There's a very mocking, cruel tone in the briefing that's gone back and forth between both parties, and I am going to not allow -- I'm allowing them to ask about it but not disparage as incompetent. And I'm going

to give a limiting instruction that there's a lot of confusion about the data produced by Everlight, and that's going to be an issue for them to resolve.

MR. SHORE: All right. The second objection besides them attacking the royalty base that they sworn to is -- the other document is a document cobbled together from -- after the close of fact discovery, never produced. This was cobbled together -- after expert report.

THE COURT: What is it?

MR. SHORE: It's a -- I guess the best way to say it is it's some document where they're trying to claim that things were made by people other than Epistar and --

MR. STEINBERG: Your Honor, I can explain.

MR. SHORE: And this was something that was never produced in fact discovery, something that was never produced prior to expert reports. It is a Frankenstein document that we've never seen during fact discovery.

THE COURT: What is this?

MR. STEINBERG: Your Honor, I need to correct some of those statements. This is Lite-On's accused product chip data -- LED chip data, okay? Most of this was produced in a document a year ago.

THE COURT: Is this a summary chart?

MR. STEINBERG: The rest of this came from SAP -- from the SAP system which they had access to.

THE COURT: Are you seeking to introduce it?

MR. STEINBERG: It is a summary chart.

THE COURT: When did you show it to them?

MR. STEINBERG: This was produced with Dr. Mangum's report. But the data inside, the majority of it was produced in another document a year ago, and the rest came from the SAP system that they had access to --

THE COURT: No, I'm not allowing this in as exhibit. I'm not allowing it as an exhibit.

MR. STEINBERG: Can we use it as a --

THE COURT: That's -- you can ask -- I don't know yet about whether you can ask about it, but this -- the information from Everlight has been a disaster --

MR. STEINBERG: This is not Everlight, this is Lite-On, and this is something that Mr. Ratliff cited in his supplemental reports that they're going to cite to today.

THE COURT: If Mr. Ratliff cited it, you can put in what he cited, not an amalgam, okay? What he cited you can put in.

MR. STEINBERG: That's fine, your Honor. Thank you.

THE COURT: Not some sort of hybrid document.

MR. STEINBERG: No, this is the document he cited. I just wanted to correct Mr. Shore's misstatement that none of this information was produced during fact discovery.

THE COURT: Did he cite it?

MR. STEINBERG: Because most of it was produced a year ago, so I just wanted to clarify that point.

THE COURT: He cited the specific document?

MR. SHORE: No, he cited it in his supplemental report in response to them bringing up all new stuff. He did not cite it in his original report.

THE COURT: I can't resolve this right now.

Bring in the jury.

THE CLERK: Okay.

(Pause.)

THE CLERK: All rise for the jury.

(The jury enters the courtroom at 9:12 a.m.)

THE COURT: Thank you. Good morning to everyone.

Did anyone speak about the case?

(No verbal response.)

THE COURT: I find the jury's complied. Please be seated. I'm sorry I'm late getting out here but there have been battles about exhibits that are better to handle before you come in rather than you wait while we're at sidebar.

So go ahead.

MR. SHORE: Thank you, your Honor.

THE CLERK: Sir, you're still under oath.

JULIO GARCERAN

having been previously duly sworn, was examined and testified further as follows:

REDIRECT EXAMINATION

BY MR. SHORE:

Q. Mr. Garceran, I'm going ask you a few questions related to some of the questions that Mr. Vasquez asked, and we're going to start by putting up DTX 122. And we'll just blow the chart up, part of this.

Okay. Looking at the first line, "Up-Front Fee," does that have anything to do with any level or amount of Cree sales?

A. No.

Q. Looking at the second line, do you know the sales figures for infringing parts for 2002? Do you have a copy of the demonstrative?

A. No, I don't have it.

MR. SHORE: Just a moment, your Honor. We got distracted.

(Pause.)

MR. SHORE: Well, let's put it up on the screen, then.

Q. All right. In that chart they talked about the royalty payments in 2002. What were Cree sales of infringing parts in 2002?

A. Zero.

Q. In 2003 they talked about a $50,000 royalty payment. What were Cree's net sales in 2003?

A. That would also be zero.

Q. And in 2004 they talked about a minimum royalty payment of $50,000. What were Cree's sales?
A. $382,934.50.
Q. And what would the effective royalty rate be on sales of that amount?
A. 13.1 percent.
Q. 2005. What was Cree's net sales that year?
A. $706,045.
Q. And what was the effective royalty rate?
A. 7.1 percent.
Q. And going to 2006, what were Cree's total sales?
A. $88,573.
Q. And what royalty rate would that yield?
A. 56.5 percent.
Q. 2007, total sales?
A. $72,071.
Q. And what would be the effective royalty rate?
A. 69.4 percent.
Q. And on and on with this chart. What is the relevance of what somebody paid if you divorce it from the amount of sales they paid it on?
MR. VASQUEZ: Objection.
THE COURT: Overruled.
THE WITNESS: There is none. There is no basis.
BY MR. SHORE:

Q. Okay. Let's go back to DTX -- when we look at the amount, the million dollar figure in line 4 for the Nichia settlement, did that have any connection at all to Cree's sales?
A. No.
Q. Did it have any connection at all to Nichia's sales?
A. No.
Q. Let's take a look at PTX 98, Section 201(b).
Now, PTX 98 is the First Amendment to License Agreement, correct?
A. Yes.
Q. And let's look at Section 2.01(b), and we're going to highlight the sentence that begins with "University shall receive a lump sum payment." Do you see that?
A. Yes.
Q. Let's kind of highlight it down for three lines.
MR. SHORE: One more line.
Q. Now, can you read that highlighted section?
A. Yes. "University shall receive a lump sum payment in an amount to be negotiated in good faith by licensee and university based on prevailing market conditions, anticipated sales by the sublicensee, the scope of the sublicensed rights, and other relevant factors, but in an amount not less than $500,000 for sublicenses of all the patent rights in all the territories for all fields of use."
Q. Now, Mr. Vasquez, when he was asking you questions, tried

to get you to say that the only factor to consider was the value of the license to Nichia. Do you remember that?
A. Yes.
Q. Is that true?
A. No.
Q. And as a matter of fact, if you were to take that -- the license rate, the normal sublicense rate of $250,000 with 1 percent or half a percent, and you were to project that over Nichia's sales for 12 years, which is what it would have been here, if that was the only factor that was considered, what would the payment have been?
MR. VASQUEZ: Objection.
THE COURT: Overruled.
THE WITNESS: The payment would have been huge. Tens of millions of dollars.
BY MR. SHORE:
Q. All right. And when we talk about other factors, you're aware that Boston University -- one of the strong factors they had throughout their dealings with Cree was supporting the U.S. LED industry?
A. Yes.
Q. Would it have been supportive of the U.S. LED industry to make Cree pay tens of millions of dollars?
A. No.
Q. All right. Now, let's go to -- you were asked some

questions about, I believe, whether or not Cree could have been an alternative source of parts for Lite-On and Everlight. Do you remember that line of questions?
A. Yes.
Q. All right. Are you in sales and marketing?
A. No.
Q. All right. When he asked you questions about whether or not Cree would have sold parts to Lite-On and Everlight, did he provide you with any specific quantities?
A. No.
Q. Did he ask you about any specific time period when these sales would have taken place?
A. No.
Q. Did he ask you about any specific price that Cree would have to meet in order to get the business on the same terms they were already getting it?
A. No.
Q. Did he ask you about any chip types or color specifically?
A. No.
Q. Now, without that information, can you testify from your personal knowledge whether Cree had the capacity to meet some unknown demand at some unknown price at some unknown time?
A. No.
Q. Can you, with your personal knowledge, be able to tell the jury that this alternative that he's talking about would have

been provided at any price?
A. No.
Q. Can you tell this jury from your personal knowledge if you take out the third largest gallium nitride LED manufacturer in the world out of the market, what the effect on price would have been overall?
A. No, I can't.
Q. Now, also, when you're talking about whether or not you're going to replace a vendor with another vendor, there are other factors that can be involved, correct?
A. Yes.
Q. Let me ask you this: Were you aware that Lite-On owns a substantial share of Epistar stock?
MR. VASQUEZ: Objection.
THE COURT: Overruled.
THE WITNESS: No.
BY MR. SHORE:
Q. Were you aware that Lite-On sits on the board of Epistar?
A. I believe I have become aware of that.
Q. Were you aware that Lite-On has invested in manufacturing facilities co-jointly with Epistar?
A. No.
Q. Were you aware that Everlight has substantial stock positions and board seats at Epistar?
A. I believe I knew some of that relationship but I don't

know precisely.
Q. Were you aware that Everlight also has invested with Epistar in manufacturing facilities?
A. No.
Q. When you were asked about an alternative source, did anybody mention to you that to change sources they would have to abandon their own investment to go somewhere else?
A. No.
Q. All right. You remember a whole series of what we call the "blank-check questions." Do you remember that?
A. Yes. I didn't agree with that terminology, but, yes, I remember it.
Q. Where they were talking about how for 275,000 Cree would just get a blank check to do anything it wanted, right?
A. That's what was alluded to.
MR. SHORE: Can we go to the ELMO?
Q. Now, Mr. Vasquez forgot to point out that the check wasn't blank. Would you read what's highlighted on Number 3?
A. It says, "Cree shall seek monetary compensation from the up to three cross-licensees for the BU patent rights. If Cree is able to secure such compensation from the cross-licensee for the BU patent receipts, Cree and BU shall share such compensation equally."
Q. So $275,000 was never considered by BU to be the end of the payments?

A. Right.
Q. As a matter of fact, at the time of the agreement, it wasn't even considered to be the end by Cree, was it?
A. That's true.
Q. Does that look like a blank check to you?
A. No.
Q. Now, in that agreement to go out and license -- I believe two of those sublicenses were provided to Osram and then the other one was provided to Philips, correct?
A. Right.
Q. Osram is a subsidiary or a controlled entity of Siemens, right?
A. That's correct.
Q. Siemens, to put it in the context for the jury, would be like the IBM or General Electric of Europe?
A. That's correct.
Q. Siemens would have the ability if it wanted to in a fight with Cree -- would Siemens have the financial wherewithal to crush Cree?
A. Well, we like to think we're pretty scrappy, but, yeah, they would definitely have more resources than Cree.
Q. And as a matter of fact, the other cross-license went to Philips, or -- and I'm going to say this wrong. It's something like Koninkli-, whatever, some Dutch word?
A. Royal Philips.

Q. Right. Royal Philips. We'll call it "Royal Philips."
And Royal Philips would be like -- in Europe. If Siemens is the GE, Philips might be, I don't know, the Intel or Texas Instruments, another huge company?
A. Yes, another huge company.
Q. Compared to Cree, a giant opponent if you had to fight them?
A. Correct.
Q. So what did Cree get or did Cree believe -- when it got patent peace with the Siemens conglomerate and the Philips conglomerate, was that worth a lot to Cree or not?
A. Yes, it was worth a lot.
Q. And did Boston University allow Cree, the U.S. partner, the U.S. manufacturer, to use those sublicenses to obtain peace?
A. Yes.
Q. Do you believe that was supportive of U.S. industry?
A. Yes.
Q. In your view is it fair, is it reasonable to try to compare how BU treated a U.S.-based company, a company that had a long relationship with BU, and pretend like that's what would have happened if BU had been dealing with Epistar, a Taiwanese company?
MR. VASQUEZ: Objection.
THE COURT: Overruled.

THE WITNESS: I'm sorry. Could you repeat the question?

BY MR. SHORE:

Q. I think the underlying theme here of Mr. Vasquez's questioning is that he's trying to lay this seed --

THE COURT: No. No. No. No.

BY MR. SHORE:

Q. I'll just ask the question directly. In your experience in dealing with BU for ten years, in your experience in this industry for many years and in licensing for many years, is it reasonable in any way to assume that BU would have treated Epistar, Everlight and Lite-On in licensing the same way they would have treated a U.S. partner entity that they're trying to support U.S. industry?

A. No.

MR. VASQUEZ: Objection.

THE COURT: Sustained. I'm going to sustain that.

BY MR. SHORE:

Q. Is Epistar a U.S. company?

A. No.

Q. Is Everlight a U.S. company?

A. No.

Q. Is Lite-On a U.S. company?

A. No.

Q. If the policy of BU is to aid U.S. companies and U.S.

industry, what aid to U.S. industry is achieved by giving a license to Epistar, Lite-On or Everlight?
A. I don't see any correlation there, but BU definitely did support us there.
MR. SHORE: I pass the witness.
MR. VASQUEZ: Thank you.

RECROSS-EXAMINATION

BY MR. VASQUEZ:
Q. Now, Mr. Garceran, Mr. Shore just asked you about the blank-check questions that I asked yesterday, and he said the blank check wasn't the end. The $275,000 payment wasn't the end. You were supposed to try and get more money, right?
A. Correct.
Q. And you did try to get more money, correct?
A. Yes.
Q. You asked Philips for more money, right?
A. Yes.
Q. And what did Philips tell you?
A. They did not want to pay more money. They didn't want to pay any money.
Q. They didn't want to pay any money. Let's take a look at an exhibit and see if that was written down anywhere. How about Exhibit 201. I'm going to hand you my book here.
MR. SHORE: Your Honor, this exhibit is not in evidence.

MR. VASQUEZ: I would like to admit it, your Honor.
THE COURT: Defendants' or plaintiff's?
MR. VASQUEZ: It's in your binder.
THE COURT: Well, I don't have it, and if it's objected to --
MR. VASQUEZ: For the record, I'm going to --
THE COURT: Did you tell them you were going to use this?
MR. VASQUEZ: It's cross, your Honor. It's cross and he just --
THE COURT: That's why we spent 20 minutes beforehand.
MR. VASQUEZ: I didn't know he was going to walk into this wall, your Honor.
MR. SHORE: Objection.
THE COURT: Let me see what it is.
MR. VASQUEZ: I'm going to show it to you.
THE COURT: You've got to come up at sidebar.
(Discussion at sidebar and out of the hearing of the jury:)
THE COURT: Whose document is this?
MR. VASQUEZ: This is -- BU produced it. It's from Garceran to BU, and he says Cree cited additional compensation for --
THE COURT: No, let me read it.
(Pause.)

THE COURT: So what else is in there?

MR. VASQUEZ: That's all I wanted to show.

THE COURT: Okay. Fine.

MR. VASQUEZ: Hold on. There's a second one coming up next. I may as well do it now.

MR. SHORE: Your Honor, this is all part of --

MR. VASQUEZ: I only want to show the e-mail. And then 264.

THE CLERK: What number? I'm sorry.

MR. VASQUEZ: 264 will be next. And 264 says -- right here. I'm going to ask him about this. This is Garceran, Cree, talking to BU, a BU document, and it says "We are having a tough time justifying any additional annual payment for a sublicense that isn't viewed as essential by the cross-licensee."

THE COURT: Who's written it?

MR. VASQUEZ: It's written by Cree with a copy by Garceran to BU produced by BU.

MR. SHORE: That's hearsay.

MR. VASQUEZ: It's Cree talking about the same exact term as the previous one. He's copied on it --

THE COURT: I'm not going to allow -- you can ask about it but that is hearsay. You can't admit it in.

MR. SHORE: That's hearsay because he's talking about --

THE COURT: I'm not allowing it in.

(In open court:)

BY MR. VASQUEZ:

Q. Can you please read Exhibit DTX 201 to yourself, specifically, the e-mail of July 7, 2010, 9:35 a.m.? It's DTX 201.

A. Right from the start where it says "warm regards"?

Q. The bottom of the page.

A. Yes.

MR. SHORE: Objection, your Honor. Hearsay. There were --

THE COURT: He's just reading it.

MR. SHORE: Oh, I thought he was reading it out loud.

MR. VASQUEZ: I'm asking the witness to read it first.

THE COURT: Out loud?

MR. VASQUEZ: Read it to himself.

THE COURT: He's reading it to himself, I think.

MR. SHORE: I'm sorry.

(Pause.)

THE COURT: Just the first page.

BY MR. VASQUEZ:

Q. Just the e-mail at the bottom.

A. Okay.

Q. Did you read it?

A. Yes.

Q. Who's George Brandes?
A. George Brandes is a colleague of mine.
Q. You and he worked together on trying to get additional compensation for the BU license from Philips, correct?
A. Correct.
Q. Okay. And does this refresh your recollection that Cree told BU --
MR. SHORE: Objection, your Honor.
THE COURT: Overruled. Overruled.
BY MR. VASQUEZ:
Q. Does it refresh your recollection that BU told Cree, Philips stated that they did not need the --
MR. SHORE: Objection to what Philips stated, your Honor.
THE COURT: Excuse me. Excuse me.
Does that refresh your recollection? Answer, as to what happened with Philips?
THE WITNESS: Yes.
THE COURT: Okay. Now ask him a straight-on question.
MR. VASQUEZ: Sure.
BY MR. VASQUEZ:
Q. Is it true that Philips stated that --
MR. SHORE: Objection to "Philips stated."
THE COURT: Overruled. Overruled.
BY MR. VASQUEZ:

Q. Is it true that Philips stated to Cree --
THE COURT: No. No, excuse me.
Do you have personal knowledge of what's in that e-mail?
THE WITNESS: Yes.
THE COURT: All right. What's the question?
BY MR. VASQUEZ:
Q. Is it true that Philips stated to Cree that they did not need the BU patents? Is that true, sir?
MR. SHORE: Objection. Hearsay.
MR. EVANS: Offered for the truth of the matter.
THE COURT: Overruled. Overruled.
THE WITNESS: That's what the e-mail says.
BY MR. VASQUEZ:
Q. And you remember that too, right?
A. I don't have an independent recollection of them saying that to me but I don't discount -- I believe what's in the e-mail.
Q. Brandes was telling the truth, right?
A. Yes.
THE COURT: So this isn't for the truth of the matter as to whether they did or didn't need the license, but you're going to have to decide what a -- if you find liability, what a reasonable royalty rate is. So this is what's happening in the marketplace with respect to royalties.

So what's the -- what's the answer again? What was happening here?

THE WITNESS: They may have stated that. I don't recall exactly independently them saying that, but I'm not sure we believe them.

BY MR. VASQUEZ:

Q. I didn't ask you about whether you believed them, I'm asking you what they said.

They said that and you repeated it to BU, correct?

A. George Brandes did in this e-mail, yes.

Q. Okay. So just to put this all together, Mr. Shore tried to suggest that --

THE COURT: No, I wouldn't let him do that to you, so...

MR. VASQUEZ: Okay.

BY MR. VASQUEZ:

Q. And previously you were asked about the license. You had an obligation to try and get more money but you couldn't get more money out of Philips despite your best efforts, correct?

A. Correct.

Q. Okay. And that's because Philips told you they don't need a license to these patents, correct?

A. No, I think it was more --

MR. SHORE: Objection. Hearsay.

THE COURT: Excuse me. I'll allow what his state of

mind was as to what was happening in the marketplace at that time.

THE WITNESS: So understand that Philips has a very large patent portfolio, and we're in a cross-licensing negotiation. They refused to pay any money whether they needed that patent or not.

BY MR. VASQUEZ:

Q. And you accepted it in good faith, correct?

A. I accepted that they were not willing to pay any money.

Q. Okay. Now, isn't it true that you also tried to do the same with Osram and were told the same thing?

A. Essentially, yes.

Q. Okay. So isn't it true that you told BU that Cree couldn't get more money from the cross-licensees because they did not view the patent in this case as essential, correct?

MR. SHORE: Objection. Hearsay.

THE COURT: Overruled. This is not for the truth of whether Osram and Philips believed that but as to what a negotiator may have understood when they were negotiating a royalty.

Go ahead.

THE WITNESS: No, I don't --

THE COURT: What did you tell BU?

THE WITNESS: We told them that, and that's what their statements may have been, but what we believe was that whether

they needed the patent or not, they just -- because they felt they had a very strong patent portfolio and they were bringing enough to the table, they were not going to pay a dime.

BY MR. VASQUEZ:

Q. Okay. Didn't BU ask Cree for a raise in 2007 and wasn't the response from Cree, "We can't pay you more for a cross-license that is not viewed" -- let me withdraw.

MR. SHORE: Objection. Beyond the scope of redirect.

THE COURT: Overruled.

BY MR. VASQUEZ:

Q. So 2007. Do you remember BU tried to get a raise from Cree on the payments?

A. I don't recall that exactly. I'm not doubting it happened, but I don't have -- I don't recall what you're referring to.

Q. Okay. Can you please take a look -- not for the jury, for you to look -- at Exhibit 264?

MR. SHORE: Again, your Honor, it's beyond the scope of cross.

THE COURT: Overruled.

BY MR. VASQUEZ:

Q. And what I want you to do is go to the second page and look at the e-mail from George Brandes dated August 20, 2007. Read it to yourself. You're copied on that e-mail.

(Pause.)

A. Yes.

Q. Did the Cree licensing department that you were a part of at this time tell Boston University that it was having a tough time justifying any additional annual payment for a sublicense that isn't viewed as essential by the cross-licensee?

A. Yes.

Q. Thank you.

THE COURT: All right. Thank you. You may step down.

MR. VASQUEZ: No, no, no, I meant thank you for that question. I just have two more.

MR. SHORE: Your Honor, I'll have --

THE COURT: No, no, no re-re, as I said.

BY MR. VASQUEZ:

Q. Okay. Now, you were shown a chart just now about monies that were paid and the implied percentage and what that meant against your sales. Now, isn't it true that Cree received $2.2 million from Boston University after it was terminated as the exclusive licensee?

MR. SHORE: Beyond the scope of redirect, your Honor.

THE COURT: Yes. Sustained. That is way beyond.

MR. VASQUEZ: Okay.

BY MR. VASQUEZ:

Q. Did Cree get any rebates on the money that it paid out that was shown on this slide?

MR. SHORE: Objection, your Honor.

THE COURT: Overruled.

Did you get any payments back?

THE WITNESS: I'm not sure what he means by "rebates" and I'm not sure which numbers he's talking about.

BY MR. VASQUEZ:

Q. Did you get a sum of money in 2013 or '14 from BU -- what year was it?

MR. BENISEK: 2012.

Q. -- 2012 from BU that's listed on PTX 122? And you can look at it by yourself to refresh your recollection.

MR. SHORE: Objection. Beyond the scope and irrelevant.

THE COURT: Overruled. I'll let him have this.

THE WITNESS: PTX 122, did you say?

BY MR. VASQUEZ:

Q. Yes. And if you direct yourself to --

A. I'm not sure I have that.

Q. It's in the binder.

THE COURT: Maybe help him. Sometimes the tabs aren't always so clear.

MR. VASQUEZ: Yeah, I will.

BY MR. VASQUEZ:

Q. The second-to-the-bottom cell on the chart. Do you see that?

MR. SHORE: Your Honor, beyond the scope of redirect.

This was never discussed.

THE COURT: Overruled.

BY MR. VASQUEZ:

Q. Do you see that, sir?

A. Yes, I see it.

Q. Does that refresh your recollection as to my question?

A. Yes, but this is beyond the chart that we were talking about before.

Q. I didn't ask you to --

THE COURT: All right. Is it? It's not part of that same chart?

MR. SHORE: No, your Honor. It's not.

MR. VASQUEZ: Well, I didn't say it was. It's PTX 122. That's --

THE COURT: I know but I don't have it in front of me, so I'm going to sustain that objection if it's not on the chart.

BY MR. VASQUEZ:

Q. If you factor in the money that was received by Cree, do you know if Cree paid any net dollars to Boston University?

MR. SHORE: Objection, your Honor. Beyond the scope of --

THE COURT: No, overruled. I'll let him say that.

Do you know that?

THE WITNESS: No, I don't know that.

THE COURT: Okay. Done?
BY MR. VASQUEZ:
Q. Is the reason you don't know that because you didn't do the math or is the reason you don't know that because you're not aware of the payment on the sheet in front of you?
MR. SHORE: Objection. Argumentative.
THE COURT: Overruled.
THE WITNESS: I haven't done the math.
BY MR. VASQUEZ:
Q. Okay. Thank you. We can figure that out later.
One more question. You testified earlier about helping companies from the United States. When the '738 patent was licensed to the equivalent of the IBM of other countries, that meant they could practice the '738 and use it as much or as little as they chose, correct?
A. I believe so, according to the license agreements that we agreed to.
Q. Okay. So in those situations, you were not favoring a United States company against their ability to market products with that '738 process, correct?
A. I think we were absolutely supporting U.S. industry. We are the LED U.S. industry.
Q. By giving away the '738 technology to the rest of the world, right?
MR. SHORE: Objection to "giving away."

THE COURT: Sustained as to the phrase.

THE WITNESS: No.

BY MR. VASQUEZ:

Q. Okay. By selling it at the prices indicated in those settlements, correct? You think that giving them that technology at those prices was good for the United States. Is that right?

A. Yes, because we were getting back very strong patent portfolios to be able to use those.

Q. Understood. With BU's technology at those prices, correct?

A. Yes, at the prices that were listed there.

MR. VASQUEZ: Thank you.

THE COURT: Thank you. You may step down. Thank you.

(The witness is excused.)

THE COURT: Next witness.

MR. EVANS: Your Honor, we call Dr. Smith as our next witness.

THE COURT: Thank you. I'm sorry you had to spend that extra night. It even rained.

THE WITNESS: It was actually interesting.

DAVID JOHN SMITH

having been first duly sworn, was examined and testified as follows:

THE CLERK: Could you please state and spell your name

for the record.

THE WITNESS: My name is David John Smith.

THE COURT: You need to speak into the that mic or we'll never hear you.

THE WITNESS: Sure. My name is David John Smith, D-A-V-I-D J-O-H-N S-M-I-T-H.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. EVANS:

Q. Welcome, Dr. Smith. We appreciate you traveling up here. Could you introduce yourself to the jury and to the Court?

A. I'm David Smith. I'm a regents professor of physics at Arizona State University. I've been engaged by the Trustees of Boston University to provide expert witness on this case.

Q. And what is your particular expertise in?

A. I've been doing electromicroscopy for about 45 years.

Q. So is that what we've been talking about in this case as TEM, or transmission electron microscopy?

A. Transmission electron microscopy.

THE COURT: For once, Mr. Evans, you have to speak up a little bit, so make sure you hit that mic.

MR. EVANS: Sorry, your Honor.

THE COURT: So could you say that again?

BY MR. EVANS:

Q. So when you said microscopy, are you talking about the

transmission electron microscopy that we've been discussing in this case?
A. Correct.
Q. Okay. Dr. Smith, do you have any interest in the outcome of this dispute between Boston University and the defendants?
A. No.
Q. Is your compensation dependent on who wins this case in any way?
A. No.
MR. EVANS: Your Honor, at this time I would like to move into evidence Boston University Exhibit PTX 193. It's Dr. Smith's resumé.
MR. McARTHUR: No objection, your Honor.
THE COURT: All right.
(Plaintiff's Exhibit No. PTX 193 received into evidence.)
MR. EVANS: Could we put up on the screen PTX 193.
BY MR. EVANS:
Q. Dr. Smith, can you identify this document for me?
A. That is my biographical data.
Q. This copy of your resumé, is it up to date and accurately describe your work experience and education?
A. That is up to date.
Q. Is it an accurate representation of your experience?
A. It's a very shorthand version of my experience.

Q. Instead of reading through this exhibit extensively, could you just give us a quick summary of your experience as it relates to this case?
A. Yeah, I've been doing electromicroscopy for about 45 years. I became a faculty member at Arizona State University in --
THE COURT: So it really is hard to hear you. See how your voice catches? Have you testified before?
THE WITNESS: No.
THE COURT: No? All right.
THE WITNESS: Normally I'd go without a mic.
THE CLERK: There you go.
THE WITNESS: Okay. So I've been a faculty member at Arizona State University since 1984. I was director of the Arizona State University Center for High Resolution Microscopy for about 15 years. I was director of the National Science Foundation, National User Facility for six years. I was president of the Microscopy Society of America for -- during 2009. I'm a fellow of the Materials Research Society, fellow of the Microscopy Society of America, fellow of the American Physical Society. I have published over 600 journal articles. I've given more than 200 lectures in about 20 countries around the world.
BY MR. EVANS:
Q. And in your work as a researcher in the transmission

electron microscopy field, have you done much analysis of gallium nitride?
A. I have studied many examples of gallium nitride over the years. I've published maybe a hundred papers on various nitride materials.
MR. EVANS: Your Honor, at this time we would like to tender Dr. Smith as an expert in the field of transmission electron microscopy.
THE COURT: He may render an opinion.
MR. EVANS: Okay.
Let's put up Demonstrative 18, please.
BY MR. EVANS:
Q. And, Dr. Smith, since you're the expert in this, could you explain to us what exactly transmission electron microscopy is?
A. Okay. This is a photograph of me sitting at the 4000EX microscope at Arizona State University. On the right-hand side is a schematic of the transmission electron microscope.
I think I point -- yeah, at the top is the electron source. We use electrons in the electron microscope rather than light. It lets us have higher resolution and higher magnification than you can get with a light microscope.
So I have the electron source and then I have a condenser lens which is used to focus the electrons down onto the sample like you do on a light microscope. I then insert the sample in where it says "specimen," and then I have an objective lens for

forming the image, and then I have a series of magnifying lenses in order to get a magnified view of the sample.

So it's somewhat like an optical microscope except that these lenses down here give me much higher power, much higher magnification, much better resolution than I could get with an optical microscope.

And finally, at the bottom of the microscope is the viewing screen, and actually, underneath the viewing screen -- we can lift up the viewing screen and take photos of the images that we're looking at.

Q. How long have you been using this particular microscope that we're looking at here?

A. Too long. This particular microscope was delivered at Arizona State University in 1984.

Q. So you're very familiar with this instrument?

A. Back to front, yes.

MR. EVANS: Could we put up Demonstrative 3.

Q. And, Dr. Smith, if you'd double tap in the right-hand corner, it will clear off your marks.

Now, we've been talking at length in this case already about these four parts, the four defendants' parts and these TEM images. What was your role in the creation of these images we're looking at here?

A. Well, first we had to make suitable samples. And this was quite challenging because the samples are very complex with

multilayers. And if I'd like to make an analogy, it's like trying to determine the carpet on the ground floor of the Hancock Building when I've got many, many stories above. So what I have to do is slice the sample.

So I have a scalpel, and I come down and use a focused ion beam to make a cross-section of the sample, and then I tip it over on its side so that I will get effectively a side view of the sample so that I can see each of the layers in turn starting from the substrate to the buffer layer and all the layers above.

Q. Now, when you mentioned the carpet of that skyscraper, were you referring to the buffer layer?

A. I was referring to the buffer layer, yes.

Q. After you prepared suitable samples, what did you do next?

A. Well, we have to put the samples into the microscope. We then have to locate -- well, we turn on the electron beam. We have to locate the area of interest. We then have to tilt the sample because we want to make sure that all our layers are not overlapping with each other in the direction of the electron beam.

So we look at the electron diffraction pattern, we tilt the sample around until we've got it correctly aligned. We then go back to the imaging mode. We then move the sample around to find the area of interest. We then increase the magnification so that we can take the general features. We

might be at a magnification of 5,000 times or maybe 10,000 times. And then finally, we will go to much higher magnification so that we can see the lattice structure, or the lattice fringes, or the atomic structure of the sample.

Q. Looking at what we have up here on the screen, these are some of the TEM images from PTX 172, 173, 174 and 175 -- or 171 through 174. Sorry.

Are these --

THE COURT: These are the four exemplars, right?

MR. EVANS: Correct.

THE COURT: We've been seeing all along?

MR. EVANS: Yup, these are what we've been seeing all along.

BY MR. EVANS:

Q. Are these the TEM images that you created?

A. These are the medium magnification TEM images that I recorded. I guess I should point out that once the four samples had been made, then I contact Dr. Piner so that he was present with me while I was carrying out this analysis. I'd also say that I did this analysis myself; this was not something that I delegated to anyone else.

Q. So did anyone direct your work and what sort of testing you should do?

A. No, I had pretty much decided that I'm self-responsible and I know what I'm looking for. But once we had the samples

in the microscope, then I was consulting with Dr. Piner. But it was my decision as to what I should do and how I should do it.

Q. So did you use your many years of experience in analyzing gallium nitride structures and TEM to decide the best way to analyze the buffer layers of these parts?

A. Sure.

Q. Now, why did you create these four particular TEM images that we're looking up on the screen here?

A. Well, initially I wasn't sure what to expect. This is like crime-scene investigation and I'm the detective, given the challenge of finding out what's going on with these samples. And so we had to put it in the microscope, I had to get it tilted, and then I had to find the area of interest which is -- from looking at these images, I don't know whether I should get up and point to the exhibit over there or not or do you want me to do it from here?

Q. Sure. If you would rather get up and teach, we can put it on the easel.

(Pause.)

THE CLERK: You have to speak into the mic so the court reporter can hear you.

THE COURT: Yes.

THE WITNESS: Okay. So what we see here, we have the four --

THE COURT: Can you hear?

THE COURT REPORTER: I cannot, Judge.

THE WITNESS: So these are the four exemplars. And at the bottom of each one there is the sapphire substrate and here is the gross layer of gallium nitride, and in this region arrowed in each case is the buffer layer. And so we can see the contrast -- I'm sorry. The pointer is not working.

So we see can see this contrast in the buffer layer, you can see it goes black and white and lots of shades in between. So I'll call these patches of black and white -- patches of black and white contrast. And so this is what I would interpret to be a series of many, many, small misoriented crystals that are changing their orientations.

So I think you saw in this model from Dr. Piner the other day that if we are looking down the atomic planes, then you could imagine as I tilt it to slightly different angles, the contrast you will see will be different. And so that's what's happening in each of these samples.

There are four different samples, or four different exemplar products as I think we're calling them, and each of those little patches of black and white contrast are telling us that I have lots of tiny little crystals that are slightly changing in their orientation across the field of view.

BY MR. EVANS:

Q. So, Dr. Smith, Dr. Redwing in her report stated that the

contrast in these TEM images can arise from a number of factors such as variations in atomic number, sample thickness, density, the presence of defect strains and other factors.

Could any of those factors be causing the contrast that you were just discussing in the buffer layers?

A. Not in any of these crystals.

Q. And is your opinion based on your more than 40 years of microscopy experience?

A. In looking at many, many, many different types of materials, yes.

Q. What is your confidence level in the opinion you're giving here today?

A. I shouldn't say 101, but I'll say 100. I think we're finished with that.

(The witness returns to the witness box.)

MR. EVANS: Pass the witness, your Honor.

THE COURT: Excuse me?

MR. EVANS: That's all. I think we're going to pass the witness.

MR. McARTHUR: One moment, your Honor.

CROSS-EXAMINATION

BY MR. McARTHUR:

Q. Good morning, Dr. Smith, ladies and gentlemen of the jury. My name is Rob McArthur, and I represent the defendants.

Now, Dr. Smith, you testified that you worked with

Dr. Piner together at Arizona State to collect information regarding the exemplar products. Is that correct?

A. Uh-huh.

Q. Had you worked with Dr. Piner before this case?

A. I'd never met Dr. Piner.

Q. So you had never met him before?

A. No.

Q. And when you tested the exemplar products that you testified to today, did Dr. Piner bring those samples with him to Arizona?

A. No.

Q. So you received those samples directly from counsel. Is that correct?

A. Well, I believe counsel received them from another source.

Q. Okay. But you received them from counsel. Is that correct?

A. Yes.

Q. And as far as you know, those samples that you tested are actually Epistar products that you identified in your report?

A. Well, that's what it said on the -- well, it didn't say, it just had the name of the product on it. But then we got a separate e-mail that identified the particular manufacturer of each of the exemplar products.

Q. And that's the basis for your belief that those are actually the Epistar products that you tested that you

testified about here today. Is that correct?
A. Uh-huh. They came in a special little sealed envelope, and it had ten in a row: One, two, three. There were ten of each of the separate products.
Q. Okay. I'd like to ask you a few questions about your microscope that you used to take these images.
MR. McARTHUR: Could we pull up Plaintiff's Demonstrative 118.
Q. I believe you testified this is you sitting at the JEM 4000EX microscope in your lab at Arizona State. Is that correct?
A. Uh-huh.
Q. And was Dr. Piner actually in the room with you sitting next to this microscope when you took the images that you've shown here today?
A. He was in the room when I took the images.
Q. Okay. And this is actually the microscope you used, correct?
A. This is the microscope I used.
Q. And you've been using this microscope since 1984. Is that correct?
A. Correct.
Q. Now, are you aware that there are microscopes on the market today that are more advanced than the microscope you used?

A. Yes. Arizona State University has three of them.
Q. Did you use any of those microscopes to take the images?
A. It wasn't necessary.
Q. And are you aware that the microscopes that are on the market today use special lenses to correct aberrations?
A. Of course.
Q. But does this microscope here have those special lenses?
A. No.
Q. Now, are you aware that the newer microscopes on the market today are built and housed in special rooms to eliminate electromagnetic --
A. Of course. We have three of these microscopes at ASU.
Q. But you did not use those microscopes. Is that correct?
A. No; it wasn't necessary.
Q. Have you heard of the Titan3 made by FEI?
A. Sure; we have a twin sister of it.
Q. Have you used that microscope before?
A. I have had samples in that microscope.
Q. Have you used the microscope?
A. I haven't put hands on myself. I've been in the room while a different person was operating the microscope.
Q. So you have not operated the Titan3. Is that correct?
A. Correct.
Q. Now, for the purposes of your opinions here today, you analyzed only the physical samples of the Epistar chips. Is

that correct?
A. Correct.
Q. You didn't analyze any packages or anything like that?
A. No.
Q. And you didn't perform any secondary ion mass spectroscopy analysis, did you?
A. No.
Q. So you did not produce any other analyses with Dr. Piner other than TEM images, TEM diffraction patterns and Fourier transform. Is that correct?
A. There were quite a few more images and a few more diffraction patterns.
Q. Were those the three categories of data that you produced with Dr. Piner?
A. Electron micrographs, electron diffraction patterns and some Fourier analysis, correct.
Q. Great. I would like to turn to page 7 of PTX 171. It's in the binder. We could put it up on the screen for you.
A. So what is it I'm looking at?
Q. There's a tab there in the binder.
A. Sorry. What is the --
THE COURT: What number?
MR. McARTHUR: PTX 171.
THE WITNESS: What is the document? Who is Michael Smith?

BY MR. McARTHUR:
Q. I'm sorry. That's an incorrect label.
A. Yeah, but I'm wondering who is Michael Smith.
Q. I'm wondering the same.
A. Okay. Yes.
Q. Dr. Smith, are these the TEM electron diffraction patterns you obtained for the sample Venus series?
A. Yes. Uh-huh.
Q. And what was the scale of the TEM image that you took these electron diffraction patterns from?
A. Typically the scale is on the order of half a micron.
Q. Half a micron. So if you go to PTX 171, page 1, would this be representative of the half a micron scale that you took the electron diffraction pattern from?
A. The scale is the scale bar in the bottom left-hand corner, .5 microns. So it would be of that sort of order, yes.
Q. So this size image of TEM generated an electron diffraction pattern that was shown on the page that we just saw. Is that correct?
A. Correct.
Q. Okay. And did you use a flood beam diffraction to take that electron diffraction pattern?
A. I don't think we normally call it a flood beam, but a broad beam.
Q. A broad beam?

A. Yes.
Q. And what was, say, the spot size of that broad beam?
A. Well, you're limited by an aperture, but the size was about half a micron.
Q. Half a micron --
THE COURT: You're limited. I didn't understand that. You're limited by a what?
THE WITNESS: We put a small, what we call an aperture, that it's transparent in the middle, it's like a round hole. So electrons go through the hole and you restrict some of the electrons further out.
THE COURT: Don't forget the two of you can't have a private conversation. We need to make sure that they hear it.
MR. McARTHUR: Okay. I'm sorry, your Honor. This microphone could be a little taller.
THE COURT: Well, you're very tall.
MR. McARTHUR: I'll try and hunch over.
BY MR. McARTHUR:
Q. Did you create any electron diffraction patterns that were smaller aperture than those shown in PTX 171?
A. No. No.
Q. So you didn't use a focus beam other than the -- I'm sorry.
A. There is a thing called a nano beam as compared to a broad beam, but there's absolutely no necessity to use a nano beam to

study these samples. I don't need to get diffraction when I can see the dark and light and dark and light contrast across the field of view that are coming from these different crystals. So, no, I didn't use the so-called nano beam technique. In my professional judgment, it was not necessary.

Q. Could you have done it?

A. Yes. Not on that microscope; on a different one.

Q. Wouldn't it have been prudent for someone who was standing in court testifying that a buffer layer of polycrystalline degenerated diffraction pattern that shows it's polycrystalline?

A. Well, I'm already 101 percent certain that the material is not a single crystal from the images that I've already taken, so I don't see a point in doing extra experiments.

Q. You understand there's dispute as to whether the buffer layer is monocrystalline or polycrystalline. Is that correct?

A. Uh-huh.

Q. So your opinion is based solely on ten micrographs of contrast?

A. More than ten micrographs. But not just the contrast, I also looked at very high magnification. And so in the high magnification images you can see the regions of the substrate, the sapphire; you can see the regions of the growth layer, the gallium nitride; you can see the continuity of the lattice fringes in both of those areas. And then you look at the

region of the so-called buffer layer and you can see that the fringes are not continuous; they are completely discontinuous. That is taken by most people in the field of electron microscopy, 99 percent at least, that that means it is not single crystal.
Q. Okay.
MR. McARTHUR: I have no more questions. I'll pass the witness, your Honor.
MR. EVANS: No redirect, your Honor.
THE COURT: Thank you very much. You can go back to Arizona where you can wear shorts.
THE WITNESS: Back to shorts? Thank you.
THE COURT: Thank you.
(The witness is excused.)
MR. EVANS: Do you mind if I walk Dr. Smith out? Do you mind it I walk him out real quick?
THE COURT: Of course. Go ahead.
MR. SHORE: Your Honor, may I ask for a five-minute break to set up for our next witness?
THE COURT: It takes too long to come in and out, so do you want us to stand and stretch while this happens? We can't take our break now because the food isn't here.
MR. SHORE: Okay. Can we stand and stretch while I set this up?
THE COURT: That's perfect.

MR. BENISEK: Your Honor, can we sidebar for a second about issues that are going to come up in Mr. Ratliff's --

THE COURT: He needs to set up, so...

(Pause.)

(Discussion at sidebar and out of the hearing of the jury:)

THE COURT: What's the issue?

MR. BENISEK: The issue is the motion we filed yesterday.

THE COURT: At 3:30 in the morning?

MR. BENISEK: Yes. Sorry about that. But the issue is you haven't ruled on whether Mr. Ratliff has met the exception to the entire market value rule. This was subject to our *Daubert*.

THE COURT: Overruled. I'm not doing a *Daubert* hearing right now. I'm not doing it. As far as I'm concerned, enough has been put in.

MR. VASQUEZ: All right. We're on the record with our objection.

THE COURT: You're on the record. And let me just say what's driving me nuts is the 3:30 in the morning, and the other issue is not conferring on exhibits.

And you need to stand up and object when you -- okay? Because the court reporter -- I meant to say this yesterday, but I can't hear you half the time, okay?

MR. VASQUEZ: Okay.

ALAN RATLIFF

having been first duly sworn, was examined and testified as follows:

THE CLERK: Sir, would you please state and spell your name for the record.

THE WITNESS: Sure. My name is Alan Ratliff, that's A-L-A-N, last name R-A-T-L-I-F-F.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. SHORE:

Q. Mr. Ratliff, we're going to present your testimony sort of guided through a PowerPoint presentation that's going to appear on the jurors' screens, correct?

A. Yes. This is a presentation that I created.

Q. Okay. Now, let's start off, why don't you just introduce yourself to the Court and to the jury and explain your role here.

A. Good morning. As I said, my name is Alan Ratliff. I'm one of the owners of a small business called the StoneTurn Group. The StoneTurn Group is a consulting firm that was created by some former forensic accountants and economists who worked for the big public accounting firm Deloitte and Touche. And our headquarters are here in Boston, Massachusetts, and we have small offices in several cities in the U.S. as well as

overseas and Europe.

And my role here today is to talk to you about damages that you may consider if you conclude that there's been infringement and that the BU patent is not invalid.

Q. Let's talk -- go to our next slide. And can you please explain to the jury a little bit about your training and experience and education?

A. Sure. My undergraduate degree is in business administration. I have a master's of accounting and tax. Then I also received a law degree.

Q. And are you certified in any professional organizations?

A. Yes. For about a little over 25 years I've been a CPA. I'm also a licensed attorney. And then I've attained additional national certifications in financial forensics. It's not the cool kind of forensics from CSI. That's much more interesting. This is sort of the boring numbers kind of forensics, but it is the kind of work that's done in disputes like this. So it's financial forensics, also in patent valuation, and also in global management accounting which, again, comes in handy in cases like this where you have non-U.S. companies in the international marketplace with different accounting rules.

Q. All right. What does it mean to be nationally certified in patent valuation?

A. This particular credential required additional coursework

and examinations and class attendance in connection with understanding the various aspects of how to value patents, trademarks, copyrights and other intellectual property for transactions, disputes and licensing.

Q. And also, let's go into a little bit deeper dive on what is financial forensics in the context of this case?

A. In the context of this case, financial forensics is the gathering and review of information. You will hear, and you've already heard from some of the witnesses already, some of this information comes in databases like SAP; other times it comes from sales systems maintained from, again, using business terminology but I think most of you've heard the words like invoices and purchase orders and things like that; other information may come from documents like licensing agreements.

And you're taking that information and compiling it in a way so that you can use it to make decisions so you can use it to understand what's happened in the past, and in the context of this case, use it to understand if you determine damages what amount to award.

MR. SHORE: All right. Let's go to the next slide.

Q. All right. Can you explain to us the information on this slide about some of your actual past work?

A. Sure. So after getting out of graduate school I worked as a public accountant in what used to be one of the big eight accounting firms back when there were eight instead of four.

And then I went back to law school, clerked for a federal judge, and then worked in a law firm on different types of litigation and intellectual property projects.

And then about 15 years ago I sort of decided I wanted to do a little of both of my backgrounds, so I moved into consulting where I work on a variety of valuation and forensic accounting and dispute projects like this one.

Q. Who are some of the universities that you've done work for?

A. On this slide you can see up at the top -- let me see if I can make that work -- some of the universities I've worked for listed there. Caltech dealt with surgical robotics technology; University of Texas with handheld device technology; University of Virginia, medical and MRI technology. So different kinds of projects for different universities.

Q. And what are some examples specifically of semiconductor or chip patent forensic experience?

A. So that's really this second category. And I'll catch on to this tapping thing eventually. I tried to list there just some examples. One of the very first projects I worked on was actually for International Rectifier. This is back 15, 16 years ago. They're not a brand name. Most of you likely haven't heard of them. They're one of those kind of companies that make parts that go into other people's products. But they were a widely licensed broad-patent portfolio entity that made

various types of semiconductor chips, just like in general the kind of chips we're talking about here, although International Rectifier's portfolio wasn't really targeted at lighting.

Then other projects, like Texas Instruments, you've heard them mentioned here, have done projects where they've been one of the companies involved in -- I think we'll talk a little bit more about one of those in a moment. And then you'll see some of the others were other mobile device companies and other computing companies. And again, I think you've already heard evidence about the use of the light technology in the context of those products. And again, I'm experienced in chip cases involving those kind of products.

Q. Have you actually personally participated in the negotiations of license agreements?

A. Yes.

Q. And how many times?

A. Combining my experience as a lawyer and as a consultant and then on projects where I've assisted a client who was actively licensing a portfolio, all together it's about 30 or 40 different licensing projects where I've participated in negotiations in one way or another.

Q. Do you have any teaching experience relative to this kind of work?

A. Yes. I have taught at three different law schools and two different business schools, on an adjunct or part-time lecturer

basis as I've gone along in my career. And those have included courses related to accounting, included courses related to valuation, IP, those kind of subjects. Also, some litigation-related cases in a law school setting, including IP litigation.

Q. How many times have you been accepted as a qualified expert in courts on the issue of assessing patent damages?

A. In total, I've probably at this point written right around 100 patent infringement damages reports in various cases over the last 15 years or so. Of those cases, this is my 25th patent infringement case to go to trial, and I was qualified to testify in the prior 24.

Q. What is a royalty audit?

A. So you'll see in the chart I've listed some additional things that I've done aside from being an accountant/attorney. An arbitrator, that's included, serving as an arbitrator where you probably know it's a private version of a lawsuit instead of coming to a courthouse and having a judge. It's in a private setting. And as an arbitrator, I was either alone or with a group of two others, and we were deciding the case. And I've done that in the context of IP disputes.

I also was appointed as a special master where a federal judge actually had a case with complicated overseas discovery issues and got frustrated dealing with the inability of the parties to agree on what needed to be provided so I was asked

to basically go overseas and organize the discovery, gather the information, bring it back to the U.S., and then prepare a report about what I found. And a royalty auditor is not unlike the role I played as a special master, but probably it will help with a little terminology. When I use the word "royalty" today, I'm referring to a fee. And it's a fee that someone would pay to someone else who has a patent that they want to use.

The way they sort of memorialize that agreement is through a license. So a license is an agreement where a party who has a patent grants to someone who wants to use the patent the right to use it in exchange for the fee. We call the person that owns the patent the licensor, and we call the person who's going to use the license the licensee.

And a royalty audit is basically where the party who has the patent, the licensor, is doing a review of whether the licensee has complied with the license, looking at things like what sales were made, where were those sales made, to whom were those sales made, how were those sales computed for purposes of computing the royalty.

And a license agreement will have some kind of royalty arrangement. Most of those that get audited, it's usually a percentage of sales or an amount per unit. And what the royalty auditor is doing is comparing their findings to what actually happened. So there's actually then royalty payments

and royalty computations by the licensee. But the real question is: Was it the right amount? And that's what the royalty audit is supposed to determine.
Q. I want to back up for just a second. When you -- you were here earlier today when Mr. Garceran testified, correct?
A. Yes.
Q. All right. And I believe that you saw -- Mr. Vasquez brought up some e-mails where it says Philips, and maybe it was Osram, said that they didn't need the '738 patent. Do you recall that testimony?
A. I do.
Q. In your 35 or 40 times when you negotiated license agreements, has the other side ever walked in and said, "I infringe this patent and I really need this license"?
A. Not once.
Q. All right. Let's go back to the royalty audit. Have you ever represented a company in defending a royalty audit?
A. Yes.
Q. And was that company a Taiwanese company?
A. I have done a couple of royalty audits related to Taiwanese companies. Probably the one most relevant to this case, because it was roughly in degree of magnitude about the same size of sales issues, I was working for a Taiwanese company called Vanguard International Semiconductor.
Q. And I was the lawyer representing Vanguard Semiconductor

in defending that audit, right?
A. You were.
Q. And we were defending that audit against Texas Instruments, correct?
A. Yes.
Q. Would you please explain to the jury what you went through in that Vanguard audit and how it turned out.
MR. BENISEK: Objection, your Honor.
THE COURT: Sustained.
MR. SHORE: Your Honor, we would tender Mr. Ratliff as an expert in economics, royalty and damages.
THE COURT: I'll let him render an opinion.
MR. SHORE: All right. Let's go to the next slide.
BY MR. SHORE:
Q. When you are coming up with opinions to render in a case, are you understanding that there's sort of two prongs of the information you rely upon: quantitative and qualitative?
A. That's fair.
Q. In other words, the rules require that you have a sufficient amount of information to render the opinions. That's the quantitative part?
A. Yes.
Q. And then the qualitative, it has to be the same type of information that would be reasonably relied upon by an expert outside the context of litigation. Do you understand that?

A. That's true.
Q. In other words, experts don't get to make up special rules for litigation and how they conduct their expertise, right?
A. (No verbal response.)
Q. So let's take a look at the information you consider. Can you please explain that to the jury.
A. So I won't read it all to you, you can see it there, but categorically it's a combination of electronic data; paper production, whether that might have been an electronic file like a PDF but it printed out as paper as opposed to a data set that might have been in SAP or Excel or some other format; it was a mixture of financial information, licensing information, information about the products and technology, marketing information, that kind of thing.
There were also a number of witness depositions, a mixture of representatives from companies, other fact witnesses, inventors, people like that. There was also industry and market research, some of which were done by the parties to this case and were produced by them, others which me and my team did on our own.
There were expert witness reports filed in this case. Again, those aren't things you're generally going to see as, quote/unquote, evidence in the case; those are part of the discovery process the parties go through but the focus is on the underlying evidence that you'll hear in this case, not on

the reports written by the experts in the case.

And then, of course, there were some declarations, prior depositions, and then the testimony and evidence here at trial. And then, of course, as I described, I have background experience which informs the efforts that I did here.

Q. Okay. And we've also had transcripts, daily transcripts of the trial prepared, correct?

A. Correct. And I reviewed those as well.

Q. Now, when the jury determines damages in a patent case, that comes after they've already made what decisions?

A. They will have been already instructed to make determinations relating to infringement and whether the patent is or is not invalid.

Q. All right. So when they're considering damages, what someone would have paid, what are they supposed to assume as to what the licensee, the person who's paying, has already decided?

A. Sure. What is being referred to is -- let me see if I can get an arrow here. There we go. What's referred to is down at the bottom of the screen. The other thing I take into account when I do my analysis, because the Court is having to hear all the evidence at this point before you've made certain determinations, is I'm assuming for purposes of my work that BU's patent is valid, that it's been infringed by the defendants, and that it's enforceable. And that is important

at this stage of my analysis because if these kinds of issues are in dispute, then agreements that parties reach usually compromise those issues in the agreement. When those issues are not in dispute, then you're truly determining the market value of the technology and the context in which it's been used.

Q. All right. Now, how many hours did you spend prior to the trial in going over all of this material, considering it, and formulating your opinions?

A. So it was me and a team of three or four of my colleagues who primarily worked on this project. And over the course of -- I guess we did small amounts of work earlier in the year, in the early summer, but the bulk of our work was over the course of the summer and the fall, all together it was about 1,500 total hours for me and my team.

Q. All right. Why was so much time necessary for this case?

A. This case had more time than I would say is normal on most of my projects like this because of the international sales data coming from three different defendants, and many times it was from multiple different sources. So there might be SAP data, there might be separate sales data, there might be fields, or information missing like who the customer was or what the origin of a chip was or what the cost was that weren't included in those standard data sets. And there were yet other reports, and we had to sort of piece it all together as best we

could to get a total picture.
Q. In the end did you have sufficient information to render your opinions?
A. Yes.
Q. And did you apply the same type of methodology that you applied in your royalty audit work and your other work in trying to determine what the royalty base was in this case?
A. Yes.
Q. Is the methodology that you applied in coming up with a royalty rate the same kind of methodology you've used a hundred other times in reports and 24 other times in testimony?
A. Yes.
Q. All right. Let's go to the next slide.
And can you explain what the requirements are for a patent damages analysis in court?
A. So what you have is a snapshot on your screen of what's often referred to as the patent damages clause in the patent statute. And again, I won't read it verbatim to you, but essentially what it's telling you is that where there's a finding of infringement, then there must be an award of damages, and it cannot be anything less than what's called a reasonable royalty for the usage made of the invention. And I'll talk more about that reasonable royalty concept in a moment.
Q. I'm going to mark this. Does the statute set out the

maximum the jury can award or the baseline minimum?
A. The reasonable royalty is the minimum.
Q. Is that what you're here to talk about, the minimum?
A. Yes.
MR. SHORE: Let's go to the next slide.
Q. Now, can you explain to us how reasonable royalty is determined and what this thing is we've heard about as this hypothetical negotiation?
A. So the most frequently used and a generally accepted approach for damages experts, courts and juries to use in determining a reasonable royalty is something called the hypothetical negotiation. It's basically a framework that resulted from a case called the *Georgia-Pacific* case which was named after one of the parties in the case, that asks us to pretend that instead of the parties being here in 2015 in a lawsuit, that at the point -- in thinking from your direction -- in the past, whenever BU's patent had issued, and at the time that the three defendants, Epistar, Everlight and Lite-On were first selling products that are accused of infringement, that the parties came together at the table and negotiated a license.
They didn't actually do that, that's why it's pretend, but you're being asked to sort of transport back to that time in taking all available information known or anything sort of indicating what would have been the views of the parties at the

time, use that to try to determine what an appropriate royalty would be.

So as we look at this demonstrative here, here you can see I have Boston University, and we have the other three defendants in the case. So they're all at the table. Time frame we know is in 2000. That's not an issue that's really in dispute between the parties. And what they're negotiating over --

THE COURT: Why is it 2000?

THE WITNESS: The reason it's 2000 is by that point BU's patent had been issued. That issued in the late '90s, '97-'98 time frame, and then the LED lights that are accused of using BU's GaN technology began being sold by Epistar, Everlight and Lite-On in that 2000 time frame.

BY MR. SHORE:

Q. Now, the judge asked a good question because damages don't start accruing until notice, which comes years later. So why do we use the date of first infringement for the hypothetical negotiation but the date of notice is the date for damages?

A. We'll talk more about notice a little bit later. You've heard the description which is that's the first point at which someone can actually be obligated to pay. But for purposes of this hypothetical negotiation framework, what's been generally accepted by the courts is that we look at the time when the first infringement occurred, whether or not the law allows you

to go back and get damages then or not, and at that point in time focus on the best available information closest to -- often a little bit after, but closest to the time of the hypothetical negotiation. That's just the structure of the approach.

Q. All right. Now, I think everyone in this courtroom will agree who has a law degree we don't understand why the Courts of Appeal do what they do, but so this is sort of a double-level hypothetical. Hypothetical No. 1 is that there was a negotiation at all, right?

A. Correct.

Q. And Hypothetical No. 2 is that the negotiation took place before any of the defendants even had any awareness that this patent we're hypothetically negotiating about even existed.

A. Again, I don't know for sure whether they knew it existed or not. It's a fact question. But it's at a point at which the evidence establishes they would have needed the patent to make the products that they're accused of making that infringe.

And so from that point then, I've put this depiction up here to sort of show there's a patent that would be licensed by Boston University, rights transferred over to the defendant's side of the table, and then in exchange for that, the defendants would be paying a royalty back over to Boston University.

Other things that are reflected here that we take into

account, you saw the last bullet point that was on information that I considered. There's certain required assumptions that must be made, which is the patent is valid, it's infringed and enforceable, basically that the defendants need it and don't have an option not to take the license.

And how we determine what's relevant to using this framework is through the *Georgia-Pacific* factors. And you'll see I've sort of got those in microscopic print. I've got a slide coming up where you're going to see those more in a list format so that you can consider how you want to use them. But the *Georgia-Pacific* factors basically are a guideline that help us understand the kind of information that a real world patent-holder and licensor like BU or Cree would take into account when licensing to licensees like Cree and the others that you've heard have licensed the BU patent.

Q. All right. Well, let's take a look at the next slide. And it talks about areas of agreement. Now, the areas of agreement here are between you and the expert hired by the defendants, correct?

A. Correct.

Q. These aren't necessarily areas of agreement between you and me.

A. Correct.

Q. Okay. All right. So where do you and the defense expert agree?

A. So again, there's no dispute about the date. We both spend a significant amount of time in our written reports talking about the BU and Cree license arrangements. We both performed computations based on using a percentage multiplied times sales as a royalty. And then we both the agree there's some additional considerations that don't necessarily have to do with the money and the royalty rate but impact a difference between a real-world license and a hypothetical license that you would take into account.
Q. Now let's go to the next slide.
All right. You talked about the *Georgia-Pacific* factors that we had in mini-print. Explain to me or explain to us something more about those factors.
A. So what I customarily do in my reports is I try to organize them by topic. It's just a list of 15, but they're not necessarily organized in a particular order. And so I take them and put them into categories like licensing considerations, technology factors, commercial factors, and then other business factors. I think in that way it makes it a little easier for you to use as you think about the issues that are important in the context of this hypothetical negotiation.
So for example, you've already heard evidence about BU's licensing of the patent, you've already heard evidence about some of the defendants in this case who licensed technology in related to GaN and related to LED lights. For example, you

heard from Dr. Piner and Dr. Moustakas, Dr. Smith about the patented technology, its advantages and its benefits, subjects like that, which I've put here in the context of technology factors.

You've heard a little bit but you'll hear more from me about commercial factors. What evidence do we have in the marketplace that the products made with the patent have been successful and the patented benefits were relevant to that success?

And then lastly, you'll hear about any other business factors, including some commission subject that we'll talk more about in a few minutes.

Q. Now, for the jury to come to a conclusion on what the minimum is, does there have to be evidence of all of these factors for them to come to a conclusion?

A. No. This is a nonexclusive list. I, again, customarily consider them all, but often there are some for which there's little or no evidence, and in some cases, some factors turn out not to be that important.

Q. All right. Let's go to the next slide.

Can you explain to me and to the jury what this party licensing timeline has to do with your opinions?

A. So attached to my report is a very detailed schedule that I use to summarize all of the different license and/or license-like arrangements that were produced by the parties in

this case. I'm not going to stay long on this because I'm going to get into talking about specific agreements, but just so you have a general idea of the color coding, the green that you see are basically licenses by Boston University. You'll see they happen early on mostly with just Cree, right? They have that exclusive arrangement with Cree, so BU's not really licensing other people.

And then you see later on after the Cree arrangement with BU is over, then Boston University does some additional licensing of others towards the end. But that's way down the line. All of that is happening in 2012, '13, '14, time periods like that.

Q. And what is the heavy period of licensing from these defendants?

A. So you see in the purple and in the orange, those are license agreements by Epistar and Everlight. Lite-On did not produce any agreements in this case. And most of those licenses are occurring in that 2008, '9, '10 time frame. Well after the hypothetical negotiation I make very limited use of that information only to the extent I didn't have anything else, do I look at some of that.

And then finally, you see the blue licensing through here, and those are all the different arrangements that Cree entered into with sublicensees under its exclusive master arrangement with Boston University.

Q. All right. I'm going to go back a little bit. In your experience, is patent litigation expensive?
A. Yes.
Q. Can patent litigation in the semiconductor area cost many, many millions of dollars to pursue?
A. All the ones I've been involved in that have gone all the way to trial have been multiple million-dollar-expense cases.
Q. Now, if you were going to approach someone about licensing, are you going to sue them before they get large enough to justify the expense of going after them?
A. In my experience, usually lawsuits are not brought until there's significant market evidence of infringement.
Q. All right. So in other words, around this 2007-2008 period, we see a lot more licensing from Epistar, Lite-On and Everlight. Were they much larger companies at that time with much larger sales than they were back in 2000 and earlier?
A. Yes. Based on the financial statements produced and that were available publicly, they were much larger entities by that time period.
Q. Would it make any financial sense for a company to go and spend the millions and millions and millions of dollars suing somebody if the result was they got a royalty that only paid them $200,000 a year?
A. No.
Q. Is that a reasonable justification to hold off on suing

somebody until they're large enough to justify the expense of litigation?

MR. BENISEK: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: That's one criteria that a company may take into account.

MR. SHORE: All right. Let's go to the next slide.

BY MR. SHORE:

Q. Explain this slide as it relates to your opinions.

A. Sure. So we're in the 2000 time frame. I'm starting to look at whatever evidence has been produced by the parties that gives me any insight into what they were thinking around the time that the patents were first -- the patent was first infringed, what we're going to call around the hypothetical negotiation date. That's the phrase I'll use where I'm talking about this time frame in 2000ish.

And there was several internal memoranda and analyses being done by Boston University where they were talking about their desire to begin trying to license their GaN technology, and in particular, the '738 patent. I'll talk more about what was going on in the marketplace at that time, but at this point we're focusing specifically on the licensing.

And I put a quote in there from one of the memoranda which talked about what Boston University was attempting to do was try to find a licensee that would pay it a minimum of $2

million over the next three years as well as an ongoing royalty of at least 2 percent on worldwide sales.
Q. Now, did you ever see Boston University in any of the materials you reviewed considering a license that only covered the United States?
A. Nothing that was produced in this case reflects that, no.
Q. Now, these patents are only U.S. patents, right?
A. The ones we're talking about here are ultimately, as we'll see when I discuss it in a moment. There were some additional method patents that would require you to actually be doing something overseas for them to have been of any value, but they were thrown in to the portfolio that Boston University licensed. But there's been testimony reflecting that the key here in terms of value was the '738 patent.
Q. In your experience, in a semiconductor industry in licensing how often are the royalties set on a worldwide base?
A. Based on -- you were discussing earlier the issue of litigation. One of the issues that can come up in the context of licensing is you've got sales all over the world, you're making parts for all different kinds of manufacturers, we're in a global economy more than we've ever been. It can, frankly, be a real burden to keep track of all of that.
So it has becomes progressively more common -- if I think back to when I first did one of these projects in semiconductors around '99-2000, there were some worldwide

licenses. It's become progressively more common to do worldwide licenses just because you don't want to go to all the expense and effort to try to keep track. And then if you don't keep track well people are suing you for breaching your license and, you know, you sort of loss the benefit you were trying to gain.

And that becomes relevant in a case like this because if only a minority of the sales happen in the U.S. but you're getting a royalty on everything, that's really a higher royalty on the U.S. sales than what the royalty rate itself is. And I'll show you an example in a few minutes.

Q. So in other words, the law doesn't allow in the hypothetical negotiation for us to base the royalties on worldwide sales?

A. Correct, because they're not considered infringing.

THE COURT: Right. So you'll hear about that in the jury instructions. It's only U.S. sales that can be considered.

BY MR. SHORE:

Q. But when you're looking at licenses that take into account a worldwide rate, when you look at that rate, is that rate generally adjusted because of the coverage of the patents involved?

A. That's generally how it would work, yes.

Q. All right.

A. So the rate on a worldwide license may be lower even if the sales are only being made in the U.S.; so therefore, if the license was restricted to the U.S., you would actually have a higher rate on those U.S. sales.

Q. So just to give you an example --

THE COURT: Are we still talking way back in 2000?

THE WITNESS: So we're talking at the time of the hypothetical there was already worldwide licensing going on for this very reason. As you've heard some of the evidence and you'll hear more, your Honor, you're going to see more and more licenses in that middle period, and you're going to see all of those were worldwide.

THE COURT: So if we're looking at 2000, it wasn't as common then?

THE WITNESS: Yes, it was happening then. It wasn't happening as often then, but you'd find it more commonly with a university because they're not wanting to have to deal with keeping track of it all. So they just say, Hey, look we're going to license our patents but we're going to do a worldwide. You can do whatever you want. We'll cut the rate a little bit. That would have been the rationale.

BY MR. SHORE:

Q. So to put this in sort of a real-life example, if the parties agreed -- and I'm not saying this is this example, I'm just giving a hypothetical example for a hypothetical. If the

parties in a particular industry agree that 20 percent of the market is the U.S. market and that a reasonable rate is 5 percent, they may cut the rate for the U.S. for the worldwide to 1 percent, or 20 percent of that reasonable rate, so they're only capturing -- I know it's worldwide, they're only capturing the equivalent of a U.S. sale?

A. Yeah. Can you give me a blank screen?

Q. Sure.

A. So actually, in my reports I cite, so I think I can say based on industry information produced by Everlight, they had documentation reflecting that about 23 percent of all GaN LED lights were sold in North America. Now, North America is a little broader than the U.S., so the U.S. piece is smaller than that, but North America includes the U.S.

So if I take the 23 percent, that's the U.S., and we know then that 77 percent is somewhere else, and that gives us our hundred percent. If there is -- and again, we'll just use the example in this case -- a 2 percent royalty that's being paid on worldwide, all right? So 2 percent, that gives you a royalty of 2. To get that same royalty just on the U.S., your rate would almost have to be 10 percent to get that same 2, right? So worldwide license is putting a lot more sales in the base at a lower rate.

Q. We're talking about U.S.-only patents?

A. Yes. If it's a U.S.-only patent or if the foreign patents

are not really what's significant to the license because that's not where the activity is, you have a much higher rate suggested for just a U.S.-only license like the hypothetical license than you would otherwise. So that's the simple math.

Q. Okay. Let's go back to the PowerPoint. All right. This next slide -- actually, let's go back. I have one more question. I need to ask you about the last one.

How much do BU's individual licensing policies unique to the university go into this analysis?

A. So I think specifically the issue here is -- you see in my first bullet point on the slide that BU's goal, its objective, was to focus on a large U.S. LED light manufacturer, and that it wanted whoever it licensed, which ended up being Cree, to then help sublicense and promote BU's technology to help build the domestic industry in LED lighting.

And so that was an objective that was somewhat unique to BU. It's somewhat unique to universities located in particular geographies, that they're wanting to promote what goes on in their geography.

So in terms of how that affects rates, there's no science to that. You're going to hear the evidence of it, you'll make your own decision, but it's clearly a factor that would influence BU's willingness to grant a license on certain terms to the three defendants as opposed to the terms it might have agreed to for Cree.

Q. Now, the Georgia-Pacific case, did that involve a university?
A. No.
Q. Did it involve an entity that had an interest in helping domestic industry separate and apart from itself?
A. No, it's -- Georgia-Pacific's a lumber company.
MR. SHORE: All right. Let's go to the next slide.
THE COURT: Let me just say, *Georgia-Pacific* is irrelevant to this. It's just the legal standard I'm going to give you in the company -- it's a legal standard from an old, old case that I'll tell you about in the jury instructions.
BY MR. SHORE:
Q. All right. This next slide, the BU/Cree license. Again, first of all, why don't you tell the jury why this license sort of acts as a benchmark in some ways.
A. Sure. So we're in the 2000 time frame. BU's trying to start promoting its technology, help build the domestic industry. They actually enter into an agreement in 2001, so still very close to your hypothetical negotiation date, and they ultimately enter into a license with very similar terms to those it was trying to achieve.
It enters into a combination arrangement, so it's two steps: There's the license from BU to Cree, which is exclusive, then they're granting rights to Cree to further sublicense others of that same technology. And BU gets a piece

of both parts of the action. They get some up-front money, they get a running royalty on anything Cree sells, but if Cree doesn't actively use the technology, they get at least some minimal annual payments.

Then on the sublicense piece, whatever Cree does in terms of sublicensing, generally speaking, BU gets 2 percent of whatever sales are licensed by Cree from other sublicensees, or if it's a fixed payment scheme, like a lump sum, BU gets a percentage of that lump sum. And I've laid out the terms here. And if we were to pull up the agreement, there's a single page that's an exhibit to the agreement that sort of lays out these terms. That's where this comes from.

Q. Now, Mr. Ratliff, what obligations did Cree take on in addition to paying this money?

A. Well, we actually have a slide coming up in a couple here where we detail that.

Q. Okay. Let's just wait, then.

A. Okay.

Q. Let's go to the next slide.

All right. Let's talk about the amendment to the license agreement in 2002 and then we'll get to that other.

A. Okay. So you heard Mr. Garceran's testimony yesterday and today talking about the fact that not long after the parties did their license, they did an amendment. Part of the rationale and need for that amendment was to provide Cree with

greater flexibility in how it would sublicense to others. Also, it was more specifically to address an issue that it had with a company called Nichia. You heard they were in a bet-the-company dispute and they needed some patent rights to throw back at Nichia in order to come to some resolution that didn't require them to pay a lot of money.

Q. Hang on a second.

A. Sure.

Q. Would you explain to the jury what a bet-the-company dispute is?

A. I'm using it I think the same way Mr. Garceran used it, was simply to say it was a big enough dispute that it would have been very detrimental to the company's ability to continue to operate successfully had they ended up having to pay large license fees to Nichia.

Q. All right. Continue, please.

A. So what you see, here's the same structure: License from BU to Cree, rights to Cree to sublicense to others. What's changed is there's been additional up-front monies paid, so another $250,000. Instead of the annual minimums being 25 grand a year, they've been doubled to 50 grand. But in exchange for that, the royalty rate on the BU/Cree part has been lowered from 2 percent to 1 percent. I describe those adjustments as economic equivalence, and I do that because in licensing a running royalty, a percentage of sales is an

unknown. You don't know how much someone's actually going to use your patents and what you're going to sell. So on day one when you enter a running royalty license, you may never see any royalties. Of course in this license there's guaranteed minimums, so there's going to be at least the minimum.

Lump sums, on the other hand, you never know how much the licensee is going to use the technology, but they're paying you money up-front. It's a guaranteed return. And although there was some commentary about this $250,000 number and the size of these annual payments, remember, we're largely talking about products here that are a penny apiece. The general pricing between Epistar, for example, and Lite-On and Everlight of those LED chips, about a penny apiece, okay? So $250,000 worth of royalty at, let's say, 2 percent.

The amount that you would have in total sales that it would take to get that, right, is something in the neighborhood of $125 million. And then in order to take that at a penny apiece, how many units, right, you're, you know, into a billion, two billion kind of range of units, 1 percent or 2 percent. So when we talk about a $250,000 lump sum, if that's your royalty, the amount of units that would be sold at a penny apiece is literally billions of units.

So there's a significant amount of sales being covered by that in lieu of paying the full royalty. But then you still have the sublicense. And again, there's slightly different

wording. It created a clear requirement that 2 percent of the sales license by Cree be paid back to BU, but it gave them some flexibility. They have the ability to do lump-sum licensing, they have the ability to do a reduced royalty rate, partial lump sum. But again, we're talking about the same size payments, $250,000, $500,000, again, not knowing if someone would ever pay a running royalty at all.
Q. Now, when you say at least with respect to the sublicensing royalty, what do you mean by that?
A. So I'm talking about the minimum, or at least, Cree wasn't required to charge only 2 percent to sublicensees. They could charge more. And, in fact, we'll see in a few minutes in the actual sublicenses Cree did that involved running royalty, they actually got more than and almost double, and sometimes even more than that as far as the terms they worked out in those sublicense arrangements. So 2 percent was the minimum but it could be more and, in fact, was more.
Q. What was the range of percentage in sublicenses that people agreed to pay in order to obtain rights to the '738 patent?
A. For the running royalties we'll see the agreements had ranges of 3 to 6 percent.
Q. Now, let's go to the next slide.
All right. What are some of the other terms besides "royalties" and "up-front payments" that Cree was obligated to?

A. So this is going back to the question you were asking earlier. So these terms are additional amounts of money that are things that Cree agreed to do on top of just paying a royalty on U.S. sales. The first item that I've identified there is to have an expanded royalty base. This was the worldwide sales as opposed to just the U.S. sales. I've already shown you an example, so you understand what we're talking about there.

Next, in addition to actually having a vigorous program attempting to license BU's patent, Cree also agreed to enforce BU's patent against infringers, okay? And if they entered into and worked out settlements with potential infringements, BU was to share in that as well. But Cree had to incur all the expenses of those efforts. This was not something BU would have to pay for.

A third thing they agreed to do was to help protect BU's patents. So if others tried to challenge BU's patent, then Cree was agreeing to put up the defense to protect BU's patent.

And then finally in connection with these sublicenses, again, you heard me talk earlier about some of the rationale for why companies do worldwide licenses, Cree had the obligation to enter into sublicensing arrangements, collect the royalty, determine it's the proper royalty and remit its share of the royalties to BU.

So all of these, if you will, were extra things that Cree

was doing as a sublicensee that in the hypothetical negotiation between BU and the defendants, all of these now essentially become obligations of BU. So to the extent BU would have given a discount and the royalty rate to Cree to handle these things, that would not be a discount that BU would give to the defendants.

Q. All right. Let's take a look at the next slide. Some of the other considerations that went into the Cree/BU relationship and how that affected the license.

A. So some of the other considerations, again, that aren't about the amount being paid but would be relevant to me and potentially relevant to you in your consideration of the reasonable royalty, is that there was ongoing dispute between Cree and Nichia, and that was significant to Cree and its desire to obtain rights to the BU patent. In fact, under the original agreement between BU and Cree, they specifically agreed that Cree, if they managed to reach a settlement with Nichia, would pay BU $350,000. A year later when they amended that, they increased the number to a million dollars. And keep in mind in the ordinary terms of the parties' agreements, generally speaking, Cree could do a lump sum license and pay BU a minimum of just $500,000. But in connection with this, they were paying more.

The other thing that made this a unique consideration is that Cree wasn't getting any money from Nichia. So under the

other arrangements we talked about, generally speaking, Cree was licensing to someone else, someone else was either paying them a lump sum or paying them a running royalty, and they were sharing that with BU. Here Cree and Nichia were doing a portfolio, we call it a cross-license. That's where you have patents, I have patents, we decide to do a deal where we just swap rights to licenses. Often no money is exchanged.

THE COURT: We need to take our morning break, so is this a good point?

MR. SHORE: Yes, ma'am.

THE CLERK: All rise.

(The jury exits the courtroom at 11:00 a.m.)

THE COURT: You can step down.

(The witness is excused.)

THE COURT: I'll see counsel on scheduling.

(Discussion at sidebar and out of the hearing of the public:)

THE COURT: So how long do you have?

MR. SHORE: Maybe an hour.

THE COURT: Oh, a while. 11:30, 12:30.

How long do you think -- who's going to cross.

MR. BENISEK: A half-hour.

THE COURT: A half-hour? So we may be done around lunch. And then who do you have?

MR. SHORE: Michael Pratt.

THE COURT: How long?

MR. BELT: Probably about half an hour. No more than.

THE COURT: Pratt is who?

MR. BELT: He's the BU licensing officer.

THE COURT: You've told me that ten times. Okay. And then what?

MR. SHORE: Well, then we're going to call Lebby but now we have to give them the depo cuts and things we're going to play which is going to take time. And then also -- or we would have called some of these guys --

THE COURT: You can have Lebby do all of it. And then how long will Lebby be?

MR. SHORE: 30 minutes.

THE COURT: So worse comes to worse, you play those clips afterwards.

And how long on cross will he be?

MR. VASQUEZ: Fifteen.

THE COURT: Fifteen, and then what?

MR. SHORE: Then we would play a couple of deposition clips. And then our final witness would -- let me think for a second. Actually, it would be Lebby, then some depo cuts, and then Pratt is the last witness.

THE COURT: Oh, then your done. You may rest today?

MR. SHORE: It's possible.

THE COURT: Who are you tomorrow?

MR. BENISEK: Tomorrow we're off.

THE COURT: Right.

(Laughter.)

THE COURT: Good point.

MR. BELT: Don't scare us like that.

MR. VASQUEZ: Fitzgerald. And then we're trying to make sure we have the schedule -- we have a witness coming in from Taiwan.

MR. SHORE: We need to know.

MR. VASQUEZ: For the first time what he just outlined --

THE COURT: We're ahead of where I thought we would be.

MR. BELT: How long do you expect to cross-examine Mr. Pratt?

MR. BENISEK: Oh, 15 minutes.

MR. BELT: So we may get done. It will be close.

THE COURT: Interesting.

MR. SHORE: Here's the real issue, is we need before we rest or close or whatever, we need to play those deposition excerpts in that we provided --

THE COURT: No, you don't, because the reality is I can hold the record open for them and we can take people out of order. I want live witnesses first until -- you have given it to me in a format that I can't rule on.

MR. SHORE: I understand.

THE COURT: So, no, we won't. We'll just take it out of order. Your guy can rely on them and -- Lebby, and I'll get to it when I can get to it. And also at this point when I saw how much there was, I have some concerns about the length of the ones that aren't going to be played, so that was a concern defendants raised. So I'm not committing to that.

MR. BELT: So we'll conditionally rest upon --

THE COURT: Yes, that happens every day of the week.

MR. SHORE: Here's the thing. It's -- and I'm not complaining, I'll deal with whatever I have to deal with, Lebby's is kind of a multimedia presentation, so we got these depo cuts that he literally relies upon --

THE COURT: See if you could agree on them. But I can't rule. I didn't have them. So I -- you know, I don't know what you want me to do. We're not going to lose the time.

MR. VASQUEZ: They can examine him and then later they can --

MR. SHORE: No, we can't. No, we can't. We would have to completely go back and redo things. It completely changes everything.

MR. VASQUEZ: We're here to have a multimedia show, and that's what he wants.

THE COURT: Excuse me. I'll put it this way. If they're admissible, I'll let them play. If they're little,

short objections, I can deal with them. I don't know what you're planning on even playing. I can't rule.

MR. SHORE: They're like two-minute little --

THE COURT: I know. But I haven't seen them. And if they object, I have to rule on them. That's the issue. I don't know. See if you can work it out.

I have a wiretap now, so I'm sorry. I have to leave.

(A recess was taken, 11:04 a.m.)

(Resumed, 11:35 a.m.)

MR. SHORE: Yes, your Honor, the plaintiff -- is the Court Reporter ready?

THE COURT: No, no.

MR. SHORE: I'm going to offer these exhibits.

THE COURT: Are they lined up?

THE CLERK: No, they're not.

THE COURT: All right, you want to read the list?

MR. SHORE: Your Honor, Plaintiff Trustees of Boston University offers into evidence Exhibits 57, 98, 126, 756 through 761 inclusive, 766 to 769 inclusive, 771 to 793 inclusive, 803 through 862 inclusive, 1571, which is Mr. Ratliff's CV with the other material removed, and 1602 through 1604 inclusive.

Now, 1602 through 1604 are some e-mails that they want to object to at the time they are offered into evidence. These are the e-mails where the numbers were verified. I think they

just want on the record their objection.

THE COURT: I have no idea what you're talking about. Am I supposed to know these e-mails?

MR. SHORE: Yes, these are the e-mails we talked about when we asked if the spreadsheets that Mr. Ratliff was relying on were accurate, and they wrote back that they were and confirmed that they concluded only GaN products.

MR. BENISEK: I think, your Honor, our point is that it's like any other e-mail. I'm not sure how an e-mail that Mr. Ratliff is not a party to --

THE COURT: It's an admission of a party opponent if the lawyer said it.

MR. BENISEK: But how does it come through Mr. Ratliff?

THE COURT: It's something he can rely on for validity. It maybe doesn't come in as -- well, let me put it this way: He can rely on them. Whether it comes in as an admission as a party opponent, maybe it could be read into the record. Admissions don't necessarily come in through a document.

MR. SHORE: Well, we're going to offer it as an admission of a party opponent and also as the foundation and basis for his opinion both, and we think it's important to have the document because a written admission that something is accurate is more powerful.

THE COURT: I don't know whether it would be an exhibit, but he sure can rely on it, and it sure can be read in.

MR. SHORE: And the remainder of those exhibits I listed are offered without objection.

(Plaintiff Exhibits 57, 98, 126, 756-761, 766-769, 771-793, 803-862, and 1571 received in evidence.)

THE CLERK: All rise for the jury.

(Jury enters the courtroom.)

MR. SHORE: Ladies and gentlemen of the jury, in your absence the parties have agreed to the admission of the following --

THE COURT: You don't have to read the numbers.

MR. SHORE: Okay.

BY MR. SHORE:

Q. All right, I believe when we left off at the break, you were in the middle of an answer on the meaning of the slide that's up here now, "Other considerations." Can you continue your testimony.

A. Yes. Where we were was talking about the Cree dispute with Nichia and why Cree wanted the '738 patent, but by the time we finished, I was focused on the fact that the ultimate arrangement between Cree and Nichia was a cross-license.

Again, you have patents; I have patents; we decide we're just going to swap rights. There's sometimes money given in

that if one person's patents are a lot less valuable than the other's. It's called balancing payment. That didn't apply here. And there was a separate agreement between Cree and Nichia specific to the '738 patent, but again there was no money exchanged. Notwithstanding that, Cree still paid BU a million dollars. It wasn't sharing any money that it received from a sublicensee; it wasn't providing payment on any sales it had made. It was over and above those normal payments.

Q. All right, as between Boston University and these defendants, is there anything in the record that Boston University desires to help these defendants with any disputes with Nichia or anybody else?

A. No. Those facts would be unique to the Cree/Nichia arrangement.

Q. Is there any evidence here or should the jury even be considering here the value of the defendants' patents, since there is no cross-license back to BU?

A. Right, so your hypothetical negotiation is much simpler than any of these agreements you're going to look at. It's just a question of what value you're going to place on the royalty to be paid by the defendants to Boston University. There isn't any cross-licensing. There's no sublicensing being done by these defendants, so Boston University has not got any upside, right? Whatever it is is going to be that royalty that you determine. It's not the same as the BU/Cree direct license

because these companies are not creating a domestic industry. They're not contributing other patents to the mix so that the U.S. will have companies that have access to all the portfolios they need to sell worldwide. So that extra consideration that BU is receiving from Cree, those extra considerations that BU is giving to Cree are not a part of the hypothetical license.

Q. Now, you were here for the trial testimony of Mr. Garceran, correct?

A. Yes.

Q. And you heard, I believe, his testimony that if the consideration related to Nichia had simply been to pay Boston University that 1 to 2 percent royalty rate, the payment to Boston University for Nichia's use of the patent would have been in the tens of million dollars of dollars. You heard that testimony?

A. Yes.

Q. Is that more like the situation the jury is facing where there are no other considerations; it's just the defendants paying for the use of the patent?

A. Correct.

Q. Now, did the BU/Cree agreement preclude Cree or anyone else from later challenging the validity of the patent?

A. No, it didn't. So for purposes of again comparing the hypothetical license to the real world license, although BU and Cree worked out an arrangement where Cree was going to be BU's

promoter of the patents helping to build the domestic industry, there was nothing that kept Cree from concluding and pursuing some kind of litigation or dispute about whether or not Boston University's patent was valid and whether or not Cree used it. And in fact what we know from the evidence you've already heard in the case is that Cree never made an actual percent-of-sales royalty payment on any sales it made of products that may have used the Boston University patent. It only made the minimum payments, meaning it never sold enough to get up to 1 percent or 2 percent of sales. It always made the minimum.

Now, Boston University doesn't necessarily agree with that outcome, and, as you know, they eventually terminated this relationship; and then Boston University much later, 2012, went out and licensed some other companies on its own. So there's not necessarily agreement between BU and Cree about all of that, but there was no prohibition that kept Cree from challenging either of those.

Q. Now, I think you're going to hear -- you will hear some testimony later today from Michael Pratt at BU, and in a nutshell, let me just ask you if this would be consistent with sort of the scenario that you've seen through these documents and through the testimony to date. BU supported Cree in its efforts to build the U.S. industry in its effort to gain rights to patents from big companies like Philips, Siemens Osram, Nichia, and at a certain point BU went to Cree and said,

"That's enough. We're tired of you taking all the benefits, we're tired of you getting all the benefits with the cross-license. We're tired of you getting all the money. Give us the patents back, and let us go out and enforce them on our own." Is that basically the scenario we saw?

MR. BENISEK: Objection.

THE COURT: Sustained.

Q. All right, I'll let you say it. At the end of the day, after BU had supported Cree and helped Cree for years and allowed Cree to use these patents for all these cross-licenses that gave massive value to Cree, did Boston University and Cree come to an agreement or an accommodation that allowed Boston University to take back the rights themselves?

MR. BENISEK: Objection.

THE COURT: Overruled.

A. Yes, they did, and I had the benefit before trial, obviously, of Mr. Pratt's deposition. I had the benefit of a letter and declarations that he did, so I am familiar with that basic story line, but, again, he'll tell you the story himself, either later today or on Thursday.

Q. Now, in 2000, would these defendants in this hypothetical negotiation have had the ability to stand up in hypothetical negotiation and say, "We want to pretend like all the benefits you gave to Cree, as a U.S. industry, we should reap all those benefits too without paying anything for them or doing anything

for them"? Is that part of the hypothetical negotiation?
A. Again, it wouldn't be. You're limited to trying to compare the information that's presented about the arrangements that were entered into, but then focusing on the limited arrangement that is the hypothetical license.
Q. All right, now, focusing a bit on the significance for the purposes of the hypothetical license on the issues of validity and infringement, how does that cause an adjustment to the royalty rate if infringement and validity are assumed to be present?
A. Based on licenses in the business world where the parties don't necessarily agree on these things, they often agree to terms, royalty rates, royalty bases, which sort of compromise those disagreements. In the hypothetical license, you don't have to deal with the compromise. You get to assume that everybody in the room agrees the patent is valid and agrees that the defendants are infringing it and they must enter into a license. Based on my experience in other chip cases, based on articles, the scholarly articles that have been published, which I cited to and provided to the parties in this case, and then based on communications I had with Mr. Pratt, who again you'll hear from from Boston University, generally speaking, they would have expected to receive another 1 to 2 percent under a license arrangement where there was no dispute about validity and infringement, compared to an arrangement where

that was not something the parties assumed. And that's roughly a 50 percent to doubling of the rate, and, again, that's consistent with the scholarly articles and my own experience in the chip industries.

Q. Now, let me give you one of my usual hopefully better than usual analogies. In the real world negotiation, let's say you're going to buy a car, but you're going to buy this car online. You can't test drive it. You can't sit in it. You can't walk around it. You can't open the hood. There's all kinds of doubts about whether the car runs, how well it runs, et cetera. That's the negotiation.

And in the hypothetical negotiation, you know everything. Your knowledge is perfect. You know you infringe. You know the car runs. You know the patent is valid. You know the car has a warranty. It's all taken care of; everything's great.

Is that sort of like what we have here in the hypothetical? It's perfect knowledge of infringement, perfect knowledge of validity, and in the real world, all of those things could be at issue?

A. Correct.

Q. Okay, let's look at the next slide. Kind of go over and explain to us kind of what this slide means as to the hypothetical.

A. So what I tried to do is sort of recap these different bullet points you've seen on the last few slides. So what you

have here is, I have taken certain categories, and I've said these are considerations that bear on how comparable the BU/Cree arrangement is to the hypothetical license. And then you have the BU/Cree arrangement in the second column, the hypothetical. And then I've indicated in the last column the effect this would have in terms of a royalty you might determine in the hypothetical license compared to the royalty that was charged in the real world. Make sense?

So the first item I put on there is the date indicating that the BU/Cree license was in 2001-2002, and the hypothetical is in 2000. Those are close in time, and there really wouldn't be any adjustment you'd need to make because of the time period.

Next I indicated whether or not the BU/Cree agreement involved the '738 patent. Of course we know it did. As does the hypothetical, again, there's no adjustment there; those are comparable.

The nature of the arrangement: The BU/Cree arrangement is a little different because it's got two parts, right? The direct license from BU to Cree and then the sublicenses from Cree to others, so there is a mixture of an exclusive and a nonexclusive arrangement there. But what we know is, under the original agreement, it was 2 percent for the exclusive part, and it was 2 percent for the nonexclusive part. So those rates were the same, so, again, those are comparable based on that

explanation, no adjustment.

Now, the scope of the license: The BU/Cree license covered worldwide. Your hypothetical license will only focus on U.S. sales. That means that you will consider a lower amount of infringing sales in determining your royalty than would have happened in the real world in BU/Cree. As a result, you would consider possibly increasing the hypothetical royalty rate to a rate higher than the BU/Cree license to even that out.

Q. Is that that calculation that we did on the blank screen before where you --

A. It is.

Q. Okay.

A. The other --

MR. SHORE: If anybody has any questions about any of this, ask them.

A. The other considerations, I have two lines there: one focusing on a possible increase factor, one a possible decrease factor. You saw that list that I put together of additional things that Cree agreed to do that the defendants aren't going to be able to do because they're going to be limited to just a license where they received rights to make the sales they've already made and to pay a royalty, but we're doing this, we're pretending this is happening in 2000. So they were agreeing to enforce, protect, do reports, go out, sublicense. Those things

will be all extra benefits that BU received from the Cree arrangement that it won't get from the defendants. So to make them apples to apples, you would consider possibly having a higher royalty rate in your hypothetical license.

Offsetting that somewhat is the fact that there were some additional patents that were granted by BU to Cree, but, again, you've already heard testimony that the core and the focus of these license agreements was the '738 patent. So you certainly have to consider that there were more rights granted, but whether or not that has a net effect is up to you overall for this consideration I showed that it would have slightly favored BU.

The licensees are going to be U.S. only. In the case of the BU/Cree license, remember, the focus is on domestic manufacturers, domestic industry; but for the hypothetical license, the three defendants are all non-U.S. entities and don't have any part in building the domestic industry. Again, you may consider a higher royalty rate because of that.

And then, finally, this presumption of validity and infringement. In the real world, no clear evidence that that was assumed, not only in the BU/Cree license but in any of those sublicenses. As to the hypothetical license, though, you definitely would assume that, and as I mentioned, Mr. Pratt will talk about the 1 to 2 percent adjustment he would expect.

Q. All right, let's go to the next slide. All right, can you

explain how this slide applies to what you did in the last slide.

A. So I almost just thought about a blank screen just writing the numbers up there, but I had a little extra time so I put the table together. So if we start with that BU/Cree baseline royalty of 2 percent, and you remember it changed a year later and went down to 1 percent but they increased the cash, so it's an equivalent of 2 percent. Then you have that adjustment for other things that Cree did that these defendants won't do. And we know that BU was getting at least a split to the sublicense royalties, and it was also only splitting those royalties because Cree was doing all those other services. So if we take Cree out of the picture, right, BU would get 2 percent directly and 2 percent on sublicenses, so you could have a 1 to 2 percent adjustment there, for validity and infringement a 1 to 2 percent adjustment. You add those up, it's some amount greater than or equal to 4 percent.

And two things that I haven't factored into the calculation is the fact that the royalty base would be worldwide, and you saw through the math we did how that generally would require a higher rate to get to the same result, and the fact that the defendants are non-U.S. licensees. I didn't do any math for those. Those are things that you could still consider in determining your ultimate royalty rate.

Q. All right, so based upon these adjustments and based upon your years of experience in this industry and your certification in patent valuation and licensing, can you tell us whether or not you believe in your opinion that if Boston University, if we went back to 2000, hypothetically, and hypothetically the defendants knew about these patents at that time and were willing and able to license them and wanted to license them, believed they were infringing them, believed they were invalid, do you believe that the minimum, absolute minimum would be 4 percent, would be the absolute minimum, and it can be adjusted upward, and I believe you have it up to 6 percent on here, but even more considering the worldwide nature and considering the preferences for U.S. licensees?

MR. BENISEK: Objection.

THE COURT: Sustained. I don't see 6 on there.

MR. BENISEK: It's also, yes, beyond the scope of his expert report.

MR. SHORE: It's not beyond the scope of his expert report.

THE COURT: No, I did it based on, I don't see 6 there. You say greater than or equal to 4 percent? Is that what you say on the --

THE WITNESS: Correct, and he's just taking the high-end range that I have put for each adjustment, and my number is greater than or equal to 4 percent. But for purposes of my

comparison, the Court is correct; I concluded it was at least 4 percent, and all he was doing was adding on the high end of the range.

MR. SHORE: Do you see, your Honor, where he has it 1 to 2 percent adjustment up?

THE COURT: I know. It says "Comparable royalty to hypothetical license greater than or equal to 4 percent." So you needed to go as to where you were getting the 6 percent.

MR. SHORE: Oh, I'm sorry. I'll ask the question again.

THE COURT: So it's at least, in your view, at least 4 percent?

THE WITNESS: Based solely on a comparable license analysis, not considering any of the *Georgia-Pacific* factors. Ultimately we'll come up with a final rate at the end, but based only on this, that's where I'm at.

Q. So if you just take the Cree license as the only thing as the comparable, just the Cree license, you come up with at a minimum of 4 percent?

A. Correct.

Q. Let's go to the next slide. All right, let's talk about this other *Georgia-Pacific* factor, relevant out-licenses and relevant in-licenses. Can you explain that?

A. So in that list of factors you saw, we not only consider licenses of the patents in suit by the patent owner, but in

this case we have Cree as an exclusive licensee, and it did some licensing, so those are additional licenses of the patent. And then we also consider licenses by the defendants of technology that they paid royalties on or agreed to pay royalties on that are related or similar technology. I've limited my list to two things. All of the ones in the top box actually included the '738 patent. And the ones in the bottom box, the first one you heard Dr. Piner say included GaN technology. The other two he couldn't remember, but they were at least LED technology. So that's our starting point, and then I can go through and explain what we have here.

THE COURT: Excuse me. Why don't you tell the jury what a running royalty is.

THE WITNESS: Absolutely. By definition, a running royalty, it's not actually going anywhere even though it uses the word "running," but what it means is it continues; you keep paying some percentage or some amount as additional goods are sold that are covered by the patent.

THE COURT: It just means a royalty?

THE WITNESS: It is a form of royalty.

Q. And in the *Georgia-Pacific* or the hypothetical negotiation, those royalties run all the way to the expiration of the patent?

A. They do, but we're resolving a dispute that runs through now, so --

Q. Well, no, it doesn't run through now because the patent expired in November of 2014. So, in other words, when the patent expires, the running royalty stops?
A. Correct.
Q. All right. Now, sometimes you have a license agreement that's only for a term of years with a running royalty, and in that case, at the end of the license term, you renegotiate or it stops, something like that?
A. Something like that.
Q. But for some period of time, in this case the life of the patent, the royalty continues to be paid as products are sold?
A. Correct.
Q. Okay.
A. So here we have, after the BU/Cree agreements that you already knew about, you heard yesterday about the Cree Bridgelux agreement from Dr. Piner. You also heard about it again from Dr. Garceran, and basically focusing on the technology that was licensed there, including the '738 patent. There was a range of rates. I've put them from low to high, but actually for this agreement, the base royalty rate was 6 percent. But as more products were sold by Cree to Bridgelux, if you will, it sort of gave it a volume discount over time, letting the royalty rate go down to 3 percent, but notice it was still expected to be higher than 2 percent.
Q. Now, did you read the deposition of Men Kuo?

A. Yes.
Q. The head of intellectual property at Epistar?
A. Yes.
Q. And did you read the testimony that Men Kuo gave about the relationship with Bridgelux?
MR. STEINBERG: Your Honor, I just wanted to stand. If we are going to get into a couple of those confidential license agreements that were testified about by Ms. Kuo, I just wanted to raise that issue that we talked with your Honor about about perhaps taking steps to preserve confidentiality.
THE COURT: Let's just not do this now. I said some of these licenses are confidential, so I'll seal them, and I'll order you not to discuss the terms of them with other people.
Q. Now, there is some questioning in her deposition where it

Bridgelux in exchange for Epistar being able to use Bridgelux's technology, and did you read that testimony where she said that

A. I did see that. The bottom line is, because this --
THE COURT: I have no idea what you just said. I think you need to amplify.
THE WITNESS: Or I can amplify. Would that help?
THE COURT: Maybe you should, yes.
THE WITNESS: I can amplify. So this Cree/Bridgelux agreement wasn't just a license. It was also a supply

agreement.
Q. No, it's Epistar.
A. Epistar, I'm sorry, yes. The Bridgelux license was not just a straight "You get to use it, you pay me a royalty," but there was actual a supply agreement, so there were additional terms. Under that supply agreement, there was a discount given, and during the deposition the point was basically made that in a way, that was very similar to a royalty that was being paid because you were getting a discount in order to have access to that technology as part of that supply agreement. So it was treated as, if you will, an equivalent. My point would It's again a worldwide license, so we know the real effective rate is higher. It's all sort of consistent. You've got a And, again, you've got a rate that's higher, but for purposes of this analysis, I'm simply showing the jury what terms were agreed to and on what basis.
Q. Now, let's go to the next slide.
A. Hang on. Let's go and finish this. We have the Cree, Ferris, and Super Bright agreement. That was another one that you heard discussed by Dr. Piner talking about the '738, and you also heard Mr. Garceran discuss it. At a point I think the Court actually asked a question while Mr. Garceran was on the

stand about the structure of that license. Instead of being a royalty rate times an amount, it was actually a cents per unit. So for every light that was in a computer case fan, so LED light in a computer case fan, they had to pay a nickel. These fans sold for five or six bucks and there were four lights per fan, so it was about 20 cents on $5 or $6. That comes to 3 to 4 percent, so I converted it so you could see the equivalent rate.

And then, finally, the last group of licenses you heard Dr. Piner talk about, Toyoda, Philips, and Luminous, and the technology involved in each. Toyoda was GaN. Philips and Luminous was LED, but as to each of those, he looked at the technology license and compared it to the '738 patent and concluded the '738 patent was at least as valuable as the patents granted in those.

A. Yes.

Q. All right, let's go to the next slide. All right, what are these?

A. So we're switching gears. Remember we had the four categories: licensing, commercial, technology, and other. There's only one item in other technologies, mostly Dr. Piner, so that won't take long. Commercial is really the other set of

considerations that we'll spend just a few minutes on. And what we're considering there is indications from the marketplace about the popularity, about the profitability, and about the commercial success of products that use the patented invention.

So the story sort of starts looking in that late 1990s/early 2000s time frame in terms of what was happening in the marketplace; and what we had is, companies you've heard mentioned in this case who licensed GaN technology, like Toyoda, like Nichia, brand names like HP and Samsung, either were making or about to start making blue LED lights. And you heard already why that was important, because we were making a progression from sort of what as a commercial guy might say novelty lighting, the reds, the greens, the yellows, into something that could actually be used to illuminate a room or a factory or, you know, other large spaces and be more energy efficient and all kinds of benefits that you heard about. So we were on the cusp of that transition beginning there in the '99/2000 time frame.

That second bullet point there comes from the deposition of Mr. Liu talking about that blue LEDs were key and necessary to the creation of the white LEDs, which, again, eventually became the sort of holy grail; and that 2000 quote is coming from independent research that was done by groups who were financing these ventures in the 2000 time frame. And as you've

already heard, so I just recap it for you here, there were certain key advantages in the lighting industry to converting to this kind of technology, again, that was largely enabled by the GaN technology that allowed for the creation of the blue LEDs.

Q. All right, let's go to the next slide where you talk about the industry organization, and we're going to hear a little bit about this from Dr. Lebby later, but can you take us through this slide and sort of about how these different people fit into the supply chain.

A. Sure, and I just took this from an Epistar presentation, and it basically would show you Epistar here. It's sort of the start of the product flow, making chips. And then you'll see as we move along, you move from packages of chips to LEDs being put on circuit boards and into various component parts of other products. And then down at the end, you sort have lighting systems by the big brand-name companies and the big channels. And the names that you've heard in this case include Epistar, defendants like Everlight and Lite-On. And then you've heard about various licenses of parties like Cree, Osram, Philips, and Samsung, who then play across the spectrum. So I wanted to put this in here just so you had sort of a mind's eye view of sort of what the industry looked like and where the companies you're hearing about sort of fit into that picture.

Q. All right, now, as we're going along from Level 0 to

Level 5, more is being added as far as to the chip, the package, the module, the light bulbs, the light bulb into the system for a car, or maybe even into the panel for a TV. So as we go from left to right, it gets more complex, correct?
A. Yes.
Q. All right, so Everlight and Lite-On are put almost down to the very chip level. They don't add much.
MR. BENISEK: Objection, your Honor.
THE COURT: Sustained.
Q. What does this tell you about where they are in the value-added chain?
A. For purposes of what's in dispute in this case, it's chips and then packages of chips, and that's the area in which Epistar, Everlight, and Lite-On played for purposes of this case.
Q. All right, now, we've heard testimony about these companies, Cree, Osram, and Philips. We kind of know that they're big players in the game, right?
A. Yes. You see products in the store with their name on them.
Q. Now, this company which we kind of think of for Samsung cell phones, TVs, washer-dryers, whatever, they also make chips, right?
A. Yes.
Q. As a matter of fact, Samsung makes D rams, dynamic rams,

and access memory chips, flash chips. I mean, they are a major semiconductor company, right?

A. Correct.

Q. Now, did you read as part of your preparation the deposition of Paul Reidy?

A. Yes.

Q. And Paul Reidy was the person who helped Boston University resolve some cases against some other defendants previously, correct?

A. Correct.

Q. And Samsung was one of those defendants, right?

A. Yes.

Q. Now, Samsung had only been on notice of this patent at the time they settled, only been on notice, damages had only been starting to accrue for about 18 months; is that right?

A. I don't remember the exact time period. I remember it was a shorter time period, though.

Q. So Samsung had only been on notice for about 18 months and paid $5.5 million, correct?

MR. BENISEK: Objection.

THE COURT: Sustained. I think you need to lay more of a foundation.

Q. Now, again, we talked about before, damages start to accrue at the point of notice, correct?

A. Correct.

Q. And I take it, have you ever been involved with negotiations with Samsung or in cases with Samsung?

A. Sure.

Q. In your experience with Samsung, are they sophisticated, intelligent, smart, tough about intellectual property matters?

A. A very sophisticated IP company.

Q. This very sophisticated, tough IP company that is about the same size as Epistar, only on notice for 18 months, what did they pay?

MR. BENISEK: Objection.

THE COURT: Sustained. I think we should move on on this.

Q. All right, let's talk about the next slide.

A. It's additional commercial considerations. Quickly again, there were research analyses done and produced by the parties as well as independent research done by my team, and what I've tried to do here is give you a snapshot. Again, this is one of the few instances where we actually had data going all the way back to 2000, so there was information showing us about the growth in LED lighting, but specifically in the GaN area during the mid to late '90s, and then separately there were projections about what was expected in the future. My reason for putting it in here is to show you generally what was happening in LED lighting compared to what was happening in GaN to sort of appreciate how significant the difference was; two

to almost three times the expectations of growth in that industry, and that's what the parties would have known at the time they were negotiating as the opportunity available for GaN lighting.

Q. And this is actually an Epistar -- they're a publicly traded company, correct, Epistar?

A. Yes.

Q. And Epistar has publicly filed materials talking about their expectations for growth in 2000. What was their expectations that they were telling everyone in their securities filings about how much they expected to grow?

MR. BENISEK: Objection, your Honor.

THE COURT: Overruled.

A. My recollection is somewhere in the 15 percent plus range year over year.

Q. Per year?

A. Yes.

Q. Compounding?

A. Right, every year 15 percent for some reasonable period.

Q. And my wife could tell you better what compounding was, but I'm going to skip that. She's the financial person. But I know that the base for the next year is bigger than the year before basically?

A. Again, 15 percent year over year. I think you get it.

Q. A history major. All right, let's go to the next slide.

What are these factors?

A. Yes, so I think we were going to note here, in the first two lines, those are based on deposition statements. The next three lines are based on data that was produced. This factor is solely about commercial success and popularity. This is not any reflection of the amount of sales that you're going to consider in the royalty base. I have a separate calculation of that that I will show you at the end, but for purposes of understanding the overall success and popularity of the technology based on the data produced, all I had was worldwide data. So I wanted to give you that caveat ahead of time so you understood what this was used for and what it wasn't used for, but I'm giving you now sort of a look at what happened.

We know what had happened in the past as of 2000. That prior slide showed you what they were expecting to happen after 2000, and this is showing, at least based on a few data points that were available in the case, the significance of the accused products to Epistar, 60 to 70 percent of their sales; the significance of those products to Lite-On. You'll remember that Epistar makes chips, and they made chips for Everlight and Lite-On, so I provided here during the damages period the number of chips that were provided, the GaN LED chips that were provided by Epistar to Everlight and Lite-On, and generally the total amount of revenue that Epistar got worldwide from the sale of those chips.

Q. Now, these numbers here, as a percentage of their total sales, these types of chips which they -- this is from actual deposition testimony, and we're going to see this later, of corporate representatives of these companies saying that their revenue was dependent -- in the case of Epistar, 60-70 percent of their revenue is based upon this technology, correct?
A. Correct.
Q. And as far as Lite-On, 40-45 percent of their revenue flows back to these products or these types of products that are accused?
A. Correct.
Q. Let's go to the next slide. Explain this to me.
MR. BENISEK: Your Honor, you were going to give an instruction on the previous slide.
THE COURT: On the one before?
MR. BENISEK: Yes.
THE COURT: Yes, I mean, I just want to keep reminding you that only U.S. sales are at issue if you get to the issue of damages. So while the percentage of worldwide sales may make some impact on other things, as will be argued by plaintiffs, the only amount of money that matters is U.S. sales. I mean, the verdict form will say, "What percentage royalty do you find?" and then the base which you multiply it by would only be U.S. sales. So, anyway, I think that gets at what you were talking about. So those previous huge numbers

were worldwide, not U.S.
Q. All right, Mr. Ratliff, talk about this next slide.
A. So in the information produced by the parties, I had revenue information. I had some cost information that were specific to the GaN products. I then had some companywide information, and taking all of that together, what I did was an analysis of what the various profit margins were. And I showed it for the whole time period the data was produced for, but I tried to focus on the dates closest again to the hypothetical. So you'll see the earliest data that I received related to GaN products was 2007, but of course your hypothetical is back here.
So what I did was looked at the first couple of years for each defendant closest to that date, and that's what you see in this column here. I'm comparing the gross margin -- that's sales -- minus the cost of actually making the product, the cost of goods sold, and it's comparing the accused products to the companywide for the first couple of years closest to the hypothetical; and you'll see in each case, the accused products were more profitable. That is a condition, again, based on pricing in the market for these GaN LED products, which you would have expected to exist in the years prior to that because those were premium products. Over time it becomes more commoditized, and the prices generally on lighting declined. So you'll see in the later years, if I look at the overall

averages, except for Epistar, generally speaking, the overall products of the company were a little more profitable than the accused products, but that's because they've moved on to new things. They've moved on to what's the next latest and greatest; they're in a new sales cycle. But for your consideration, one of the things you're focused on is, what would the parties have believed in the 2000 time frame; and based not only on this information but the other industry information I talked about, you would have expected these GaN LED products to have been more profitable.

Q. All right, a few things that I want to focus on about the costs that they were deducting. We actually took the deposition of some of their financial people who talked about the costs that come out in their calculations and margins, correct?

A. Yes.

Q. So one of the things that these margins or percentages take into account of, they backed out all the cost of any other license they had, right?

A. Eventually. I don't think it came out in cost of goods sold, but our next slide is "Operating profits," and it does come out before then.

Q. Well, another thing that they pull out is, they say said if they have investment losses in the Taiwanese stock market, they'll spread those investment losses in the stock market over

their products. Do you recall that?

A. Yes, and mathematically it would come out in arriving at operating profits anyway.

Q. So when we're talking about the cost of goods, they've taken out things that a normal person would never think of as: This is what it costs for the ingredients for my cake. I bake my cake; I sold my cake. It's also like: I lost money in the stock market, so I'm going to take that out of the profit of my cake. I lost money, you know, in a joint venture in Taiwan to somebody. All those costs they consider and take out and spread that to their products; is that right?

MR. BENISEK: Objection, your Honor.

THE COURT: Overruled.

A. Those items eventually reduce the overall company operating profits, and, again, the next slide I think will show us where we are on that.

Q. Let's go to the next slide.

A. So, again, there's a whole lot of data that goes into what's now a fairly simple graph that you can look at. That first column is just showing you that 4 percent calculation that I did earlier because the point of this slide, one of the *Georgia-Pacific* factors asks us, what royalty rate would a party have been willing to pay in a license or who has a patent been willing to accept that would have still left the licensee with a reasonable profit? The rules don't require us to leave

any profit, but it's just one other factor you can consider.

So what I am demonstrating here is based on the overall operating margins, and then where I had product-specific information, generally speaking, 8 to 11 percent during the relevant time period was what the parties' operating profits were. And operating profits would be sales minus the cost of goods sold minus other things, marketing, administration, those kind of costs. Some of those are overhead, right? They're there whether you make the product or not. Other of those are variable. I was being ultraconservative, so I showed you the actual operating margin, and even at that level, those margins were all still greater than the royalty.

Q. As a matter of fact, their testimony was that none of these companies, all of them claimed they don't even calculate how profitable any individual products are? Is that what they said?

MR. BENISEK: Objection, your Honor.

THE COURT: Overruled. Is that what they said in their depositions?

THE WITNESS: In the depositions, they said that they did not do a product-specific level profitability. Like, if there was a particular material number, they don't know how profitable that one product was. Instead they have whole groups of products in a particular facility or in a particular business unit, and they've got aggregate data on all of those

but not at the product-by-product level.
Q. And sophisticated semiconductor companies, multi-billion-dollar companies, have you ever before seen a company not know how much money they make on any particular product they sell?
A. I can't say I've had any where they weren't able to query for additional information to at least come up with a reasonable estimate, but I've certainly seen some where they didn't track it contemporaneously.
Q. But ultimately they have to track it. I mean, is this one of the situations where we lose money on every product but we make it up on volume?
A. I don't think that's the case, but there are definitely allocations that are not product-specific. So, again, I've not seen situations where we couldn't develop it, but there are a number of companies who don't necessarily track it all the way down to the operating or net profit level.
Q. All right, so in all of the terabytes of information that you were provided, all the documents you were provided -- well, we asked in discovery for documents related to profitability, correct?
A. Yes.
Q. We asked for documents in discovery for anything related to how they determined how they price a product, right?
A. Yes.

Q. But they couldn't tell us on a product or even on a gallium nitride product basis what their profit margin was, could they?

A. Not based on the information I saw.

Q. Do you find that believable?

MR. BENISEK: Objection, relevance.

THE COURT: Sustained.

Q. Let's go to the next slide.

A. So, again, turning the page here, we're moving on from the commercial factors to the technology, and what I've done is just give you a couple of slides here with statements out of Dr. Piner's report. You heard him testify. When I put my slides together, obviously that testimony hadn't occurred, but I had seen his report and I was familiar with what his opinions already were; and all these next couple of slides do is reinforce the importance of the '738 patent and how it was an enabling invention for these bright-light LEDs which you've heard called the GaN LEDs.

Q. Let's go to the next page.

A. Again, you heard these were the key features of the patents that drove their demand, the color and the brightness, and that those were enhanced and enabled by the patent. We can go on to the next one.

And the last topic that we had had to do with non-infringing alternatives. So I thought, first, I'd sort of

tell you what that means from a business perspective. You heard a little bit of testimony about that during Dr. Piner, but it's a technical perspective. From a business perspective, one of the questions is: If the defendants don't take a license to the patent, what other choices do they have that would allow them to keep making a product that would be similar to the one that they were making that's accused of infringement? And by similar, what I mean, that it achieves the same kind of benefits, has the same kind of features; similar in the sense that customers would accept it in lieu of the product that they're making now; similar in the sense of its cost and price. Obviously, if you've got a 1-cent product now and your only other alternative costs 5 or 10 cents, in an industry like this that's about high volume and low price, that probably wouldn't work.

So that's what we mean by that, and according to Dr. Piner, at least with respect to Epistar, which are the two that I've identified here, that it would be very difficult for them to devise a way around the patent in suit. It would require years and millions and millions of dollars of R&D costs. It would require a lot of time.

Q. Now, these factors on this slide, this is just for the manufacturing defendant, Epistar?

A. Correct. Those two circled bullet points I have there are specific to Epistar.

Q. Now, you've read every expert report in this case, right?
A. Yes.
Q. And you've read all the depositions taken in this case, correct?
A. I don't know that I read all, but there was that list of twenty or so, and I either read them or I searched for key words related to the subjects I cared about. I haven't mastered all that information, but I at some point was exposed to it.
Q. Did you see any expert testimony from any semiconductor manufacturing engineer that there was a cost-effective way for Epistar to make a different product with similar performance?
A. I don't recall any, but, again, I primarily relied on Dr. Piner's analysis of those issues for my opinions.
Q. Now, would it in your opinion as -- you know, you determine what's relied upon for making conclusions like this, correct?
A. Again, in this area, it's the technical experts, so I consider their opinions.
Q. All right, so for someone to come in and say that Epistar could have made something else, would that take the opinion of somebody -- could a lay person come in and do that, or would that require an expert opinion from someone who knows the difficulties of the R&D, the cost of the R&D, the likelihood of success of the R&D, the time it would take to do the R&D, and

all those other factors?

MR. BENISEK: Objection, your Honor.

THE COURT: Why don't you rephrase that.

Q. In other words, you when you're doing these analyses under the *Georgia-Pacific* factors, is it credible to take into account non-expert testimony on the subject of acceptable non-infringing alternatives to a semiconductor design?

MR. BENISEK: Objection, your Honor.

THE COURT: Overruled.

A. As to the engineering design itself, I would rely on technical expert testimony. As to other business considerations like I outlined, like price and time periods and those things, there could be other witnesses familiar with that, but as to the design itself, how long that would take, those kind of things would be a technical expert.

Q. All right, let's go to the next slide.

A. We may just want to comment on the other two --

Q. Oh, I'm sorry, I'm sorry. All right, so that's Epistar. For them to change gears, they have to basically retool, potentially retool their factory, redo their R&D, scrap years of work. Let's talk about Everlight and Lite-On, okay?

A. Okay.

Q. Now, Everlight and Lite-On, they buy chips from people, right?

A. Correct.

Q. And I guess you heard, I believe it was Mr. Vasquez ask Mr. Garceran, "Well, you guys could just have bought these from Cree." Were you in here for that testimony?
A. I was.
Q. Is it that simple that you can just go buy from somebody else?
A. If that's reality, sure, that's simple.
MR. BENISEK: Objection, your Honor.
THE COURT: Overruled.
Q. All right. Now, if you take out of the equation the third largest manufacturer in the world, would you need evidence that the other people had the capacity to meet that demand?
A. One of the questions that would matter on whether there was an alternative would be, who else could make that supply up?
Q. As a matter of fact, capacity in the semiconductor industry around this time, 2002-2010, was somewhat constricted and limited, wasn't it?
MR. BENISEK: Objection, your Honor. I'd add another objection Rule 26 objection, outside his report.
THE COURT: Sustained.
Q. Is capacity in the semiconductor industry unlimited?
MR. BENISEK: The same objection, your Honor.
THE COURT: I'll allow that.
A. It is not unlimited.

Q. And what about if you're going to go buy somewhere else --

THE COURT: You know, if this is beyond his report, I think you've got to stick with his report.

MR. SHORE: It's not, your Honor. He talks about alternatives in his report.

MR. BENISEK: No, your Honor.

THE COURT: Well, then talk about the alternatives.

Q. Are there a lot of business factors that go into whether or not an alternative supplier is viable?

A. Yes.

Q. If that alternative supplier is more expensive, is that truly an alternative supplier?

A. As I said earlier, if you're limited to the facts of this case, pennies, nickels, and dimes, and it's going to cost significantly more than that, then that wouldn't be an alternative.

Q. All right, so, in other words, if the royalty rate is going to be 4, 6 percent or whatever it is, if the other supplier costs more than that, that's not an alternative to a license, is it?

A. If it's more than that, enough to where it would matter; you know, 1.1 cents versus a penny might not matter, but 2 cents, 3 cents, 5 cents. And based on the data produced in this case, based on schedules I have attached to my reports, we can see that not everybody got the penny-a-piece pricing that

Epistar gave to Lite-On and to Everlight. Other people Epistar sold to, they charged higher rates, and Cree charged higher rates.

Q. One of the reasons why Epistar gave favorable rates to Lite-On and Everlight is because those companies are interrelated, aren't they?

MR. BENISEK: Objection.

THE COURT: Overruled.

A. Again, based on the evidence that existed before trial and some of the testimony the jury has heard, there are some relationships that are not arm's length between those companies.

THE COURT: Well, but is there any evidence in the record or in your report that the rates were more favorable?

THE WITNESS: No. I did not reach that conclusion.

Q. But they share members of their boards of directors?

A. Based on the evidence that's been present, that's my understanding.

Q. And they also share investments in the factories that make some of these products?

A. Again, my understanding of the facts presented, yes.

Q. And they actually hold themselves out to later-down-the-line customers --

THE COURT: You know, not leading.

Q. Do they or do they not hold themselves out as vertically

integrated with each other to their customers?
A. Again, I've heard testimony that that's how they went to market.
Q. Let's go to the next slide.
A. The final subject that we're addressing is other considerations, and the only thing I put in here related to commissions. And there was material produced in this case about commissions paid by the defendants to certain U.S. domestic sales reps and manufacturer reps, and based on what I saw and cited in my reports, the range of those commissions were 3 to 5 percent. I include this not because it's a royalty. I include it as an analogy because you pay commissions to people who make sales someplace where you want to make sales in order to allow you to more successfully access the market. All right, that's what salespeople do: They help the company make sales. You put them places where you don't have people to try to make sales in those areas.
So it is an analogy to what the, if you will, sort of proper rate or price to access an opportunity might be. A patent that someone has that allows them to make a product they couldn't make is by analogy, again, something that you need in order to access an opportunity. So I've simply presented this to show you one other, if you will, sort of data point in this case that gives you some information about accessing the marketplace in the U.S. for these GaN LED chips.

Q. All right, let's go to the ELMO, please, and we're going to look at Plaintiff's Exhibit 126. And this is actually one of the manufacturers' representative's agreements?

THE COURT: What's OEM?

MR. SHORE: OEM is an original --

THE COURT: No. What's an OEM?

Q. What is an OEM?

A. It's an original equipment manufacturer. It would be people that would make a chip or a product or other requested good or service.

Q. All right, so what's an example of an OEM?

A. You know, companies like Samsung are considered OEMs when they're in the manufacturing mode. The HPs, the IBMs in their manufacturing roles can be OEMs. But it can also be companies that you don't know their brand name of, but they are the ones who the big brand names hire out to manufacture things from them.

Q. All right, so when I buy this end product, this monitor, this monitor is made by an original equipment manufacturer that buys the components from other people and puts them together to make this end product? Is that what an OEM is?

A. That would be an example of an original equipment manufacturer.

Q. All right, now, when they sell these Lite-On and in this case of this Exhibit 126 Everlight products, what's the

commission when they have a direct sale to an OEM?
A. Five percent.
Q. Let's go back to the PowerPoint. All right let's look again, the next one, please, the next slide. All right, so let's sort of give us a summary of the reasonable royalty analysis we've just been through.
A. Sure. So what I've done here is just sort of recapped the considerations, sort of put them all in front of you at once. We had the licensing considerations where we talked about BU/Cree and Cree licenses to others. We also talked about the defendants' licenses, generally seeing rates in the range of 3 to 6 percent, but on a worldwide base and other things that differentiated those from your hypothetical license.
We considered commercial factors like the success of the patented technology. We considered the profitability closest to the hypothetical negotiation date. We considered what we heard from Dr. Piner and others about the technology and the importance of the features of the invention, and about the difficulties in trying to come up with some other way to do it that wouldn't infringe. And then, finally, we had some other consideration, which was the commissions.
Q. Now, let's talk about the Epistar royalty base now, all right?
A. Yes. So at this point most of that we've been talking about has focused on the rate, and then now we're going to

focus on what you would consider as the base to apply the rate to.

Q. So this hypothetical negotiation has ended. The rate is based upon your analysis -- and we'll get to the final conclusion. The rate will be whatever the jury decides it is under *Georgia-Pacific* factors, considering your testimony, but now we have to decide what it is or the proof of what it is that rate should be applied to. Is that the base?

A. Yes.

Q. Tell us how you came up with the base for Epistar.

A. So for Epistar, they provided SAP data and --

THE COURT: What's an SAP?

THE WITNESS: Sure. So SAP is a type of database. It's got the ability to either buy modules that are plug and play that have various types of accounting structures. It can also be more custom designed, but it's a very common business information platform that is deployed across the world in order for companies to be able to input information and develop reports that inform them, allow them to make decisions, inform the marketplace about their businesses. And so SAP was the particular type of data system that Epistar was using to capture its sales data.

Q. All right. So we're going to put up on the screen now -- the ELMO, please -- Plaintiff's Exhibit 589. And there's a large binder of exhibits that have gone into evidence, I

believe here will be called Ratliff Bridgelux.
A. Yes.
Q. What is in this Ratliff Bridgelux binder with all these exhibits that have come into evidence?
A. It is sales documentation between Epistar and Bridgelux. You heard me say earlier I was provided sales data by way of an electronic database, SAP; but then I also received many, not all but many of the underlying documents that reflected purchases, called purchase orders; sales invoices, both ones that are internal to their system as well as ones they might send to a customer. It also included payment, transaction verifications, so it's like a wire transfer and it's a record that reflects that. Generally those kind of records.
Q. All right, so is Plaintiff's Exhibit 859 an example of what's called a purchase order from Bridgelux to Epistar?
A. Yes.
THE COURT: Now, let me just stop you here for one second. So not only will you have to decide what the percentage is, if you get to the issue of damages, but you have to decide what to multiply it by, and some of these numbers are hotly disputed. So with respect to Bridgelux, there's an issue about how much was covered by a license, and then as we go along, I'll tell you what the disputes are. But that's why he's going through this in length, and I wanted you to focus on, if you get to, you know, what do you multiply it by, you're

going to have to make some fact-findings along the way. So go ahead.
Q. Now, is Plaintiff's Exhibit 859 an example of what's called a purchase order from Bridgelux to Epistar?
A. Yes.
Q. All right, now, what's the difference between a purchase order and an invoice?
A. A purchase order is the customer saying, "This is what I want to buy." Invoice is sending them a bill for what they bought.
Q. Okay. Now, is Plaintiff's Exhibit 859 representative of the binder of all of the purchase orders that are in the binder from Bridgelux to Epistar?
A. Yes.
Q. All right, now, if you add up all the purchase orders in the binder, is that the number or not?
A. Yeah, it's not complete, but, again, both myself and Mr. Mangum for the defendants used the SAP data, but the binder we put together of the documents that were produced just to sort of understand the flow, to understand where people were located, where the orders were coming from, where the payments were being made, things that sort of showed whether it was U.S. versus non-U.S.
Q. All right, and what we have here is, these sales go back to about 2007, correct?

A. Something like that, yes.
Q. All right, so they may not have paper records going all that way back, but we have the SAP data?
A. Correct.
Q. Now, let's take a look at this representative purchase order. Where is this purchase order originating from?
A. From California.
Q. And California is part of the United States of America, correct?
A. Yes.
Q. And then where does it indicate the parts are being shipped to?
A. In this particular case, shipped to the U.S., but if we looked at other ones, they could be shipped to other places.
Q. All right, and where is the billing going to?
A. That's in the U.S., and that was consistent across all the purchase orders.
Q. Every purchase order we see, is the "bill to" address in the United States of America?
A. Yes, and the order address is in the U.S.
Q. Now, this purchase order that is issued from the United States of America, it's a little small, I'm going to read it into the record: "Absent a master agreement between the parties, this purchase order, together with Bridgelux purchase order terms and conditions, and any attachment here to

(collectively 'order') shall constitute an offer by Bridgelux to seller." Did I read that correctly?
A. Yes.
Q. Do all these purchase orders coming from Livermore, California, contain the same language?
A. Yes.
Q. And then under the purchase order terms and conditions, it identifies the purchaser as who?
A. As Bridgelux.
Q. Bridgelux, Inc., correct?
A. Correct.
Q. That's a United States entity, right?
A. Yes.
Q. And the choice-of-law clause, what law governs the transaction?
A. California.
Q. The United States of America?
A. Yes.
THE COURT: All right.
MR. SHORE: All I know, the statute says United States, your Honor.
Q. Now, let's take a look at Plaintiff's Exhibit 784, and what is Plaintiff's Exhibit 784?
A. So it's an internal record to Epistar, but it basically is the equivalent of a sales invoice. If you can zoom in right up

here just to make it easy to see the next document in the sequence, you can see U.S. dollars, $3,697,582.23.

Q. All right, and then the second page that corresponds to the invoice is a wire transfer record, correct?

A. Yeah. Actually, there's a page in between those two.

Q. Oh, I'm sorry.

A. I only pick it because again you're able to see that big number up there.

Q. So the number matches on this particular charge document?

A. If you go down to the bottom, you'll see what bank it was paid out of in San Jose, California, and then if you go back to your left a little bit, you'll see again the Bridgelux address in -- sorry, up.

Q. I'm sorry?

A. Go down to --

Q. Oh, I'm sorry.

A. There you go. So you'll see again the account being paid from California.

Q. And the second page again indicates the bank where?

A. In California, and again this looks like a wire transfer kind of confirmation.

Q. So all of these example transactions that we have with purchase orders and invoices, do all the purchase orders issue from the United States?

A. That's correct.

Q. Are they all governed by United States or California law?
A. Yes.
Q. Do all of them indicate a "bill to" California address?
A. They do.
Q. And are all the payment records coming from banks in the United States?
A. Yes, the ones that I saw, and then from the SAP system, Bridgelux was shown by Epistar to be its U.S. customer.
Q. All right, now, in the system, did they have a column, I guess, in their Excel or spreadsheets, or whatever they are, that identifies the location that they consider the customer to be from?
A. Yes.
Q. And in every one of those, where was Bridgelux, the customer, to be considered to be a customer from?
A. Well, within their master customer list, they showed Bridgelux as a U.S. customer.
Q. Now, in addition, did we have some sworn testimony in the case from anyone at Epistar that indicated that the transactions with Bridgelux were U.S. transactions?
A. There was a corporate representative designated who did testify at a deposition. I don't remember the name, but their testimony was consistent with documents.
Q. Well, I had that. Well, I'll maybe find that on redirect.
All right, so the basis for your numbers related to

Bridgelux are the Bridgelux SAP system, the Bridgelux purchase orders, the Bridgelux invoices, and the sworn testimony of their corporate representative?

A. And the bank confirmations, yes.

Q. And the bank confirmations, yes. All right, let's move on to Everlight. How did you come up with your royalty base for Everlight?

A. Multiple data sources. We did get some SAP data, but there was a large file as part of that that was corrupt, and we never could resolve that issue. There was also sales data provided separately for ELT and ELA, separate entities, and basically --

THE COURT: What are those?

THE WITNESS: It's Everlight in Americas, and like Everlight Technology, so one's not the U.S. entity; the other is the U.S. entity. But we focused only on the U.S. sales that those entities made, but they're all part of Everlight. And from the multiple sources, we pulled the information together. We did still have some missing time periods. There were certain fields that didn't have data in them. So ultimately we were provided with some communications between counsel about those documents and data that allowed us to know what to include in that royalty base.

Q. All right, now, let's make sure we're clear. The numbers that you relied upon for Everlight originated from Everlight,

correct?
A. Correct.
Q. This is not something that you yourself went and created from any Everlight database or anything else. These are numbers that came from Everlight?
A. Correct, because the SAP data we couldn't use, so these were separate schedules with separate Bates numbers that were provided with product information and sales.
Q. All right, now, when Everlight sent this information, I believe the first time it arrived was in answer to an interrogatory. Can you explain to the jury what an interrogatory is.
A. In simple terms, the parties are allowed to ask questions to each other and get written responses that are then verified under oath.
Q. All right, so the information that was provided from Everlight to you that you relied upon, was that information sworn to under oath as accurate?
A. The accuracy, yes. Then there were some questions about what it actually represented.
Q. As a matter of fact -- let's go on the ELMO. This is Plaintiff's Exhibit 1602, and this is an e-mail from Jeffrey Smith, an attorney at Finnegan, Henderson, Farabow, Garrett & Dunner, who represented the defendants during this period, and it says, "Defendants' production bearing Bates numbers," and it

has Bates numbers -- I think we talked about what Bates numbers were before -- "can be downloaded using the following link. Please note these documents are designated confidential," et cetera.

Now, this second number, ELT1110410 -- maybe we can get it highlighted. Oh, I can't highlight on here, can I? There we go. Is that the spreadsheet that was provided to you representing Everlight's gallium nitride LED sales?

A. Yes.

Q. All right, and that came from where?

A. Again, it was produced as part of a production by counsel for Everlight.

Q. All right, now, how many pages of information is included in that?

THE COURT: Could you say that again? What is that, ELT11 --

MR. SHORE: ELT1110410.

THE COURT: What did you understand that to be?

THE WITNESS: That was -- well, it was sales data. There was an understanding it was what it was. It was sales data. It wasn't until I saw the e-mail exchanges --

THE COURT: No, but sales data for what?

THE WITNESS: For LED light products, so they would have been packages, packages of chips.

Q. All right, now, once these were downloaded and received by

Boston University's counsel, there was some confusion that developed, correct?
A. Yeah. There was an exchange of e-mails trying to clarify exactly what was included.
Q. All right, so then Boston University's counsel, Chris Evans, writes back and asks, "Do the sales spreadsheets that are Bates labeled," the same numbers in the prior e-mail, "include only Everlight and Lite-On products that incorporate Epistar indium gallium nitride LEDs, or do they show sales of all Everlight and Lite-On products that contain gallium nitride LEDs regardless of the source? If the latter, please identify the Everlight and Lite-On products that contain Epistar indium gallium nitride LEDs."
Did I read that correctly into the record?
A. Correct.
Q. So this is only a week after the receipt of that spreadsheet, correct?
A. Yes.
Q. And then in the second paragraph, it was pointed out to them that the financial figures could not possibly be correct because the financial figures exceeded the total revenue of the company, right?
A. Correct, because there was a -- the way it was presented was in a base of a thousand as opposed to in the right units, so --

Q. So it looked like they'd sold billions of dollars a year, right?
A. Correct.
Q. So we, Boston University, asked two things: One, "Is this indium gallium nitride LEDs?" And, two, "Are you sure you got your numbers right?" We asked them to verify both of those things, right?
A. Correct.
Q. By the way, that's Plaintiff's Exhibit 1603. And in response to that, we got the e-mail, Plaintiff's Exhibit 1604, and I'll read this into the record from Jeffrey Smith --
THE COURT: Did you offer that?
MR. SHORE: I'm going to offer all three of them when we get to it.
Q. And then the response is, "Chris: The Everlight and Lite-On sales data referenced in your e-mail contain sales of products with all gallium nitride LEDs regardless of the supplier. I am looking into the rest of your questions and will provide an update by next week." Do you see that?
A. Yes.
Q. Now, in the two years we conducted this litigation, or two and a half years that we conducted this litigation, up until the time of trial, did Everlight ever deny that those sales were indium gallium nitride LED sales?
A. I don't know of any of that in terms of documents produced

that I reviewed.

Q. Did you rely upon the sworn interrogatory answer of Everlight, sworn testimony which was never amended, never supplemented before trial, in forming your opinions?

A. That coupled with the explanation from the e-mails.

Q. So not only was it sworn and verified, it was also verified by their attorney?

A. Yeah, I don't know if that's a verification, but it was explained by their attorney.

Q. Now, ultimately, in response to our telling them that the numbers could not possibly be right, did they provide corrected spreadsheets with the correct unit numbers?

A. There was late production of some additional information that had information about -- that had been manually input into some spreadsheets about whether something was GaN or not GaN --

Q. No, I'm not talking about that. I'm talking about only a week later after receiving that --

A. Correct.

Q. So we got a corrected one, and that's the one you've been using?

A. Correct.

Q. You haven't been using the one where they sold billions of dollars a year?

A. Correct.

THE COURT: You have or you have not?

THE WITNESS: I have not. In other words, they eventually provided something that took that multiplied times one thousand issue out.

THE COURT: When you say "IN GaN chips," is that the same as the chips we've been talking about all along?

MR. SHORE: Yes, indium gallium nitride.

THE COURT: Do you agree with that?

THE WITNESS: It is. You see two different kind of labels on some of the columns. Some have the I's; some don't.

THE COURT: It's the same product?

THE WITNESS: That's my understanding.

MR. SHORE: They're all essentially gallium nitride. We would offer Plaintiff's Exhibit 1602, 1603, and 1604 into evidence.

MR. BENISEK: Your Honor, we object to them coming in directly, but --

THE COURT: Overruled. I'll allow them in.

(Plaintiff Exhibits 1602, 1603, and 1604 received in evidence.)

THE COURT: How are you doing timewise?

THE WITNESS: Last slide.

MR. SHORE: Last slide.

Q. Well, we have Lite-On. How did you come up with the Lite-On royalty base?

A. Again, you saw that e-mail made the --

THE COURT: Can I just back up. That Everlight base is -- remember, I said there were some things that are disputed? So I'm just focusing your attention. That will be one of the factual disputes.

A. That e-mail you just provided both had representations on Everlight and Lite-On's production, and Lite-On did have data that was produced that generally reflected their sales and where their sales were made to, and they're a much shorter period of time. Their damages don't arise until the time the lawsuit was filed, so it's only a couple of years.

Q. Yes, so, in other words, the same source that was used for Lite-On -- I mean, the source of the money that Lite-On made, again, comes from Lite-On?

A. Correct.

Q. And it comes from Lite-On under oath in an interrogatory response?

A. Correct.

Q. Verified by their attorney, correct?

A. Correct.

Q. All right, so using this data, let's go to the last slide. We need to switch over. All right, take us through this slide.

A. So what I've done, again, you've got Epistar, Everlight, and Lite-On, and I've now taken that sales information that you just heard how it was produced and what we did, and I have totaled up during these time periods. And you heard earlier

about notice. So you'd already heard testimony from other witnesses about the dates that notices were sent to these parties. So for Epistar, their damages period starts in November, 2006, based on the information I was provided, Everlight in April, 2007, and Lite-On at the time the suit was filed in December, 2012. All of the damages run through the expiration of the patent in November, 2014, so they all have the same ending date, even if different start dates. And then I've taken the accused sales from each, and I have multiplied it times the minimum 4 percent royalty rate to come up with a reasonable royalty.

And the only additional thing that we haven't talked about is, you'll see this "Unique inducement." It's inducement -- there's a reason I use the word "unique." What we mean here by inducement is that Epistar is the one who sold chips to Everlight and Lite-On. The current Epistar sales number only includes Bridgelux sales, but Epistar has been on notice back to November, 2006. Everlight and Lite-On didn't receive notice until 2007 and 2012. So there are sales that they made that were chips supplied by Epistar which occurred before their damages period, but it occurred within Epistar's damages period. And if in this case Boston University is successful in proving inducement, then Boston University would also be entitled to a royalty on the Epistar chips that were provided to Everlight and Lite-On during that additional period. So

multiplying those sales by 4 percent gives you the $1.5 million. The real number is around $38 million and change is the actual royalty base, but, again, it just covers the period that these parties were not already having these sales counted in their own category, so it's not double counting is the point.

Q. I want to talk about inducement a little bit. So if I know about a patent and that my part likely infringed that patent, and I sell it to somebody with that knowledge with the expectation that they're going to sell into the marketplace, is that what inducement means?

A. Yes. Again, the proof requirement is generally as you describe, but inducement is saying you can be liable for selling something that someone else, right, then sold in an infringing manner.

Q. All right, so for Everlight, this inducement number would only include sales from November of 2006 to April of 2007?

A. As to the Everlight piece, and to December, 2012, for the Lite-On.

Q. Hang on a second. So, first, it's the stuff that Epistar sold Everlight, but then you discount it more by only the things Everlight sold in the United States?

A. Correct.

Q. So it's not the total that Epistar sold Everlight. It's only those things that Epistar sold Everlight that Everlight

then sent to the U.S.A.?
A. And, again, for all of our computations, these are our understanding of the U.S. sales.
Q. And the same for Lite-On: It would be the sales from Epistar to Lite-On from November, 2006, until December, 2012, and then only those sales that subsequently can be traceable to the United States?
A. Correct.
Q. No double dipping?
A. No double counting.
Q. Now, this 4 percent rate, that's U.S. only unadjusted for the worldwide basis?
A. Correct, I did not make an additional adjustment for that.
Q. That 4 percent rate is not adjusted for Boston University's strong policy of favoring U.S. entities or only foreign entities that could help U.S. entities?
MR. BENISEK: Objection, your Honor.
THE COURT: Sustained, leading.
Q. Does that take into account --
THE COURT: It's also one o'clock. How much longer do you have with him?
MR. SHORE: Two minutes.
THE COURT: All right, we'll finish that.
Q. Tell us the things that this does not take into account that the jury can take into account.

A. We had a prior slide, and you saw I made certain adjustments trying to create a comparable license based on the BU/Cree license for the hypothetical license. Then you saw there were a couple of things that I didn't take into account mathematically. And you saw there were ranges, and I used the low end of the range. We also talked about commercial factors which would suggest a good royalty rate. We talked about technology factors that would suggest a good royalty rate. I didn't modify what we saw in the comparable license by any of those other considerations, though clearly some of them would have been embedded in the BU/Cree license to start with. But ultimately I think the two significant things that you're interested in is that I didn't specifically make an adjustment for the worldwide sales base, and I specifically didn't make an adjustment for the priority being on a domestic manufacturer or licensee.

Q. Is this a conservative or a crazy liberal --

THE COURT: No, no, no.

Q. Is this the minimum that would be required under the statute?

A. In my opinion, yes.

MR. SHORE: I pass the witness.

THE COURT: All right, we'll see you at lunch.

THE CLERK: All rise for the jury.

(Jury excused.)

THE COURT: I'll see counsel just for a second at sidebar.

SIDEBAR CONFERENCE:

THE COURT: So maybe this is obvious to everyone, but you never did provide an alternative number in case they find that -- what's it called? -- the whole market value rule, the entire market. See, I had suggested that you provide a backup because I'm going to have to provide a jury instruction on that. So you're all or nothing? You're going for the, at least for Everlight and Lite-On, winner take all, no backup? Is that it?

MR. SHORE: First, I don't think it is the entire market value rule, but even if it were, we would win.

THE COURT: Well, most certainly I will be instructing them that they should consider that issue, and so I'm having trouble with it because there's no standard instruction on it. Have any of you given me an instruction on that yet?

MR. BENISEK: No, your Honor. My understanding is, it's always a gatekeeper issue; it's not a jury issue. If you decide it's in, it goes to the jury. If you decide it's out, it doesn't go to the jury.

THE COURT: Well, wait a minute, wait a minute, wait a minute.

MR. SHORE: You already said it was in.

THE COURT: There is enough evidence to have it go in,

but let me say this: Now you're taking me by surprise. You'd say there's enough to go to the jury. You're saying they don't have the option of doing a backup?

MR. BENISEK: If they put one on.

MR. SHORE: Well, I think they are the ones that have to put on a discount --

THE COURT: No, excuse me. Are you planning on attacking that?

MR. BENISEK: Absolutely.

THE COURT: Yes, I thought so. So you're all taking me by surprise, so maybe you didn't brief it well or I didn't read it well in the volume of paper. So let's say they agree with you that it's only a penny, not the five pennies, can't they do a damage figure based on that?

MR. VASQUEZ: We literally believe that if you allow the evidence in and the verdict comes in, then that's reversible error. That's the issue.

MR. SHORE: No, no, no.

MR. VASQUEZ: That's our belief. That's what the brief says. But our expert is going to take on the issue. He's going to definitely say you shouldn't --

THE COURT: So you're saying I shouldn't give a jury instruction to this jury on this --

MR. SHORE: No. There is no jury instruction on entire market value rule.

THE COURT: No, there was not. We couldn't find one.

MR. SHORE: It is a battle of the experts. They can believe either expert they want to believe.

THE COURT: And what if they find that it doesn't apply? You're saying the jury can't just back out those damages?

MR. SHORE: It's their burden at this point. Once we show a prima facie case, which we have, that the entire market value rule applies, it's their burden to show what that discount would be. And to make that proposal to the jury saying, "Instead of using their numbers, what you should use are these numbers," that is their burden as an offset to a prima facie case of entire market value. Now, if they don't put in a number, an alternative number --

THE COURT: Right, I think you have a right to put in an alternative number and to attack their number.

MR. VASQUEZ: It's in our rebuttal report.

THE COURT: Yes, but just I have to give a jury instruction on it. That's all I'm saying.

MR. BENISEK: Well, respectfully, your Honor, we do disagree on the issue of the jury instruction. It's a matter of law. We will put in a separate --

THE COURT: I am really flummoxed by this. Maybe I am completely misunderstanding the issue.

MR. SHORE: You're not.

THE COURT: He has enough to make his prima facie case that the driving force is the brightness, not the little leads and not the plastic casing, okay? He's put in that case, in my opinion. I thought you had the right to then attack that and tell the jury, "No, don't do the five cents. Do the one cent."

MR. VASQUEZ: We will be attacking, but we did brief, your Honor, that he didn't put any customer evidence on. That one customer can't testify, and he doesn't have any --

THE COURT: I ruled against you on that.

MR. VASQUEZ: I get it, I get it.

THE COURT: But now what?

MR. VASQUEZ: Now Dr. Mangum is going to testify, and he's going to say the small salable unit is the chip.

THE COURT: And then what does the jury do?

MR. VASQUEZ: The jury is going to get two different expert opinions. One has much more --

THE COURT: And then what do I tell the jury to do? I need a jury instruction.

MR. SHORE: Actually, your Honor, that's not really how it works. You really don't. The only thing you tell the jury is, here's the *Georgia-Pacific* factors and --

THE COURT: But can't they back that out of the base?

MR. SHORE: They have to argue for them to back it out of the base. They can, yes, your Honor.

THE COURT: Precisely, precisely. And don't I have to

tell the jury they can consider that in determining what the base is?

MR. VASQUEZ: We will review the *Georgia-Pacific* instruction and we will come back with an answer for that, but we literally thought that you were going to make the ruling today on that. But our expert is going to address the issue, so the evidence is going to be before them. The only question is the form of the jury instruction and how --

THE COURT: Customer surveys would be desirable. I get that.

MR. VASQUEZ: Right, right.

THE COURT: That's what the First Federal Circuit -- they didn't have that. But here I've seen the little plastic thing. I've seen the little leads. I've seen the testimony that the brightness is what matters, and that's intuitively correct. I've never heard anything else, never heard anything else.

MR. VASQUEZ: Well, that's because the defense hasn't put on any witnesses yet.

THE COURT: So right now, they put on a prima facie case.

MR. VASQUEZ: We'll be putting on a witness.

THE COURT: And then let's assume for a minute you do, then what do I tell the jury to do with that? I thought I would tell them to consider that as part of the decision about

what the base is.

MR. VASQUEZ: We're going to address the issue.

MR. BENISEK: Well, your Honor, our thinking was, at this point now it's in where we have to 50(a) it, and at that point you decide. If it's up, if it's in our favor, then they have to take --

THE COURT: Well, I'm going to have to look at that legally. I assumed it was a jury question once I decided there's a prima facie case. So you're telling me a jury doesn't make a decision?

MR. BENISEK: Exactly.

MR. VASQUEZ: No. We think it's a Rule 50(a) issue, and we will be bringing a motion.

MR. SHORE: But it isn't -- I've never seen it done that way.

THE COURT: Can I just say this: I haven't had one of these since those cases came down, so I actually don't know how it plays out in front of a jury.

MR. VASQUEZ: Well, that's why we're going to make the Rule 50(a) motion, your Honor.

THE COURT: Have either of you been involved in a trial where this has played out?

MR. SHORE: Yes. I've never seen it anything other than they have to prove an offset based upon a smaller salable unit.

THE COURT: So what case was that?

MR. SHORE: Every single case I've ever been involved in.

THE COURT: Excuse me. Did you have a jury instruction on point?

MR. SHORE: Oh, no, no. No, there's no jury instruction. You just give them the *Georgia-Pacific* factors and --

MR. VASQUEZ: In the *Apple* case they had a survey, but they did the survey wrong, and they made them retry the case. That's the point.

MR. SHORE: That's totally different.

THE COURT: Excuse me. In the *Apple* case, did the court give the jury an instruction?

MR. VASQUEZ: Well, that's what we're going to find out, your Honor, because we told you our impression. Our impression was it's a pretrial issue, but we will find out the answer to your question.

THE COURT: Yes, of course it is.

MR. VASQUEZ: We will absolutely find out the answer to your question.

THE COURT: I agree with you, I agree with you, it's a judge question as a *Daubert* gatekeeper. I made that. But that doesn't mean I take it from the jury. That just means there's enough to go to the jury.

MR. VASQUEZ: We'll have the answer for you.
THE COURT: Perfect.
MR. SHORE: Here's the point, and I think I just have to do this: I'd like to reopen and put him back on because if they're going to say it's a Rule 50(a) issue and that there's going to be a jury instruction on it --
THE COURT: Overruled.
MR. SHORE: -- it will take me five minutes.
THE COURT: Overruled. No. You have redirect.
MR. SHORE: I'll do it on redirect, okay.
THE COURT: I'm tired, we're all tired. I have a wiretap.
THE CLERK: Mr. Shore -- Judge, can I just ask --
MR. SHORE: We offered 1602, 1603, and 1604.
THE CLERK: It's on the record. Do the defendants object to that?
MR. BENISEK: We do object. I thought she overruled us.
THE CLERK: That's what I wanted to clear up. These are in then, correct?
THE COURT: Excuse me. My law clerk has found Northern District of California instructions on point as well as -- what was it, AIPLA?
THE LAW CLERK: Yes.
THE COURT: -- has them on point. So let me just say,

I think you need to look at it.

MR. VASQUEZ: We'll look at that.

THE COURT: I mean, you know, we've started the drafting process, and that's actually what I have in my hand because I understand that we may get to it sooner than I otherwise had anticipated. We've started this, and we think you do, but you look at it, would you?

MR. SHORE: And I'll deal with it on redirect.

THE COURT: And that said, I'm going to need any supplemental -- your instructions were hopeless because they all, you know, they were all boilerplate before the trial started going. I'll give you a draft probably, and then we can work off of it.

MS. GLOVSKY: What was the year of the AIPLA in the Northern District of California?

THE LAW CLERK: I want to say 2012, but it might have been later than that. I honestly --

THE COURT: So I'm just saying focus on that issue, what I do now, because that's new to me. I haven't had one go to the jury since those cases came down.

MR. SHORE: It's only about an $800,000 difference, so...

THE COURT: Boy, Texas thinks big.

MR. SHORE: No, it is.

THE COURT: That's a big difference.

MR. SHORE: Oh, yeah, okay. Thanks.

(End of sidebar conference.)

(Noon Recess, 1:11 p.m.)

THE CLERK: All rise for the jury.

(Jury enters the courtroom.)

THE CLERK: You can all be seated.

MR. BENISEK: May I begin, your Honor? Good afternoon, your Honor, ladies and gentlemen. My name is Eric Benisek, and I represent the defendant.

CROSS-EXAMINATION

BY MR. BENISEK:

Q. Good afternoon, Mr. Ratliff.

A. Good afternoon, counsel.

Q. Mr. Ratliff, I believe you testified that you have rendered approximately 100 expert reports on patent infringement damages?

A. Roughly.

Q. Okay. How many of those reports have been excluded by the Court?

A. I've not had any reports excluded.

Q. All right. Well, let me phrase it a little bit differently. How many times have you had a Georgia-Pacific reasonable royalty analysis excluded by the Court?

A. I initially had one in Avocent/ClearCube, but then the Judge reversed that order within the last 30 days, so I've not

had any.

MR. BENISEK: Ms. Molloy, could I have the Elmo, please.

Q. Mr. Ratliff, this is Plaintiff's demonstrative, and it's slide 17. Do you recall testifying about this slide in your exhibit?

A. Yes, I prepared it as an exhibit to my original report.

Q. Okay. Now, on the first license agreement, the Boston University/Cree agreement, can you estimate for me how much money Boston University was paid by Cree in the entire 15 years of this license agreement?

A. I am aware of a list, but I don't have a number memorialized.

Q. Would it be more than $1 million?

A. So, you're specifically focused on payments by Cree, not payments as a result of the license between Boston University and Cree?

Q. What I specifically want to know, there's a Boston University/Cree agreement listed here. I want to understand all the money Cree paid Boston University while it was the exclusive licensee under that agreement?

A. Okay. So the Boston University/Cree agreements are multiple, and they include a termination agreement, which is when Boston University took back over, so if I limit to only the payments that were made by Cree during that time period, you know, there were a couple good size payments, like

1 million, there was the $250,000 up fronts, there's the $50,000 a year, so within those that you'd be adding up plus a more moderate payments that were specific to the cross licenses, the $275,000, a couple other smaller ones, so it was some number of millions, but I don't, again, have that number memorialized.
Q. Any doubt in your mind it does not exceed $3 million?
A. Prior to Boston University taking back over, that's probably a fair cap.
Q. Sure. And I'll represent to you that it is below $3 million.
A. Something less than that through that date.
Q. Okay. So we'll say -- okay. That was for the entire 11; 10, 11 years while Cree was the exclusive licensee for Boston University?
A. So, again, there's a final agreement, which is a termination agreement, so, again, focusing only on what Cree paid to Boston University, not the total amounts that came in as a result of the relationship, yes, that would be it, but there's more.
Q. Okay. And for the termination relationship -- strike that. Now, looking at the next agreement, the Cree/Bridgelux agreement, how much was Cree paid for licensing Bridgelux in that agreement, and when I say paid, how many, cash amount, dollars?

A. Right, there was an upfront payment. I'm going to look at my report unless you want to hand it to me. It was 1.5 million upfront payment, and then the royalty was going to relate to the supply agreement, which ended up not going forward.
Q. Okay. That was 1.5 million paid by Bridgelux to Cree?
A. Correct.
Q. And how much -- strike that. What did Boston University receive as a result of the licensee agreement between Cree and Bridgelux?
A. There was an agreed to amount of $1 million.
Q. Excuse me, for the Bridgelux.
A. Oh, no, sorry, hang on a second. Yes, so that one I don't think there was a separate payment.
Q. Would a payment of $250,000 refresh your recollection?
A. You know, I'm looking at my report to see where we covered that. Yeah, again, I know there was a schedule that was produced that shows these payments, so I don't remember that one specifically, but there was some payment, but I don't see it listed.
Q. Okay. And that payment was for the sublicense which Bridgelux received to the '738 patent?
THE COURT: You're speaking so softly.
MR. BENISEK: I sound loud over here, but I'll speak up.
Q. Mr. Ratliff --

A. I don't have the documents in front of me, so I'm not going to speculate, I'm sorry, counsel.
Q. Okay. But you understand that as part of the Cree/Bridgelux agreement that Bridgelux also received a sublicense to the '738 patent?
A. They did.
Q. And Boston University received some amount of money for that sublicense?
A. Again, I don't have something in front of me, so I can't comment.
Q. Okay. Now, the Cree and Ferris and Super Bright license, do you see that?
A. Yes.
Q. Could you consider those agreements to be relevant to your opinion?
A. In terms of how the general structure and for the agreed to royalty equivalent, I do, but, again, as to any amount that was actually generated, no.
Q. Do you agree these agreements are not economically significant?
A. I think the license agreement in and of itself meets a test for economic significance. The amount of royalties paid, if any, were negligible.
Q. Okay. Do you recall the testimony by Mr. Garceran yesterday where he explained these agreements generated less

than $5,000?
A. Correct.
THE COURT: What were these agreements, the Ferris and Super Bright?
MR. BENISEK: Yes, your Honor.
Q. Now, moving down, there's a heading, "Most relevant defendants in-licenses, and let's start with the Philips license." Mr. Ratliff, are you relying on the Phillips license in any way in reaching your opinions today?
A. The way in which I'm relying on all three of these are to show based again solely on what was provided. These were running royalty rate licenses that the defendants entered into either related to GaN, LED or to LED technology, and they were in a running royalty format, and so, yes, to that extent, yes, I consider them and rely upon them.
Q. Now, you understand the Phillips license agreement was not allowed into evidence?
A. That was my understanding from yesterday because Dr. Piner could not recall whether it involved GaN technology. As I indicate here, they were the most relevant defendant in-licenses. It doesn't mean they were spot on in terms of the GaN technology.
Q. Right. Dr. Piner could not establish that they related to gallium nitride, and, therefore, the Court did not allow the license agreement in, correct?

MR. SHORE: Objection. Mischaracterizes the testimony.

THE COURT: I think he didn't know, he just didn't remember.

MR. BENISEK: Ergo, he did not establish they were gallium nitride.

THE COURT: He just didn't know one way or the other.

MR. BENISEK: Okay.

Q. You understand that agreement is not in evidence in this case for the jury to consider?

A. I believe I'm allowed to rely on evidence that is not admitted, and if I explain my basis for why I relied on it and how I relied on it, they can consider it.

Q. And you think it's okay to rely on the agreement that the Court has expressly excluded?

THE COURT: Objection sustained. You'll deal with me on that.

Q. Same question for the Luminous license agreement, are you relying on that agreement for your reasonable royalty opinion today?

A. Yes, in the same way since Dr. Piner did review them, since he found the technology, the '738 patent was more --

THE COURT: I should see you at sidebar on this.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: So we've got a problem here. I didn't

admit them because he didn't lay the foundation, but he couldn't remember is really what it came down to, so he needs, if he's going to rely on them --

MR. SHORE: They're in his report.

THE COURT: They may be in his report. They've got to be reliable, so he's got to have an independent basis for understanding that they are based on analogous technology.

MR. SHORE: They're in Piner's report. Where Piner -- they didn't refresh his recollection. They're in Piner's report as comparable technology. He's relying upon Piner's report.

THE COURT: Does his report say it's based on that technology?

MR. SHORE: It does not, your Honor.

MR. EVANS: Since the license in those agreements are not --

MR. BENISEK: The reason you didn't let it in is because in his report he says it's generally related to LED technology, and when he was pushed about whether it was related to gallium nitride, he couldn't answer the question. You sustained the objection.

MR. SHORE: He said he didn't remember.

THE COURT: I have no basis for saying it relates to gallium nitride technology right now.

MR. SHORE: Well, I think the way to do this, he

should be required to show him Piner's report that he relied upon and what the basis for relying upon it was, but it's in Dr. Piner's report, which his expert can rely on in another expert's report in the different field.

THE COURT: Right, but it's got to say it in the report.

MR. SHORE: It does.

THE COURT: Excuse me, he's allowed to rely on the report. Just because the witness on the stand forgets, it's not true one way or the other if he discounted it, so you need to show him the report. You need to lay the foundation, and I'll tell the jury. I mean, I don't know what to do.

MR. BENISEK: I can't cross him on someone else's report when he's saying he's relying on it.

THE COURT: Well, I'll ask him then.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: Excuse me, sir. Were you here when I excluded the testimony involving was it the Phillips and the --

THE WITNESS: -- Luminous --

THE COURT: -- license agreements?

THE WITNESS: I was here when they tried to admit it into evidence that you were sustaining it.

THE COURT: Yes, because he couldn't remember.

THE WITNESS: Correct.

THE COURT: What are you relying on to support that

those are analogous licenses?

THE WITNESS: So they're related to LED lighting. Dr. Piner in his report specifically compared the '738 patent technology to the patented technology licensed under each of these agreements and concluded it was technologically more significant, so what that would suggest to me is that the patented technology would draw an equal or greater royalty rate, everything else being equal than the technology licensed by these in an LED light context.

THE COURT: All right. So let me just say this, it's an odd area of federal law where you remember he couldn't remember one way or the other as he was sitting here, but he's allowed to rely on an expert report, and it goes to the weight of whether or not you think that that's credible for him to be relying on that testimony at this point given that the expert couldn't remember. Because you're relying solely what Piner said in his report?

THE WITNESS: Correct.

MR. BENISEK: Thank you, your Honor.

THE COURT: In other words, he has no independent basis for knowing anything about -- not about economics but about gallium nitride technology.

THE WITNESS: I get that at home, your Honor.

Q. Mr. Ratliff, the last license agreement amongst the three, is that the Toyoda Gosei?

A. I believe so, it's an Everlight license, I think.
Q. I believe you testified on direct it was your understanding it was a license agreement related to gallium nitride technologies?
A. That's what I previously have been told, what I previously seen in Dr. Piner's report, and that's what he said on the stand yesterday.
Q. Okay. Let's take a look what you have in your own expert report. This is work paper 10.3, and I'll blow it up for you. So, Mr. Ratliff, do you recognize this as one of your work papers from your expert report?
A. Yes.
Q. Okay. So looking at the Toyoda Gosei license that I've highlighted in yellow, could you please read for us how you described the technology for this particular license?
A. Sure. I just took it straight out of the license technology relating to LEDs containing a certain new phosphors contracted products, including LEDs covered by patents and applications that contain the relevant phosphor, and, again, my understanding from Dr. Piner is that included GaN technology.
Q. Okay. So when you summarized the technology, you didn't reference gallium nitride at all?
A. I wouldn't. I not be trying to interpret the words in the agreement. It's a technical issue consistent with the Judge's comments. I wouldn't make an independent determination of the

technical significance or description. That wouldn't be my role.

Q. Well, it looks like you wrote these, "Patents relate to relevant phosphors;" is that correct?

A. Containing a certain new phosphors, but then it refers to a patent portfolio, but, again, I wouldn't be able to interpret what that includes.

Q. So you wouldn't bother to even check whether -- excuse me, Dr. Piner, what he was telling you was accurate, you are just taking his word for it, and even when you summarize the technology, and it doesn't refer to gallium nitride, that doesn't lead you to just maybe double check to see if it truly is related to gallium nitride?

A. Yeah, I don't really think that's a fair characterization. I do a lot of this work. If there's patents that claim, for example, in this case, gallium nitride, and somebody patents somebody on top of that, and they refer to the thing they referred to on top of that. I really wouldn't be going into patents and trying to work my way back. That wouldn't be a skill that an economic damages expert would have.

I relied on, again, Dr. Piner's testimony, Dr. Piner's report, and that's the basis for my understanding. I don't really check technical experts work, and they don't usually check my work.

Q. Now, Mr. Ratliff, on the --

MR. SHORE: Your Honor, we asked that that document be admitted into evidence, the one that was put on the Elmo and cross-examined.

THE COURT: What's your position?

MR. BENISEK: I'm not moving it into evidence. They can attempt to move it on cross.

THE COURT: He was wanting to do that. Do you oppose it?

MR. BENISEK: Absolutely.

THE COURT: Sustained.

MR. BENISEK: Mr. Mortensen, could you pull up defendant's demonstrative. Oh, Ms. Molloy, could you switch over?

THE CLERK: I already did. Do you want the document camera or attorney 4?

MR. BENISEK: No, up on the screen.

THE COURT: Are you done?

MR. BENISEK: No, your Honor.

THE COURT: Pick up the pace here.

Q. Mr. Ratliff, on a screen is a demonstrative that the defendants have put together, and we've attempted to capture every party that has ever taken a license to the '738 patent. Is it in front of you, sir?

A. It is.

Q. Okay. And my first question for you is what is the most

any party has ever paid for a license to the '738 patent?

MR. SHORE: Your Honor, we'd object to this exhibit. There's no evidence that anyone has paid $540,000.

THE COURT: Overruled.

A. So, I wouldn't --

THE COURT: This isn't an exhibit, it's a chalk.

MR. BENISEK: No, it's a demonstrative, your Honor.

THE COURT: That just means it's a picture drawn by the lawyer, and unless he supports it, it's to help understand the questioning.

A. Are you ready?

Q. Absolutely.

THE COURT: What's the question?

Q. The question is, your Honor, Mr. Ratliff, what is the most any party has ever paid for a license to the '738 patent?

A. So you don't have it described on here, but it would be those are all done part of one license called RPX. It's 13.5 million or something in that neighborhood was the total amount, and that was done in the same year that the patent expired.

Q. Right.

THE COURT: So what's the amount?

THE WITNESS: It's like $13,500,000. You probably got it in front of you.

Q. 13.5 million, does that sound right?

A. That sounds right.

Q. Okay. So 13.5 million, and as a result of that payment, 25 companies got a license to the '738 patent?

MR. SHORE: Objection. It's completely wrong, for one.

THE COURT: That's why you have a witness. Please sit down. Overruled. Is that a correct statement?

THE WITNESS: So RPX is an unusual entity because it aggregates IP and then sells memberships to companies who can sort of buy into the IP that is aggregated, so it would be correct to say that those entities would have gained some rights as members of RPX.

Whether they needed those rights, whether they separately paid for those rights, it's unknown. Whether they needed them in the past or only right now or possibly in the future, unknown, but as a result of the RPX structure, they did get access to those rights as part of this overall payment.

Q. Now, Mr. Ratliff, you were hearing for opening statements, correct?

A. I wasn't here, but I did read the transcript from the opening Monday statements.

Q. And you heard the counsel for BU say the entire world has taken a license to this patent except the defendants in this case; do you recall that statement?

A. Or words to that effect.

Q. Right, okay. So RPX and its members, can you list some of

the companies?
A. Well, you've got them pretty well listed there, so Apple and Blackberry and Dell and Microsoft, HP would all have been RPX members.
THE COURT: No, I keep saying it's late in the afternoon. Unless you want all of us to fall asleep, you have to keep your voices up, both of you. You know, if you stand over there, he has to speak to them and your voice goes into mic for the court reporter.
MR. BENISEK: Fair enough, your Honor.
Q. So, Mr. Ratliff, the RPX agreement and these 25 companies, Apple, Samsung, Microsoft, Motorola, that's the rest of the world counsel is referring to, right?
A. I can't say for sure, but those would be other big companies who would have obtained rights towards the very end of this patent's life.
Q. Right. They have the right or they earned the right to practice the '738 patent just like any other non-exclusive licensee?
A. I think that's fair.
Q. Okay. And when you -- well, let's do some simple math. What is the average amount attributable to each one of those 25 defendants from that $13.5 million payment?
A. Well, I think you've done the computation. I would not do the computation because you don't know which, if any, actually

needed it and used it, but you've done a computation just dividing the total amount by the total members who gained rights, and it's a little over half a million.
Q. Okay. Now, that was the largest payment that any entity has ever made to use the '738 patent, correct?
A. 13.5 million, yes.
Q. What's the next largest payment?
A. In terms of the -- so, again, we've got a structure here of Boston University to Cree, and there's certain payments made there, and then there's sublicenses paying to Cree, but I think the next biggest single payment was probably that Nichia payment that was made.
Q. Okay. That was for $1 million?
A. Yes.
Q. After the Nichia payment, what's the third largest payment ever received in the 15-year licensing history of this patent?
A. Again, as a single payment amount, maybe $275,000 as a single amount. There's some cumulative that Cree was paying with minimum royalties and upfronts that was larger, but in terms of a single amount, I think that's probably next.
Q. Okay. And the last one, the fourth largest payment ever made for a license to the '738 patent?
A. Probably the upfront payments of $250,000, which cumulate with other payments to Cree to a little over a million.
Q. Okay. How about the lowest payment? What would have been

the smallest payment in order to obtain a license to the '738 patent?

A. Again, I think you had testimony that there were a couple that were under some amount. We don't really know the amount. I see you just put them on here, $5,000 because you knew it was less than that. It looks like there's one very small one that the $232, but I think that was a running royalty towards the end of the patent, and they didn't need it for very much.

Q. And so what's reflected here is all the money that has been paid in the 15 years of licensing this patent to the rest of the world except the defendants in this case; do you agree with that?

A. I'm still struggling with your characterization at the end. This reflects the payments made, but most of these entities took licenses and didn't necessarily end up needing or using the technology when contrasted with our current case where we've got very extensive use of the technology, so it's not really an apples to apples, but it is reflective, I think, of all the cumulative payments made relative to the '738 patent.

Q. Sure, 15 years' worth.

MR. SHORE: Objection, your Honor.

THE COURT: Sustained. I strike the comment.

Q. Mr. Ratliff, you've had some testimony during your direct about commission payments and the commissions that the

defendants pay their -- is it their manufacturers' representatives?
A. Yes, I believe it was the domestic manufacturers' reps. I don't remember specifically on that as opposed to something else.
Q. Can you just explain the relevance of the commissions the defendants pay to their salespeople and how that's relevant to your reasonable royalty opinions here today?
A. Sure. I only used it as an analogy, as a representation of an amount that the defendants were willing to pay in order to get access to a certain market and make sales in that market.
There are a number of things in any business where you may make payments to get access to a market. One company could have multiple things they're making payments on to get access to a market, so I looked at the commissions that were being paid as just one data point to consider, and it was in a range consistent with the royalty rates that I considered.
Q. Let me ask you this. Do you believe the jury should consider commission payments to the manufacturers' representatives as a relevant fact for purposes of determining a reasonable royalty?
A. It would be a relevant consideration for context when we are sitting in settings like this if the folks on the jury don't have that kind of specific experience sort of

understanding how companies operate, how they may pay certain fees to have certain opportunities, sort of puts it in context. It's clearly not a license. I didn't tell you it was a license, I told you it was commissions, I told you that it was an analogy. In that context, I think it's relevant.
Q. Now, Mr. Ratliff, these commissions are paid on sales of gallium nitride products?
A. Yes.
Q. And they're also paid on sales of non-gallium nitride products?
A. That's true.
Q. They're paid on all products?
A. I don't know if it's this particular range that's paid on all products, but, yes the range that I used was on LED lighting, including gallium nitride and non-gallium nitride, but, again, it was to access the LED light market in America.
Q. So, this isn't a commission that is special to the products in this case, this is a commission that the company pays its salesmen for making a sale of any one of their products?
A. It includes the products in this case, and certainly we know from before lunch 70 percent of one defendant, 45 percent of another defendant's sales were these kind of products, so a lot of those commissions paid would be on these kind of products, so for that reason, I think it's relevant.

Q. Mr. Ratliff, I believe you testified that your firm has worked about 1500 hours or 1050, I can't remember?
A. 1500.
Q. How much is StoneTurn billed in this matter?
A. It's in the half a million dollar range.
Q. Now, Mr. Ratliff, you agree that you and I can both go out and buy blue gallium nitride LEDs, one, that there's no dispute is non-infringing, and another one where there is a dispute that it's infringing, and what I'm referring to, you know, we can both go out and buy a Cree LED blue gallium nitride, or we could buy one of the defendant's LEDs, blue LEDs, and there's a dispute about whether that one infringes. You understand the choice?
A. You're asking about the fact that Cree is licensed?
Q. No, I'm asking about the fact that Cree makes a non-infringing gallium nitride blue LED, you understand that, correct?
A. I do know that they make those. I don't know that they are the same or similar to the accused products.
MR. SHORE: Objection, your Honor. It violates the motion in limine.
THE COURT: No idea what you're referring to at this point.
MR. SHORE: Can we approach?
THE COURT: Yes, I'd have to see you.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

MR. SHORE: They're taking his royalty base, including his royalty base and including the Cree non-accused GaN products, so he's attacking his royalty base, which you said they could not do because --

THE COURT: I didn't, I didn't get that. What are you doing here?

MR. BENISEK: Non-infringing alternative, your Honor.

THE COURT: That's what I thought it was. Can I say something? Speak up, speed up. You're going to put everyone to asleep.

(SIDEBAR CONFERENCE WAS CONCLUDED)

MR. SHORE: Your Honor, I apologize, I didn't know where he was going. There's no violation.

THE COURT: It was just going in a direction different from what he thought. Every once in awhile, I have to do these sidebars, but it's a good opportunity to stand and stretch. I just want you to know how hard these guys are all working. I got a brief filed at 3:30 this morning, so some of them are a little sleep deprived. This is a marathon.

MR. BENISEK: Thank you, your Honor.

Q. So, Mr. Ratliff, the issue is this. You were here for Mr. Garceran's testimony, and he was asked about Cree's silicon carbide gallium nitride blue LEDs, and Mr. Garceran testified that it was Cree's position they are non-infringing. Do you

recall that testimony?
A. Generally.
Q. Okay. So now you understand that a company like Lite-On or a company like Everlight has a choice, they could buy that non-infringing blue LED from Cree or they could buy it from someone else?
A. My understanding from Mr. Garceran, both what he testified to and my discussions with him is not for the kind of price Epistar was giving to Lite-On and Everlight.
Q. No, but you understand --
A. This is pretty important.
Q. This is for a different point. Okay. You'll understand in a minute. So you understand that Everlight and Lite-On as the customer has the right to choose, excuse me, has the ability to choose to purchase from Cree a non-infringing blue gallium nitride LED or from someone else who may sell an accused gallium nitride blue LED?
MR. SHORE: Objection. Predicate. There's no time frame.
THE COURT: Overruled, overruled.
A. So I don't know whether or not they have that option or not based on the products they're selling. I heard Mr. Garceran's testimony. You repeated what he said, and I heard him say that.
Q. And you understand that these defendants, Everlight and

Epistar, do in fact buy Cree chips, blue gallium nitride LEDs?
A. I don't know that I know that for sure. Again, if he testified to that, I don't know to what extent that's true.
Q. Well, if Everlight and Lite-On can purchase a non-infringing chip from Cree, blue LED, and they can purchase an accused infringing chip from Epistar, what is the basis for the demand of choosing one over the other? How do you possibly conclude that Mr. Moustakas' invention is driving the choice between those two chips?
A. If the chip can be --
MR. SHORE: Objection, relevance. That's not the test.
THE COURT: Overruled. Let's get through this.
A. Part of the advantages attributable to the patented technology is the typical semiconductor of faster, better cheaper, right, so it's an improvement that would allow potentially brighter light for lower cost, less heat, other improvement elements so that it's driving it may be in part because it allows you to have a chip that's less expensive than other technologies that might be used to make a blue LED, so that was my point earlier.
Imbedded in your assumption is somehow that price doesn't matter and that something is not cheaper because of the technology. I don't know that that's consistent with my understandings of the benefits of the patent.

Q. So the customers choose because of price?
A. It's a factor in their decision. Something has to meet a minimum standard. It has to be something they can afford. It has to be compatible with the things that they're assembling for the OEMs who they're providing these packages of chips for. There's a number of things that go into buying decision.
Q. Okay. But you understand that Everlight and Lite-On have the option to purchase Cree chips, which are non-infringing, even though they may cost a little more, they can choose that option?
A. But given that the tradeoff is paying a royalty, if something costs a penny, and the royalty is four percent, that's four one-hundredths of a penny. If instead the other chip is two cents, that's really not an option. It's not an infringing alternative.
Q. So the reason I would choose the other chip is because of price?
A. You might. In other situations, it might have a brighter light, it might have more heat efficiency, it might have other benefits that for a particular OEM that you're supplying LED chips to for some other product they're making might have requirements that the Cree chips don't meet, right? So there can be other reasons why those two defendants, Lite-On and Everlight, chose to buy chips made a certain way instead of going to Cree and buying blue LEDs made another way.

Q. Right. Others reasons not attributable to Dr. Moustakas' patent?

A. Or reasons attributable to his patent because it allows features and characteristics that Cree can't simulate without also --

THE COURT: You can't guess. Do you know this technology?

THE WITNESS: I'm simply suggesting that there's not been an example of someone's decision, there can be reasons other than just the features.

MR. BENISEK: Your Honor --

THE COURT: I think you need to lay a foundation that he knows what the Cree technology is.

MR. BENISEK: My point is to show that he has no foundation about testifying what the possible demand or reasons for it.

THE COURT: Excuse me. You can ask him what is the basis for it. You're asking him about another technology.

MR. BENISEK: Right.

THE COURT: Do you know anything about the Cree technology?

THE WITNESS: There's a limited amount of information in the case, so I knew of their lights, but I don't know any of the features or the functions of the lights and specifically not the ones Everlight and Lite-On purchased, if they did, from

Cree.

MR. BENISEK: I'm going to approach the witness and hand him some exhibits, your Honor. May I approach, your Honor?

THE COURT: Yes.

Q. Mr. Ratliff, could you do me a favor and go and review paragraph 62 and 63 of your report.

A. 62 and what else?

Q. Paragraph 62 and 63.

A. Okay.

Q. Can you explain for the jury the issue of inducement infringement and why Epistar has a different royalty base or at least should have a different royalty base than Everlight and Lite-On as described in your report?

A. Right. But you understand the purpose of this report was when there was a dispute about what evidence would and would not allowed be in the case. So now I understand that dispute is resolved, opinions on the new information that were provided after my report would not be things I would rely on.

These two paragraphs specifically relate, if you will, to alternative analyses I did in the event that new information was allowed to replace the prior information, so I can explain that inducement, as you heard my testimony this morning, is where a party sells a product that someone else then incorporates into another product and then sells, and there is

an infringement that's occurring by the person that sold that product, but another party providing them a part that went into that product is potentially inducing that infringement causing it to result in infringement.

The products that Lite-On and Everlight sold were packages of chips. The products Epistar sold were just chips, and those are priced differently, but I was not provided with information in order to be able to figure out chip-related information for those packages until after I filed my report and my opinions in this case.

Q. Now, Mr. Ratliff, this is your supplemental report, correct?

A. Yes.

MR. SHORE: Your Honor, I object.

THE COURT: Sustained.

Q. Mr. Ratliff --

THE COURT: Here's what happened is that Everlight kept, and you'll hear about it, gave different numbers than it did originally, and so --

MR. BENISEK: Different issue, your Honor.

MR. EVANS: This is chip count?

MR. BENISEK: This is not chip count.

THE COURT: Then both of us are wrong. I don't know what it's about, so maybe you can amplify.

Q. Mr. Ratliff, could I have the Elmo, Ms. Molloy. So you

write in paragraph 62, "To be clear, Epistar and Everlight and Lite-On were in different positions since Epistar only got paid for the chips, whereas Everlight and Lite-On got paid for the entire package." Do you see that?

A. I do.

Q. And what are you explaining there?

A. I am focused on if additional information that was not provided to me at my report was ultimately allowed in by the Court, and I was not allowed to rely on the prior information I was given, then I might consider a different sales amount for the inducement claims against Epistar than I did for the direct infringement claims against Everlight and Lite-On.

Q. Right.

MR. SHORE: Your Honor, again, we object. This is the late information that has been objected to.

THE COURT: I don't know what it goes to. Maybe I should see you at sidebar, but we'll never get through this exam.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: Here's the issue: Since I'm not understanding it and he's not understanding it, what is this about?

MR. BENISEK: Your Honor, the issue is this, Mr. Ratliff's supplemental report admits that the right way to calculate Epistar's inducement liability is to use the chip

price. That's it. So he says it right here in paragraph 63, and he did it.

MR. SHORE: No, no, no.

MR. BENISEK: He serves his report, Mangum's serves him his rebuttal, gives him all the information, and he says --

THE COURT: About what?

MR. SHORE: About how many chips --

THE COURT: So it is a chip count.

MR. BENISEK: No, no, no, it is not a chip count. We just accused him of not using Epistar's sales. He just went straight to the packaging.

THE COURT: This is the apportionment issue? I'm just trying to understand it. Is this the apportionment issue?

MR. VASQUEZ: The inducer only collects money on the sales. Why should they have to pay damages on the customer?

MR. SHORE: He admits it right here.

MR. VASQUEZ: It's the complexity. It's the tripling of the base.

MR. SHORE: He just wants to establish he did it and he agreed to it.

MR. BENISEK: And I want to establish that he did it here.

THE COURT: I actually don't understand this.

MR. SHORE: I'm actually going to help, okay. What happened was on September 15th, late, they send a new data, new

information. We did not have the cost of what Everlight paid at the start for the Epistar chips that ended up in the Everlight products that are part of the inducement claim. They never gave us that information.

MR. BENISEK: That is not true.

THE COURT: At least I'm trying to understand it.

MR. SHORE: They finally -- now I guess they'll say they provided it in SAP, we should have figured it out. They finally provided it in written form on September 15th. They finally provided it in written form on September 15th. They said instead of using the price that Everlight paid going to their customer to figure out the damages number for Epistar of what Epistar sold them, induced them to buy, you should adjust back the amount that Epistar actually received on the induced sales.

Our whole point is that information came late, and we didn't have it, and we had a Daubert hearing on it and everything else, and if the Court concluded that we were allowed to rely upon what we had at the close of fact discovery and what we had prior --

THE COURT: Excuse me, I didn't have a Daubert hearing on anything, on this issue, for sure.

MR. SHORE: If that's what he's doing, he's saying that he wants to very adjust the number.

THE COURT: For the inducement?

MR. SHORE: For the inducement only.
THE COURT: Is that what you're trying to do?
MR. BENISEK: Yes, he has two --
THE COURT: Can I tell you, it's incomprehensible to me, and I've been living with the case for three years.
MR. BENISEK: Your Honor, we need the records.
MR. SHORE: I don't want him to do this.
THE COURT: Excuse me, the jury has to understand. If I didn't understand and he didn't understand, he thought it was chips. I thought maybe it was the apportionment or I thought -- I honestly didn't understand what you were doing, so why don't you explain.
MR. BENISEK: I will.
MR. SHORE: We have an alternative number if he gets that in.
(THE FOLLOWING OCCURRED AT SIDEBAR:)
THE COURT: Here's the debate, and I think I'm finally understanding this. I've told you now twice, and I'll tell you a third time. The numbers from Everlight were extremely confusing, and so it's led to a supplemental report as to induced damages as to what's the right way of calculating it. So I think if you accept the alternative numbers that Everlight's going to produce, I think there would be an alternative way of calculating those damages. Is that right?
MR. BENISEK: It's a little different.

THE COURT: Almost.

MR. BENISEK: A little different.

THE COURT: I'll tell you what, then you explain it. Please sit down, we have to get through this. It's been a long afternoon, and this is complicated because the numbers keep changing.

MR. BENISEK: The issue is that Epistar sells chips for a penny, and they sell --

THE COURT: Is that true? You need to ask him. You can't argue.

Q. Mr. Ratliff, you understand that Epistar sells chips to Lite-On and Everlight for one penny each?

A. Right, it's a little bit higher average than that, but it's in that ballpark.

Q. Now, what did you use for Epistar's royalty base for the inducement claim? Did you use the penny or did you use something else?

A. In my original report because I didn't know how many chips were in the packages, I used the package prices for the inducement claim, but to be clear, a package doesn't just have one chip, and based on the data that was produced, because I know everybody is worried about this new data, 70 percent of the Everlight in the new production still don't have chip counts. Only 30 percent even have chip counts.

In the Lite-On production, it's still less than half, so

we don't know how many chips are in those packages, and if it's multiple chips, if it's three, four, there was even one list of package that had 340 chips in it, so all I'm saying is you're acting like those are apples to apples, and it's not one penny versus a nickel for a package. The package is how many chips it is. We just don't know.
Q. So, Mr. Ratliff, let me get this straight. Epistar sells a chip to Lite-On for a penny, Lite-On incorporates that chip into a package and sells that package for five cents?
A. Or two chips or three chips or four chips. We don't know how many chips are incorporated into the package.
Q. Certainly not five chips if it's five cents?
A. Well, sometimes the average reflects highs and low, so there could be some that were sold at a loss and others that were sold --
THE COURT: Why don't you tell us, what was the typical package.
THE WITNESS: We don't know because less than half of the package --
THE COURT: Based on what you've got, what was the typical package?
THE WITNESS: So it was between 1 and 2 for the 30 percent.
Q. But you defaulted to 5; isn't that correct?
A. I didn't default to anything. I looked for data about the

number of chips in the package, and there being none, I used the direct sales by Everlight and Lite-On as the inducement sales for that small piece. Out of the total amount of damages for Epistar, this is less than 20 percent, but for that small piece, I used Everlight and Lite-On's sales numbers.

Q. Mr. Ratliff, it is not a small amount, going from one penny, from what Epistar sells the chip for, and charging them for five cents is a five times increase on Epistar's sales on money they never even see, they get one penny back, yet you're charging them a royalty on five cents?

A. I'm only doing that where the package only has one chip. Where the package has more, I'm doing that, and the royalty is 4 percent of a nickel, which is two tenths of a cent. The royalty I've computed is two-tenths of a penny.

Q. Right. Multiplied by many millions and millions?

A. The point is it's less than the penny sales value. It's still less than that, it just increases the rate on that penny, but it's still less than the penny. You're making it sound like my royalty is five and the thing only sells for one. That's just the royalty base. The royalty is only four percent of that number.

Q. You understand though from a legal standpoint the proper royalty base would be the Epistar chip for Epistar?

A. It would be the total number of chips that were part of the Everlight and Lite-On sales, and it would be based on

information they would provide me. I assure you had it been provided properly, I would have been happy to have used it.

THE COURT: What's your backup number if you only used a typical package of 1 to 2 chips?

THE WITNESS: For the incremental amount of?

THE COURT: Induced.

THE WITNESS: Right, induced infringement, the number goes from about 1.5 million, which is what you saw earlier, to around 800,000, so earlier I think somebody told you 700,000 or 800,000. That's pretty close.

MR. BENISEK: May I approach the witness, your Honor?

THE COURT: Yes. So if you get damages and when you're going to down the list and that induced damages period of time, that's an alternative way of thinking about it if you find that the chips are the correct way to go.

Q. So, Mr. Ratliff, you agree that chips that do not gallium nitride are non-infringing in this case, correct?

A. That's my understanding.

Q. And so to the extent non-gallium nitride chips made it into your royalty base, your base should be adjusted by some amount?

MR. SHORE: Objection, your Honor.

THE COURT: Overruled. That can be a fact question. Remember, that's the confusion, the numbers keep changing, so if some of those the jury finds were not appropriately, not

attributing any fault to you, but when Everlight comes in, some of those are not gallium nitride, how would you adjust for those?

THE WITNESS: So based on -- if there's evidence that the jury finds believable that says some of these are not gallium nitride, then you would remove that sales value from the infringing sales, again, based on the information we've gotten, there's a whole lot more that we don't know that answer on based on what's been produced than we do.

MR. BENISEK: Okay. Mr. Mortensen, could you put up Plaintiff's opening demonstrative slide Number 7.

THE CLERK: I switched.

MR. BENISEK: Thank you.

Q. Mr. Ratliff, you understand or you can see in plaintiff's demonstrative that the gallium nitride chips relate to the cover spectrum on the left, the blues, greens, purples; do you see that?

A. I see that side, yes, and I see you're talking about down here where it says GaN wavelengths.

Q. Precisely. Now, you understand the color spectrum for LED chips to the right are non-GaN, correct?

MR. SHORE: Objection. It calls for an expert opinion outside his area of expertise.

THE COURT: Yes, sustained.

Q. Do you believe that red LEDs should be in your royalty

base?

MR. SHORE: Objection calls for speculation.

THE COURT: Overruled. What was your assumption?

THE WITNESS: So my assumption was that I needed to know either from the information of the defendants or technical experts what products had GaN technology in them. What I don't understand or I'm not able to answer about the question that's being asked is GaN technology was enabling a full spectrum so there could be something that had another color but had GaN. It might not be being used at that time to be green, blue or purple, but that doesn't mean it's not still in there, it's just not being used for that purpose.

Q. So you've been here for all the expert testimony, correct?

A. Yes.

Q. And you've heard Dr. Moustakas specifically say that GaN chips are the blue and the green and the purple, correct?

A. Again, my understanding was those are what they enabled, but it doesn't mean they can't be in chips and products that have other colors, but that's uniquely what they're enabling, so I guess what I'm saying, if it's GaN technology, it's GaN technology no matter what color the LED light may actually be.

Q. All right. Let me put it this way. If you could determine a chip was yellow, red or orange, would you still keep it in your royalty base?

A. I personally wouldn't know whether that still had GaN

technology, so I would need a technical expert or I would need engineers who are identifying what different LED chips are made out of to make that assessment, and the information that was provided to me after my report just had certain fields filled in with yes, no, but sometimes with nothing, so there was no way to know.
Q. Well, for now, assume that the colors that are not identified as gallium nitride wavelengths are indeed non-GaN and non-infringing, can you assume that for now?
A. Yes.
MR. SHORE: Objection. It assumes facts not in evidence.
THE COURT: Yes, sustained.
MR. BENISEK: Your Honor, I'm just going to ask him to make a assumption that come on and fill in the holes for Mr. Ratliff.
THE COURT: No. Sustained.
MR. BENISEK: Could you please pull up the demonstrative PTX 1573.
Q. So what's on the screen, Mr. Ratliff is a demonstrative taken from Plaintiff's PTX 1573, which is one of your schedules. Do you see that?
A. Yes. These are some excerpts from that schedule, so it's not complete, and it's the one that sort of changes colors.
Q. It is, yes.

MR. SHORE: Your Honor, this exhibit was objected to. This is one of the two we did not get to earlier today.
THE COURT: They haven't moved it in yet, and if they do, you object?
MR. SHORE: Well, they're using it as a demonstrative. We object to it.
THE COURT: Overruled as an demonstrative but as an exhibit.
MR. BENISEK: Thank you, your Honor.
Q. We're going to take a look at the products identified 17-21/R7C. Do you see those?
A. Yes.
Q. Okay. Now, why don't you take the catalog out there, and the catalog is DTX-0296, and please go to page 74.
MR. BENISEK: And, Mr. Mortensen, could you put up DTX-506.
MR. SHORE: Your Honor, objection. This is a 2012 catalog.
THE COURT: Excuse me, overruled. Let me look.
MR. SHORE: The catalog is for the wrong year, your Honor.
Q. Mr. Ratliff, could you just focus in --
THE COURT: Excuse me, he did point out that it's a 2012 catalog. When was the sale?
MR. SHORE: The sales were 2011, 2013, 2008, 2009.

It's not even the same year's catalog.

MR. BENISEK: Your Honor, this is our catalog off our website and produced in litigation.

MR. SHORE: I agreed, they produced it.

THE COURT: Excuse me, let's not have this debate. I'll let you answer this question, but, but you're going to have to put in a proffer that it's the same as from the year before.

MR. BENISEK: Absolutely.

Q. So page 74, are you there?

A. I am.

MR. BENISEK: Okay. And the Everlight Part Number 17-21/R7C, could you blow that up, Mr. Mortensen.

Q. Could you tell me what color that is?

A. It says deep red.

Q. Okay. Now, let's go back to the demonstrative DTX-1573. Let's now look at the product number 264/7UYC. And now you could go to the catalog, Mr. Ratliff, page 115 and look for that same part number, and we'll call up DTX-508 on the screen. Are you there, Mr. Ratliff?

A. Page 115?

Q. Yes. Are you there?

A. On page 115.

Q. You're looking at part 264/7YC?

A. Okay.

Q. What color is this product?
A. It says super yellow.
MR. BENISEK: Okay. Let's go back to the 1573. Thank you, Mr. Mortensen.
Q. Now, we're going to look at 67/21/R6C, and, Mr. Ratliff, could you go to page 104 of the catalog, and we're going to look for that same part, 67/21/R6C.
A. Okay.
Q. What color is that part?
A. It looks like brilliant red.
Q. Okay. One more. So, back to the --
A. Get me in the holiday spirit.
Q. Back to the demonstrative, we're going to look at the last part which is 67-22-R6Y2C, and if you could go to page 98 of the catalog and look for that same part number 67-22-R6Y2C, and what are the colors of those chips?
A. 67-22R, what's next, R6.
Q. I'm sorry, 67-22-R6Y2C?
A. Brilliant red and brilliant yellow.
Q. Okay. Let's go back to you're the excerpt from your sales data, and as we can see, there's red, deep red and orange in the sales data now. I want to be fair that you're not certain whether these are GaN or non-GaN, correct?
A. That's correct.
MR. SHORE: Objection, your Honor. They're

questioning his basis. These are the ones they swore under oath.

THE COURT: I strike the comment. As I said, hotly disputed as to what numbers were given by Everlight and whether Everlight gave false numbers or not, and that's what we're going to have to hear about.

Q. And you would agree if it is explained that red, orange and yellow are non-GaN LEDs, that those should not be in your royalty base?

A. If -- well, you say if they're explained to be, so, again, if the jury believes the evidence that they are these different colors and they're not GaN, they could choose to rely on that. Again, this information was not available when I did my report.

Q. Right. If the jury chooses to believe what's in the catalog --

THE COURT: No, no.

Q. All right. A few final questions.

THE COURT: Let me ask you, did you go cross-check against the catalog?

THE WITNESS: It wouldn't do me any good because if you look on the screen, you don't see any reference to chip type. They subsequently produced some data where they added a column and they put in GaN or GaN, and something of the fields have something in them. They'll say yes or no. You don't know how you know yes or no.

THE COURT: The data you got didn't have that?

THE WITNESS: Still wouldn't have the ability to do that.

MR. BENISEK: Mr. Mortensen, could we have Demonstrative 23.

Q. So, Mr. Ratliff, I just have a couple questions with this exhibit. Could you explain the blue bars are the defendant's operating margins?

A. Yes, except for Lite-On, and I used EBITDA because it had something unusual that year that it reduced its expenses by, so I used the earnings before interest and taxes.

Q. And I just want to make sure because I might not be understanding this correctly, but if you assumed your 4 percent royalty rate, that would account for half of Epistar's operating margin?

A. Operating margin, that's correct, and remember my testimony was that includes overhead, which you were going to incur anyway. That data was not produced to allow me to find, and, again, I know you do a lot of these cases, so you know the parties' incremental margin. That's really what we want. That's somewhere in between this and gross margin, but I didn't have that, so I limited it to this just to be conservative to show there would still be a profit left even if they paid the 4 percent royalty.

Q. I see. So, notwithstanding all of the other technology

that the jury is going to hear about that goes into these products, the 4 percent, in your opinion it's reasonable to take half of the -- at least Epistar and Lite-On's operating margin; is that correct?

A. Based on my understanding of the importance of the patented technology to these types of products, yes.

MR. BENISEK: Thank you, Mr. Ratliff. I pass.

MR. SHORE: I'm sorry, can we please put up the defendant's exhibit where they had the list of parts.

REDIRECT EXAMINATION

BY MR. SHORE:

Q. Mr. Ratliff, did Everlight swear under penalty of perjury that every one of those parts included gallium nitride?

A. Yes.

Q. Did they do it not once but twice but three but four times in interrogatory responses and supplemental interrogatory responses?

A. I don't have a count, but it was multiple times.

Q. Did Everlight's lawyer also confirm that every one of those parts include gallium nitride?

A. Yes.

Q. Did we, did you operate in this case for two and a half years believing that every single one of those parts sworn to under oath and verified by the attorney contained gallium nitride?

A. That was what I believed based on the e-mail exchange and the interrogatories.
Q. And the first time Everlight tried to deny it was September 15th, 2015 after the deadline for discovery had passed, after the deadline for expert reports had passed and after the deadline for disclosing what we're going to do at trial past, right?
A. I don't know if all those deadlines, but, yes, it was September 15th, and it was after close of discovery.
Q. All right. You were asked again about a license agreement that talked about I believe it talked about phosphorous, right?
A. Yes.
Q. And what the attorneys have tried to imply, I believe, was that if it had phosphorous, it can't have anything to do with gallium nitride. Do you recall that questioning?
A. Yes.
Q. Let's take a look, if we can go to the Elmo, let's take a look at the testimony of Dr. Piner on Day 4 of the trial, page 56 starting at line 2. I'll read it to you.
"So what you're looking at here, your Honor, again, is that part right there that I just covered, I'll remove the highlight -- is the chip. The yellowish part is actually like the lid you put over it to protect the chip. And then also because -- the reason it's yellow is it contains some other materials, phosphor, for example, or phosphors, so what happens

is the blue light coming from the chip interacts with the phosphor to get some yellow light, and then the blue and the yellow together make white. And so that would be what a white LED looks like before you were to light it up." Did I read that correctly?
A. Yes.
Q. According to Dr. Piner, can you have phosphor associated with a gallium nitride part?
A. Yes.
MR. BENISEK: Objection, your Honor.
THE COURT: Overruled.
Q. Do you think it was misleading to cross-examine you on the idea that phosphor couldn't have anything to do with gallium nitride?
MR. BENISEK: Objection, your Honor.
THE COURT: Sustained.
MR. SHORE: All right. Let's put up the defendant's demonstrative where they showed all of the line of payments, I guess.
Q. All right. First of all, I want to talk to you about something called the patent exhaustion doctrine, okay?
A. Okay.
Q. The patent exhaustion doctrine is if I have a license and I sell something to Judge Saris, is Judge Saris covered by my license?

A. Generally, yes.

Q. Is everyone downstream of me who I sell to covered by my license?

A. Generally, yes.

Q. All right. So all of these companies that are listed, these 25 companies that are listed, at the time they took the license, how much life did the patent have left on it?

A. Six to nine months, something like that.

Q. So six to nine months of life. Is there any evidence that any of those companies was previously on notice of the patent?

A. No.

Q. So six months left of life, not on notice. Now, they wouldn't need a license, would they, if they bought anything from Cree because Cree was licensed?

A. Correct.

Q. What if they had bought things from Nichia?

A. They were licensed.

Q. What if they bought things from Bridgelux?

A. They were licensed.

Q. What if they bought things from Osram?

A. Again, licensed.

Q. What if they bought things from Phillips?

A. Licensed.

Q. What if they bought things from Toyoda Gosei?

A. Licensed.

Q. So let's play the game and say that these people bought, paid $540,000 for a six-month license that only covered the parts, they only needed a license for the parts they bought during a six-month period and only from these defendants?
A. Okay.
Q. The effective royalty rate would probably be what 25, 30 percent?
MR. BENISEK: Objection, your Honor.
THE COURT: Overruled.
A. It would be closer to a million a year, and here we're looking at a damages period of six to eight years, so compared to my royalty rate for the low end defendant, it would at least be double, and for some of the others, it would be more than that.
Q. Okay. So if we're going to look at numbers, do you need to consider when they were put on notice or if they were ever put on notice?
A. It wouldn't matter as to what sales they could possibly make where they would need the license because they wouldn't owe anything if they weren't on notice.
Q. When you're looking at numbers, do you need to consider whether the patent exhaustion doctrine already covered the gallium nitride parts they used?
A. So to the extent that they were already buying from people who were already licensed, they wouldn't need a license.

Q. When you were looking at numbers, unless you had the information about what they were buying, when they were put on notice, who they are buying it from, do these numbers mean anything?
A. No, they're -- I mean, at this stage, I included a discussion of the RPX agreement in my report, but I wasn't relying on it because it was so late in time, so long after the hypothetical, so my view would be not only did you not have enough information, but it was also late in time.
Q. Let's talk a little bit about RPX, okay. Does RPX -- how does RPX make a profit?
A. Selling memberships, and its organization that gives you rights to certain patent portfolios.
Q. So the 540,000 is dividing what RPX paid, correct?
A. Correct.
Q. It's not dividing what these people paid RPX for those rights, which would have some greater amount so RPX can make money?
MR. BENISEK: Objection, your Honor.
THE COURT: Overruled. Do you know?
THE WITNESS: I don't know the specific amounts they paid for their membership. I think it's in the agreement, but beyond that --
THE COURT: He doesn't know. Finish this up.
THE WITNESS: -- I don't know.

Q. Now, we do know from Mr. Redi's deposition that Samsung, the RPX member, in addition to what they normally paid, paid five and a half million dollars, right?
A. Yes.
MR. BENISEK: Objection, your Honor.
THE COURT: Overruled.
Q. And that was for a mere license where they only had license for less than a year and a half?
A. Correct.
Q. Now, when they were talking about the payments prior to the RPX deal, did they include -- included in those payments is the value that Cree received for a cross-license to a multi-thousand portfolio from Phillips?
A. That was a benefit Cree received for licensing the '738 patent.
Q. But is that benefit included in these numbers?
A. No, the focus I mentioned was solely on amounts actually being paid by Cree to BU or received by BU, which was only one part of the transaction.
Q. But the value that was received by the people who got rights includes more than the value that was passed onto BU, right?
A. That's correct.
Q. Now, a couple questions and we're going to get into one alternative. Is there any evidence in the record that Cree had

the ability to supply Everlight in any year from 2000 to 2014?
A. I'm not aware of any if you're talking about their capacity to supply.
Q. Is there any evidence in the record from 2000 to 2014 that Cree would have supplied them at a price within 10 percent of what they were buying from Epistar?
A. No.
Q. Now, you were asked if you ever considered a color in determining your analysis, right?
A. Yes.
Q. Why would you consider color and go look at catalogs if you had multiple sworn interrogatory responses and verification from lawyers sworn to be officers of the court telling you that what you were looking at and what you had used was gallium nitride LED products?
A. I wouldn't have any reason to go beyond that.
Q. Is what you're being asked to do is that you shouldn't trust the defendants, that if they swear to you, you should go verify it somewhere else?
A. I'm don't know sure for what they're suggesting.
Q. Well, if they're suggesting that their own clients can't be trusted, how can we trust them for anything?
MR. BENISEK: Objection, your Honor.
THE COURT: Sustained.
MR. BENISEK: Thank you.

Q. All right. Now, you were asked a little bit about the value of the Everlight packages versus the Epistar parts in one of your analyses, correct?
A. Yes.
Q. Let's put up a slide. We're going to put up a slide that gives the jury an alternative view if the jury decides that these packages are the real value and not the chip. Okay?
A. Okay.
Q. All right. So if the jury decides that the packages and not the chip is the value, go over and tell them what this slide means.
A. So here's what's --
THE COURT: Do you mean the reverse of that, or am I getting too late in the day?
MR. SHORE: No. If the primary driver of demand is not the chip but instead the package or something else other than the chip, this is the entire market value analysis that basically only uses the value of the chip to the extent we can calculate that.
THE COURT: I see. This isn't the inducement?
MR. BENISEK: Your Honor, I would object on the characterization of the law on that issue.
THE COURT: Overruled.
THE WITNESS: So actually, your Honor, it's both. So this number you see is smaller than the one you saw earlier

today. So what has happened with that number is I've limited the value of all of the sales made by Everlight and Lite-On outside of their damages period that related to Epistar chips to just the one cent per unit instead of whatever the package was, so that's one adjustment. In the other chart that you saw, that number was closer to 1.5 million, 1.4 something.

Then the second adjustment that this reflects is using for these other two defendants where they have provided chip information and only where they've provided chip information, I've used the chip price that they were charged by Epistar rather than the package price, but as I indicated during my cross, for Everlight, I only had chip information for about 30 percent, and for Lite-On I only had chip information for about 50 percent, so there's still more chip information missing than exists.

In the report that this additional information came with, there were some additional estimates that were done by the defendants, not real numbers, just estimates where they tried to fill in the rest, but these are the only numbers where we actually know the numbers of chips.

Q. All right. I apologize, Mr. Ratliff, I know I'm scrambling around trying to hurry. I was paying attention to you, I promise, I was listening to every word, but I'm trying to get us through here. Okay. So these numbers are an alternative to the numbers you gave before?

A. Correct, adjusted for late information about chips.
Q. Now, it will be up to the jury to decide what is the demand driver in the products, the package or the chip, right?
A. Correct.
Q. And if the chip aspects is what drives demand, then the first number you recommended are the numbers that they should use?
A. I think that's fair.
THE COURT: Other than the unique inducement issue?
MR. SHORE: Correct, other than the unique inducement, thank you, your Honor.
THE WITNESS: That's correct.
Q. Let's take a look at the data sheet. Let's blow up that line or that area. All right. Other than the size, did you hear, were you here when Dr. Piner stated that every other aspect on the data sheet relates to the performance of the chip? Were you here for that?
A. That was in his transcript testimony I read, but I don't think I was here for that part of his statements.
Q. So the information that they're actually providing their potential customers other than the size is all chip-driven?
A. Yes.
MR. SHORE: I pass the witnesses, your Honor.
MR. BENISEK: Real quick, your Honor.

RECROSS-EXAMINATION

BY MR. BENISEK:

Q. Mr. Ratliff, I believe you said if the party buys three chips, they're licensed?

A. If it's chips that are covered by the license, then generally they would be licensed, yes.

Q. Chips covered by the '738 license, right?

A. Right, which now is a non-exclusive.

Q. So well they would either be licensed or the chips are non-infringing, which we already discussed, correct?

A. I mean, I think we talked about this during my cross, right, I said if they're buying from Cree and it relates to the '738, then it's probably licensed and, therefore, not infringing.

Q. So, if any Cree chips were in the royalty base for say Lite-On, you would agree that those are non-infringing?

A. I'm not sure based on how the fact information about those particular chips came out. It wasn't clear to me that it's as clear-cut as what you're asking me now.

Q. How would Cree chips be infringing?

THE COURT: Are you talking about the Bridgelux?

MR. BENISEK: I'm just talking about Cree chips either sold pursuant to the '738 license, so they're licensed, or the Cree chips that are non-infringing.

Q. My question is if they're in the royalty base --

THE COURT: If something isn't licensed.

A. My general view would be if it's not licensed, then it would be infringing; if it is licensed, it wouldn't be, but I don't recall exactly what it is, but there's some fact issue about that.

Q. So there might be Cree chips that might be infringing; is that what you're saying?

MR. SHORE: Your Honor, at this point he's asking for an opinion on fringing.

THE COURT: At this point everyone is speculating.

MR. BENISEK: Thank you, your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you, your Honor.

THE COURT: Next witness.

MR. SHORE: Your Honor, we have a witness we're going to call on video, very short, no objections.

THE COURT: Okay. This is probably a videotaped deposition. Is that right?

MR. SHORE: Yes. We're wondering if your Honor had a chance to review.

THE COURT: Yes, but I'll deal with it later.

MR. SHORE: Because that's next.

May we give the jury a brief introduction about who this witness is?

THE COURT: Sure. Who is it?

MR. EVANS: His name, I believe, is Lee Yi Fei, and he is a Lite-On technology employee, and he testified as a corporate representative.

MR. SHORE: We'd also like to have an agreement. We do not have the swearing in on the video.

THE COURT: They're all under oath. It's a deposition. Both sides were present at the time of the deposition.

(Videotaped deposition of Lee Yi Fei was played.)

MR. SHORE: Your Honor, that concludes that proffer.

THE COURT: All right.

MR. SHORE: Our next witness is Dr. Lebby. He's going to take probably about --

THE COURT: Is he right now?

MR. SHORE: He's going to take 30, 40 minutes.

THE COURT: That's great. We'll use six minutes of it right now.

MICHAEL LEBBY

having been first duly sworn, was examined and testified as follows:

THE CLERK: Could you please state and spell your name for the record.

THE WITNESS: Michael Lebby, M-i-c-h-a-e-l L-e-b-b-y.

DIRECT EXAMINATION

BY MR. SHORE:

Q. Are you ready, Dr. Lebby?

A. I am.

Q. Please introduce yourself to the jury and the Court.

A. My name is Michael Lebby. I've been retained by the Trustees of Boston University to opine on the design sales process.

THE COURT: All right. You need to speak up a little bit into the microphone so we can all hear you.

THE WITNESS: I'm not sure I can get any closer.

Q. Okay. So your job here is to try to explain the ladies and gentlemen of the jury how these LEDs are sold; is that right?

A. That is correct.

Q. Before we get into the substance of the sales cycle for LEDs, can you please outline for us your qualifications, work experience, education and training in this area?

A. So I have four degrees, I have two doctorates, and I have an MBA, and I have a bachelor's of engineering. I have about 30 years' experience in the field of optoelectronics, which includes light-emitting diodes and laser diodes.

During that period, I've worked at places like AT&T, Bell Labs and Motorola Corporate Research. Back in 1989, while at Motorola Corporate Research, that's when I got excited about

light-emitting diodes and LEDs.

At the time I was looking doing some R & D on LEDs for light images for pagers and cell phones like Motorola produced in that time period. I also assisted Motorola sales both in the U.S., in Europe and in Asia in selling of optoelectronic devices, including LEDs and laser diodes, so I was actually one of the technical people helping Motorola at the time doing the sales. From that point, I was about ten years at Motorola, I quickly went to Tyco Electronics and then started a number of my own start-up companies using venture capital money, and at that time I actually bought my own sales and marketing teams to do sales in the business.

Q. All right. Let me show you what has been marked as PTX 1452. Can you identify Plaintiff's Exhibit 1452, please?

A. That is my C.V.

Q. All right. Is Plaintiff's Exhibit 1452 up to date, accurate and fairly reflect your work experience, education and training in the fields described?

A. Yes, it is.

Q. You talked about your education. Can you give us a little bit more detail on the degrees that you have relevant to what we're talking about here?

A. In particular, I've done an MBA, which is a master's of business, so that is supportive of the sales marketing process. As part of that degree, I focused on entrepreneurship, and you

can see the four degrees on the screen. I talked about them earlier.

MR. SHORE: Okay. Your Honor, we'd offer Plaintiff's Exhibit 1452 into evidence at this time.

THE COURT: All right.

(Exhibit No. 1452 received in evidence.)

MR. SHORE: Is it admitted?

THE COURT: Yes.

Q. Okay. All right. Let's kind of get into the meat of this a little bit. What is a manufacturer's representative?

A. A manufacturer's representative is typically a small company. It's what I refer to as indirect sales. It's a company where you would use them to extend your sales reach, for example, when I was doing startups, and I really didn't have the funding to fund a full sales team, I'd actually hire one salesperson and a bunch of manufacturing representative companies.

Those folks would be geographical located in regions where I think I would get the sales, so, for example, if you take the bay area, you'd have a number of different manufacturers in that region, probably one for like Santa Clara, one for San Jose'.

In the midwest, for example, you'd have one manufacturer's representative for like three or four states because there's not so many companies. It's a small company that actually is

paid by commissions, and they do the sales for you in areas where you really don't have the financial resources to do that reach.

Q. Do you have any direct experience in gallium nitride LED sales or that sales process?

A. Yes, I have. When I was employed at Translucent in the Bay Area, Translucent puts gallium nitride, indium gallium nitride devices and betrayers on wafers, and at Translucent, I was the GM and the local company CEO and built the sales and marketing team there to sell those products.

MR. SHORE: Your Honor, we tender Dr. Lebby as an expert in the field of LED device marketing and, in particular, the process the process or the sales process for the sale of LEDs.

THE COURT: All right. I'll let him render an opinion tomorrow morning at nine. See you.

THE CLERK: Thursday. All rise.

THE COURT: Not tomorrow, Thursday. I'm going to be here in jeans.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT: So a couple of things. I've read the depositions, and I overrule the objections, so that can be done. How much time is left for the plaintiff's case?

MR. EVANS: Your Honor, on the two that were submitted at the lunch break?

THE COURT: Yes. That's all I looked at.

MR. EVANS: Just to be clear on depositions, Mr. Evans for the plaintiff. There's still like eight transcripts we have disputes. Our intention was to get the low tech versions done and ready for you tonight. The question is how would you like us to submit? Do you want us to bring them over to the courthouse tomorrow for you? We can courier them to you somewhere.

THE COURT: I don't know what you're going to do. Let me ask you this. How much longer does the plaintiff have? Probably not very much.

MR. BELT: Probably about four hours and 45 minutes.

MR. SHORE: We're going to reserve four hours hopefully for cross and closings.

THE COURT: Right. So how much time do you have Thursday?

MR. EVANS: We got two witnesses left.

THE COURT: So you guys are doing 45 minutes?

MR. SHORE: Well, maybe an hour. He's got 25 minutes left.

MR. BELT: And I can trim down.

THE COURT: When are you going to play all these depositions?

MR. SHORE: The ones that we want to play are less than 30 or 40 minutes.

THE COURT: I think you're going to run out of time.

MR. SHORE: The others we're going to submit in transcript form.

THE COURT: Maybe.

MR. SHORE: We'll beg for your time.

THE COURT: No, you won't because you're not getting it. So the question really is I don't know that was very easy for me to rule on, so I saw it, I saw it all in context, so I don't know when you're going to get it to me.

MR. EVANS: We can just bring them Thursday morning.

THE COURT: I think that's realistically what's going to have to happen.

MR. VASQUEZ: So far clarity purposes, we should have our first witness ready to go between 10 and 11.

MR. SHORE: We need to know who you're going to call on Friday on Thursday, the order.

MR. STEINBERG: Now that you've given us your updated schedule, we'll tell you then.

THE COURT: Who do you think you're going to have?

MR. STEINBERG: We're going to have Mr. Fitzgerald first. We sent this to them yesterday, Ke Wong, then I believe Titus Chang and then Men Kuo. We're just still not sure if Titus will be here in time.

MR. SHORE: There's going to be a big battle over Men Kuo.

THE COURT: Did you list her as someone who knew about willfulness?

MR. SHORE: No.

THE COURT: Wait. You know, you're a pretty aggressive lawyer. I just asked. Read your brief.

MR. STEINBERG: They deposed her, and she revealed that she was the one that was involved in some of these conversations.

THE COURT: Did she reveal the conversations?

MR. STEINBERG: This was the waiver issue, so she was the one that dealt with Finnegan on the non-infringement opinion, she was the one who had some contact --

THE COURT: Did she disclose during her deposition the willfulness information that you are now going to use in court?

MR. STEINBERG: I believe so, your Honor, yes.

MR. VASQUEZ: She's not going to say I relied on counsel.

THE COURT: No, that's a different issue. Let's put it this way. You did not disclose, as I understand it, that she was the person who had corporate information on wilfulness, is that right?

MR. STEINBERG: No, she disclosed that in her deposition.

THE COURT: Just answer my questions. When you listed who had information, you didn't list her, right?

MR. STEINBERG: I'm not sure what the disclosure said about her, I read her deposition.

THE COURT: You've now gotten their brief. Excuse me, I just want to understand the issue. I want to understand the issue. Did you disclose her as a person, corporate representative with knowledge?

MR. STEINBERG: I don't know. I haven't gone through --

THE COURT: All right. Then I'm going to assume the answer is no, so then the issue is --

MR. STEINBERG: Can I check?

THE COURT: No, just follow. I get your point. But you're saying, even if he didn't disclose, which you probably didn't because he said you didn't, and you can't remember, you're saying as a matter of fact, she disclosed it at the 30(b)(6) deposition?

MR. STEINBERG: That's right, your Honor.

THE COURT: She said I know this information.

MR. STEINBERG: Yes, and on top of that --

THE COURT: Is all the information you're going to ask about information that was disclosed in the 30(b)(6) deposition?

MR. STEINBERG: Yes, I mean, it's stuff that they asked about. I don't know if they asked all the details that we might ask, but they were certainly well aware.

THE COURT: Let me put this to you. You're limited to the deposition.

MR. STEINBERG: What about depositions of other people? So they also deposed the two persons from Finnegan, both of our attorneys said our contact at Epistar was Men Kuo. Men Kuo was the person that sent some of this analysis over from Epistar.

THE COURT: I thought you weren't relying on advice of counsel?

MR. STEINBERG: No, we're not. I'm just trying to say they had plenty of notice of what Men Kuo's area of knowledge was.

THE COURT: Let me put it this way. As far as I'm concerned, you didn't disclose that she was a person with knowledge beforehand, whatever you call them, preliminary --

MR. EVANS: -- disclosures.

THE COURT: You say that you told them that at the deposition, you agree with that?

MR. SHORE: No. She was never disclosed as a person with knowledge of relevant facts.

THE COURT: Excuse me, I will allow her to discuss what she discussed at the deposition. That's it, nothing else. That way there's no more gotcha, surprise.

MR. VASQUEZ: So the gotcha, surprise here is that they filed a motion last night and brought witnesses, and now

you're ruling before we get a chance to submit papers on it. Can we please have the opportunity?

THE COURT: Yes, you can, but be prepared to go on that.

MR. VASQUEZ: No, we will. We understand your direction, but we want to get a full record on the facts, excluding the asked questions, and we have other people in the office trying to focus on the brief.

THE COURT: That's fine. I feel their pain. I'm trying to catch up, too, but if she's coming on Thursday, we may not have time for a full vetting.

MR. VASQUEZ: She won't be coming on Thursday because of the duration on the others.

THE COURT: My basic rule of thumb, there's no gotcha.

MR. VASQUEZ: Got it.

THE COURT: All right. If she has testified to a certain subject, you can ask about it, but if she hasn't, it can't be brand new conversations or brand new documents they've never seen. That's the rule of thumb, no unfair surprise.

MR. VASQUEZ: We will address it in that context when we file the papers.

THE COURT: All right, that's fine.

MR. SHORE: I just have a point of clarification. When she testified, she testified as a corporate representative. The case law is clear when she comes to court,

she can't testify as a corporate representative, she has to testified based only on her personal knowledge.

THE COURT: Yes.

MR. SHORE: There's no such thing as a corporate representative as a witness in trial.

THE COURT: I agree.

MR. SHORE: I'd like to make sure that they know she can't testify in anything that was in the deposition and based upon her personal knowledge.

THE COURT: Right, it's got to be admissible. Fair enough. Fair enough. Let me just, other things, I'm not going through what I went through this morning with 25 depositions that you all hadn't conferred about, not depositions, documents. You've got to confer. I don't have time to go through that in the morning. We lost 15 minutes of jury time, so that's not a good thing.

Now, on these other depositions, what will have to happen, you'll have to give them to me. You weren't able to do it probably by the close of day today. I'll be here until six anyway. You probably won't be able to get it here. I don't know if I'm going to come in tomorrow or work at home. The office is basically closed. It's a federal holiday.

MR. SHORE: Is the form that you got in earlier today that we highlight the part that we objected to, is that okay?

THE COURT: Perfect.

MR. SHORE: That's what we'll do. We'll go through. There's really not that much. We'll take the edited versions, not the full version, the edited version and just highlight the stuff.

THE COURT: If I get it Thursday morning because while I may be working tomorrow, everything is closed, everything, so you'll have to bring to it me Thursday morning, and then I will deal with it when I can and I'll hold the record open. It will not be essential to a Rule 58, believe me.

MR. EVANS: If you're going to be here until six, I've got it all back there, we could see what we can go through and give you something by six.

THE COURT: That would be acceptable.

MR. STEINBERG: I'm not sure we have time to actually write out the objections on the transcripts as I understand is what you would like.

MR. SHORE: What you got, highlighted --

THE COURT: Highlight what the objections are. You're welcome to write in the margin what the issue is, but I think I've got it. If you want to make it, I'll do it Thursday morning, but I'll let them hold the record open. You don't have much time left is your critical problem. I'm not going to allow that pile to go in. That's much more than I anticipated. Under just 403 cluttering the record, I mean, no one is going to sit and read it. I'm not even sure you need it.

MR. VASQUEZ: You allowed me to reserve some time, so I'm going to do a small brief statement before the defense case before we do the first.

THE COURT: Fair enough, fair enough. Was there anything else that we needed to --

MR. EVANS: Can we just get a clarification on how our rebuttal case works or if we get to put on a rebuttal?

THE COURT: I assume you get to put on a rebuttal.

MR. SHORE: It will have to be awful short.

THE COURT: Your problem is time, not me.

MR. EVANS: Can we recall witnesses for rebuttal I guess is the question?

THE COURT: It's time, not me. Yes, I mean, typically that's what happens.

MR. SHORE: Can you look out over the cliff without falling?

THE COURT: Are we still on line to essentially probably go to the jury on Tuesday? It's fallen behind a little bit.

MR. VASQUEZ: We'll look at our calculations. It looked like it jumped ahead. We look at our calculations, and we'll let you know.

MR. SHORE: We can ask also since we're not going to know, since tomorrow is an off day, we would be entitled to know who they are going to be calling on Monday tomorrow, can

we have them tell us who they are going to call, basically the order of witnesses through Monday by tonight so we can get ready?

MR. VASQUEZ: We won't know that, but on Thursday, we'll know that because basically had to keep people on hold in Asia to tell them to get on a plane or not get on a plane.

THE COURT: Do I need an interpreter for all these people?

MR. VASQUEZ: We'll bring in our interpreter.

THE COURT: That doubles the time.

MR. VASQUEZ: We understand we're not going to go on long.

THE COURT: That's fine. Having many people in chinese, it doubles the amount of time.

MR. SHORE: It's more than doubles. You've got to do the question and answer.

MR. VASQUEZ: They are not extensive examinations.

THE COURT: That's fine. I take it you guys aren't ready to settle?

MR. SHORE: We're ready.

THE CLERK: Okay. The paralegals need to meet with me now to go over all the exhibits.

THE COURT: By the way, you see a morphing towards treating the amount of damages as a fact question, not totally there what the base should be. They'll find what it is and

then multiply it out, and then I'll deal with post-trial judgments on the Everlight issues.

MR. SHORE: They believe what they believe.

MR. LINDGREN: It works out on the bar on that one.

MR. SHORE: Kinds of come down to credibility.

THE COURT: As to what the numbers are. Well, it's unfortunate.

(Adjourned, 4:12 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

We, Marcia Patrisso, Lee A. Marzilli, and Valerie O'Hara, Official Federal Court Reporters, do hereby certify that the foregoing transcript, Pages 5-1 through 5-259 inclusive, was recorded by us stenographically at the time and place aforesaid in Civil Action No. 12-11935-PBA, Trustees of Boston University v. Everlight Electronics, et al, and thereafter by us reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 10th day of November, 2015.

/s/ Marcia Patrisso
/s/ Lee A. Marzilli
/s/ Valerie O'Hara

MARCIA PATRISSO
LEE A. MARZILLI
VALERIE O'HARA
OFFICIAL COURT REPORTERS