IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRUSTEES OF BOSTON UNIVERSITY,<br>Plaintiff<br>-VS-<br>EVERLIGHT ELECTRONICS CO., LTD., et al,<br>Defendants | CA No. 12-11935-PBS<br>Pages 8-1 - 8-215 |

**JURY TRIAL - DAY EIGHT (REDACTED)**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES CHIEF DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts 02210
November 16, 2015, 8:46 a.m.

LEE A. MARZILLI and VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
(617)345-6787

A P P E A R A N C E S:

FOR THE PLAINTIFF:

MICHAEL W. SHORE, ESQ., CHRISTOPHER L. EVANS, ESQ., and ALFONSO GARCIA CHAN, ESQ., Shore Chan DePumpo, LLP, Bank of America Plaza, 901 Main Street, Suite 3300, Dallas, Texas, 75202.

ERIK PAUL BELT, ESQ., McCarter & English, LLP, 265 Franklin Street, Boston, Massachusetts, 02110.

FOR THE DEFENDANTS:

RICHARD C. VASQUEZ, ESQ., ERIC BENISEK, ESQ., JEFFREY T. LINDGREN, ESQ., STEPHEN STEINBERG, ESQ., and ROBERT McARTHUR, ESQ., Vasquez Benisek & Lindgren, LLP, 3685 Diablo Boulevard, Suite 300, Lafayette, California, 94549.

SUSAN G. L. GLOVSKY, ESQ., Hamilton Brook Smith & Reynolds, 155 Seaport Boulevard, Boston, Massachusetts, 02210.

## I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MENG CHUN KUO | | | | |
| By Mr. Shore: | | 8-49 | | |
| By Mr. Vasquez: | | | 8-68 | |
| By Mr. Shore: | | | | 8-69 |
| JOAN REDWING | | | | |
| By Mr. Lindgren: | 8-72 | | | |
| By Mr. Evans: | | 8-159 | | |
| BERND KAMMERER | | | | |
| By Mr. Vasquez: | 8-172 | | | |
| By Mr. Shore: | | 8-187 | | |
| EWING LIU | | | | |
| By Mr. Steinberg: | 8-188 | | | |

| EXHIBITS | RECEIVED IN EVIDENCE |
|---|---|
| Plaintiff: | |
| 35 | 8-58 |
| 1612 | 8-58 |
| 1618 | 8-61 |
| 1617, 1617 | 8-71 |
| 1619 | 8-170 |
| 1608-1611 | 8-170 |
| Defendant: | |
| 123 | 8-73 |
| 296 | 8-193 |

P R O C E E D I N G S

THE COURT: So once again you inundated me over the weekend. I expected it on jury instructions but not the rest of it, so I'm not quite sure where I start. A juror is running late, so we might have till 9:15 to get going. What's the first issue I need to resolve?

MR. SHORE: I think probably the first issue you need to resolve is the cross-examination of Meng Kuo.

THE COURT: She's still on the stand, right?

MR. VASQUEZ: She's still on the stand, but he waived it three times over the weekend.

THE COURT: No, he can cross. I'm not going to stop someone from cross-examination. He has limited time. He therefore will have a limited cross.

Okay, what's the next issue?

MR. SHORE: The next is --

MR. STEINBERG: The depo designations, your Honor?

THE COURT: The what?

MR. STEINBERG: The objections to our depo designations.

THE COURT: Excuse me, sir. I got these five minutes ago.

MR. STEINBERG: That's their objections.

THE COURT: No. I got them five minutes ago. I've given fair warning to everyone that I need 48 hours, never mind

more than five minutes. I'm not prepared to deal with those.

So, Mr. Shore, you are the author of the toxic e-mail series, and we're supposed to have civility among attorneys, and you do not exemplify civility. It's not as bad as that other e-mail, my goodness, but I don't know why you do that.

MR. SHORE: I get provoked, and I respond before I think, but --

THE COURT: Well, I think right now you shouldn't issue any more e-mails. Do it through Mr. Evans, Mr. Belt, whatever.

MR. SHORE: Okay.

THE COURT: No more e-mails, okay. It's not like this is supposed -- all right, let me just put something out here that you'll all cringe at: It's just about money. Okay? There is more toxicity in this case than in criminal cases where people are going away for 20 or 30 years. I don't quite understand it. Maybe it's because you're from California and you're from Texas and I'm from Boston, and you figure we'll never see each other again. But some of these people here are Massachusetts folks; we see each other all the time. So it's not acceptable here. So the sanction is no more e-mails.

All right, now, what's the next issue?

MR. SHORE: The next issue, your Honor, is one that I hope is really easy for you. On our corporate rep depo submissions, we are going to withdraw several, and we have cut

down the others --

THE COURT: I've already ruled on that. I'm not allowing you to put it in unless you want to play it.

MR. SHORE: That's what I mean.

THE COURT: Oh, oh, all right.

MR. SHORE: I'm putting in the ones I want to play in my closing. They're two -- they total -- one of them total --

THE COURT: No, you've got to play them as part of your evidence.

MR. SHORE: And, again, your Honor, this is the only corporate representative testimony --

THE COURT: Well, put it in as a rebuttal.

MR. SHORE: But we don't have time. That's why we want to put it in as a transcript.

THE COURT: I don't know. I don't know. I've been struggling all weekend to do jury instructions. I don't know. You know, you've done hundreds of jury objections, et cetera. I don't know, okay?

So now let me just get through your case. You had a series of questions, Mr. Vasquez, Mr. Steinberg. You seek to present 50(a) motions at the close of all the evidence, is that it?

MR. STEINBERG: Yes.

THE COURT: Well, you've already missed the hurdle for the infringement piece, not the --

MR. STEINBERG: I think, to be fair, your Honor, the deadline is before the case is submitted to the jury.

THE COURT: Well, that's the second deadline. I mean, there are two iterations of it. But that said, I'm not hearing argument. I'm not directing on anything. I'm not hearing argument. It will all be reserved for JMOL. So if you want to file something, file it, but I'm not taking the time to hear oral arguments.

MR. STEINBERG: That's fine, your Honor.

THE COURT: Okay, so file it whenever you think it's timely. I'll leave it for an appellate court to sort that out. Everything will go to this jury.

MR. STEINBERG: Okay, good. Thank you, your Honor.

THE COURT: Okay, the second issue, "We would like to confirm that the only evidence that has been left open for the plaintiff's case in chief is manufacturer representative depositions." They are entitled to play them. I'll have to figure out whether they can do it in their closing or not. I don't know the answer. That's the first time I was -- no, I'm going through their issues first. With their case in chief? Yes, that's correct. However, with respect to -- they can do rebuttal. I mean, that's fully open to them, both with respect to validity and possibly a rebuttal on infringement.

It's not limited in invalidity. Rebuttal is rebuttal. I mean, you can do a rebuttal case. The invalidity isn't

even -- the response to it isn't even considered a rebuttal. It's considered a response to your burden of proof, so I leave that up to them.

"Defendants would like to know if they have leave to introduce surrebuttal on issues." Sure. If you have time, you have time for surrebuttal. It's time is of the essence. Did I just go through your list?

MR. VASQUEZ: So, your Honor, I just wanted one point of clarification. We had no notice of this idea of playing clips in close. If he's saying --

THE COURT: On what? On what?

MR. VASQUEZ: Playing clips of the manufacturers' reps in close.

Let me just ask my question, please. Thank you.

So if I heard him correctly, he's talking about playing a clip that he's not going to play before the jury. We would object. If he plays a clip in the courtroom and the jury sees it, we don't object to playing it again in the summation, but you can't sum up evidence that the jury didn't see, and you can't introduce it for the first time in a closing argument.

THE COURT: Well, I have on occasion allowed evidence to go in; for example, documents that haven't been read to a jury. I have never been asked to do it with respect to a deposition. I don't know. As I said, I ruled under 403 I wasn't going to allow a deposition dump. If there were one or

two of them, I don't know. I don't know.

MR. VASQUEZ: We would object on the grounds that we wouldn't have any opportunity to be able to put on rebuttal evidence.

THE COURT: Yes, I have concerns about that, and I don't know why, since it's all one big time clip bump, why it matters whether it's done during a closing or done during your rebuttal case. I'm not understanding the time.

Yes?

MR. SHORE: To keep our record as clean as we can for everyone, what we would -- and, by the way, they said manufacturers' representatives in their questions. We also submitted corporate representatives, which is the tiny binder. What we would be willing to do, if the Court would entertain us for it, is, we will withdraw even offering the manufacturers' reps' depositions, except to the extent they were played during Mr. Lebby's testimony, which they're already in evidence, and if the Court will just let us put in the corporate rep, which is tiny.

THE COURT: No. I've said, under Rule 403, I'm not going to allow depositions just to be put -- I started reading them. They're complex. It's not just, like, authenticating a record or something. No. I'm allowing you to play them, okay? He can play them, and then he can comment on them.

MR. VASQUEZ: In the evidence?

THE COURT: Yes.

MR. VASQUEZ: Right. That's the only objection. I don't want him to throw up, for instance, if he wants to throw up --

THE COURT: What's our next big issue?

MR. SHORE: All right, so the next big issue is, and this is a giant issue, is, at 7:00 o'clock last night we got some what they said were demonstratives for Mr. Ewing Liu. It is clear that what they're going to put Mr. Liu on for is a full-blown expert testimony on packaging and the importance of packaging.

THE COURT: Did you take his deposition?

MR. SHORE: We took his deposition as a corporate representative. Huh? I'm sorry?

MR. EVANS: That was not a topic.

MR. SHORE: That was not a topic that he was designated for.

MR. STEINBERG: That's not correct.

THE COURT: You know what? It's his turn. Then I'll let you, Mr. Steinberg. Otherwise I lose track.

MR. SHORE: But, more importantly, your Honor, this is a dead-on Rule 26(a)(2)(C) case where you have a -- there's no way that you can say that packaging is not specialized, technical, or scientific knowledge. That's exactly what it is, so it can't come in under 701(c).

THE COURT: Did you have the opportunity to depose him on the packages?

MR. SHORE: No. He was not designated --

THE COURT: Did you depose him? Were there questions about the packaging?

MR. SHORE: No. We --

THE COURT: All right, Mr. Steinberg, do you say that he did get deposed on the packaging?

MR. STEINBERG: Thank you, your Honor. Absolutely. He was deposed. They asked him about the various features that drive demand for the products. He talked about different features of the packages during his deposition.

I also want to note, they noticed Everlight's deposition a year and a half ago. They declined to take it until the very close of discovery. That was their election. They kept canceling and delaying it, but they did finally take it. They had their opportunity at Mr. Liu. He's going to come in here and testify consistent with his deposition.

THE COURT: But nothing beyond the deposition?

MR. STEINBERG: Well, nothing beyond the topics of the deposition. It's all personal knowledge.

THE COURT: We'll see. Okay, we'll see.

MR. STEINBERG: And it's not expert testimony. He's a percipient witness testifying based on his personal experience. He's not going to be providing opinion testimony.

THE COURT: All right, that's fine.

MR. STEINBERG: That's what Rule 26 is about is if someone is going to come in and put in an opinion.

THE COURT: I'll allow him to talk about what he observed.

MR. STEINBERG: That's all we're asking for, your Honor.

THE COURT: And personally knows. Now, what's the next issue?

MR. STEINBERG: Perfect. Thank you.

MR. SHORE: Your Honor, in fact, if I may respond, there is a case which we provided the Court which is directly on point here, and it says -- and this is the *Baker* case -- and it says, "A 26(a)(2)(C) witness opinion must be based on facts or data obtained or observed in the course of the sequence of events leading to the litigation." He can't come in and give a bunch of background information. The only --

THE COURT: I agree. It's just got to be what he knows.

MR. SHORE: What he knows about the sequence that led to this litigation.

THE COURT: No. It's if he's involved with the packages or what he sees or what's being produced, like the other guy, what he saw.

MR. SHORE: Your Honor, he's a marketing rep. He's

not --

THE COURT: Well, let me put it this way: I don't even know who he is, okay? I haven't read his deposition. I will take it question by question, no opinions, the conversations he's personally had, what he has personally observed, no opinions.

MR. STEINBERG: Absolutely. That's what we did with our other --

THE COURT: Okay, that's the limiting framework. You had an opportunity to take his deposition. That's what we're doing.

MR. STEINBERG: And, your Honor, could I just ask one more --

MR. SHORE: Excuse me, Mr. Steinberg. I would just say that if we had known -- they have this big computer animation that they're trying to bring in through this guy.

THE COURT: All right, that I don't know.

MR. SHORE: And the big computer animation shows a type of package, and then it takes the package apart and shows the components of the package. This is not the package at issue in this case on 99.9 percent of the products. They're trying to show this extremely complex package and that these packages contain gold and these packages contain all this. If we had known, we would have designated an expert on this.

THE COURT: Excuse me. Have you given them notice

about that animation before this trial?

MR. STEINBERG: No. This was a demonstrative that we shared with them in compliance with the parties' agreement to exchange demonstratives.

THE COURT: But did Mr. Liu talk about this or anything where they could explore this?

MR. STEINBERG: Well, he talked about the different features of the package, which is exactly what the animation is showing.

THE COURT: You can't pop this stuff on people.

MR. VASQUEZ: It's not a moving picture, your Honor. It is a single diagram, and it --

THE COURT: Well, let me see it.

MR. VASQUEZ: The jury can't see the part because it's too small, so this is a normal blown-up diagram.

THE COURT: Wait. I can't have everyone talk at once. Let me just look at it, okay. Let me just look at it.

MR. STEINBERG: The part that is going to be shown is just the picture part, and that's what we want to show.

THE COURT: So it's the picture part. Did you ever see it before?

MR. SHORE: No. I saw it last night at 7:00 o'clock.

THE COURT: All right, objection sustained. If he wants to draw something, he can draw it. That's typical -- you can't do that at the last minute. That's part of the "gotcha"

stuff. On both sides, no "gotchas."

MR. STEINBERG: But, your Honor, the parties have been exchanging demonstratives the night before.

THE COURT: Well, then call them on it.

MR. STEINBERG: We hadn't seen the animations that they prepared. I mean, that's normally done during trial.

MR. VASQUEZ: There's a stipulation that they're due the night before.

THE COURT: Yes, but something that's brand-new, a technical thing?

MR. VASQUEZ: So this approach of not overruling it because it was given at 7:00 o'clock at night was agreed to by the parties, and it's consistent with the entire trial.

THE COURT: Excuse me. Has he ever seen anything or heard anything about this device before?

MR. SHORE: No.

MR. VASQUEZ: It's a device that's accused of infringement.

THE COURT: Is it one of the series?

MR. VASQUEZ: It's a single diagram of a package to explain. Your Honor, you've been trying to tell us to educate these jurors about the package. Our client is finally going to tell them what's inside a package. The record so far has been a travesty that a guy stood up, Dr. Piner, and said the package has no value. That's wrong. We should be able to at least

tell them what's inside a package with a photograph so that they could actually understand it, which has been the tenor of your --

THE COURT: Have they ever seen it before, any package like this?

MR. SHORE: No.

MR. VASQUEZ: Yes. This is just a blown-up diagram that shows the elements in a package. It's not controversial.

THE COURT: Have you ever shown any packages?

MR. VASQUEZ: We showed it to them at the deadlines that they agreed to. They didn't show us their animations until 7:00 o'clock the night before. We didn't object because we never saw the cartoon until the night before at 7:00 p.m.

THE COURT: That thing that looks like teeth?

MR. VASQUEZ: Yes, the thing that looks like teeth, and every single one they brought in.

THE COURT: Excuse me. Is that true?

MR. SHORE: No. We offered to show them that in September, back in September, and they declined.

THE COURT: All right, you know what, this is just a demonstrative. I'm going to allow the demonstrative to be shown, but it's going to be taken down and not offered as an exhibit.

MR. VASQUEZ: Thank you, your Honor.

MR. STEINBERG: Thank you, your Honor.

THE COURT: If that's the way it's been going.

MR. STEINBERG: Yes, we're not going to seek to admit it.

MR. SHORE: And the other thing I would say is, when you talked about what Dr. Piner said, what Dr. Piner said was in a written report, a 26 report that was sent to them weeks before trial. What they're trying to do is something that we got last night.

THE COURT: Overruled if that's been the mode of operating, but it is not an exhibit, and it is not an opinion. He's going to have to say he knows it because he's seen these packages.

MR. VASQUEZ: Understood, your Honor.

MR. STEINBERG: Your Honor, he's the worldwide marketing director for the entire company.

THE COURT: Overruled. Okay, what's the next issue? Are all the jurors here yet?

THE CLERK: No, but that's an issue.

(Discussion between the Court and Clerk.)

THE COURT: Excuse me. We have a problem with a juror, which is, the train broke down and she may be under a tunnel.

THE CLERK: But I'm not sure.

THE COURT: We're going to try and get her in a cab, but we have an hour here. What exhibits?

MR. VASQUEZ: There's an issue that we were talking about whether we do it now. Since we have time, why don't we do it now.

THE COURT: What are the issues?

Will you tell the jury to come back at 10:00.

THE CLERK: Yes. I'm going to go over and tell them, and I'm going to check with the Jury Clerk.

THE COURT: I'm sorry, just this is part of the Murphy's law.

MR. STEINBERG: Your Honor, when we do play the two deposition clips from Mr. Nijhawan and Mr. Reidy, which I believe they've submitted objections to this morning, there are two exhibits that Mr. Nijhawan talks about during his testimony.

THE COURT: What are we talking about?

MR. STEINBERG: These are two exhibits that they have objected to that would come in through the deposition testimony of Mr. Nijhawan.

THE COURT: I don't even know who he is. Is this one of the things you handed me this morning?

MR. VASQUEZ: He's BU's licensing head for most of the --

THE COURT: Yes, but I haven't even read this yet. Why don't I go upstairs and read it?

MR. VASQUEZ: That sounds good.

MR. STEINBERG: We were just trying to anticipate some other issues that could come up.

THE COURT: Yes, what else?

MR. SHORE: We did not get through Ewing Liu. We also -- they are attempting to introduce to the jury our preliminary infringement contentions and to try to show that there was some sort of attorney mistake about including red or yellow or other LEDs in our preliminary infringement contentions. Preliminary infringement contentions generally are almost universally not allowed to be brought in to the jury. It literally forces the lawyers to have to step up and try to explain. It makes them a witness. It makes them a witness in trying to explain how preliminary infringement contentions are done. It violates the local rules. It is not a sworn interrogatory response from a party. It's not a party statement, it's preliminary, and that's the whole reason why they're called "preliminary." So we don't believe that they should be publishing to the jury anything with our name on it. They even put our signature block on it and trying to say that we made some sort of a mistake. It's highly prejudicial. It puts us in the position of basically making us a witness to try to go back and explain.

THE COURT: Did you at some point amend it and change it?

MR. SHORE: Yes, of course we did. We amended it and

changed it. And then the other --

THE COURT: Excuse me. Where did you do that, in a pleading?

MR. SHORE: Yes, we did it in pleadings.

THE COURT: You changed the preliminary infringement?

MR. SHORE: We filed multiple versions of the infringement contentions in response --

THE COURT: Stop for a minute. So were you planning on putting on a first version?

MR. STEINBERG: We are not -- first of all, let me just clarify. I think the slide Mr. Shore is referring to we're not actually going to put up.

THE COURT: Okay.

MR. STEINBERG: But, also, they did not amend the list of accused products in their infringement contentions. The reason why we need to be permitted to talk about it with Mr. Liu is because this is how we have to explain what Everlight did with its sales data. There's been a ton of argument, both by Mr. Shore, there's been comments by the Court as well, about how Everlight screwed up in producing too much sales data. We have to explain that. The explanation is or part of the explanation is that they got their infringement contentions. The infringement contentions from BU included a lot of red, orange, and yellow aluminum indium gallium phosphide products. It was not limited to gallium nitride

products. We're going to show that through this witness, Mr. Liu. He is going to explain -- he's the one who verified the interrogatory response --

THE COURT: Excuse me. Mr. Shore said they amended it to eliminate those. Is the key to this that they never saw the amendment?

MR. STEINBERG: That's not correct. They only amended the technical portion of the contentions. They did not amend the list of accused products in the contentions, and in fact they filed an amended complaint late last year that added even more red, orange, yellow non-GaN products to the case, so that was late last year.

THE COURT: Let me say this: I was considering as we've been doing the jury instruction a charge that roughly models after the AIPLA charge; that if you find that Everlight hadn't produced in an appropriate way, you can draw that inference against them. So they do have a right to explain it if you want that charge.

MR. SHORE: Well, yes, ma'am, I want that charge, but let me sort of back up. We actually on the record, and I cited this in our objections to Mr. Liu's thing, we actually had a deal on the record, and the Court ruled this is how we're going to handle it. You can go in and you can explain that some of these parts are not gallium nitride parts, you can do that, and Boston University can say, "You swore they were and your

attorney confirmed they were." That's fine. But what they're trying to do is to have Mr. Ewing Liu get up and say, "When I swore to this, here's the reason why I got it wrong." That was not the deal. The deal was, they can put on the evidence of what the amount should be, but he can't get up and try to explain away something he did under oath.

THE COURT: Yes, he can if he wants. Let me put it this way: I am going to give that instruction. I was very annoyed about that. It's sort of thrown a huge monkey wrench into the damages for Everlight. It's only one piece of the case. I am going to allow them to explain it so there's no allegation of bad faith. I am going to give an adverse inference instruction, not as strong as your spoliation instruction, but an adverse inference instruction.

Now, while I'm at this, let me just move on. I had a few questions that I just wasn't even sure of. I have to be honest, I was a little surprised. Is it actually in contention whether or not the Bridgelux sales are U.S. sales?

MR. SHORE: No. Well, I don't think so.

MR. STEINBERG: Yes, well --

THE COURT: Excuse me. You know, you are the kid who sits at the front of the class and just jumps in. I can only imagine you in law school. So let me just -- are you alleging that these aren't American sales?

MR. BENISEK: Your Honor, so we will file a 50(a) in

the morning, and with Bridgelux, there are two types of sales. There are 99 percent which are accepted and delivered overseas, which makes them non-U.S. sales, and there is a 1 percent where we stipulate are shipped to California, delivery --

THE COURT: All right, so it is an issue. I missed the issue. You know, the biggest mistake I learned from this case is, never waive the pretrial memo. I actually understood, I think, the infringement and invalidity case but not the damages case as well as I should have. I didn't know that was an issue. Okay, so you're going to be putting on evidence that a fair amount of -- so I do need to put in offer to sell and sell instructions.

MR. BENISEK: Yes.

THE COURT: Good. That helps me. Two is, are you planning on challenging -- I get it that there's a challenge as to the value of the chips within the packages and the attribution issues under the single market rule. Are you claiming that --

MR. SHORE: Yes, they are.

THE COURT: -- that within the chip itself, that the claimed invention is not the whole invention?

MR. BENISEK: Well, your Honor, what you're entitled to --

THE COURT: I may be phrasing this incorrectly. That the small salable unit is the buffer?

MR. BENISEK: No, no. For purposes of this case, your Honor, we will stipulate that the small salable unit is the chip.

THE COURT: The chip. Okay, so I don't have to give that because that gets too confusing.

MR. BENISEK: Correct.

THE COURT: Okay, okay, so in doing the charge, some of these things popped up at me.

MR. BENISEK: But, your Honor, that's different than the patented feature, okay?

THE COURT: Well, in the package.

MR. BENISEK: Your Honor, the patented feature is what exists in the chip; what is it about the chip that has moved the prior art along? So you have to establish what the patent teaches; what did Mr. Moustakas do to advance the art?

THE COURT: Well, let me just say this: I think this would be confusing beyond belief to a jury. Let me just start there. It's never been litigated this way. I will listen to all the evidence, but I am leaning against giving a separate instruction that they have to decide what the market value is of the -- I don't even know how to phrase it -- the --

MR. VASQUEZ: The patented feature of the invention.

THE COURT: -- the patented feature of the invention vis-a-vis the chip. I thought the chip was the patented invention.

MR. VASQUEZ: Well, that's going to be cleared up in Mr. Mangum's testimony, but we told your Honor this at sidebar the other day that that's why this is for all the judges a judge issue and not a jury issue.

THE COURT: It isn't. Every single case and jury instruction has said the contrary. At least with respect to packages, I feel I'm on very firm ground. Suddenly I was not on firm ground when I realized you were saying there was something within the chip that was different than the patented feature. I've not heard it yet. So I will wait and hear. I am inclined not to -- I just am taken by surprise.

MR. VASQUEZ: Our last witness will be addressing the issue in his analysis.

THE COURT: All right, well, I'll be happy to hear it. The third issue is, on Taiwanese law, I'm assuming, because BU has been researching this for a while, are there any cases in the United States of America -- we could not find one -- that talks about notice to a company pre-merger?

MR. EVANS: Your Honor, we couldn't find one either, but we talked about this before trial, and they told us that this wasn't going to be an issue, which is why we didn't submit a foreign law issue to you ahead of time. They told us the only issue on notice to Epistar was going to be whether the chip that was put on notice to Epitech had the same structure as the chips that Epistar --

THE COURT: And that's fair game. Is that still the case?

MR. BENISEK: Your Honor, actually, we agree with the instruction exactly as written. There's not a dispute whether there's a successor issue. The issue is, once the notice comes to Epistar, it should be the notice at the time that Epistar takes over the company, and that's the notice sufficient for Epistar.

THE COURT: So do you agree that Epistar had notice of the Epitech conversation with Cree?

MR. BENISEK: Epistar got the Epitech letter when it took over the company.

THE COURT: All right, so that is enough to put them on legal notice, so the fact question is whether or not it was the same product.

MR. VASQUEZ: Or whether they got specific notice of the part that's at issue in this case.

THE COURT: Yes, yes, yes.

MR. VASQUEZ: That's the issue. You're correct a hundred percent.

THE COURT: That helps me because I've been starting to study Taiwanese law, which I don't want to do, and we wasted maybe three hours over the weekend trying to find a United States analog, what happens with merged companies.

MR. SHORE: That's not the issue, and I just want to

clarify what Mr. Vasquez said. The standard is not whether or not the part that Epistar was selling is exactly the same part. It's whether or not it had the same patented features in it as the Epitech. That's the issue that the jury will have to decide.

MR. VASQUEZ: No. The issue is whether you got notice that your part infringed. And so he can make his argument; I'll make my argument. I think the evidence is pretty clear, and I intend to demonstrate that.

THE COURT: Well, I don't know, but at least I don't have to spend my precious hours at this point researching Taiwanese law. And we could find nothing under federal law. I mean, I could find nothing in the patent context about -- we could find notices to agents. We could find notices but not in the patent context.

MR. VASQUEZ: The simple way to think of it is, Epistar on the day that they acquired the company, they're looking at a box, and whatever is inside that box they have notice of, and then we'll argue about what's inside that box was sufficient for the marking purpose.

THE COURT: All right, so it's whether it's the same chip and whether they --

MR. VASQUEZ: Whether there was any --

THE COURT: -- notice of that chip that they were manufacturing?

MR. VASQUEZ: Yes.

MR. EVANS: Your Honor, the legal standard is substantially similar, so is the products substantially similar? So is the Epitech chip substantially similar to the Epistar?

THE COURT: That may be. It's just I don't have to research Taiwanese law. And I'm trying to think if there were any other big questions that I had. Oh, yes, I am hoping that I don't have to deal with a big battle later on. I'm hoping that -- so, for example, each side is going to give me and I'm going to give to the jury, if this is the base -- if you include Bridgelux, this is the base; if you don't include it, this is the base, and just go through the different -- if you apportion, this is the base, if you don't apportion, and then they can multiply anything probably between 1 and 6 percent.

MR. VASQUEZ: Or a lump sum.

MR. SHORE: Or a lump sum, that's fine.

THE COURT: Or a lump sum.

MR. SHORE: What I would suggest is, Mr. Ratliff provided them two alternatives, you know, between -- I believe it was the induced is included, isn't included, that thing. And we put up a summary chart with the royalty base for each and, you know, the royalty rates, the royalty base and rates. Now, one of the things I noticed when we reviewed the transcript is, what he said was, "This figure in column

whatever, this figure in column whatever," without actually saying the figure.

THE COURT: Right.

MR. SHORE: So what we would like to do is either have -- we can bring him back and he can say -- I mean, they were taking notes.

THE COURT: No, no, no.

MR. SHORE: But we could bring him back, or we could just read those figures in.

THE COURT: But can I saying something? They don't remember. What I want is, I want each side to put forth a chalk, which I'm going to say, "This is defendants' position, this is plaintiff's, depending on different notice dates, carving out Bridgelux, carving out --" Is there a separate carve-out of Cree licensing things apart from Bridgelux?

MR. VASQUEZ: Yes.

THE COURT: "-- apart cutting out whether the sales were to and from, here are the different options that you have," just so they're not guessing at the numbers. They'll have to make facts to decide which they're going to go with.

MR. VASQUEZ: We think that's a sound approach, your Honor.

THE COURT: Because they won't even -- you know, I could have them do it; they won't remember. You'll just give it to them. You'll give them the chalk.

MR. SHORE: A debate. So we'll just have each version of the royalty base for each defendant in a chart with an explanation --

MR. VASQUEZ: We're going to do that in our close, your Honor.

THE COURT: And I won't hand them a calculator because it will make me seem like I have a thumb on the scales that they're getting there, but if they ask for one, I'll give it to them. But I view the math as being fairly straightforward -- you've got some smart people here -- as a percentage based on, and then they're going to have to come up with the denominator or whatever the base --

MR. SHORE: So I think what the Court is saying to make sure is, counsel will just come up with a chart to addend to the instruction that says, "Here are the various versions of the royalty base. You decide which one is correct," and --

MR. VASQUEZ: Your Honor, we're going to do that in our case. I don't want to have to negotiate with --

THE COURT: No, no, no, you're not going to. You're both going to --

MR. VASQUEZ: So our last witness is Dr. Mangum. Dr. Mangum will sum it up so that it's clear. He won't leave anything out. We won't ask to reopen. And then we'll show in close on two or three slides how they can attack those numbers. That's already been planned.

THE COURT: Yes, all right, thank you. Can I go off.

(Discussion between the Court and Clerk.)

THE COURT: So my basic view of life here is, we'll reconvene here at 10:00 o'clock. She is stuck on the tracks -- this is our wonderful subway system, the commuter rail system -- she is stuck on the tracks under the tunnel. We can't even send a taxi. She's coming in on the commuter rail. So I will see you all at 10:00 o'clock.

MR. SHORE: One other thing real quick?

THE COURT: Yes.

MR. SHORE: May I approach?

THE COURT: Yes.

MR. SHORE: These are the two version summary slides that there's no argument on.

THE COURT: I remember those, yes.

MR. SHORE: Okay, so what I requested of defendants is, I won't object to them offering into evidence summary slides that have the same -- no argument, just the numbers just like that, if we will also be able to put those summary slides in. Otherwise, unless he agrees to let me read that into the record, I want to make sure the appellate record has that instead of Mr. Ratliff saying, "If you look at this number in the column," whatever.

THE COURT: And we could introduce these for identification as a chalk, but you don't have everything here.

So, for example, what if they find that there was no notice and that there were different parts? You might have to have another column here? I don't know how you want to handle that. Let me put it that way. They'd be guessing, right? They'd have to go from when, from --

MR. SHORE: We can do that at closing because then if there's no notice, then it's the date of the filing of the complaint.

THE COURT: Yes, but what I'd let you do, though -- and I don't know how you want to handle it -- what I don't want is a motion for a new trial because they have no way of knowing -- we have no way of knowing how they came up with the dollar figure. It would be very difficult to try to reverse engineer this to come up with a -- what would it be, 2012? When was it?

MR. SHORE: 2012.

THE COURT: I don't know how they would do that.

MR. SHORE: So I guess the question is...

THE COURT: So, anyway, think about that. I don't know how to do that.

All right, let me go try and read these depositions.

MR. STEINBERG: Your Honor, can I raise one more issue?

THE COURT: You know, this is like the never-ending machine.

MR. STEINBERG: I apologize. I just want to get some clarification on the amount of time that the parties have left. Now, at the beginning of the day on Friday, I believe we were on the same page that the plaintiff had three hours and 20 minutes left. I had them spending 46 minutes on cross-examining Mr. Fitzgerald.

THE COURT: You know what, I'm not going to do this. Why don't you confer. Is there a difference of opinion?

MR. STEINBERG: Do you agree that it's two hours and two minutes left?

MR. EVANS: Two hours and six minutes.

MR. STEINBERG: I'm sorry. I had been told that on Friday at the exhibits conference they were claiming to have two and a half, so I just want to get some clarity on that.

MR. VASQUEZ: We'll agree it's 2.06. Agreed?

MR. SHORE: That's fine.

MR. VASQUEZ: Thank you.

MR. EVANS: Your Honor, there is one kind of big issue, though. They gave us their slides for Dr. Mangum, and he's using numbers from schedules that they produced to us during trial that were not part of his expert report.

THE COURT: I don't know. I can't deal with it now.

(A recess was taken, 9:20 a.m.)

(Resumed, 10:11 a.m.)

THE COURT: Unfortunately, the juror is still not

here. What does this do to the timing of our case? I only have us scheduled a half a day on Wednesday. When do you think you're going to finish your case.

MR. VASQUEZ: We thought we would be in the middle of Mangum at the end of the day under the original schedule, so Mangum was going to be a one-hour witness for us.

THE COURT: And then you'd have closings tomorrow?

MR. VASQUEZ: Then we'd have closings tomorrow. I was thinking we'd definitely have him in the afternoon and maybe before. I mean, it depends on how they use their time because they don't have that much time.

THE COURT: I don't know now.

MR. VASQUEZ: So we may be able to do it Wednesday morning before closings.

THE COURT: Yes, we could. The odds of my being able to -- what's bad news is, I could fit in your closings on Wednesday morning, but I don't know if the jury can stay in the afternoon. We only slotted that for half a day, so that puts jury instructions into Thursday. Maybe we could still do the closings tomorrow afternoon and do the instructions first thing Wednesday morning.

MR. VASQUEZ: Yes, that's what we were hoping. That was my plan until this.

THE COURT: But I don't know. I don't know.

MR. VASQUEZ: Okay.

THE COURT: It's really way off now. She's going to call when she hits South Station. The train is moving.

So let's go through the depositions. In my view, anything that Mr. Moustakas says back in this time period is an agent of BU, and it comes in under the admissions rule, but there is sometimes hearsay loaded within hearsay, and that's where the problem comes. Most of this, the objections are overruled. You know, George Rabstenek, he's not an employee, but the e-mail was from Moustakas. So all that comes in.

Now, the concern that I have is, occasionally there's hearsay within hearsay, and, like, what Ashley thought, and that should be blacked out.

MR. VASQUEZ: Okay, so we need to black out what Ashley thought. I mean, Ashley is BU also.

MR. SHORE: I actually think the more important thing is what Cree thought because in these e-mail you have one person -- no, it's not.

THE COURT: Well, let me just go through the e-mails. I'm now talking about Defendant's Exhibit 203 written by Moustakas. So it's an admission of a party opponent, and the question is, I think you need to -- I don't know, I can't mini-edit it.

MR. SHORE: Our concern is that --

THE COURT: Wait a minute. Excuse me. The problem is, you did an across-the-board objection which I overrule.

There may be pieces. The one that really hit me is, "I inquired with Ashley, and he does not know yet the companies to whom Cree is going to sublicense the patent." Now, I'm not sure that hurts anyone, but that piece could go out as to what Ashley knew.

MR. SHORE: Ashley is inside the department. He was the boss at --

THE COURT: Yes, but still, he's not saying it. That's Ted saying what Ashley knew, so that's hearsay within hearsay. I don't know when we go --

MR. EVANS: It's my understanding this one is no longer an issue. It's just going to be 204 and 205.

THE COURT: I see. So 204 would be the -- what Ted said is full game.

MR. VASQUEZ: That's what we think.

THE COURT: So I don't have a problem with that, so this line --

MR. SHORE: If you go back, I can show you the hearsay within hearsay on this one. So it's talking about, "Thus, Cree is not likely to --" I mean, it's talking about what Cree might do. "It appears that all of them do not want to get into litigation with each other." That is coming from Cree.

MR. VASQUEZ: Cree is their agent.

THE COURT: Can I say this: This is what's BU's state of mind is, and I will allow it for that purpose as a

hypothetical negotiation.

MR. EVANS: Your Honor, just one point of clarification.

THE COURT: Yes.

MR. EVANS: Ted is a researcher, not in the Technology Transfer Department. He doesn't do any of the licensing. That's not --

THE COURT: He's an agent. He's an agent. He's an employee, and I'm allowing it in as an admission.

MR. VASQUEZ: Thank you.

THE COURT: But the issue is that I may -- I don't know how to do this on a mini-level. Like, some of this is -- I might just say broadly, "This is for the state of mind of Boston University as it enters into hypothetical negotiations rather than for the truth of it," because that is the case; Mr. Moustakas was acting as an employee, and he was actively involved in this licensing stuff.

Now, RPX is a different story altogether because that was a 408 settlement discussion. Now, as I understand it, did the 11 -- I couldn't see that chalk when you put it up there. Does that include the $11 million figure on the chalk?

MR. VASQUEZ: If I could briefly, your Honor, answer your question. They asked him, "How did it come about that you were paying for these licenses?" and he said, "We offered them $11 million," and that's the testimony today, "because that was a number we thought they might accept," and then they ended up

accepting $13 million, and the deal is that --

THE COURT: Yes, but that's classic 408 stuff. That's classic 408. I mean, that's heartland. So that can't come in. As I understand Federal Circuit law, you're allowed discovery into this, which is how I assumed you all got it, but 408 still applies. We all get into trouble when we try and be different from the standard rules, so 408 applies. But I think the bottom-line number is permitted to show -- so the bottom-line number $13 million is in. Now, it doesn't mean all of this comes out. It just means the back-and-forth from the $11 million comes out.

MR. SHORE: But there's one other issue, your Honor. I think I can briefly summarize this. What RPX is is a company that did not exist in 2000. It didn't exist until relatively recently. And with patent litigations, these companies -- there's a couple of them, RPX is one -- what they do is, they go out in litigation that could impact a lot of people. And what they do is, they say, "We'll go out and we will try to get you, BU, a deal with all the people that are noneconomical to sue."

THE COURT: Sure.

MR. SHORE: And what we'll then do, we'll pay you a lump sum, and then we'll go out and we will get them to pay us extra, so they make a profit, a spread. That has nothing to do with the hypothetical negotiation in 2000. Let me finish

talking, please.

THE COURT: But you've got to move it along.

MR. SHORE: Right. Let me finish, please.

MR. VASQUEZ: There's no evidence of what you just said.

MR. SHORE: Yes, there is. It's in the deposition.

MR. VASQUEZ: Well, then let it in.

MR. SHORE: No, that's why it doesn't get in, because it's completely irrelevant.

THE COURT: Overruled. It is going to come in but not the stuff that's classic 408, not that "We did $11 million, and we thought it would save them the cost of litigation," and blah-blah-blah. That's 408, the back-and-forth. That comes out.

MR. VASQUEZ: Sure, I understand that. I understand that. So in the opening statement he basically told the jury, "The world beat a path to Dr. Moustakas' door because his invention was so great."

MR. SHORE: I didn't say that.

MR. VASQUEZ: He's using the piece that everybody in the world has license to this patent. We have the entitlement to show what --

THE COURT: Yes, I'm not disagreeing with that, but you've got to get out of the back-and-forth.

MR. VASQUEZ: I'll attack the $11 million. The

question is, what he basically says is, "We didn't even look at the value of the technology. We looked at what's the cost of defense for these 25 defendants." That's a complete refutation that the money came in because of the value of the --

THE COURT: Yes, objection sustained for all of this.

MR. VASQUEZ: For the yellow?

THE COURT: For the yellow, but not for the whole deposition.

MR. VASQUEZ: But not for the whole deposition, only the yellow.

THE COURT: Objection sustained. And then what you base your analysis on, overruled. I mean, that doesn't matter how long litigation goes, how much it costs, "We consider a case, we consider cost average." That's not an offer and a response. That's just what their business strategy is. That's fine. Yes, that part is in. Overruled.

Sustained. That was the $11 million figure. So I don't remember what else there was. Overruled, how many members there were and the membership. So I think I've ruled on that.

MR. VASQUEZ: So we should take the clips, show it to you guys. You guys make your objections. If there's anything left, we'll bring it to you.

THE COURT: Now, what are the two snippets you want to play as part of the --

Have we heard from her yet?
THE CLERK: No. I just saw Jimmy, the jury clerk. They haven't heard from her.
MR. VASQUEZ: Your Honor, can we get a copy of this?
THE COURT: Take it.
MR. VASQUEZ: Thank you.
MR. SHORE: I want to take it, but if he wants to read it first, that's fine.
THE COURT: We couldn't find the "substantially similar" language on the notice. You can either give that to us, or we're just going to track some case, the key case in the area. It begins with an A.
MR. EVANS: I have those cases. I could send them to you over lunch.
THE COURT: Yes, there's a case that begins with an A.
MR. VASQUEZ: We had it in our Rule 50(a) motion.
MR. SHORE: A couple of things. The Meng Chun Kuo corporate rep, not as an individual, corporate rep, they did not offer anything in response. You've already ruled on those objections. The only stuff that we want to offer as paper is this, which is a three-page deposition, which you've already ruled on. You already ruled that these three pages are all in. It's three pages long. And the reason why, this is translated, so that's why it's eleven minutes because it's translated. We don't want to play for eleven minutes something that's

translated that's only two pages long. That is our issue is --

THE COURT: Well, I'll have to read it, but I don't have a -- I mean, this is much thinner. It's not a big dump.

MR. SHORE: Then the other one is Mr. Fleming. The video is 35 minutes, and we will, frankly -- we took out the other, the Lite-On guy. This is the Everlight guy.

THE COURT: I would have to read it.

MR. SHORE: And you've already ruled on this too. But that's it as far as --

THE COURT: Let me read it. All right, so you'll call me when the woman comes down.

I had another question. We just didn't understand an objection you made. We've been working through all the objections on the charge. Hopefully we'll get you a revised charge by the time we get to the charge conference with a drop and add kind of thing, but --

MR. STEINBERG: We did send a red line of the charge. You mean the verdict form?

THE COURT: The verdict form. I'm pretty much staying with what I've got. I'm adding one little instruction. You said that if you say "no" to this -- that's fair, but I'm pretty much not changing it.

Occasionally these issues are taking me by surprise. I thought we all agreed the exemplar parts were representative of all the accused products, except maybe this red/yellow

thing, which still had to do more with damages than it did infringement. You've asked me to list all four parts. I deleted them because as far as I could tell, at least based on what I've heard so far, plaintiffs rise or fall on the same interpretation, and suddenly you want me to list them, and I've not heard evidence yet that you could differentiate them in a way that would be consistent with the stipulation.

MR. LINDGREN: So the issue was, the initial stipulation identified four Epistar products that covered specific series within the GaN group of products, okay? So Venus was going to represent the Venus products, the Lunar products, and the J Series. The Mars represented the Mars, and then there were two breakouts on the F Series products because they had different buffer layers. The F Series also have different substrates. So there is some minor distinction between them. Our defenses are all based on the nature of the non-single crystalline versus single-crystalline buffer layers.

THE COURT: For everything.

MR. LINDGREN: For everything, but there are differences when you look at some of the photos on some of the products just based on the sapphire substrate, so we're not really sure why we wouldn't identify that.

THE COURT: I don't have strong feelings about listing them versus not listing them. I haven't heard it yet. Let's put it that way.

MR. LINDGREN: Okay.

THE COURT: And I was taken by surprise because you have the stipulation that they were representative of all the accused products.

MR. LINDGREN: Now, on the non-Epistar products, fine, we understand that when you said non comes in, there had never been any discussion that non would be covered by any particular --

THE COURT: But you're saying three of the exemplars may be infringing, but the fourth isn't? Is that what the position is? That's fair enough, if that's what you're saying.

MR. LINDGREN: That's what I would worry about, correct?

THE COURT: No, not worry. I'm not going to list them unless you are taking the legal position through your -- maybe I just should wait and hear her -- that Dr. Redwing is going to say F doesn't infringe.

MR. LINDGREN: She's going to say all of them don't infringe.

THE COURT: Right, but if she's going to somehow distinguish F from the crowd.

MR. LINDGREN: Okay, well, I think she did that already in her report.

THE COURT: Well, if I do hear a distinction, it's possible that it's three of the four, then that's fair enough;

you have the right to say one of them doesn't infringe. But I'll wait to listen to it. Just I haven't heard it yet. And when you say I hear it in the report, do you have any idea how much paper you all have filed on me?

MR. SHORE: We have some idea.

THE COURT: At the end of the day, I didn't memorize every nuance of every report. So you didn't brief this. No one has argued it. I thought your basic opening statement had to do with a very clear statement that they were monocrystalline.

MR. LINDGREN: Right, and that's going to be the argument certainly.

THE COURT: But now you're telling me that there's some sub-argument about F, besides, the other three might infringe but not F.

MR. LINDGREN: Well, then let's see what happens after Professor Redwing.

MR. SHORE: Just for a point, we told them before the trial, and we'll say it now, they can pick the one that they think is the least likely to be found of infringement, and we'll try it on that one and submit that one to the jury. They've refused to do that. But, again, I think the problem is that they see it -- and I understand it. I'd probably be doing the same thing that they're doing. There's a couple that their image is a little bit sharper that show just, I mean, massive

individual crystals, you know, separate crystals; and what I think they don't want to have happen is have the jury say, "Oh, wait a minute, so if one does, they all do, that one, so that one blatantly clearly obviously does." I understand that.

THE COURT: Well, I don't. So let me just say this: It's the first time I've heard that you're trying to differentiate within the F line, and that's your right to do that because that's the exemplar. If you're going to make the argument that F doesn't infringe, then I have to put in the separate exemplars, but if she's not saying that --

MR. LINDGREN: Then let's just wait until after the testimony.

THE COURT: Just talk to her and see how far she's going to go on this, okay?

Were there other -- yes, I'm going to do something about admissions. The way I was thinking of doing it is taking Mr. Yoches' statements but then highlighting the dispute. In other words, not simply saying he admitted there were low-grain boundaries within the buffer, but there is a dispute as to whether that's consistent with the defect within a crystal versus or it signifies polycrystalline. So I'm going to put it in context, and you'll see if I've caught it.

MR. VASQUEZ: Listen to Dr. Redwing before you write that one down.

THE COURT: Can I tell you? I can't because you're

moving too fast for me. We spent all day yesterday, last night, got here early. I thought I'd have a charge tomorrow, so I may have a little more time than I thought I had. But, in any event, we're going to get you what I can get you -- what do you call it, running royalties, running objections? -- as close as I can. And that doesn't mean it doesn't stop again, but we're going to try and get you something before the charge conference.

MR. SHORE: And, your Honor, I think with that discussion about placing Yoches' statements in context, you know, as you know, a judicial admission, they can't put on evidence that contradicts a judicial admission.

THE COURT: No, but can I just say I agree with them on something? You misstated it in your opening. You haven't misstated it since, but if I remember it, because I was in the middle of that colloquy as part of the summary judgment, if I remember right, he agreed that there were low-grain boundaries, but there was a hot dispute as to what that signified.

MR. SHORE: Oh, no, I agree with that.

THE COURT: Okay.

MR. EVANS: That's the issue.

MR. SHORE: That's the issue. But then the other thing I want to make sure is on the record, when they said that the exemplars were only exemplars for series, that's not true. The stipulation was, the exemplars were exemplars for all

accused products.

THE COURT: Yes.

MR. LINDGREN: Within the series, that all the products within --

MR. SHORE: No. There are accused products way outside the series.

THE COURT: Excuse me, excuse me. That's not true. It's for all the accused products, and I specifically asked you, "Do you have any evidence as you stand here that any of them wouldn't be infringing and there would be some gross injustice?" And other than the red/yellow issue, you said "No." So the red/yellow issue is another disaster in terms of damages only with Everlight only. So I have to sort that through, and I'm making it a fact issue for the jury is basically it.

MR. VASQUEZ: I want to make sure you make that distinction really clear.

THE COURT: Well, I'm going to put it in a jury instructions that this adverse inference flows only to Everlight; it is not Epistar or Lite-On's issue. You may have a difficult time explaining that to your client, but, anyway, they must know.

(Discussion off the record.)

(Resumed, 11:17 a.m.)

THE CLERK: All rise for the jury.

(Jury enters the courtroom.)

THE COURT: So good morning still. Who was stuck on the train?

A JUROR: Four hours.

THE COURT: I am so sorry. I said that the only thing that would slow us down was Murphy's law, and this morning was proof of it. So I thank you for your perseverance in getting in here. And also I want to thank you that you called because otherwise we wouldn't have known what to do. So here we are. So we're a little behind, but, you know, still we're pretty much still on track. It just pushes us back a couple of hours. All right.

THE CLERK: You may all be seated. Ma'am, you're still under oath.

MENG CHUN KUO

having been first duly sworn, was examined and testified as follows:

MR. SHORE: May I proceed, your Honor?

THE COURT: Yes.

CROSS-EXAMINATION BY MR. SHORE:

Q. Ms. Kuo, do you know a man named Robert yea?

A. Yes.

Q. Who is Robert Yeh?

A. He is our --

THE COURT: No, you need to speak up. We need to all

hear, all right? Who is he?

THE WITNESS: He is our previous counsel in this case.

Q. No, not Robert Yoches. Robert Yeh?

A. Oh, Robert Yeh. Sorry. He's the chairman of Everlight.

Q. Yes, has he attended trial?

A. Robert Yeh?

Q. Yes.

A. No.

Q. Okay. Let me show you what we've marked as PTX 34, Plaintiff's Exhibit 34. This is a presentation to Everlight Electronics Ltd. from Cree. Now, using this -- and, by the way, there's a notebook in front of you that has these exhibits in it. So, Ms. Kuo, in 2007 Everlight came to Epistar because Cree had accused Everlight of infringing the '738 patent, correct?

A. Yes.

Q. Now, in response, Epistar chose a Venus product, a Venus chip to have reverse engineered by a third-party lab, correct?

A. Yes.

Q. Now, that Venus chip, by the way, the presentation that Cree gave, as we look on the screen in front of you, the presentation that Cree gave clearly covered Claim 19 of the '738 patent, correct?

A. Yes.

Q. And Cree used TEM images to explain to Everlight the

infringement analysis, correct?
A. That's what it shows.
MR. SHORE: And Plaintiff's Exhibit 34 is already in evidence, your Honor.
THE COURT: So was that also part of the presentation?
MR. SHORE: Yes.
THE COURT: Was that, Ms. Kuo? You saw that?
Q. In other words, Mrs. Kuo, you have it in front of you. The pages that we're going through with the TEM images, those are all part of the Cree presentation to Everlight that Everlight sent to Epistar, correct?
A. Yes.
Q. All right. Now, going back, we have Plaintiff's Exhibit 171. This is the Venus part that we've been talking about in this case, so the Venus part that Epistar sent for analysis to a third-party lab is the same Venus part that's at issue in this case, correct?
A. Yes.
Q. Now, after Epistar got notice from Everlight that Cree was accusing Everlight of infringing the '738 patent, you went and hired the Finnegan Henderson law firm in the United States to help respond on behalf of Everlight, correct?
A. Yes.
Q. And Plaintiff's Exhibit 1612, which is in your binder and on the screen, is an e-mail from you to several people

informing everyone that Finnegan Henderson had been hired, correct?
A. Yes.
Q. Now, who is Douglas Weinstein?
A. He is the counsel in Finnegan at that time.
Q. Who is Ray Wang?
A. She is our contact window in Finnegan's Taipei office.
Q. John Allison, is that another Finnegan lawyer?
A. Yes.
Q. And Robert Burns, correct?
A. Yes.
Q. Now, who is Sam Lin at everlight.com?
A. Mr. Lin is the contact window about IP matters in Everlight.
Q. And, as a matter of fact, you instructed -- the e-mail was to Sam Lin -- you instructed Everlight that they could provide them, meaning Finnegan Henderson, any necessary information to facilitate Finnegan understanding the case, correct?
A. Yes.
Q. Okay. Now, let's go to Plaintiff's Exhibit 35. Plaintiff's Exhibit 35, and we'll go to Slide 4, is a presentation that you supervised the creation of at Finnegan Henderson, correct?
MR. VASQUEZ: For the record, this is Slide 3.
MR. SHORE: I'm sorry.

Q. You're right, it's Page 3, but this presentation, Plaintiff's Exhibit 35, was on the '738 patent, correct?
A. So your question is?
Q. The presentation, the Everlight presentation that they gave back to Cree, the first question is, you were the person who supervised its creation, correct?
A. I didn't supervise.
Q. You instructed Finnegan Henderson to create it?
A. We provide the materials for them to prepare this slide because the patents at issue is multiple, so we just provide the materials they need about the chip patents.
Q. So is it your testimony that all you did was provide Finnegan materials, but you did not give them any instructions?
A. Uhm, instructions, basically we just provide the information they need so they can prepare the slides and prepare to meet with Cree.
Q. All right, well, let's play some of the deposition of Charles Wong. First of all, who is Charles Wong?
A. Huang or Wong?
Q. Yes. He's a person at Finnegan, right?
A. Charles Huang, Mr. Huang, yes.
Q. All right. Well, let's see what Mr. Huang from Finnegan says whether or not you instructed him on what to do:

(The deposition audio was played as follows:

"Question: Mr. Huang, could you state your full name for

the record. Answer: Yes. Ysin-Yuan Huang. Question: Were you part of the team that was working on analyzing Cree's patents in relation to Epistar's products? Answer: Yes. Question: And one of those patents was the '738 patent that's at issue in this lawsuit? Answer: Yes. Question: What did Epistar give you? Answer: It's an X-ray diffraction graph and TEM picture and TEM diffraction pattern. Question: Did you meet with Epistar engineers? Answer: Yes. Question: Who else did you talk to at -- do you remember anyone that you communicated with at Epistar? Answer: Miss Meng -- Meng Kuo. Question: What were your noninfringement arguments? answer: Based on the data that Epistar provided us, I determined that the, the buffer layer is single crystalline. Question: And when you say the buffer layer, what are you referring to? Answer: Referring to is the layer that, you know -- it's the layer between the device and the, and the substrate. Question: So in your noninfringement opinions, were you talking about an aluminum nitride layer? Is that what you were referring to as the buffer layer? Answer: Yes. Question: So you didn't consider any gallium nitride layers? Answer: Consider? How do you mean? Question: You didn't analyze the crystallinity of any of the gallium nitride layers? Answer: Yes. No. I mean... Question: No meaning you did not? Answer: I did not, yeah. I did not analyze gallium nitride layer. Question: Is that because the reverse

engineering that Epistar provided to you only analyzed the aluminum nitride layer? Answer: No. Based on, based on the discussion I had, I have with Epistar, they told me that the buffer layer is, is the aluminum nitride. Question: And you read the '738 patent, correct? Answer: Yes. Question: And you were aware that the claims called for a gallium nitride buffer layer, weren't you? Answer: Yes. Question: But you didn't analyze the gallium nitride layer in the device? Answer: No. Question: You focused instead on an aluminum nitride layer? Answer: Yes. Question: Exclusively? Answer: Yes. Question: Because that's what your client told you to do? Yes. Question: So your understanding at least in how you developed your opinion was that those three pieces of data that Epistar provided you all came from the same LED? Answer: Yes. Question: Were you aware that Everlight and Epistar were working jointly on this project? Answer: I believe at the time we were representing both. Question: Was anyone at Epistar besides Bruce working on this project? Answer: I think Meng, Ms. Meng Kuo also knows about this project.")

Q. All right, so, Ms. Kuo, no Mars products, no F-Series products were tested at all, correct?

A. Could you rephrase your question again?

Q. To prepare Plaintiff's Exhibit 35, no Mars products, no F-Series products were tested at all, correct?

A. Correct, because Everlight told us they are using Venus

products, so that's why we sending the Venus products to analysis.
Q. So, again, when someone says -- because I believe you were asked on direct whether your products infringed. The only products that were even looked at in relation to Cree's allegations were the Venus products, correct?
A. That's what Everlight told us.
Q. Is that a "yes"? The only products that were looked at were Venus products?
A. Yes.
Q. Okay. Now, and what you instructed Finnegan to do was to ignore the gallium nitride part of the device, correct?
MR. VASQUEZ: Objection.
A. That's not correct.
Q. So your lawyer, Epistar's lawyer when he testified that he was instructed to ignore the gallium nitride part of the device, you disagree with him?
A. I don't believe that's what he said.
Q. Okay. Now, the presentation, Plaintiff's Exhibit 35 -- and you have it in front of you -- this is what you and Epistar intended to be provided to Cree by Everlight, correct?
A. Like I said, that's how we helped Finnegan to prepare the slides for the meeting with Cree.
Q. And Finnegan were lawyers for Epistar, correct? You were paying them?

A. Yes.
Q. And you were paying them to prepare a presentation to present to Cree on behalf of Everlight, correct?
A. Yes.
Q. And nowhere in that presentation does the word "Epistar" ever appear, does it?
A. I want to clarify that we are just responsible for the part related to chip patents because in the presentation, you can tell there are other package patents involved.
MR. SHORE: I'm going to object as nonresponsive, your Honor.
Q. No where in --
THE COURT: A, you have to wait for me to rule.
MR. SHORE: I'm sorry.
THE COURT: B, I couldn't understand what she said, so you can either --
Q. This is a very simple question: Nowhere in Plaintiff's Exhibit 35 does the name Epistar ever appear, does it?
A. Yes.
THE COURT: Well, it does appear?
THE WITNESS: No appear.
THE COURT: It doesn't appear.
THE WITNESS: Thank you.
Q. All right, let's take a look at --
MR. SHORE: And, by the way, we will offer Plaintiff's

Exhibit 35 into evidence.

MR. VASQUEZ: Your Honor, we wanted it in evidence before. If he wants it in now --

MR. SHORE: Objection to the sidebar comment.

THE COURT: Yes, I strike the comment. I allow it in, 35.

(Plaintiff Exhibit 35 received in evidence.)

Q. Now, let's take a look at Plaintiff's Exhibit 1618.

MR. SHORE: And, by the way, your Honor --

THE COURT: Let me just say this: I think there's a little bit of a language barrier here, so when you ask the double-negative kinds of questions, I think that's not a good way to proceed here.

MR. SHORE: Correct.

THE WITNESS: Thank you.

MR. SHORE: We would also offer Plaintiff's Exhibit 1612 into evidence. That's the e-mail from her to Everlight stating that they're hiring Finnegan Henderson.

THE COURT: All right.

(Plaintiff Exhibit 1612 received in evidence.)

Q. Now, Plaintiff's Exhibit 1618, would you take a look at that in your notebook, please. Now, 1618 is a contract between Everlight and Epistar related to preparing to answer the Cree allegations, correct?

A. Yes.

Q. And could you turn to Page 4, the last page of that agreement, and tell the jury who signed on behalf of Epistar and who signed on behalf of Everlight.
A. It shows the agreement was signed by Everlight's chairman, Mr. Robert Yeh, and Epistar's president, Mr. Bingjie Li.
Q. Now, Exhibit 35 that is in evidence, and you've got it in front of you, a copy in front of you, how many patents are analyzed in Exhibit 35?
A. May I take a look?
Q. Yes, ma'am.
(Witness examining document.)
Q. I believe it's four.
A. Yes, there are four patents.
Q. And more than half of the presentation is devoted to the '738 patent, isn't it?
A. May I count the pages?
Q. You don't need to. I think the jury can count the pages when they get it. All right, in the Joint Interest and Confidentiality Agreement, Everlight was banned from telling Cree where the parts came from that Cree was accusing, weren't they?
A. I don't understand your question.
Q. Okay. Well, the agreement is in evidence. We'll talk about that on closing. If Epistar did not believe that -- well, we'll talk about that.

THE COURT: Just ask a straightforward question. I think she's losing you in the question.

Q. You were asked by Mr. Vasquez on direct whether Cree ever mentioned the '738 patent during negotiations, and you stated "Never." Do you remember that testimony?

A. Yes, that's right.

Q. Okay. But if you take a look at patent discussions between Cree and Epistar dated October 21, 2010 -- this was presented to you at a meeting in San Francisco, wasn't it?

A. Yes.

Q. What patent is mentioned on Page 9 of that presentation?

A. It shows '738.

Q. Now, let's go to Plaintiff's Exhibit 1616. Plaintiff's Exhibit 1616 is a disclosure related to the merger between Epitech and Epistar, correct?

MR. VASQUEZ: Objection, your Honor, beyond the scope of direct under 611(b). There were no questions on Epitech of this witness. They could have asked it of the witness that testified about it.

THE COURT: Overruled. What's the question? What is the question?

Q. This document is a disclosure related to the merger between Epistar and Epitech, correct?

A. I need to look into the documents.

MR. SHORE: While she's doing that, your Honor, we

would offer Exhibit 1618 into evidence. That's the contract between Epistar and Everlight related to responding to the Cree allegation of infringement of the '738 patent.

THE COURT: Allowed.

(Plaintiff Exhibit 1618 received in evidence.)

Q. And particularly, so you understand what the Document 1616 is, Ms. Kuo?

A. Yes, but you just mentioned about the merger. I need to look into the documents, which part you mentioned.

Q. All right, why don't you take a look at this chart right here that is from the document. It's in Chinese, and there is an English translation which is the next exhibit, Exhibit 1617. But if you look on this slide, there are some names of people, correct?

A. Yes.

Q. And one of those names, and I may not pronounce this correctly, is Zepeng Chen, correct?

A. First one?

Q. No, why don't you just read me the names listed down in order.

A. The first one is Mr. Li Bingjie, and the second one is Mr. Chou Mingjun. The third one is Mr. Chen Zepeng. The last one is Mr. Du Quancheng.

Q. All right, are any of those men also known as S.M. Chen?

A. No. There is not S.M. Chen.

Q. All right. Mr. Zepeng Chen, you're saying his name is not listed here?
A. S.M. Chen?
Q. The way I have it is Z-e-p-e-n-g Chen.
A. Based on the pronunciation, I believe it's the third one, Mr. Chen Zepeng.
Q. All right, I'm sorry, I don't speak Chinese, and I apologize. All right, but you believe that's the third person listed on this document?
A. Yes, that's Chen Zepeng, not S.M. Chen.
Q. All right, now, do you know that man?
A. Know what?
Q. Do you know this man, the third man listed? Do you know him?
A. Yes.
Q. All right, tell the jury who he is.
A. It shows he is the Board member of -- you mean on the page or in Epistar?
Q. Just tell us who he is. Based upon your knowledge of him, tell us who he is.
A. He is a current consultant in Epistar.
Q. All right, who did he used to be a Board member of?
A. Frankly speaking, I don't know.
Q. How is he described on this document?
A. On this document it shows Mr. Chen is the Board member,

one of the Board member in Epitech.
Q. Right. So after the merger, though, he continued to work for Epistar, correct?
A. Yes, because Epitech is already banished at that time.
Q. Agreed, but after the merger, he continued to work in Epistar, correct?
A. Before the merger, he already works in Epistar.
Q. Okay. So when the jury looks at who at Epitech received the notice, that's the man listed here in the document about the merger between the companies, isn't it?
A. That's not correct. Based on the letter I see in the trial, Mr. S.M. Chen, he is not this Mr. Chen.
Q. Well, who is S.M. Chen?
A. S.M. Chen?
Q. Yes.
A. He is the president or chairman in Epitech at that time.
Q. Did he continue to work at Epistar or have a Board seat at Epistar after the merger?
A. No.
Q. Where did he go?
A. I don't know. He left.
Q. So you have no idea what happened to the chairman of Epitech after the merger?
A. I don't know.
Q. Were you there?

A. Where?
Q. At Epistar at the time of the merger, were you there?
A. Yes.
Q. Now, Mr. S.M. Chen would have been a major stockholder in Epistar, wouldn't he?
A. I don't know.
Q. Well, I guess the translation of the document will point that out. Let's talk about -- well, you testified also on direct: "Now, why do you research with the University of California at Santa Barbara?" you were asked, and you said "Because Dr. Nakamura's lab is there." And then without being asked this, you state, "Dr. Nakamura invented the blue LED, which he received the Nobel Prize in 2014 because of it." That's what you testified, correct?
A. Yes.
Q. So is your testimony that Dr. Nakamura and Epistar have a close working relationship?
A. I don't believe that's what I said there. I just said we have cooperation with his lab.
Q. All right, but you're not trying to tell this jury that you have cooperation with Dr. Nakamura, are you?
A. I don't understand your question.
Q. Now, and you state here that Dr. Nakamura invented the blue LED. Are you aware -- Plaintiff's Exhibit 185 -- that Dr. Nakamura actually gave a presentation --

MR. VASQUEZ: Objection, your Honor. This is not in evidence. The objection was previously sustained, so this shouldn't be shown to the jury.

THE COURT: I sustained it as to admitting the document, but I didn't say he couldn't ask a question.

MR. VASQUEZ: He shouldn't be able to show a non-admitted exhibit.

THE COURT: Well, why don't you show it to her.

MR. SHORE: She has a copy right in front of her.

MR. VASQUEZ: Can he take it off the screen until it's in evidence?

A. So which one I should look into?

Q. The one I want to show you when you gave the jury testimony that Dr. --

THE COURT: Let me just say this: There is no issue before you, and I will tell you about it again in the jury instructions, about who invented this patent, so that is not an issue. There are other questions of invalidity, whether it was enabled, whether it was an adequate written description, but who invented it is not a question that will be before you.

Q. But, anyway, when you stated, Exhibit 185, when you stated Dr. Nakamura alone invented the gallium nitride LED, were you aware that in his presentation to the Nobel Committee, that he listed Dr. Moustakas, his invention of the '738 patent as a major achievement in the development of blue LEDs?

MR. VASQUEZ: Objection, your Honor. First --

THE COURT: Overruled.

MR. VASQUEZ: First, Mr. Shore --

THE COURT: Overruled. Were you aware of that?

THE WITNESS: No, I was not aware of this.

MR. SHORE: Can I put it up now, your Honor?

THE COURT: No.

Q. So you weren't aware of the slide show that he presented to the Nobel Committee where he listed several --

THE COURT: Why don't you show it to her. What page do you want her to be --

MR. SHORE: She has it, your Honor.

THE COURT: Okay, take a few seconds.

MR. SHORE: Page 35, Page 35 of that presentation. This is what it looks like, Ms. Kuo.

THE WITNESS: I'm sorry. Let me find the document.

(Witness examining documents.)

Q. Do you have it in front of you?

THE COURT: Okay, just take a second and read down the list of people who contributed to the GaN and buffer layer and see if that refreshes your recollection.

A. May I inquire, is the page titled "Gallium Nitride on Sapphire Research"?

Q. Yes, "Gallium Nitride on Sapphire Research," part of the Nobel Prize Committee presentation of Dr. Nakamura.

MR. VASQUEZ: Objection, lacks foundation.
THE COURT: Overruled. Look at it. Does that refresh your recollection?
(Witness examining document.)
THE WITNESS: I haven't seen this before.
Q. Who is the only non-Japanese person listed by Dr. Nakamura as having an achievement --
THE COURT: Sustained. She doesn't know it. She hasn't seen it.
Q. So, in other words, when you gave the jury the opinion that it was Dr. Nakamura alone who invented the blue LED, you hadn't seen Dr. Nakamura's own words about who did it?
MR. VASQUEZ: Objection. She never stated alone. He's misrepresented it twice.
THE COURT: Yes, sustained, sustained.
MR. VASQUEZ: Thank you.
Q. When you stated that Dr. Nakamura invented the blue LED, you were not aware of who Dr. Nakamura had credited with help in that invention, were you? You weren't aware of that?
MR. VASQUEZ: Objection.
THE COURT: Overruled. Did you know anything about who Dr. Nakamura rested his work on?
THE WITNESS: No.
THE COURT: All right, move on.
MR. SHORE: Pass the witness, your Honor.

REDIRECT EXAMINATION BY MR. VASQUEZ:

Q. On Friday you testified that your opinion, based on your education and experience and reading the patent, was that Epistar's Venus chip did not infringe. Have you changed that opinion at any time since you came to it before you talked to the attorneys?

MR. SHORE: Objection, calls for an expert opinion.

THE COURT: Yes, sustained, sustained. This is beyond. She's only testifying as somebody who works at Epistar, not as an expert witness.

Q. Before you contacted Finnegan, was it your opinion and your personal belief and the belief of Epistar that the Venus chip did not infringe?

MR. SHORE: Objection.

THE COURT: Overruled. This goes to the state of mind of the corporation back then. I'll allow that because you'll have to answer questions on willfulness. I'll allow that.

A. Yes, that's my belief.

Q. When you met with attorneys and talked to them about it, did you change your opinion in your own mind that Epistar did not infringe?

MR. SHORE: Objection, based on --

THE COURT: Overruled.

MR. SHORE: -- waiving the attorney-client privilege.

THE COURT: Oh, yes, yes, sustained as phrased.

Q. At any time after you talked to different people, including the attorneys, was your belief --

THE COURT: I strike the "including the attorneys."

MR. VASQUEZ: Okay.

Q. Before you talked to the attorneys, were you confident in your belief that the products didn't infringe?

A. Yes.

Q. Are you confident today in that?

A. Yes.

Q. Thank you. You were asked about the 2010 negotiations. Did anyone from Cree ever tell you, "We think you infringe and we might have to sue you on the '738"?

MR. SHORE: Objection, hearsay.

THE COURT: Overruled.

A. No. They just pass me the list, and they even didn't go through the pages, so, frankly speaking, I don't know what's inside.

Q. Do you mean to say that there was no actual oral discussions about the '738?

A. No. They just said they have bunch of good patents and we should take a good look.

MR. VASQUEZ: No further questions. Pass the witness.

MR. SHORE: Very briefly, your Honor.

<u>RECROSS-EXAMINATION BY MR. SHORE</u>:

Q. You were here for Julio Garceran's testimony, correct?

A. I'm sorry.
Q. Julio Garceran from Cree, you were here for his testimony, correct?
A. Yes.
Q. And you were here when he said that he went over the '738 patent with you at that meeting in San Francisco? You heard him say that, right?
MR. VASQUEZ: Objection, misrepresents testimony.
THE COURT: Overruled.
A. I don't -- I don't recall he say that.
Q. And that he said the only reason why they didn't give you claim charts again with reverse engineering is because you already had them through Epitech? You heard him say that as well?
THE COURT: But you've got to ask her a question.
Q. In other words, were you here --
THE COURT: Not "Were you here?" Is that true? Is that what happened?
THE WITNESS: That's not true. The people I met from Cree is Mr. George Brandes. I never met Mr. Garceran before the trial.
MR. SHORE: Your Honor, we'd offer PTX 1616 and PTX 1617 -- that's the certified translation into evidence --
THE COURT: Well, I hear no objection. That's fine. Well, wait a minute, 1616 is a --

MR. SHORE: 1616 is the Chinese.

THE COURT: Chinese, and 1617 is the translation?

MR. SHORE: Certified translation.

THE COURT: I'll allow that.

(Plaintiff Exhibits 1616 and 1617 received in evidence.)

Q. So it's your testimony to the jury that you received a presentation from Cree, and you never read it?

MR. VASQUEZ: Objection, misstates --

THE COURT: Overruled.

A. Because in the meeting we just try to know each other. That's our first time to meet. And then what's the purpose of the meeting was the goal both sides want to achieve. That's basically what the discussion is.

MR. SHORE: I'm going to object as nonresponsive.

Q. You want the jury to believe that you were given a presentation by Cree alleging infringement of patents, and you did not read it?

MR. VASQUEZ: Object to form.

THE COURT: Overruled.

A. They didn't say we infringed. They said they have a bunch of good patents --

THE COURT: Answer what he said. Did you read what they gave you?

THE WITNESS: No, not in the meeting.

MR. SHORE: Pass the witness.

MR. VASQUEZ: No questions, your Honor.

THE COURT: Thank you. You may step down.

(Witness excused.)

THE COURT: Who's the next witness?

MR. VASQUEZ: May this witness be excused, your Honor?

THE COURT: Yes.

MR. LINDGREN: At this time the defendants call Joan Redwing.

JOAN REDWING

having been first duly sworn, was examined and testified as follows:

THE CLERK: Could you please state and spell your name for the record.

THE WITNESS: Yes. My name is Joan Redwing. The first name is Joan, J-o-a-n, and the last name is Redwing, R-e-d-w-i-n-g.

MR. LINDGREN: All right, good morning, ladies and gentlemen. Good morning, your Honor.

DIRECT EXAMINATION BY MR. LINDGREN:

Q. I guess I'd ask you to formally introduce yourself to the jury, please.

A. Yes, I'm Joan Redwing, and I'm a professor of materials science and engineering at Penn State University, and I also have joint appointments in the Departments of Electrical

Engineering and Chemical Engineering.

Q. All right, now, Professor Redwing, how long have you been at Penn State?

A. For about fifteen years, since the year 2000.

Q. All right, and did you go to Penn State to help establish its Materials Science Department?

A. No. Penn State has had a very long and well-established Materials Science Department for over sixty years.

Q. Now, do you have an area of specialty?

A. Yes, I do.

Q. And what is that?

A. It's crystal growth and epitaxy of compound semiconductors; in particular, gallium nitride and related Group III nitrides by MOCVD growth.

MR. LINDGREN: Now, Mr. Mortenson, if you could please pull up Defendants' Exhibit 123.

Q. And, Dr. Redwing, could you tell us what this document is.

A. So this is my CV or resume`.

MR. LINDGREN: All right, and at this time, Madam Clerk, we would like to offer Defendants' 123 into evidence, please.

THE COURT: All right.

(Defendant Exhibit 123 received in evidence.)

Q. All right, now, have you been retained by the defendants to provide your testimony and opinions in this case?

A. Yes, I have.
Q. And are you getting paid for your time?
A. Yes, I am.
Q. Is your compensation in any way related to the outcome of this case?
A. No, not at all.
Q. Now, where do you live currently?
A. I live in State College, Pennsylvania.
Q. And are you married?
A. Yes, I am.
Q. Do you have any children?
A. Yes. I have a 19-year-old daughter and a 13-year-old son.
Q. Now, where did you go to college?
A. So I went to the University of Pittsburgh.
Q. What did you get your degree in?
A. In chemical engineering.
Q. And when did you graduate?
A. In 1986.
Q. Now, what did you do after graduation?
A. So after I got my bachelor's degree, I took a position with General Electric Corporate Research and Development.
Q. And where was that job located?
A. That was in Schenectady, New York.
Q. And what did you do there?
A. So I developed a process to grow polycrystalline tungsten

films for X-ray target applications. So these are used in like CT scanners for their Medical Systems Division, and it was by chemical vapor deposition or CVD.

Q. And what was your title there?

A. I was a research technician.

Q. And how long were you at GE?

A. For two years.

Q. What did you do after you finished working at General Electric?

A. Then I decided to go to graduate school, so I went to the University of Wisconsin at Madison.

Q. And what degree did you earn?

A. A Ph.D. in chemical engineering.

Q. And when did you complete your Ph.D.?

A. In 1994.

Q. Now, while you were at the University of Wisconsin, did you do any research?

A. Yes. I was a graduate research assistant at Wisconsin.

Q. And so what kind of research did you do?

A. So I worked on MOCVD growth of gallium arsenide, aluminum gallium arsenide, and related III-V materials, and so epitaxial growth of III-V materials.

Q. Now, did you go straight --

THE COURT: What's a III-V material?

THE WITNESS: So, yeah, I guess this was discussed

early on, so --

THE COURT: Don't forget, we're your undergraduates, so we may not remember back a week or two ago.

THE WITNESS: The III-V materials are compounds that are comprised of an element from the Group III column of the Periodic Table, so things like gallium or aluminum or indium; and then the V comes from the Group V column, so things like nitrogen, arsenic, phosphorous. So we call them III-V materials, but that includes gallium nitride, it includes gallium arsenide, so they're all very similar materials.

Q. Okay, now, after you completed your Ph.D., did you go into teaching?

A. No, not directly.

Q. So what did you do?

A. I took a position with a company called Advanced Technology Materials, Incorporated, otherwise known as ATMI or Epitronics.

Q. And how long were you there?

A. I was there for five years.

Q. So what did you do while you were at ATMI?

A. Initially at ATMI I worked on MOCVD growth of Group III nitride materials. So this was a time when gallium nitride was really starting to get off the ground, and so I worked on epitaxial growth of gallium nitride and related materials. And then later on I took a position; I was promoted to manager of

III-V technology. So in that position, I was responsible for manufacturing processes to grow epitaxial wafers of gallium nitride device structures as well as gallium arsenide and indium gallium phosphide device structures.

Q. Okay, and maybe just to help the jury understand, can you explain what you mean when you say a gallium nitride wafer.

A. Oh, yes. So actually what I mean there is a gallium nitride epitaxial film grown on a sapphire substrate, so similar to what we're talking about in this trial.

Q. And how does a wafer relate to the chips that we've been discussing?

A. So a wafer -- I think Dr. Fitzgerald mentioned this -- so you would deposit the film on a large wafer. So this might be something that is, you know, six inches in diameter, so you'd grow your device layers on that wafer. And then to form the chips, the LED chips, that wafer is diced up into very small pieces. So it's the pieces that we're talking about here.

Q. And, now, while you were out at ATMI, did you work with Dr. Piner?

A. Yes, I did.

Q. And were you his supervisor?

A. Yes, I was.

Q. Okay, now, how did you come to teach at Penn State?

A. So I was recruited for a faculty position there.

Q. And did you know why Penn State recruited you?

A. Yeah. They were interested in someone who had expertise in MOCVD growth of gallium nitride materials in particular.
Q. And when did you start at Penn State?
A. In the year 2000, so early 2000.
Q. What type of students do you teach at Penn State?
A. So I teach both undergraduate students and graduate students.
Q. And do you teach both in the classroom and in the laboratory?
A. Yes, I do.
Q. Now, is your laboratory teaching limited to graduate students?
A. No. I also teach undergraduates in the lab.
Q. Now, have you taught your students about crystalline and noncrystalline materials either in your classroom or lab teaching?
A. Yes, extensively.
Q. And have you taught your students how to identify whether a material is a crystalline or noncrystalline material in both the classroom and in the lab?
A. Yes. That's very important.
Q. Have you taught your students about crystal growth in epitaxy both in the classroom and the laboratory?
A. Yes. That's the area I specialize in.
Q. All right, and do you teach your students about the

characterization techniques used to determine whether materials are crystalline or noncrystalline structures?
A. Yes, I do.
Q. Now, what's the official title, the position you currently hold at Penn State?
A. So in addition to being a professor of materials science and engineering, I'm also an associate director of the Materials Research Institute at Penn State.
Q. Okay, and what is the Materials Research Institute at Penn State?
A. So that is a campus-wide institute that oversees all research related to materials, so it's across different departments, across different colleges.
Q. Do you advise any graduate students who are seeking advanced degrees such as master's or Ph.Ds?
A. Yes, I do.
Q. And how many graduate students have you advised while you've been at Penn State?
A. I've advised over twenty Ph.D. students and over five master's degree students.
Q. Now, in your position at Penn State, do you also conduct any kind of research?
A. Yes, I do.
Q. And can you please describe some of the research that you've conducted at Penn State.

A. Right, so I specialize in MOCVD growth of III-V materials and other semiconductor thin films and nano structures.

Q. All right, now, have you received any awards for your work?

A. Yes, I have.

Q. And can you just briefly describe some of the awards that you've received.

A. So recently I received a Fulbright Scholar Award. I've also received a National Science Foundation Career Award, and I'm a fellow of the American Physical Society and the Materials Research Society.

Q. All right, so can you tell the jury a little bit about the Fulbright Scholar Award.

A. So the Fulbright Scholar Award is an award that's given by the U.S. State Department to faculty members to enable them to pursue teaching and research abroad. So I was very fortunate to get one of these, and I'll be traveling to Sweden in the spring in order to teach a class on crystal growth, and also do research with a group at Lund University on epitaxial growth of III-V materials.

Q. Now, could you describe for the jury what the National Science Foundation Career Award is.

A. Yes, so the Career Award is an award that's given to early stage researchers, so this is given to people who have particularly promising research accomplishments and also have

the potential to develop into teacher scholars in their career.
Q. Now, you also mentioned that you're a fellow in the American Physical Society and the Materials Research Society. Could you just briefly describe what those societies are.
A. Yes. So the American Physical Society is the premier professional society for physicists in the U.S., and the Materials Research Society is similar. It's the premier professional society for materials scientists.
Q. Are you a member in any academic or engineering groups?
A. Yes, I am, in a number of them.
Q. Okay, in what groups?
A. So in particular, I currently serve as the vice president of the American Association For Crystal Growth, and I also serve as an editor of the Journal of Crystal Growth.
Q. Now, have you authored any scientific publications or articles?
A. Yes, many.
Q. And have you been named as an inventor on any U.S. patents?
A. Yes, on nine U.S. patents.
Q. All right, and generally what do these patents and publications cover?
A. So the publications cover a broad range of research activities that I worked on, including gallium nitride and related Group III nitride materials; and the patents are

primarily focused on gallium nitride devices that are fabricated or that contain materials and specific device structures.

Q. All right, now, have you ever been appointed as a technical advisor to a United States District Judge in a patent case?

A. Yes, I have.

Q. Do you have any experience characterizing materials using electron microscopy?

A. Yes. I have extensive experience.

Q. Can you describe your experience to the jury.

A. Yes. I've used electron microscopy as a standard characterization tool in all of my research for the past 25 years, and that includes some of the things that we'll be talking about: obtaining images by transmission electron microscopy, scanning TEM, also obtaining electron diffraction patterns using a variety of techniques.

MR. LINDGREN: All right, at this time, your Honor, we would offer Professor Redwing as an expert in the field of compound semiconductor devices, including gallium nitride LEDs and epitaxy.

THE COURT: She may offer an expert opinion.

MR. LINDGREN: Thank you, your Honor.

Q. Now, Professor Redwing, did you see the deposition clips from your previous deposition where plaintiffs suggest that you

testified that single crystalline material could be made up of multiple grains?

A. Yes, I did.

Q. Now, was the testimony that they showed accurate?

A. So it was my actual testimony, but it was taken out of context based on my answer to the next question that I was asked. So just to clarify, single crystal materials can be comprised of domains. So the domains form as a result of the island nucleation process, and they can have some twists and tilts associated with them.

THE COURT: Can you just back up and speak to us so that we can understand.

THE WITNESS: Sure. Sorry. Okay --

THE COURT: Me a political science major. All right, so just back up. All right, so say it, what is your opinion?

A. Yes, so my opinion is that single crystal materials do not contain multiple grains, just to be straightforward.

Q. Okay. And, now, did you also see a deposition clip that the plaintiff played where you stated that a diffraction pattern of a perfect single gallium nitride crystal and one of a gallium nitride layer with a low-angle grain boundary would be the same?

A. Yes, I did see that.

Q. And was that testimony accurate?

A. Yes, that was accurate.

Q. Okay, and can you explain to the jury why the diffraction patterns of these two separate types of materials would be the same.

A. Sure. So in single crystalline materials, you can have low-angle grain boundaries. So the term "low-angle grain boundary" is actually a very broad term. It can include arrays of dislocations that maybe only extend for a short period. That would be a low-angle grain boundary that you would find in single crystalline material. So in that case, there would be no difference in the crystal orientation across that boundary. It could also include higher-angle misorientations, and in that case, if you went across the boundary, there would be a difference in the crystal orientation on one side and the other.

THE COURT: What's an array of dislocation?

THE WITNESS: Yes, so Dr. Fitzgerald talked about the misfit dislocations that form at the interface between the substrate and the film when you're doing epitaxy, if you remember that, so there's an extra row of atoms that try to fit in in order to accommodate the difference in the lattice constant or the spacing of atoms in the substrate and in the film. So those are misfit dislocations.

THE COURT: And that's the same as an array of --

THE WITNESS: Yes. So in this case, you have a number of dislocations, and they line up.

Q. Now, have you provided any assistance in patent matters to any other LED companies?

A. Yes, I have. I've provided assistance to Cree, and I know Mr. Julio Garceran who testified earlier in this trial.

Q. Now, have you been asked to provide any opinion in this case?

A. Yes, I have. So I was asked to provide an opinion as to whether the Epistar parts that we're discussing, whether they infringe the asserted claims of the '738 patent.

MR. LINDGREN: Okay, and, Mr. Mortenson, if we could pull up Defendants' Demonstrative 401, please.

Q. And I was going to ask you, Professor Redwing, what claims of the '738 patent have been asserted against the defendants in this matter?

A. Which of these claims? Is that what you're asking me?

Q. Yes. Are these the claims that have been asserted against the defendants in this matter?

A. Oh, yes, yes.

Q. And this is what you're basing your opinion on?

A. Yes.

Q. And what is your opinion on the question of whether the Epistar products do in fact infringe the asserted claims of the patent?

A. Yes, my opinion is that the Epistar products do not infringe the claims of the patent.

Q. And what is the basis for your opinion?

A. Because I've done extensive testing of the representative Epistar products, and in no case do any of the products contain a non-single crystalline buffer layer, which is essential for infringement.

Q. Now, how did you arrive at this opinion?

A. So I arrived at this opinion by considering a combination of things. So I did my own testing and analysis of the representative Epistar products. I also considered the testing and analysis that was done by the plaintiff's technical experts, so I used that combined information in order to arrive at my opinion.

Q. Now, have you provided an opinion on what the level of ordinary skill in the art would be with respect to the '738 patent?

A. Yes.

Q. And were you here for Professor Fitzgerald's testimony when he identified the level of skill on Thursday?

A. Yes, I was.

Q. And do you agree with his definition on the level of ordinary skill?

A. Yes, I do.

Q. Now, generally, what does the '738 patent relate to?

A. So the '738 patent relates to a semiconductor device that's fabricated using a monocrystalline gallium nitride layer

that is grown on a substrate using a non-single crystalline buffer layer.

Q. So let's talk a little bit about the crystal structure of these semiconductor films that we have been discussing.

MR. LINDGREN: If you could, Mr. Mortenson, pull up Plaintiff's Exhibit 1601, and this is the jury glossary. And if you could, could you go to the page with the technical definitions at the back, and what I'd like you to do is pull up the definition for single crystalline. Actually, single crystalline first.

Q. Okay, so, Professor Redwing, do you agree with the definition for the term "single crystalline"?

A. Yes, I do.

Q. All right. And is there a difference between the term "monocrystalline" and "single crystalline"?

A. No. They're the same.

MR. LINDGREN: If you could now pull up the definition of polycrystalline, Mr. Mortenson.

Q. Okay. And do you agree with the definition for the term "polycrystalline" that appears in the jury's glossary?

A. Yes, I do.

Q. Now, there's another term that we've heard which is the term "amorphous." Could you tell us what that means.

A. All right, so in an amorphous material, there is no short-range or long -range order between the atoms. They sort

of are randomly related to one another.

Q. Now, do you agree with the testimony from plaintiff's experts that to grow a high-quality monocrystalline gallium nitride film, that you want to use a polycrystalline gallium nitride buffer layer?

A. No, I don't agree with that.

Q. And can you tell me why.

A. Because Dr. Fitzgerald explained this a little bit earlier, but this is basically an issue of epitaxy, right? So you want to obtain single crystalline film, and to do that, you're using a substrate that is single crystalline, right, because you want the lattice of that substrate to provide a template so that as the atoms come down and deposit, they can align with that template and then grow as a single crystal, right, with long-range order between the atoms.

So the problem with a polycrystalline buffer layer is that now you're disrupting that long-range order, right? You're disrupting the crystal lattice right at that interface, and that is definitely not something that you would want for epitaxy because you really want to have a, you know, single crystalline buffer layer in order to grow your, you know, single crystalline film on top of it.

Q. Now, how can you tell if a material is monocrystalline, polycrystalline, or amorphous?

A. Yes, you can do diffraction analysis, in particular,

electron diffraction, which you would carry out in a transmission electron microscope.

Q. And again just because it's been a long trial and some of these terms have been many used before, what is a transmission electron microscope?

A. Yes, so a transmission electron microscope is an instrument that's used to characterize the structure of materials. Do you want me to explain how it operates again?

Q. Sure. I think that's always helpful.

A. Okay, so in a transmission electron microscope, or a TEM, you have an electron beam, and you focus that electron beam so that it can interact with your sample. And the sample has to be very thin because you want the electrons to be able to transmit through that sample. And then, as a result of that process, you collect either an image from that sample or you can collect a diffraction pattern. So the diffraction pattern provides you with information on the crystal structure of the material that you're analyzing.

Q. And how does electron diffraction work?

A. Yes, so I mentioned it a little bit. So electron diffraction involves the interaction of the electron beam with the atoms that comprise the material. So, for example, if you have a single crystalline material, the electrons that pass through that material are all going to be diffracted at particular angles that are going to be representative of the

lattice or the periodic and repeated arrangement of atoms. So what you end up with is a spot pattern, right? And that spot pattern is characteristic of the lattice of a single crystal material.

MR. LINDGREN: Mr. Mortenson, could we please pull up Defendants' Exhibit 35, and if you could go to Page 3.

Q. Okay, now, Professor Redwing, what does a diffraction pattern for a single crystalline or monocrystalline structure look like?

A. Yes, so a single crystalline material would have this spot pattern similar to what I'm showing in the upper right-hand corner of this figure.

Q. And what does a diffraction pattern for a polycrystalline material look like?

A. Right. So in the case of a polycrystalline material, you get a ring pattern similar to what is shown down here because you have a range of crystal orientations, and so you no longer get just single spot pattern; you get rings that are characteristic of a polycrystalline material.

Q. Now, what does the diffraction pattern for an amorphous material look like?

A. So this is a characteristic diffraction pattern for an amorphous material. So since in an amorphous material there isn't short-range or long-range order, you don't get spots, you don't get distinct rings, but instead you get sort of this

blurred ring structure, and that indicates that it's an amorphous material.

Q. All right, now, are the diffraction patterns that appear in this textbook, are they for gallium nitride?

A. No. I believe they're for other materials like aluminum and copper.

THE COURT: What are they?

MR. LINDGREN: Mr. Mortenson, can you blow that up.

A. Okay, so the amorphous diffraction pattern is amorphous carbon, so it's a carbon material. The single crystal is aluminum, and the polycrystalline diffraction pattern is for gold. That's what Au is.

Q. Okay. Now, are the diffraction patterns that you might see for gallium nitride material different?

A. They're going to be similar, in that single crystal will give you a spot pattern, polycrystalline will give you a series of rings; but gallium nitride has a different crystal structure and different spacing between atoms, so there will be some slight differences in the spacing of spots or in the diameter of those rings that you get in the diffraction pattern.

MR. LINDGREN: Now, Mr. Mortenson, could you go to Defendants' Exhibit 4 and go to Page 2 and enlarge Figure 5.

Q. And, Professor Redwing, if you can tap your screen to remove the green.

A. Oh, sure.

Q. Okay, now, is this a diffraction pattern for a polycrystalline gallium nitride?

A. Yes, this is a diffraction pattern for polycrystalline gallium nitride, and I believe it's from one of Dr. Moustakas' papers.

MR. LINDGREN: Okay, now, Mr. Mortenson, if we could go to Defendants' Exhibit 5 and then go to Page 7 and blow up the bottom of Figure 13.

Q. All right, and this is a diffraction pattern for single crystalline gallium nitride?

A. Yes, this is a diffraction pattern for single crystalline beta gallium nitride, and again this is from Professor Moustakas's publication.

MR. LINDGREN: Thank you, Mr. Mortenson. If you could go back to Exhibit 35 at Page 4.

THE COURT: Well, what's the difference between beta gallium nitride and what we're talking about?

THE WITNESS: So in one case, the beta gallium nitride is cubic, so the crystal structure is like a cube, versus what we're talking about in the trial which is work site gallium nitride, and the crystal structure is hexagonal, it looks like a hexagon.

THE COURT: Yes, I'm asking the questions. You guys have to --

THE WITNESS: Yes, feel free to ask questions.

MR. LINDGREN: Okay, and, Mr. Mortenson, if we could just highlight the portion on the bottom right-hand corner. Actually, if you can start up a little bit more where it says "The questions that we can address."

Q. Okay, so, Professor Redwing, is the transmission electron microscope diffraction a reliable way to determine the crystal structure of a material?

A. Yes. It's a standard method to determine the type of crystal structure.

MR. LINDGREN: All right, thank you, Mr. Mortenson.

Q. Now, have you heard of Fourier analysis?

A. Yes, I have.

Q. And can you explain for the jury what Fourier analysis is.

A. So Fourier analysis is a mathematical technique. So you start off with a high-resolution TEM image, and you select a portion of that TEM image, and then you use a Fourier transform to convert from an image to the electron diffraction pattern, so you're converting from real space to reciprocal space, but we won't get into that.

Q. But is the Fourier transfer you're talking about, is that a mathematical equation? Is it an algorithm? What is that in a simple --

A. Yes, it's basically a mathematical treatment of the data.

Q. Okay, so that mathematical treatment of data coming from an image outputs a simulated diffraction pattern?

A. Right, it's a simulated diffraction pattern.
Q. And what is Fourier analysis used for?
A. So you can use Fourier analysis in order to interrogate a small region of, say, a high-resolution transmission electron micrograph. So if you want to obtain a simulated diffraction pattern from, you know, a small region of that image, you can use Fourier analysis to do that.
Q. Now, you just used the word "TEM micrograph." Is that the same thing as a TEM image?
A. Yes, it is. I'll try to use "TEM image" from now on.
Q. I just don't want to be introducing any new concepts. Now, can a low-resolution TEM image be useful in trying to characterize the crystal structure of material?
A. A TEM image?
Q. Yes, a low-resolution TEM image be useful in trying to characterize the crystal structure of a material?
A. Yes, it certainly can be useful, but you should be careful not to use only a low-magnification TEM image because the contrast in that type of an image comes from a number of different factors. So, for example, grain boundaries or other things that we've talked about in this trial, so dislocations also contribute to contrast. If the sample bends a little bit because it's a very thin sample so you can have bending, that will also introduce contrast. And if you have strain in the material, if there's sort of strain between one layer versus

another, that also introduces contrast. So you have to be careful whenever you are interpreting a low-resolution TEM image.

Q. So are there any other types of techniques that you would use if you felt that you needed more information than what was in a low-resolution TEM image?

A. Yes, certainly. So there are a variety of other techniques that you can use. So you can use high-resolution imaging. So in that case, instead of, you know, looking at the sample at a low magnification, you can really focus in to certain regions of the sample, so that's a common technique that's used.

There's also a technique to obtain an image. It's called STEM. It's scanning TEM microscopy. So in that case, what you're doing is, you take your electron beam and you focus it down to a small area, and then you move it back and forth across the sample. Rather than kind of blasting it with a large beam of electrons, you're moving the electron beam across the sample. And what this allows you to do is that it allows you to obtain contrast in the image that comes from differences in the atomic number of the elements that comprise the material. All right, so I may refer to this as Z contrast because Z is the atomic number of elements. So, you know, for example, gallium has a higher atomic number than aluminum, and so the differences in the elements are going to scatter the

electrons in a different way. And you can use this Z contrast or differences in the atomic number to obtain contrast in your STEM image, so in that case the contrast is primarily from differences in the atomic number. So it's just a different way of looking at the sample.

Q. Now, did you analyze any Epistar LED parts to arrive at your noninfringement opinions?

A. Yes. I examined the four representative Epistar parts that we have been -- that I guess both sides have agreed upon.

MR. LINDGREN: Okay, so, Mr. Mortenson, can you pull up Defendants' Demonstrative 402.

Q. Can you tell us what Epistar parts you analyzed.

A. Yes. So I analyzed the Venus series, I analyzed a sample from the Venus series, from the Mars series, and then a sample from the LT F-Series and the HT F-Series, so four different samples.

Q. So we'll use those terms rather than the numbers. Now, do you know where Epistar makes these chips?

A. Yes. Epistar makes their chips in a manufacturing facility in Taiwan, and they use MOCVD growth.

Q. Okay, now, let's talk a little bit about each of these different parts. So let's focus first on the Venus series product. Can you tell me what process is used to make the Venus chip?

A. Yes. So Mr. Lin from Epistar testified earlier in this

trial that the process that's used to fabricate the Venus chip is designated with the exhibit DTX 0129, as I'm indicating here.

Q. Now, it uses the word "recipe." Can you tell me, what is meant by the term "recipe"?

A. Yes. So recipe is a term that we give to the process for MOCVD growth. So it's a little bit like cooking. So you start [redacted] or series of steps, right? So each of those steps may involve a different temperature. It may involve a different time. It may involve a different amount of those precursors or ingredients, and that's what the recipe is. It describes that whole process.

Q. Okay, so what is the range of temperatures that is used within this recipe to manufacture the Venus LED chip?

A. [redacted] So this is going to be a very high temperature. It's going to be glowing red hot, so, you know, that's the temperature range

that we're talking about.

Q. And when you identify the temperature, what is it the temperature of?

A. So this is the temperature of the substrate. So, again, keep in mind that you're heating up the substrate to this very high temperature. It's like cooking on the top of your stove. It's not like cooking in an oven. So, you know, you have your substrate. You could think of it as a griddle, and it's going to be heated to a high temperature, and then the heat is going to be transferred from the substrate, you know, up through the layers as they grow.

Q. And then how long does the process take from start to finish?

A. [redacted]

Q. And do the temperatures and the times used to make the Venus LED chip inform your opinion about the crystal structure of the buffer layers in those devices?

A. Yes, they do. So as I mentioned, these are high temperatures, right? This is glowing red hot, and that's going to provide the atoms with a lot of energy. So as these atoms come down to deposit on the substrate, they're going to be able to move all over the place, right? And what they want to do is, they want to find that template in the substrate, and they want to align to that template. And so if you deposit these

films at high enough temperature, that's going to give them enough energy to move around and deposit on this template epitaxially.

Q. All right, so let's move on to the Mars series.

A. Okay.

Q. Now, again if you could tell us, what is the process that's used to make the Mars series LED?

A. So Mr. Lin testified earlier that the recipe that's used in this case is given by Exhibit DTX 0130.

Q. Okay. And again we won't go through it, but recipe, it's the same type of process you described with respect to the Venus chip, correct?

A. Correct.

Q. All right. And are the temperatures and times set out to making the Mars chip similar to those set out for the Venus series chip?

A. Yes. They're identical.

Q. And do the temperatures and time inform your opinion as to the crystal structure of the buffer layers?

A. Yes. Again, you know, this is a very high temperature, so you would expect the buffer layer to be monocrystalline under those conditions.

Q. So let's move to the HT F-Series product. Again if you could identify what process is used to make it.

A. So the LT F-Series, I guess we could start there. So as

Mr. Lin testified, the recipe in that case is from Exhibit DTX 0132.
Q. All right, and what are the temperatures that are used in this recipe?
A. [redacted]
Q. And how long does the process take to create this device?
A. [redacted]
Q. And, again, do the temperatures and times used to make this device inform your opinion about the crystal structure of the buffer layer in it?
A. Yes. Again, the sample is going to be held at a very high temperature for, you know, almost three hours, and as a result of that, you would expect the buffer layer to be monocrystalline.
Q. All right, and then, finally, on the HT F-Series product, what is the process that's used to develop it?
A. So, again, as Mr. Lin testified, the recipe in this case is DTX 0131.
Q. All right, and what are the temperatures that are used to make the product?
A. [redacted]
Q. And how long does the process take?
A. [redacted]
Q. And does this inform your opinion as to the crystal structure of the buffer layers in this product?

A. Similar to the others, this is very high temperature for an extended period of time. You would expect the buffer layer to be monocrystalline under those conditions.

Q. Now, are there any differences between these four Epistar parts?

A. Yes. There is a difference in the type of substrate that's used.

Q. Okay, and what are the differences?

A. So the Venus series and the Mars series use a flat sapphire substrate, so it's completely flat, while the F-Series, both the LT and the HT use what is called an engraved substrate or a pattern substrate. So in that case, you have small little mounds that are patterned periodically across the sapphire substrate, so it's no longer flat over the entire area.

MR. LINDGREN: Okay, now, Mr. Mortenson, could we pull up Dr. Piner's trial testimony from Day 4 starting on Page 118 at Line 22.

Q. Professor Redwing, can you tap your screen, please. Thank you. And then going through Page 119, Line 7. So do you recall this testimony, Professor Redwing?

A. Yes, I do.

Q. And specifically I'm talking about the testimony with respect to that the work of etching or creating the mounds can do damage to the material.

A. Yes, I recall. I agree.
Q. Okay. And that was going to be my next question. Do you agree with this testimony?
A. Yes, I do.
MR. LINDGREN: Could we pull up defendants' demonstrative Slide 403, which takes information from DTX 135 and 136 as well as Plaintiff's Exhibit 173.
Q. Now, can you explain what is shown in these images?
A. Right, so these are low-resolution TEM images of the cross-section of these F-Series chips, all right? And you can see that now in this case the interface between the gallium nitride and the sapphire is no longer completely flat. There are these mounds. You can kind of see the mounds. I guess I can draw this.
MR. LINDGREN: Actually, Mr. Mortenson, can you blow up the LT F-Series. Thank you.
A. Okay, yes, so you can see that there are mounds here, and these mounds are rough as a result of the etching or engraving process that's used to make these substrates, so the mounds themselves have some roughness associated with them. So you have mounds, and then they're separated by flat areas.
MR. LINDGREN: All right, Mr. Mortenson, can you pull up Plaintiff's Exhibit 1606. Thank you.
Q. Now, is this an image showing some of the rough portion of the sapphire substrate?

A. Yes, this is. So this is a STEM Z contrast image that's taken from the side of one of those mounds, and so you can see the roughness in the substrate because you can see the dark regions that are going to contain aluminum, right? So this is representative of the roughness of the substrate.

Q. All right, now, let's talk a little bit about the testing and characterization analysis that you performed on these Epistar parts.

MR. LINDGREN: Could we pull up Defendants' Demonstrative 304, please.

Q. All right, so could you explain to the jury the different types of testing you performed.

A. Right. So I performed two different types of imaging in order to obtain TEM images, both transmission electron microscopy and scanning transmission electron microscopy, and I described those earlier. And I also performed several techniques to obtain electron diffraction patterns, including selected area diffraction and also nano-beam diffraction, and I'll describe those in a little bit.

I also did EDS mapping, so that stands for energy dispersive spectroscopy. It's basically a chemical analysis technique that enables you to map the composition of your samples so you can determine what elements are present in what layers. And then the last type of testing that I did was to use the Fourier transform in order to generate simulated

electron diffraction patterns from high-resolution TEM images.

Q. Now, why did you do all of these different types of tests?

A. So it's very important whenever you are trying to, you know, characterize the structure of a material to do as comprehensive a set of tests as you possibly can, right? So all of these different tests are giving you different pieces of information, and then you pull all those pieces of the puzzle together in order to figure out what you have.

Q. All right, now, before I ask you to go through each of these and provide a little more of an explanation to the jury on them, what type of equipment did you use to perform these tests?

A. For this TEM analysis, we used a Titan 3 instrument, so that's an aberration corrected electron microscope. It's a state-of-the-art electron microscope that we have in the materials characterization lab at Penn State.

Q. And you used the term "aberration corrected." Could you provide a simple explanation of what that means.

A. Yes, so you could think of it as being similar to your eyesight with contact lenses. So, you know, if you're nearsighted or farsighted, you don't have a good focus, right? Things are blurry. And you can think of aberration correction as being, you know, similar to putting contacts or wearing glasses, where the lenses of the contacts or the glasses help you to focus better.

So certainly, you know, this is a very sophisticated electron microscope, so that's a simplified description, but that's basically what the aberration correction is doing is, it's enabling you to really focus down and look at individual atoms or, you know, atomic-level structure of materials, so it's a really nice instrument to have.

Q. Now, did you personally operate the Titan 3?

A. No, I didn't. So Dr. Ke Wang who testified on Friday, he operated the Titan 3 for this analysis.

Q. And do you work with Dr. Wang at Penn State?

A. Yes, I do. Yes, I've worked with him extensively.

Q. Now, do you have any experience in analyzing TEM and scanning TEM images?

A. Yes. I use it extensively in my research.

Q. Now, let's turn back to the different tests that you performed. If we could go to Defendants' Demonstrative 305, please, which takes information from Defendants' Exhibit 133. Could you please explain to the jury what the TEM image is.

A. Yes. So these are two types of images that we obtained on the sample. The one on the left is a high-resolution TEM image. So in this case we're really zooming in on the region that includes the gallium nitride layer and the sapphire substrate and the interface between the two, which is where the buffer layer should be located. So you can see in this TEM image that you have a lot of contrast, right? So there are

varying shades across the gallium nitride layer, and, as I mentioned, that contrast can come from a number of factors. So there are dislocations in this material, and that's going to introduce contrast into the TEM image; also, if you have strain or bending or other types of defects.

But the other thing that you can see in this high-resolution image is that you start to see lattice fringes, so you can, you know, see these individual points, right? And those fringes come about due to the lattice of the film and the substrate.

Q. And, again, when you use the term "lattice," can you explain to the jury and to the Court what you're talking about.

A. Yes. So a lattice would be that periodic and repeated arrangement of atoms in a crystal.

Q. All right, now, could you explain to the jury the STEM image you have on the same page.

THE COURT: Could you just circle first what the buffer is. Is that on the same line with interface?

THE WITNESS: Well, so the buffer layer should be somewhere above this interface, right? And I think there's some uncertainty of what the plaintiff is calling the buffer layer, but it's basically going to be the layer in between the substrate and the growth layer.

THE COURT: So you can't tell from here where it is?

THE WITNESS: I can't tell from that.

Q. Okay, so if you can tap your screen and then explain to the jury the STEM image.

A. So the STEM image is obtained using Z contrast, so that's where -- the contrast that you see in the image is primarily coming from differences in the atomic number of the elements that comprise the material, right? So in this case, the gallium is going to -- it's going to scatter the beam more so than the aluminum, and so the gallium atoms appear as bright spots, right? So those are the gallium atoms that comprise the gallium nitride lattice.

The aluminum is not going to scatter it as much, so it appears darker, but you can still see, you know, in the bottom sapphire region, you can see the, you know, the atoms that comprise the sapphire. And what's particularly nice about STEM imaging is that it removes all of the contrast due to things like dislocations. And what you're actually seeing are the individual gallium atoms or aluminum atoms. So it provides a very clean image of the lattice or the, you know, periodic and repeated arrangement of atoms in the material.

THE COURT: Well, can you tell on a STEM where the buffer is?

THE WITNESS: So, okay, again, so this is really zoomed in, so I would prefer not to say what I think is the buffer layer here because we're looking at just a very high magnification area. Once we zoom out, we'll see what I think

is the buffer layer.

THE COURT: All right.

Q. Well, maybe the simple thing to start with, Professor Redwing, is, can you draw a line where you believe the sapphire substrate ends and then the film grown on top of it begins. Maybe that's the easiest thing to do to start, right?

A. Yes, that would be the easiest. Okay, so you can see that that occurs, you know, right along this line in the STEM image.

Q. And is that also true on the TEM side?

A. Yes, so you could also draw a line right across here. Whoops, sorry. So that would be the interface between the substrate and the film.

Q. And the buffer layer would start approximately above the green line that you drew, correct?

A. Yes. So, again, you want to have epitaxial growth of your film on your substrate, and so, you know, this is what that would look like. You have all of the atoms of the film that are lining up relative to the atoms in the substrate.

Q. Okay. Now, let's change subjects and discuss diffraction patterns. What kind of diffraction patterns did you take or create?

A. So I used two different approaches in order to obtain diffraction patterns in this case.

Q. And what were those two approaches?

A. So I obtained electron diffraction patterns in the TEM instrument, and then I also used Fourier analysis in order to extract a simulated diffraction pattern from the high-resolution TEM images.

Q. So let's start with the diffraction patterns that you took from the TEM instrument. What types did you obtain?

A. So I used selected area diffraction, and that involves the use of an aperture, so basically just a hole in order to collect electrons that are diffracted in a particular area of your sample. So you can select an area of the sample in order to obtain a diffraction pattern from. So that was one technique.

And the other technique that we used was nano-beam diffraction. So in that case you take the electron beam and you focus it down to a very small spot, and then you can obtain an electron diffraction pattern just from that area that, you know, where the spot hits.

Q. Okay, so let's actually pull up Defendants' Demonstrative 306, which takes information from Defendants' Exhibit 133. So why don't you explain to the jury about selected area diffraction.

A. Right. So this is a low-magnification TEM image of a gallium nitride layer on a sapphire substrate, and what we're doing is, we're using the apertures in order to select an area from this image to obtain the electron diffraction pattern

from. So in this case, the aperture that we used was about 150 nanometers in diameter, and that will give us a spot size of about 100 nanometers up to 200 nanometers. So we can select an area, and that's what I'm showing by these different colored rings here. So these are the areas where we've selected to obtain the electron diffraction pattern from.

Q. And actually, Professor Redwing, I'm going to interrupt for one second. Can you just put a green mark on what you're saying is the low-res TEM image just so everyone's clear.

A. Oh, oh, okay, so that's this whole thing.

Q. Okay. And then when you're talking about the circles, if you could just identify those by putting a little green mark as you go through them so the jury is following the explanation.

A. Sure, yes. So we can use selected area diffraction to look at a region in the gallium nitride layer. That's shown by this blue circle, right? And we get an electron diffraction pattern that I'm showing over here which comes from that area that is the gallium nitride layer. And likewise we can do a similar thing in the sapphire substrate. So that's shown by this green ring, so we're selecting an area from the substrate, and then we're obtaining an electron diffraction pattern from that area, and that's what I'm showing here.

And then, finally, we can select an area that contains both the gallium nitride film and the sapphire substrate, and this region where you can see a lot of contrast, right, this is

what I believe the plaintiff is identifying as the buffer layer region, so this region in here, right? So you can see that in this red circle, we have some of the gallium nitride, we have some of the sapphire, but we also are encompassing that region of high contrast which is the buffer layer, what we're referring to as the buffer layer. And if you see, in that case, so you get all spot patterns in this case. In the case of the interface region, you're picking up diffraction from both the gallium nitride and the sapphire, so those electron diffraction patterns overlap, and that's what you're seeing in the red square there are two overlapping diffraction patterns.

Q. Okay, so let's move to nano-beam diffraction, if we can pull up Defendants' Demonstrative 307. You can tap your screen. Thank you. And briefly explain to the jury --

THE COURT: So are you saying you can't say much about the buffer because the diffraction patterns are interfering with each other or superimposed on each other?

THE WITNESS: Well, so in that case what we see are the two -- we see the gallium nitride and the sapphire electron diffraction patterns.

MR. LINDGREN: Mr. Mortenson, can you go back one page.

THE WITNESS: Yes, yes, so according to the electron diffraction pattern that you get at that interface, everything there would be single crystal, right? It would either be

single crystal gallium nitride or single crystal sapphire, so you could use this to say something about the buffer layer, but we did additional analysis as well.

Q. Okay, so if we then can go to the next slide going back to nano-beam diffraction. So could you explain for the jury just briefly what this shows.

A. Okay, so in this case, as I mentioned, with nano beam you're focusing the electron beam down to a very small spot size. So with selected area diffraction we were using, you know, a spot that was, like, 100 nanometers, 200 nanometers in diameter. Now we're focusing it down to 5 nanometers, so we're looking at a very small area. And what this is is, this is a zoom-in electron TEM image of that buffer layer region, the region of contrast in the previous image, right? So you can see that there's contrast here, right? So I will be bold and call that the buffer layer. But if, you know, if you take a look, you can use nano-beam diffraction in order to interrogate the different regions in this sample.

So, for example, you know, in the blue circle -- again, this is 5 nanometers, so we're really focusing, you know, down into the sample here -- we get this electron diffraction pattern, all right? Again, if we look at the sapphire substrate which is shown here, we get this electron diffraction pattern. And then if we take a look at that buffer layer region using this nano-beam diffraction, we can look at it in a

variety of different areas, and these are all electron diffraction patterns that we obtained from that buffer layer region. And if you see, in this case, everything that we obtain is a spot pattern, right? So even when we look at this sample, you know, very closely using a very small beam, everything has spots that are representative of monocrystalline material.

Q. Now, for purposes of the techniques that you used, is one better than the other?

A. No. Actually, I mean, you can't really say one's better than the other. They're complementary. And you should use a variety of techniques in order to look at a sample like this because you really want to look at different length scales as you're trying to understand the structure of a material.

Q. Okay, now, if we could go to Defendants' Demonstrative 308, and now I'd like to talk a little bit about the Fourier analysis simulated diffraction patterns. Could you explain to the jury what's shown in this slide.

A. Sure. So this is a high-resolution TEM image that you're seeing here, right? Okay, again you have the sapphire and the gallium nitride, and this is the interface between the two, so we can clearly see that. And then what we can do with this image is, we can select different regions. So I've indicated them with different rectangular boxes, A, B, C, and D, and also a square box, E. So we can select regions from that image, and

then we can use this Fourier analysis technique to convert that image to an electron diffraction pattern, right? And that's what we're showing in this whole series of diffraction patterns on right, so these are all simulated diffraction patterns that are obtained from these different rectangles or squares. All right, and if you take a look at those, again you can see the spot pattern. You do see some, you know, long lines that may go vertical and horizontal, and what that is is, that's an artifact of the Fourier analysis because you're selecting a finite region, right? So there are edges to those rectangles and edges to the square, and that results in these lines. But, nevertheless, if you look, you can see that there are clearly spots that are associated with those simulated diffraction patterns.

Q. Now, is what you did here similar to the Fourier analysis that Dr. Piner testified about previously in this case?

A. Yes. It's essentially identical.

Q. And how does the Fourier analysis compare to nano-beam analysis?

A. So the Fourier analysis is just an alternative technique in order to extract the electron diffraction pattern. So nano beam is a direct measurement of it. Fourier analysis is just a mathematical technique to get that same type of information.

Q. Okay, if we could then go to Defendants' Demonstrative 310, please. Now, I want to talk a little bit

about what you call the "energy dispersive spectroscopy." So could you explain to the jury briefly what's shown in this slide and what you did.

A. Right. So as I mentioned earlier, energy dispersive spectroscopy, or EDS, is a chemical analysis technique, so you're looking at the interaction between the electron beam and the atoms that comprise the sample. And as a result of those interactions, you can determine the atomic composition, so you can determine what elements comprise the sample. And so on the top left, this is a STEM image, again looking, you know, at this interface between the gallium nitride layer and the substrate.

Q. And again, Professor Redwing, when you're going around the slide, if you can just make a little -- yes, so everyone knows where you are.

A. So that's where I'm at. So this is this STEM image. If you remember, STEM is obtained with Z contrast, so the contrast that you see there is due to differences in the atomic number, right? So you can see -- and here we're really zooming in on that area of contrast that we saw in the other images. You can see here that, you know, you see these regions of darker contrast, right? And what's really nice about EDS is that then you can go in and determine, okay, well, what elements comprise those areas?

So what I'm showing in the series of images to the right

are maps. They're basically telling you where there is aluminum, like in the red, or oxygen in the green, or gallium in the dark blue, or nitrogen in the light blue, and then this is a combined image of all of those. So what this tells us, which hopefully you can see from your screen, is that this contrast in this region is actually due to the presence of aluminum. So you can see it probably most clearly here, right? So we can see that there is aluminum present in that layer.

And the other thing that you can do is, you can take a scan which I'm showing, you know, here going from A to B going through this interface, so from the gallium nitride through this region where we see aluminum and into the sapphire substrate. And then we can plot out, like, the concentration of gallium or the amount of aluminum, which is the red here, right, as a function of distance from A to B. And so you can more clearly see that, you know, this layer around A is gallium nitride, and then there's a layer that contains both aluminum and gallium, so that's going to be aluminum gallium nitride. And then there's a very thin layer right at the interface which is aluminum nitride. It's very thin, though, so it's somewhat difficult to resolve. And then you have the sapphire which has aluminum and oxygen in it.

THE COURT: But where is the buffer? Where's the buffer?

THE WITNESS: A good question. So I would -- I think

for the purposes of this trial, we're saying that everything, you know, this aluminum nitride, this aluminum gallium nitride, and even this gallium nitride layer are the buffer layer.

Q. So maybe just to clarify, to answer the Court's question, if you look, Professor Redwing, at the last block that has the multiple colors starting at yellow in the bottom, could you just take the Court and the jury starting at the bottom through to the top and identify what those are made of.

A. Right, so let's start in the sapphire. So, you know, this area that looks kind of yellowish green, this is all the sapphire substrate, so from here down. And then if you take a look at this, we have a very thin layer that looks red. That is the aluminum nitride. I don't know that I can write on this. Okay.

THE COURT: Can I ask probably a very simplistic question? Did you stain this, or this is how it appears in nature?

THE WITNESS: So this is just converting the information from the EDS to a map that uses color to display the information.

THE COURT: So you made these colors?

THE WITNESS: Yes, yes, yes, right, right. Yes, this isn't nature.

THE COURT: All right, so there's aluminum nitride, and then where?

THE WITNESS: So you have this thin aluminum nitride layer, and then on top of that you can see that you have both red and also blue, so, you know, you have this layer here which would be aluminum gallium nitride, or at least that's what the data indicates. And then on top of that you have the gallium nitride.

Q. Now, if we can quickly --

THE COURT: Where is the buffer?

THE WITNESS: So, you know, the buffer is definitely going to be this aluminum nitride layer and the aluminum gallium nitride layer. You could argue that the gallium nitride layer on top of it is also the buffer layer, but, you know, if you just think about epitaxy, those initial layers, the aluminum nitride and the aluminum gallium nitride, those are going to be the important layers, right?

Q. And why would those be the important layers?

A. Because that's where you're initially starting this templating process, so you want, you know, those layers to be single crystalline so that that can transmit through the entire structure. And you wouldn't want a situation where you have single crystal aluminum nitride and aluminum gallium nitride and then you grow polycrystalline on top of that. That would not be an epitaxy process.

MR. LINDGREN: Okay, Mr. Mortenson, if you can take this one down, and if you could tap your screen,

Professor Redwing.

THE COURT: So are you essentially saying there is no buffer layer of pure gallium nitride?

THE WITNESS: In this particular sample, there is aluminum nitride and aluminum gallium nitride.

THE COURT: So it's a mix?

THE WITNESS: It's a mix, yes.

Q. And then above it is gallium nitride?

A. Above it is gallium nitride.

Q. Now, also this may be helpful for the Court.

THE COURT: Although we've hit lunch period.

MR. LINDGREN: You know what, I've got two more questions and I'll wrap it up. Mr. Mortenson, if you can take the STEM image that I just put my pointer on and just blow that up for a second.

Q. Can you tell us just what the scale bar here shows that will maybe help the Court understand what we're looking at.

A. You mean the scale bar down here?

Q. Down here so that they understand the sizing in this image.

A. Yes, so that's 5 nanometers, that line, which is the scale bar. So if you take a look at this region, you know, where we see the darker contrast, that might be about 15 nanometers thick, so that's a very thin layer right at the substrate.

Q. Okay, now, if we could move to Defendants'

Demonstrative 410, which takes information from Defendants' Exhibits 133, 134, 135, and 136. Now, did you perform this type of EDS analysis on all four of the Epistar exemplar products?

A. Yes. We did the EDS analysis on all four of those products.

Q. And what did that EDS analysis show you?

A. Okay, so, as you can see if you take a look at these series of, you know, figures, again, this is the compositional map, and I would say focus specifically on the red, you know, the red diagram which is for aluminum, and maybe also this one which is the combined one. Those are the easiest to see. If you take a look at the Venus series and the Mars series and the F-Series, this HT F-Series, these all have this aluminum, right, that's present in this region that we're calling the buffer layer. So all of these have aluminum gallium nitride in the buffer layer and a structure similar to what I just talked about, right? The difference is in the LT F-Series. If you take a look at this one, you know, again, if you're looking at the aluminum composition map and also this combined map, you really don't see any aluminum above the sapphire substrate. So in this case, the buffer layer is considered to be gallium nitride. So the nice thing is, you can really determine the composition of these different layers using this EDS technique.

MR. LINDGREN: I'm happy to stop right now, your

Honor.

THE COURT: How much longer do you have with her?

MR. LINDGREN: I could ask her just two more questions and then go on to something new but --

THE COURT: No. If we were going to finish her, that would be one thing, but you're not.

MR. LINDGREN: No, no.

THE COURT: How much longer do you have with her testimony in general.

MR. LINDGREN: We're at a good stopping point.

THE COURT: No, but all together.

MR. LINDGREN: Oh, how much longer? I hope that I will be done within half an hour.

THE COURT: All right, so we have quite a bit with her still. I'll see you at 2:00 o'clock.

Now, can I ask you all to talk about this issue. So obviously for nobody's fault, we got a little behind. The question is, I've only blocked off half a day on Wednesday. There's a chance, who knows, Murphy's law could strike again, but there's a chance we could get this case to you, have closing arguments tomorrow and a charge Wednesday morning. This may have been moved forward, so it's really not going to happen till Wednesday and Thursday. I mean, that's sort of what I need to worry about. But would you want to sit on Wednesday afternoon? So that's something for you to -- you may

have planned around it, got it. I told you it was half a day, but that's sort of what I'm trying to figure out, how to sort of readjust at this point. Okay, so maybe let us know that. Thank you.

(Jury excused.)

SIDEBAR CONFERENCE:

THE COURT: It looked as if, unfortunately for planning purposes, they are planning that half a day is what we're going to have on Wednesday, unfortunately.

A few questions: "Is grain synonymous with crystal?"

MR. EVANS: Yes.

THE COURT: "Are low-angle and high-angle grain boundaries both grain boundaries?"

MR. SHORE: Yes.

THE COURT: That's a question for you.

MR. LINDGREN: That's a question.

THE COURT: "Must a grain boundary form a closed surface to separate grains?" I'm not so sure I understand that. I don't know.

THE CLERK: Judge, sorry to interrupt, but he asked me, the juror who handed that to me specifically said to me, "Could you ask the judge to ask the witness."

THE COURT: I will. A few questions: "Is grain synonymous with crystal?"

MR. EVANS: Yes.

THE COURT: "Are low-angle and high-angle grain boundaries both grain boundaries?" That's a question for you.

MR. LINDGREN: That's a question.

THE COURT: "Must a grain boundary form a closed surface to separate grains?" I'm not so sure I understand that. I don't know.

THE CLERK: Judge, sorry to interrupt, but he asked me, the juror who handed that to me specifically said to me, "Could you ask the judge to ask the witness."

THE COURT: I will. "Can a cross-section of a buffer layer be polycrystalline adjacent to the substrate yet monocrystalline adjacent to the growth layers?" As you can see, those are the questions.

All right, can I tell you, she's real smart; I don't understand what the buffer layer is. Is the argument that there is no buffer layer, I mean, that there isn't one?

MR. LINDGREN: No.

MR. SHORE: It will come out on cross.

THE COURT: All right, maybe I'm just not asking the right questions to tease this out.

MR. LINDGREN: I understand.

THE COURT: Is the argument -- I understand that you could have because it's consisting essentially of gallium nitride, you could have some aluminum in there. I understand that. But was what she's saying is, the mixture of the gallium

and the aluminum is what is the buffer layer that we're talking about here?

MR. LINDGREN: Starting for three of the products, starting immediately at the substrate surface, for three of them there's a layer of aluminum nitride, and then you get to a layer of aluminum gallium, and then you have all your gallium.

THE COURT: I get that. Is that the buffer?

MR. LINDGREN: Well, right, that's what they've been pointing to.

THE COURT: No, I'm asking you. Where is the buffer?

MR. LINDGREN: Okay, a buffer is anything -- it starts at the substrate and works its way up. I understand --

THE COURT: She needs to use the word "buffer."

MR. LINDGREN: Right, that's fine.

THE COURT: She needs to tell us where the buffer is because I think it's undisputed there's a buffer. The only question is what it looks like. Am I right?

MR. EVANS: There's more than one layer that can be called the buffer layer.

THE COURT: Yes. Yes, yes, yes, yes, but there's a buffer.

MR. LINDGREN: Sure, yes.

THE COURT: So just --

MR. LINDGREN: No, we'll make that clear.

THE COURT: That there's a buffer and that it can have

some aluminum in it. It doesn't destroy the patentability of it or the way I've construed it. I mean, the pictures are beautiful. It's just I don't know what to look at.

MR. LINDGREN: Sure, understood. We'll make sure that's clear, and I'm sure they will make it clear as well when they ask her questions.

THE COURT: I don't know, but here's my problem. I don't know anything about it. I'm almost exactly where I was at summary judgment as I am right now with two very smart people looking at very small samples coming to opposite conclusions, okay, with fancy-shmancy technology. So that's where I'm at, and I'm not sure that I'm understanding it. At the very least, I understood with Dr. Piner where he said the buffer was. I'm not sure even sure with her where the buffer is, so --

MR. LINDGREN: Right.

THE COURT: All right, now, the second thing is, we have jury instructions. I'm giving them to you with huge trepidation. There is a direct order that you cannot file anything with your people back in the office while we're all sitting here.

MR. VASQUEZ: Okay.

THE COURT: I won't be able to catch up. So we're going to give it to you. They can read it. It's for the charge conference so you won't come into it cold.

MR. VASQUEZ: Sounds good.

THE COURT: Okay? But I can't be in a situation where they're filing memos while we're all sitting here. I just can't keep up with it, okay? You won't read it; I won't read it.

MR. VASQUEZ: You and me both.

THE COURT: So I'm giving it to you with the order that no memos be filed while we're --

MR. SHORE: We don't have anyone back at the office, so --

(Laughter.)

(End of sidebar conference.)

(Noon Recess, 1:08 p.m.)

(Resumed, 2:08 p.m.)

THE COURT: We have another jury question. All right. Bring in the jury. The question is: "Does stem imaging remove all contrast from TEM images including dislocations?" That's the question. I'm going to ask all these questions.

MR. SHORE: Before they come back in, can we reserve some of those questions until after cross?

THE COURT: No. They asked them now, they could have raised their hand and asked them.

MR. EVANS: Your Honor, could we get an instruction that tells the jury we're supposed to not talk to them?

THE COURT: Did someone try to talk to you?

MR. EVANS: No, just so they don't think we're intentionally ignoring them.

THE COURT: Don't worry about it.

MR. SHORE: They should wear their tags.

THE COURT: Oh, I see, so you're bumping into them, is what the genesis of the issue is?

MR. SHORE: We didn't realize. There were some two tables away from us, they didn't wear their tags, and then we realized those are jurors. I don't think we said anything they shouldn't hear, but they should wear their little badges.

THE COURT: I don't know if they are allowed to.

THE CLERK: All rise for the jury.

(Jury enters the courtroom.)

THE COURT: All right. We've got questions. They are so shy, so I ask the dumb questions, all right. You guys ask good questions. So let me just start off, I got a series of questions before the lunch break. The first one is: "Is grain synonymous with crystal?"

THE WITNESS: So a grain is a region of a crystal, right, so a grain is going to -- you know, a crystal -- a grain is going to be comprised of a crystal lattice, basically.

THE COURT: So, is a grain a crystal?

THE WITNESS: Yes.

THE COURT: All right. Yes. Number 2: "Are low-angle and high-angle grain boundaries -- Grain boundaries,

is that how a person of ordinary skill in the art would interpret them?"

THE WITNESS: Yes, so you have to be careful, so a high-angle grain boundary, which would define, you know, the boundary between two grains that have different misorientations, that's clearly a grain boundary, right. When you get into --

THE COURT: Meaning it's clearly polycrystalline?

THE WITNESS: It's polycrystalline.

THE COURT: All right. So high angle is clearly polycrystalline, right?

THE WITNESS: Right, exactly.

THE COURT: Now, low-angle --

THE WITNESS: When you get into "low-angle," that term is used broadly, so it's used to include boundaries similar to the high-angle grain boundary, right, but it can also include situations where you have dislocations that line up, right. Think of it as dislocations being like puddles, right, so they are individual puddles, right. It's not like a stream. The grain boundary is more like a stream. It's all connected, and it separates two regions, right, so if you think about these dislocations as being like puddles. In between the puddles is going to be land. It's all going to be connected, right, and that connection is that long range periodic arrangement of atoms, which is a single crystal, so it's not just the grain

boundary, you also have to consider the orientation of the crystal, right.

I hope that was clear.

THE COURT: So the short answer to "Are low-angle and high angle grain boundaries both grain boundaries," the answer is yes, but they can -- well, or is it no? What is it? Are low-angle and high-angle grain boundaries both grain boundaries? What's the answer?

THE WITNESS: So I would say no.

THE COURT: No is the answer. "Must a grain boundary -- "

MR. SHORE: Your Honor, we would object to that answer as violating the glossary agreed by the parties.

THE COURT: You'll have to cross on it. "Must a grain boundary form a closed surface to separate grains?"

THE WITNESS: Yeah, that's a really good question. So a grain boundary that would separate grains with different orientations would entirely enclose the entire grain, so it would be all around the entire grain, right. It would not just be one particular line between two grains. That grain boundary would go all the way around a grain.

THE COURT: Would that be true with defects, too?

THE WITNESS: No, that would not be the case with defects. Defects, again, are things like a missing atom in the lattice, right. That's just a single point. A dislocation,

which is a line, right, so that's not going to enclose any region. So defects, like point defects and dislocations, would not be the same as grain boundaries that enclose an entire region.

THE COURT: "Can a cross-section of a buffer layer be polycrystalline adjacent to the substrate yet monocrystalline adjacent to the growth layer?"

THE WITNESS: That's a good question. So if we're talking about epitaxy, which is what this patent is about, the idea there is that you want to start off with a single crystal substrate, right, and you want to eventually end up with a single crystal on top of that, so if you add any layer in between those two that's polycrystalline, that's going to disrupt that templating effect of the substrate, and you will not get a monocrystalline layer on the top, so you wouldn't have a polycrystalline layer near the substrate and then monocrystalline further up.

THE COURT: All right. "So how many defects can a single crystalline layer have before it is considered non-single crystalline?"

THE WITNESS: Yeah, that's a good question, too. So the answer is there's no set amount. Again, you have to go back to the definition of what single crystal is and what polycrystalline is, so, again, a polycrystalline material has multiple grains with different orientations. A single crystal

has a single crystallographic orientation and long range and repeated order of atoms, so you can have defects in the single crystal, but as long as they don't disrupt the orientation of the crystal or the long-range repeat of the atoms, it's still single crystal.

THE COURT: So the answer to the question, "How many defects can a single crystalline layer have before it is considered non-single?"

THE WITNESS: I can't give a number.

THE COURT: So it could be any number?

THE WITNESS: It could be.

THE COURT: "Does stem imaging remove all contrast from TEM images, including dislocations?"

THE WITNESS: That's another very good question.

THE COURT: See, they're smart.

THE WITNESS: Yeah, they're really thinking. In the stem imaging mode, you're enhancing the contrast from the differences in the atomic number. That doesn't mean that you won't get some contrast from dislocations. You know, you will see some of that, but compared to a conventional TEM image where the dislocations really cause a lot of contrast, the stem image has most of its contrast due to differences in atomic number, so the answer is dislocations can, you know, contribute, but it's not the dominant factor in a stem.

THE COURT: So the question, again, is: "Does stem

imaging remove all contrast from TEM images, including dislocations?"

THE WITNESS: Not all.

THE COURT: Okay. Thank you. All right.

MR. LINDGREN: Is that it? That's all the questions? Okay.

THE COURT: Anyone want to follow up on any of that?

MR. LINDGREN: There we go.

THE JUROR: So if you have a crystal with the long-range order and you have a fully disclosed grain inside and it has a different orientation, would that still be single crystal or polycrystalline?

THE WITNESS: That's a good question. So, it would still be considered single crystalline because over long range, it's going to have that same order, you know, as the overall crystal, so it would be single crystalline.

THE JUROR: Then how many of those would make it non-single?

THE WITNESS: This is where you have to also look at the electron diffraction pattern, so the electron diffraction pattern, you use that in order to determine if it's single crystal versus polycrystalline, so, the single crystal is going to give you just a single set of spots, the polycrystalline is going to give you a ring, right, so you would have to have enough of those to give you a ring in order for it to be

polycrystalline.

THE JUROR: There's no set number?

THE WITNESS: There's no real set number, it's more determined by that electron diffraction pattern.

THE COURT: Anything else?

MR. LINDGREN: All right, thank you. Ladies and gentlemen of the jury, Professor Redwing, the Court, Mr. Mortensen. Could you pull up Plaintiff's Exhibit 1601, which is the jury glossary. I just want to make sure we clear up something right before we dropped off. If you could pull up the definition of a non-single crystalline buffer layer.

BY MR. LINDGREN:

Q. Now, Professor Redwing, did you use this definition in forming your opinions in this case?

A. Yes, I did.

THE COURT: Could you hold on one second. I've completely gone dead on my computer.

Q. Based on the Court's instruction, where do you understand that the buffer layer can reside?

A. According to the claim construction, the buffer layer can reside anywhere between the substrate and the first growth layer, and we're defining the first growth layer here as being the first doped layer in the device structure.

MR. LINDGREN: So, Mr. Mortensen, could you quickly go back to Defendant's Demonstrative 310. Can you highlight the

multi-colored square, blow it up.
Q. So, Dr. Redwing, based on that definition, where does the buffer layer start?
A. So, again, the buffer layer is going to be in between the substrate, which I'm identifying using this line, and the first growth layer, which is going to be somewhere, you know, up above this, so outside of this region.
Q. So everywhere that's above the green line under the Court's construction would constitute a buffer layer?
A. Yes.
MR. LINDGREN: And if you can, Mr. Mortensen, quickly go to Defendant's Demonstrative 306, please.
Q. Professor Redwing, can you tap your screen?
THE COURT: Could you go back to that again. Anything above the --
Q. So, Dr. Redwing, can you draw --
THE COURT: Everything above which green line?
THE WITNESS: Let me write this again. So this is the line that identifies the substrate, right, and according to the claim construction, the buffer layer is anything in between the substrate, which we identify by that green line, and the first growth layer, which is one of the layers of the device structure, which is further up in this layer.
THE COURT: So it's above the horizontal green line, is that the buffer?

THE WITNESS: Yes, so everything above the horizontal green line.

MR. EVANS: Your Honor, we'd object. We defined the buffer layer, and that's not how we defined it.

THE COURT: That's how to understand her testimony, so it's both the blue and the red?

THE WITNESS: Yes. I'm just applying the claim construction, right, the language of the claim construction that was agreed upon here.

THE COURT: All right.

MR. LINDGREN: Okay. And so if we could go then to Defendant's Demonstrative. Thank you, Mr. Mortensen. If you can blow up the large scale TEM image.

Q. Okay. And, again, Professor Redwing, can you draw a red line where the substrate is?

A. All right. So the sapphire substrate will be located in this region.

Q. Okay. And can you identify where under the Court's construction the buffer layer could be located or is located?

A. Yes. So according to the Court's instruction, the buffer layer is anywhere between the substrate --

MR. EVANS: Objection, your Honor, she's testifying about legal conclusions about the claim construction.

THE COURT: Overruled.

A. I'm applying the claim construction. So it's anything in

between the sapphire substrate and the first growth layer, which we've identified previously as being the n type layer farther up, so it's somewhere up here.

THE COURT: What's the "it"?

THE WITNESS: The buffer layer.

THE COURT: So we're not looking at the buffer layer?

MR. LINDGREN: Okay.

THE COURT: No, are we looking at the buffer layer?

THE WITNESS: Yes, the buffer layer is somewhere in here. I'm really sorry about this, so I'm just applying the Court's claim construction, right.

THE COURT: Can you tell where the buffer layer is from this picture?

THE WITNESS: So, you know, the buffer layer is going to be the layer that starts right at the substrate surface, so you can see that there is a region of contrast right near that surface.

We could call that the buffer layer, however, according to the claim construction, we've defined it as being anything between that sapphire substrate surface and the first growth layer, which is further up, so, technically, you know, this area that's circled by blue could be called the buffer layer.

THE COURT: Could it also be the growth layer?

THE WITNESS: If it has -- if it is n type doped.

Q. Okay. So if we could, where we left off --

MR. LINDGREN: You can take that down, Mr. Mortensen.

Q. So we were about to get into your testing of the samples. Can you tell me how the samples were prepared for your analysis?

A. Yes, we used a technique identical to what Dr. Smith used to prepare the samples for his analysis. It was focused ion beam, which is a technique which allows you to carve out a thin sliver of a sample, so that's a standard technique used for TEM sample prep.

Q. And have you previously used these techniques when you characterized and analyzed materials?

A. Yes, extensively.

Q. And has your previous work on characterization and analysis included gallium nitride materials?

A. Yes, I've worked extensively on TEM characterization of gallium nitride materials.

Q. Now, I want to turn to your examination of the Epistar parts.

MR. LINDGREN: Could you pull up 1601, first page, Mr. Mortensen, and if you could blow up the portion that says glossary of the Court's claim construction.

Q. Now, did you rely on these constructions as part of providing your opinions in this case?

A. Yes, I did.

MR. LINDGREN: Okay. And if we can drop that out, Mr. Mortensen, and go to the glossary of agreed constructions.
Q. And did you use these agreed constructions for the purposes of your opinions in this case?
A. Yes, I did.
MR. LINDGREN: All right. Thank you, Mr. Mortensen. Can you go to the last page with the technical definitions.
Q. And did you use the definitions relating to polycrystalline and single crystalline that appear in this glossary for purposes of your analysis?
A. Yes, I did.
Q. Now, have you been here for the testimony of Dr. Moustakas, Dr. Piner and Dr. Smith?
A. Yes, I was.
MR. LINDGREN: And if you could please pull up Plaintiff's Demonstrative 3, Mr. Mortensen.
Q. And did you hear their testimony that it was their opinion that these images indicate that the buffer layers in the Epistar parts are polycrystalline?
A. Yes, I did hear that.
Q. Where did you understand that Dr. Moustakas, Dr. Piner, and Dr. Smith identified the polycrystalline buffer layers in these images?
A. So they indicated that the buffer layers were identified by the white arrows that are shown here.

Q. Okay. Do you agree that these four images indicate that the buffer layers in these Epistar parts are made of polycrystalline material?
A. No, I don't.
Q. And why not?
A. Because as I've mentioned before in a low resolution TEM image, such as this one, the contrast that you see comes from a variety of different factors, right, so there's strain, there's bending, there are dislocations, possibly from grain boundaries as well, so there's no way from a low resolution image, like this, that you could tell if it's polycrystalline or not polycrystalline. You really need to look closely, you know, and do a very thorough analysis of the sample.
Q. Okay. Now, Dr. Piner and Dr. Moustakas also stated that to grow a good monocrystalline growth layer, you would want a polycrystalline buffer layer. Do you agree with that?
A. No, I don't.
Q. Why not?
A. Because just based on the epitaxy process, in order to get a single crystal film, you want to start off with a single crystal substrate that serves as a template, and then the buffer layer that you grow on top of that, you also want that to be monocrystalline or single crystal so that it can provide a template for the growth of the rest of the layers, right, so you're trying to maintain this crystalline template all the way

through the entire process.

If you have a polycrystalline layer, right, so a polycrystalline layer has multiple grains with different crystal orientations, there's going to be different orientations. You will not be able to grow a monocrystalline film of a single orientation on something that has multiple orientations because it wants to template those multiple orientations.

MR. LINDGREN: Okay. Could we go to Plaintiff's Exhibit 1517, please. If you could then turn to page 2.

Q. Do you recall Dr. Piner's testimony suggesting that this Epistar document supports his claim that the buffer layers are polycrystalline?

A. Yes, I do.

Q. Do you agree with that?

A. No, I don't.

Q. Could you take us through what is being described or what you understand is being described here on this page?

A. Sure. So this is a schematic showing the MOCVD growth process for these layers, so in this initial case, you're starting off with a substrate, and you introduce aluminum and also ammonia, which is your nitrogen source, right, so the substrate is at a high temperature, remember, so the aluminum and the nitrogen are going to react, and they're going to deposit a film, and it's going to grow epitaxially on the

sapphire substrate, on that template that we formed.

So what is shown here are these epitaxial islands of aluminum nitride that have formed, so, you know, the epitaxial islands are going to be templated off of the lattice of the substrate, and then what happens is you introduce some gallium, all right, so now you have aluminum gallium nitride, and you grow that layer on top, which is what is shown here, right.

And if you think back to the EDS data that I showed you, the chemical composition, the chemical map, there was a layer of aluminum nitride and then aluminum gallium nitride on top of that, so what this schematic is showing is not that you have different grains, right, and that's indicated by different colors, but, instead, the different colors represent the different compositions that you get in those layers as a result of one being aluminum nitride and the other being aluminum gallium nitride.

And then on top of that aluminum gallium nitride layer, you grow the gallium nitride, so you remove the aluminum, you grow gallium nitride, you continue growing it until you get a very thick film that's smooth, and then you have -- you know, you add your device layers on top of that to get your full LED device structured.

Q. Now, is there anything in this diagram that suggests that the buffer layer portion is polycrystalline?

A. No. This is showing an epitaxial growth process where

you're using layers of different compositions.

THE COURT: In that last picture, which one is the buffer?

THE WITNESS: Okay. So this is good. So let's call this the N-type layer, right, and here is the substrate down here, so according to the claim construction for a buffer layer, the buffer layer can be anything from the substrate up to this first growth layer, so this entire region.

THE COURT: That's the buffer?

THE WITNESS: According to the claim construction, that's the buffer layer, so it includes the aluminum nitride, the aluminum gallium nitride and the undoped gallium nitride layer.

Q. Now, Professor Redwing, can there be different layers within what you've identified as the buffer layer region?

A. Can you be more specific?

Q. Yes. Could you have different regions of different chemical compositions within the buffer layer region?

A. Yes, certainly. I mean, that's what we have, that's what we're showing here is that you have a layer of aluminum nitride, a layer of aluminum gallium nitride and then a layer of gallium nitride on top of that, and all of those could be considered to be part of the buffer layer according to the claim construction.

Q. Okay. Now, let's keep moving through this exhibit.

MR. LINDGREN: Could you please pull up page 5 of Plaintiff's Exhibit 1517.

Q. And I'd like you to take us through what this page of the exhibit is showing.

A. Right. So this is showing a cross-section TEM image of the aluminum nitride nucleation layers, so those are those initial aluminum nitride islands that deposit epitaxially on the substrate, and you can see, you know, in this image here, this is the sapphire substrate, right, so you're getting some aluminum nitride islands that are growing epitaxially on the substrate.

You can see that within those islands, there's some contrast, and that contrast is coming from the dislocations as it tries to accommodate the difference in the lattice between the substrate and that layer, but if you take an electron diffraction pattern in this region, in this aluminum nitride nucleation region, you see that you just get spots, so a spot pattern is indicative of a single crystal material, and as it shows down here, the aluminum nitride layer shows a single crystal property. It implies the aluminum nitride layer was grown at high temperature. Well, we know it was grown at high temperature, so it's consistent with it being a monocrystalline layer.

Q. Does this show separate crystals or grains?

A. No, it doesn't.

MR. LINDGREN: Please pull up Exhibit 7 of Plaintiff's 1517.

Q. Now, if you could explain what we have going on in this slide?

A. So this is the second stage where we're depositing the aluminum gallium nitride epitaxially on those aluminum nitride islands, so what we see here, again, this is a cross-section TEM image after the aluminum gallium nitride has been deposited. It's growing epitaxially on top of the aluminum nitride islands that form there, so you can, again, you see contrast in that layer. That's due to the dislocations that we talked about.

To interrogate it, you obtain electron diffraction patterns in that aluminum gallium nitride layer and also in the aluminum nitride layer, and you can see that in both cases, we're getting spot patterns, right. Spot patterns are consistent with single crystal material. Again, these layers are also grown at high temperatures, so you would expect them to be single crystal under those conditions.

MR. LINDGREN: Okay. If we could go to page 9 of Plaintiff's Exhibit 1517.

Q. Could you please explain what this shows?

A. Sure. So now this shows, we have the aluminum nitride nucleation layer, the aluminium gallium nitride layer we've deposited on top, and now we've also grown a thick undoped

gallium nitride on top of that, so we're seeing the cross-section image of those layers here, and, again, this is a much thicker layer, so this is not as high magnification.

We're looking at, you know, the entire thickness of this whole structure, and we go in and we take electron diffraction patterns in the gallium nitride layer, in the aluminum nitride nucleation layer and in the aluminum gallium nitride layer, and that's what's shown in these three diffraction patterns here.

You can see all of them are spot patterns. Again, that would be consistent with everything in that image being single crystal, right, because it shows that it has long-range order and repeating of atoms.

Q. And does anything in this Plaintiff's Exhibit 1517 that you've received indicate that the buffer layers would have multiple grains with different crystal orientations?

A. No, there's nothing here from the electron diffraction patterns.

Q. So it's your opinion that nothing in this exhibit shows polycrystalline buffer layers?

A. No, nothing does.

Q. All right. Now, if we can go back to Plaintiff's Demonstrative 3. So do you agree with the plaintiff's position that these low res. TEM images indicate that the buffer layers in the Epistar products are polycrystalline?

A. No, I don't.

Q. Why?

MR. LINDGREN: You can take it down, Mr. Mortensen.

A. So, as I mentioned already, the contrast that you get in the low resolution TEM image, like this, comes from a number of factors. You can't tell with certainty that that's due to grain boundaries. We looked at the information, you know, in that series of, you know, of images starting with the aluminum nitride, the aluminum gallium nitride and the gallium nitride, and in that case, all of the data is consistent with it being single crystalline.

Q. Now, did you do any testing to support your opinion that the Epistar products do not have non-single crystalline buffer layers?

A. Yes, I did very comprehensive testing.

Q. What kind of testing did you do?

A. I did TEM analysis to get TEM images, I did stem analysis to get stem images, I did electron diffraction to get selected area diffraction patterns and nano-beam diffraction patterns, I did Fourier analysis to get simulated diffraction patterns, and then I also did the energy dispersive spectroscopy, the EDS chemical characterization.

Q. Now, did you rely on any testing done by plaintiff's experts?

A. Yes, I did.

Q. So, can you summarize the nature of the material that

you're relying on for your opinion?
A. Right. So I'm relying on the testing and analysis that I did myself on the four Epistar products, I'm also relying on the testing and analysis that the plaintiffs did on those four representative Epistar products.
Q. Okay. So, let's talk about the different diffraction patterns. How do the diffraction patterns support your opinion that the Epistar products do not have a non-single crystalline buffer layer?
A. Okay. So the diffraction patterns all show spots. They show a spot pattern, which is consistent or which is expected for a single crystalline material.
Q. Okay. If we could pull up Defendant's Demonstrative 412, which is based on Plaintiff's Exhibit 171, 172, 173 and 174. How do these diffraction patterns support your opinion?
A. So these are electron diffraction patterns that were obtained by the plaintiffs, and these are obtained on large areas, so I think Dr. Smith said the aperture size that he used to obtain these electron diffraction patterns was about 500 nanometers. All right. So this is a pretty large area that we're looking at, and if you blow up the Venus Series.
So, again, doing something similar to what I did in my analysis, I looked at the gallium nitride, you know, the gallium nitride region, the sapphire, so the gallium nitride region, the sapphire region and also the region at the

gallium nitride sapphire interface, and you can see at this length scale, so we're looking at a really large area, you know, a fairly large area.

In all cases, we get spot patterns. At the interface, we get two overlapping from the sapphire and from the gallium nitride, but all of these are, you know, spot patterns indicating that it's single crystal material.

Q. Okay. If we could pull up -- well, and is there any difference between your analysis of the Venus Series and any of the other Epistar products?

A. No, as you can see in all of these images, in every single case, we get spot patterns, so it's all single crystal material.

MR. LINDGREN: Okay. Mr. Mortensen, could you pull up Defendant's Demonstrative 413, which is based on Defendant's Exhibit 133, 134, 135 and 136. How do these support your opinion?

A. Okay. So these are a series of electron images or transmission electron microscope images and also electron diffraction patterns that I obtained using selected area diffraction, and maybe we could blow up the Mars Series in this case.

So the plaintiffs also did selected area diffraction, and they used an aperture that was 500 nanometers, so they were looking at a large area, and one of the comments that they made

was that that area was very large. It would be very difficult to pick up a thin buffer layer using that large of an area, so what I did is I used selected area diffraction, but I used a smaller aperture. I used an aperture that's 150 nanometers so I could look at a smaller volume of that material.

And so, again, what you see here is, you know, the circles. The blue indicates the region that I looked at in the gallium nitride layer. You can see that it has a spot pattern. This is the region that I looked at in the sapphire substrate. It, again, is a spot pattern, and if we look at this region right near the gallium nitride sapphire interface, again, we get a spot pattern that consists of two overlapping spot patterns because we're picking up, you know, some from the gallium nitride and also from the sapphire, but in all cases, we're getting spot patterns, so there's no evidence of polycrystalline material at this length scale as well.

Q. Okay. If we could pull up Defendant's Demonstrative 415. Actually before you do that, with regard to the analysis you did for the Mars Series, is it any different for the other three?

A. No, they're all identical. If you take a look at it, they're all spot patterns indicating single crystalline material.

Q. So now if we could go to Plaintiff's Demonstrative 414, which is based on Defendant's Exhibit 133, 134, 135 and 136.

Could you please explain, Professor Redwing how these support your opinion?

A. Okay. These are high resolution TEM images that are shown here, and then we used a nano-beam diffraction, so, again, the plaintiffs used 500 nanometer aperture, then we used 150 nanometers aperture. Now we're using a spot size that's 5 nanometers, so we can go right in and look at the region right next to the sapphire interface, so maybe we could blow up, let's see, the H-TF Series.

Okay. So, again, this is a high resolution TEM image right at that interface. We're using our 5 nanometer probe to look at a region in the gallium nitride layer. We get a spot pattern from there. You know, we use -- we focused down into the sapphire substrate. Again, we get a spot pattern, and we can take the nano beam, and we can look at a number of locations all along this region here, so that's what I'm showing by these red spots, so we're looking at a variety of different spots all through this layer, and in all cases, if you take a look at this, in every single case, we get spot patterns, right, so there's no evidence of polycrystalline material, again, at this length scale, so we've looked at it 500 nanometers, 150 nanometers, 5 nanometers, and we don't see, you know, any evidence of polycrystalline material.

Q. All right.

THE WITNESS: I think we have a question.

MR. LINDGREN: Yes.

THE JUROR: So I forget what you called this crystal structure, gallium nitride, what is the spacing between the different gallium nitride particles?

THE WITNESS: The atoms in the lattice?

THE JUROR: Yes.

THE WITNESS: So you mean the lattice constant, so the spacing in between?

THE JUROR: Yes.

THE WITNESS: It's like 3.189 angstroms.

THE JUROR: What is that in nanometers?

THE WITNESS: That would be .3 nanometers.

MR. LINDGREN: Any other questions? Okay.

Q. Okay. Is your analysis that you just provided with respect to the H-TF Series any different for the other three products?

A. No, it's all similar, it all shows spot patterns indicating that it's single crystal material.

Q. Now, if we go to Defendant's Demonstrative 415, and this is based on Defendant's Exhibits 133, 134, 135 and 136. How do these images support your position?

A. Okay. So, again, these are high resolution TEM images. Maybe we could blow up the Venus Series. That might be the best one. Okay. So, again, this is a high resolution TEM image. We're looking right at that interface between the

sapphire substrate and the layer on top of it, the film, and so what we're doing in this case is we're using Fourier analysis to select a particular region, again, you know, we have these red rectangles. We're selecting regions A, B, C and D.

We also looked at a square-shaped region, which is E, and we use Fourier analysis in order to convert this image to an electron diffraction pattern, and so I'm showing all of these electron diffraction patterns here.

And I should mention, I should point out that now in this case the areas that we're looking at are larger than the nano beam, than when we used that nano beam because these boxes are like 5 nanometers tall and maybe about 25 nanometers long, all right, so this is a larger area, again, and when we do the Fourier analysis in each case, we see the spot patterns. We don't see ring patterns, so, again, this is all consistent with single crystalline materials. It's indicating it's all single crystalline material.

Q. Okay. Is your analysis with respect to these Venus Series the same for the other three products?

A. Yes.

Q. Could we go to Plaintiff's Demonstrative 416. This is based on Plaintiff's Exhibits 180, 181, 182 and 183. Now, could you tell me -- I'm sorry, this is based on Plaintiff's 179, 180, 181 and 182, my apologies. Can you tell us how these images support your opinion?

A. All right. So these are basically a similar analysis that was done by the plaintiffs on these, on the Epistar products. Again, if you want to blow up one of maybe the Venus Series here.

Okay. So, again, we have a high resolution TEM image. You can see the sapphire substrate and the gallium nitride layer, and the plaintiffs selected --

THE COURT: So, of these, which box is the buffer? I keep asking because that's what we're worried about here.

THE WITNESS: Right, right. So the response that I will give is that the buffer layer, again, if we apply the claim construction is the layer between the sapphire substrate and the first growth layer, which is going to be somewhere above what we're looking at here.

THE COURT: You would say it's 2, 3 and 4?

THE WITNESS: Yes, it's definitely 2, 3 and 4.

THE COURT: All right.

A. Okay. So getting back to this, so we select these regions or the plaintiff selected these regions, and then they carry out a Fourier analysis on those regions. You know, in each of the regions, they get spot patterns, again, indicating single crystal material, so there's no evidence of polycrystalline material in any of this.

Q. Okay. Is there any difference between the results on the tests on the samples that both you tested and that the

plaintiff tested?
A. No, there are no differences.
Q. So what is your opinion based on your review of these five sets of diffraction patterns?
A. So my opinion is that all of the -- the entire buffer layer is single crystalline material. There's no evidence that any of it is polycrystalline.
Q. Now, let's move onto the stem images you took.
MR. LINDGREN: Could you please, Mr. Mortensen, pull up Defendant's Demonstrative 417.
Q. All right. Do these stem images support your opinion?
A. Yes, they do.
Q. Okay. Can you explain why?
A. Okay. So let's put up the Venus Series again. Okay. So these are stem images. So most of the contrast that we see in this image is coming from differences in the atomic number of the atoms, you know, that comprise the material, so you saw an image similar to this earlier, right, so you have the sapphire substrate.
It appears dark now in a stem image, and then we have the aluminum nitride, aluminum gallium nitride layer on top of that and the gallium nitride layer on top of that.
So the nice thing about stem is that you no longer have all of this contrast from other factors, you can actually look at the individual atoms, but to do that, you have to zoom

in. All right. So we're going to zoom in on this area that's close to the substrate surface, so that's what I'm showing by this, you know, this yellow box here, so let's zoom in on that area, and that zoomed-in image is this next image, so we're taking that area, zooming in on it, right, and now what you can start to see in this image at this magnification is you can start to see the rows of atoms, right.

So if you take a look, there's a row of atoms that will go all the way across the image there. If you look down in this layer that has darker contrast because it has aluminum, those layers also were continuous, right.

So let's go, you know, a little further, deeper into this material, higher magnification. Let's look at this region right here near the substrate interface, all right, and if we do that, if we take a high magnification image right near that interface, these are in two different regions. I showed you this before.

So this is an image, you know, right near the sapphire interface. If you take a look at the lattice or the crystal above this, which is the aluminum nitride, the aluminum gallium nitride, this is part of the buffer layer, you can see that these are the atoms that you're looking at.

They're all aligned. You don't see any misorientations between those atoms. You're getting this long-range order that's characteristic of a single crystalline

material, so, you know, the stem images are consistent with what we saw in the EDS. Everything is indicating single crystal.

Q. Okay. So based on -- so what do these -- how do these images support your opinion?

A. Yes, so these images support my opinion because they're all indicative of what you would get in single crystal material.

Q. Okay. Now, let's move onto some of the high resolution TEM images.

MR. LINDGREN: Mr. Mortensen, could you please pull up Defendant's Demonstrative 418. This is based on Defendant's Exhibits 133, 134, 135 and 136.

Q. Can you tell the jury how these images support your opinion?

A. Yes. So these are high resolution TEM images. This is not stem, this is just TEM, and you can see. Let's just blow up the Venus again.

Okay. So you can see in this image, you have the sapphire substrate, right, and you have the layers on top of it, but now you're getting contrast from dislocations from other defects that are present there, so you have more contrast, but, nevertheless, if you look closely, you'll see lines that run almost horizontally across the entire image.

It's kind of difficult to see. It's not as easy to see in

this type of image as it is in the stem because the stem is just a clearer picture of the lattice, but, nevertheless, these are lattice fringes, so they're associated with that long-range periodic arrangement of atoms, which is a single crystal material.

MR. LINDGREN: Okay. Could we go to Defendant's Demonstrative 419, please, and this is based on Plaintiff's Exhibits 171, 172, 173 and 174.

Q. Could you please tell us how these images support your opinion?

A. These are high resolution TEM images obtained by the plaintiff on these representative samples, and, again, let's blow up maybe the Mars Series in this case. Okay. So, again, in this TEM image, which is going to have contrast from a variety of factors, you can see the sapphire substrate interface, right, and on top of that, this is the gallium nitride layer, and there's contrast from dislocations and other defects, but, nevertheless, you can see the lattice fringes as well in this layer, so you can see that there are lattice fringes that run across this image, so that, again, is consistent with single crystal material.

Q. Now, do you believe that high resolution TEM images are more useful in characterizing the crystal structure of the material in the buffer layer than some of the lower resolution TEM images relied upon by plaintiff's experts?

A. Yes. I mean, high resolution images are helpful, particularly if you're trying to focus in on this region right next to the substrate interface. It's just useful to look at this at a higher magnification.
Q. Now, if the buffer were, as Dr. Piner argues, with in some cases billions, in other cases, millions of grains in the buffer layer, would you expect to see evidence of these grains in these photos or in these images?
A. Yes, you would definitely see evidence. I think Dr. Piner, he was comparing the low resolution TEM image with a schematic that he drew, you know, of showing these different grains, and just based on that, the average grain size should be about 5 nanometers or so, maybe 5 nanometers wide, 10 nanometers tall. You can check it out.
Anyway, so if you looked at this image, if you have grains that are 5 nanometers in grains, you should see those, right. There should be a lot of grains in this image, and you don't see it.
Q. So, what is your opinion based on the review of these two sets of high resolution TEM images?
A. So my opinion is that this is all single crystal material.
Q. Now, is there anything regarding the way Epistar manufactures these products that you believe supports your opinion?
A. Yes.

Q. What is that?
A. So Epistar uses high temperatures to grow these materials, to grow these buffer layers, and they use MOCVD growth, which is carried out at high temperatures, so you would expect the material to be single crystalline just based on those process conditions.
Q. So my final question to you is have you seen any real scientific data that shows any evidence that the Epistar parts analyzed in this case by either party have non-single crystalline buffer layers?
A. No, I have seen no evidence.
MR. LINDGREN: All right. I pass the witness, your Honor.

CROSS-EXAMINATION

BY MR. EVANS:
Q. Dr. Redwing, I just handed you four exhibits marked 1608, 1609, 1610 and 1611. Are those transmission electron microscopy work that you and Dr. Wang did on the accused products?
A. Yes, these are all, they all appear to be stem images for the accused products. Maybe not all. I take that back.
Q. And would you agree that 1608 is from the Mars Series? Well, let me represent to you your attorneys told me that 1608 was from the Mars Series.
A. I agree.

Q. 1609 was from the H-TF Series, 1610 was from the L-TF Series, and 1611 was from the Venus Series. Does that sound right to you?
A. That sounds right.
Q. And you just testified -- well, when were these images created?
A. So these images were obtained in early August of 2015.
Q. And then you first used these images in your expert report, which was served to us on September 11th, 2015?
A. That sounds about right.
Q. And you received all the samples that you tested from your lawyers?
A. Yes. So I did receive them from counsel.
Q. And then on October 27th, 2015, six days before trial, you disclosed the remainder of the images that you took that you chose not to put in your report; is that right?
A. Yes, those were sent.
Q. And some of those images are in these 1608, 1609, 1610, 1611 exhibits that I've just handed you?
A. Yes, that's correct.
Q. And I thought you just testified that you haven't seen any evidence of a non-single crystalline gallium nitride structure; is that right?
A. That's correct.
MR. EVANS: Could we put up slide 4.

Q. Now, this is from PTX 1610. So this is -- what is this image?

A. This is a stem image.

Q. Okay. This is from the slope of one of those humps?

A. Yeah, again, this is from a sample that has engraved substrate, so there are little mounds on the substrate, and this is an image that's taken from the side of one of those mounds.

Q. And so the dark portion of this image is the sapphire?

A. Yes.

Q. And everything above this is gallium nitride?

A. No, not exactly.

Q. All right. Could you animate in. You actually tested this using the EDS, right?

A. Yes.

Q. And this is the EDS results?

A. Yes.

Q. Could we scan back out. So from your EDS results, the sapphire ends right there; is that right?

MR. EVANS: Scan in again. Zoom it out again.

Q. So that means everything above that is gallium nitride, right?

A. No, because if you take a look, so look at this region right here, all right, that has a dark contrast.

Q. Let's go back to your EDS, and blue means gallium nitride,

right?
A. Okay. So if you look, you can see in this same area, it looks more purple-colored because now you're adding in some red in with that.
MR. EVANS: Your Honor, I object. It's nonresponsive. The question is is the blue area gallium nitride?
THE COURT: She answered that.
A. The blue answer is gallium nitride, just the blue area.
MR. EVANS: Let's pull up Plaintiff's Slide 1.
Q. So, Dr. Redwing, these are some definitions of polycrystalline we've all agreed to in this case. The first one is from Epistar's concise statement of undisputed material facts they filed with the Court, and they defined a polycrystalline material "has multiple grains or crystals and thus has at least one grain boundary." Do you see that?
A. Yes, I do.
Q. And you used that exact same definition in a sworn declaration that you submitted in this case, which is the second definition?
A. That may have been a sentence or two from my declaration, but it's not the definition that I used.
Q. But you submitted that definition in a sworn declaration?
A. That was not a definition in my declaration.
Q. But this is a statement from your declaration?
A. It is, yeah, it's two sentences from my declaration.

Q. And Epistar also said that "grain boundaries can be identified from high resolution TEM, HRTEM images." That's what they said is a concise statement of undisputed material fact?
A. So that's a single sentence in, you know.
THE COURT: Just answer.
Q. So I read it correctly?
A. You've read it correctly, yes.
Q. And then we've also submitted a joint definition of polycrystalline to the jury in the glossary that's at the bottom, "a material that is comprised of multiple grains that have different crystal orientations"?
A. Correct.
Q. Now, there's nothing in any of these definitions that has any particular -- for any specific type of grain boundaries required to show that a material is polycrystalline, is there?
A. So, I mean, so the definition of polycrystalline says that it's comprised of multiple grains that have different crystal orientations, so that's the definition that I use.
Q. Does the word "high-angle grain boundary" appear in any of these definitions?
A. No.
Q. So "high-angle" is not a requirement of any of these definitions?
A. If these are definitions, no.

Q. Let's go to the next slide. Dr. Redwing, on this slide is an excerpt from the *Callister's Material Science and Engineering* textbook that everyone in this case has agreed is a fundamental textbook. Do you understand that?
A. Yes, I do.
Q. Okay. Now, this is the same textbook right here that defendant's used to cross-examine Dr. Piner. What we're looking at here is figure 4.7 from page 103 of that Callister textbook. Would you agree that Dr. Callister, and I'm looking at the text at the bottom, he's defining a small or low-angle grain boundary as meaning the same thing?
A. According to this definition, he's using the term "small" and "low" interchangeably.
Q. Dr. Redwing, this figure 4.7, it's designed to illustrate the difference between a low-angle grain boundary and a high-angle grain boundary for students; is that right?
A. So it's illustrating a type of low-angle grain boundary.
MR. EVANS: Objection. Nonresponsive, your Honor.
THE COURT: Overruled.
Q. Let me just ask that again. Is it your understanding that this illustration is designed to demonstrate the difference between a low-angle grain boundary and a high-angle grain boundary?
A. Yes.
Q. All right. For the rest of these questions, I'm going to

label these crystals shown in this diagram just for clarity. So I'm going to call that one in the middle Number 1, and I'm going to call the crystal in the upper right Number 2. All right. Now, crystal 1 and crystal 2 in this diagram are separated by a high-angle grain boundary. Is that right?
A. That's what this is illustrating.
Q. Would you agree?
A. So it's illustrating a high-angle grain boundary, I would agree, but it's a cartoon, it's not, you know, it's not a TEM image that we're looking at.
Q. Right, it's just illustrating?
A. Illustrating.
Q. But you agree that those 1 and 2 are separated by a high-angle grain boundary in this diagram?
A. That's what it's showing.
Q. You'd agree with me crystal 1 and crystal 2 are separate crystals?
A. If they're separated by a high-angle grain boundary.
Q. And two or more crystals means that this material is polycrystalline, right?
A. Multiple crystals with different orientations. I don't think we defined it as two crystals.
Q. So you don't believe that this is polycrystalline?
A. So it has a high-angle grain boundary. Assuming that that high-angle grain boundary entirely encloses a grain, which I

believe it does, then, you know, this would be a polycrystalline material.

Q. Let's look at crystal 3, which is going to be the crystal on the lower right-hand side. Now, you'd agree that crystal 3 in this diagram is separated from crystal 1 by a low or small angle grain boundary?

A. So according to the diagram, it indicates it's a small angle grain boundary, so, yes.

Q. And you'd agree that crystal 1 and crystal 3 in this diagram are separate crystals?

A. So, yes, if the misorientation between the two regions is large enough that you could pick it up on an electron diffraction pattern, that would indicate that the two orientations are different.

Q. So you just said these are two crystals separated by a grain boundary, right?

A. I said that they would be if you do electron diffraction and you can see that there's a difference in the orientation.

Q. So in this diagram --

A. This is a drawing.

Q. I'm asking you in this drawing, there's two separate crystals separated by this grain boundary, 1 and 3 are separate crystals. Do you agree or disagree?

A. I do not agree.

Q. Okay. What you testified today, I believe, you agreed

that you could not tell the difference between the electron diffraction pattern of a gallium nitride buffer layer with many low-angle grain boundaries versus one that was perfectly single crystalline; is that right?
A. I did, yes.
MR. EVANS: Let's go to slide 3.
Q. All right. So what we all agree on is we all agree on a definition of "grain boundary" because it's in the jury's glossary, so we all agree that a grain boundary is the boundary separating two small grains or crystal having a different crystallographic orientation and polycrystalline material, right?
A. Yes.
Q. And we all agree that the buffer layers of all four of the exemplar parts contain millions, if not billions, of low-angle grain boundaries?
A. I don't agree.
Q. You don't agree that there are any low-angle boundaries or how many there are?
A. I have never detected a low-angle grain boundary in any of these materials.
MR. EVANS: Could we play Redwing 35, which is from her deposition page 86 starting at line 17.
(Videotaped deposition played as follows:
"Q. So you don't consider anything that has low-angle

grain boundaries to be polycrystalline?

A. I didn't mean that. So, for example, gallium nitride layers, if they're grown on a lattice mismatched substrate, they have low-angle grain boundaries.

Q. So would sapphire be a substrate that has a --

A. Sapphire would."

MR. EVANS: Could we put slide 3 back up.

Q. All right. So we all agree there's low-angle grain boundaries present in these buffer layers because they were grown on a lattice mismatched substrate?

A. So, there are high density of dislocations present in these layers, right. We see that because of this lattice mismatch. Statistically speaking, there is a good probability that some of those dislocations are going to align in a line, right, and we call that a low-angle grain boundary. So I have no evidence that there are aligned dislocations in any of these from any of the analyses that I did, but just statistically speaking, you would assume that there would be some aligned dislocations and perhaps low-angle grain boundaries.

Q. You realize that defendant's lawyers have already judicially admitted that low-angle grain boundaries are present in the buffer layers of each of these parts?

MR. LINDGREN: Objection, your Honor.

THE COURT: I'm not sure exactly whether they admitted it that way. Do you want to read it exactly?

MR. EVANS: Sure.

THE COURT: I'm not sure they said each of these parts.

Q. Well, they admitted that there's low-angle grain boundaries present in the buffer?

MR. LINDGREN: Objection, your Honor.

THE COURT: Overruled because there was an admission.

Q. So this is what the Court asked to defense counsel, "Thank you. So we all agree what's undisputed is there are low-angle grain boundaries in the buffer layer." Defense counsel: Right."

THE COURT: Do you agree with that?

THE WITNESS: So, yes, just statistically speaking, there should be some low-angle grain boundaries, but I've never seen any, and you can't actually detect them because this electron diffraction pattern is identical.

Q. Right. All right. So we agree that there are low-angle grain boundaries present, you're just saying you haven't seen one?

THE COURT: Let me just say the standard is more likely than not, is it likely statistically that there are low --

THE WITNESS: Statistically, yes, there are likely some low-angle grain boundaries.

Q. Okay. So we all agree there are low-angle grain

boundaries, and so the only point of disagreement in this whole case is the conclusions that we're drawing from that?

THE COURT: Is that right? Just to follow up, everyone agrees there's statistically going to be some low-angle grain boundaries, and you would say they are from defects, and they're saying it's from polycrystalline; is that what the big issue is?

THE WITNESS: Yeah.

THE COURT: All right.

MR. EVANS: I pass the witness, your Honor.

THE COURT: I hope I got that right.

MR. EVANS: Callister's textbook in evidence is 1619.

THE COURT: Yes. Any objection?

MR. LINDGREN: No, your Honor.

(Plaintiff Exhibit No. 1619 was admitted into evidence.)

MR. LINDGREN: Your Honor, pass the witness. We're done.

THE COURT: You're done.

MR. EVANS: I can move 1608 to 1611, can I move that?

MR. LINDGREN: Yes.

THE COURT: That's fine.

(Plaintiff Exhibit Nos. 1608-1611 were admitted into evidence.)

MR. LINDGREN: Your Honor, one, can we excuse

Professor Redwing?

THE COURT: Yes.

MR. LINDGREN: Secondly, it was brought to our attention by plaintiff's counsel that the samples, while we had asked that they be admitted, had not been admitted, and these are DTX 136, 137, 138 and 139.

THE COURT: So they are in that box?

MR. LINDGREN: Yes, they are, your Honor.

THE COURT: Open it up. Let's see.

MR. VASQUEZ: Get your microscope out.

MR. LINDGREN: Your Honor, may I approach?

THE COURT: Show the jury what they look like.

MR. LINDGREN: This will give you an idea of the size we're talking about.

THE COURT: We can all stand and stretch. Are you all set?

MR. LINDGREN: Your Honor, I just need to make a correction on the record. I think I misread one of the numbers on the samples, I apologize. According to our list, they are Exhibits Defendant's 137, 138, 139 and 140.

THE CLERK: Thank you. That's okay.

THE COURT: May I see them?

MR. LINDGREN: You may.

THE COURT: All this time I've been presiding on this case, I've never seen them. Very exciting.

Why don't you state for the record what you're showing us.

MR. LINDGREN: So these are portions of the LED chip that was taken off, shaved off and then put in the electron microscope, so it's not the whole chip, it's the portion that was tested.

THE COURT: The thing that looks like a little worm?

MR. LINDGREN: Yes.

THE COURT: It's a little darker thing?

MR. LINDGREN: Correct.

THE COURT: Did you all see it? Okay.

MR. VASQUEZ: For the defense next witness, we call Bernd Kammerer.

BERND KAMMERER, having been duly sworn by the Clerk, testified as follows:

THE CLERK: Could you please state your name.

THE WITNESS: My name is Bernd Kammerer, B-e-r-n-d K-a-m-m-e-r-e-r.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. VASQUEZ:

Q. Good afternoon, Mr. Kammerer. Where do you live?

A. Good afternoon. I live in Dallas, Texas.

Q. And who do you work for?

A. I work for Everlight Americas.

Q. What is your job title?
A. I'm Everlight America's president and COO.
Q. Now, what's the relationship of Everlight America, your employer, with Everlight Electronics?
A. Everlight Americas is a fully-owned subsidiary by Everlight Electronics.
Q. How long have you worked for Everlight Americas?
A. Since 2005.
Q. Okay. And before you went to work for Everlight Americas, where did you work?
A. I started working for Everlight in 1999, and I was hired to establish the European headquarters in 1999.
Q. Tell me about your educational background.
A. I hold a bachelor and a master's degree in electrical engineering.
Q. Okay. And when did you get that?
A. I got the degree in 1989.
Q. From what institution, sir?
A. The Armed Forces University in Munich, Germany.
Q. So you got the bachelor's of science and then the master's of science?
A. Yes.
Q. Okay. You said you spent time in the German armed forces?
A. Yes, I served ten years.
Q. What did you do in the military?

A. I was a weapons officer on a submarine.
Q. What rank did you achieve?
A. I achieved rank of lieutenant commander.
Q. When did you start in the LED business?
A. I started in the LED business back in 1994.
Q. Okay. What did you do in the LED business before you joined Everlight in '99?
A. Between 1994 and 1999, I worked for a semiconductor distributor, Everlight and also other LED manufacturers were my suppliers.
Q. So before you worked for Everlight, you were involved in a business relationship with Everlight?
A. Yes.
Q. Just briefly describe it.
A. Well, it was my supplier, so we sold Everlight LEDS to customers all over Europe, and I was a product manager for LED.
Q. Okay. Are an owner of Everlight Americas?
A. I'm a minority shareholder.
Q. Okay. How much do you own?
A. Two percent.
Q. Two percent of the subsidiary company?
A. Yes.
Q. Of the Taiwanese company?
A. Yes.
Q. Okay. Can you tell the jury how Everlight got started?

A. Started in the early --

MR. SHORE: Objection, your Honor, personal knowledge. He's not a corporate representative.

THE COURT: Overruled. It's a general background.

MR. VASQUEZ: This is not a long, a brief portion that he'll tell business customers.

A. Started back in the early '80s.

Q. Okay. Did it start as an LED manufacturer?

A. Yeah, Everlight started making, designing and making LEDS in Taiwan in about '83, 1983.

Q. Is it a private company or publicly-held company?

A. It started as a private company, but it's a public listed company since 1998.

Q. And how many employees today are at Everlight Electronics?

A. Worldwide, about 6,000.

Q. In how many different countries do they operate?

A. About 10.

Q. And how long has Everlight been selling products in the United States?

A. Since the beginning. Everlight started selling products in the '80s as a private label manufacturer, so Everlight made products for other brands in the U.S., like Fairchild or QT Optoelectronics.

Q. Which companies did they make private label products for?

A. Fairchild or QT Opto.

Q. And those are United States public companies?

A. Yes.

Q. Did that business model change at some point in the United States?

A. It changed in the '90s when Everlight decided to brand under its own name, so in the '90s, Everlight decided to go away from the private labeling, more into marketing LEDS in the United States under Everlight's brand.

Q. Okay. And so when it made that transformation, when did it start Everlight Americas?

A. Also in the '90s, early '90s.

Q. Okay. And how many people does Everlight Americas employ in the United States?

A. We employ about 30 people in the United States.

Q. And how many are in sales?

A. About 15.

Q. Okay. I'd like to switch topics. In the year 2007, did you know who the company Cree was?

A. Yes, I knew Cree as a competitor as well as a supplier for chips.

Q. At that time, 2007, was Everlight buying chips from Cree?

A. Yes, we bought chips from Cree, mostly silicon carbide.

Q. And what did you do with those chips when you bought them?

A. We packaged them and sold them as blue and white LEDS.

Q. In late 2007, early 2008, did Cree tell you that they had

executed a license that allowed them to be the agent for Boston University on their '738 patent?

MR. SHORE: Objection. Hearsay.

THE COURT: Did you personally have that conversation with someone at Cree?

THE WITNESS: I had a conversation at Cree.

THE COURT: All right. I'll allow it.

Q. Where did that occur, sir?

A. In Durham, North Carolina.

Q. Durham, North Carolina?

A. Yes.

Q. And you sat down at the table with someone from Cree?

A. Yes, I had a meeting November 8th, 2007 with Cree.

Q. Do you recall who was there for Cree?

A. Mr. Brandes.

Q. George Brandes who's been talked about during the trial?

A. Yes, George Brandes.

Q. Did Mr. Brandes tell you that they were representing Boston University's '738 patent during that meeting?

MR. SHORE: Objection. This is hearsay.

THE COURT: Overruled. This is an issue of notice, I imagine.

MR. SHORE: Notice is stipulated with this defendant.

THE COURT: Overruled.

A. I've seen a presentation during that meeting where Cree

indicated they have an exclusive license for that patent.

THE COURT: I'll allow this for state of mind as to Everlight at that period of time.

Q. And did you understand you were talking to Boston University's agent from that conversation, sir?

MR. SHORE: Objection.

THE COURT: Overruled.

A. My understanding was that we were talking to a licensee.

Q. And you understand he had authority to talk on behalf of the patent, correct?

A. Yes.

Q. Did Cree tell you that they had licensed the '738 for their chips, their Cree chips that they were selling?

A. No, they didn't.

Q. Okay. Did Cree tell you that Everlight was infringing the '738 patent by using Cree chips?

A. No, they did not.

Q. Now, how did you get to that meeting in North Carolina, not physically, but what were the circumstances that led you to be there?

A. I received an invitation from George Brandes in about October, 2007 to come to a meeting in Durham.

Q. And did he tell you what he wanted to talk about at the meeting?

MR. SHORE: Objection. Leading.

THE COURT: Overruled.

A. He told us the reason for the meeting was to discuss possible infringement of the IP.

Q. Did he discuss any secondary purposes?

A. Not before the meeting but during the meeting he discussed or we discussed a possible business solution.

THE COURT: You know, I can barely hear you. You need to speak up.

A. During the meeting we discussed a possible business solution.

Q. What did Mr. Brandes say was a possible business solution?

MR. SHORE: Objection. Hearsay and 408 as well.

THE COURT: Well, did he charge you with infringement at that point? Did he say you were infringing?

THE WITNESS: I've seen a presentation where he claimed that we infringed or certain products infringed Cree's IP.

THE COURT: Did he threaten litigation?

THE WITNESS: Not really.

THE COURT: All right. I'll allow this discussion.

MR. SHORE: Hearsay, your Honor.

THE COURT: This is for state of mind as to what the hypothetical licensor, remember, if you get to the issue of royalty as to what people --

MR. SHORE: Your Honor, may I approach?

THE COURT: Overruled. No, let's just get through this. We have half an hour left today.

MR. SHORE: This is not the purpose.

Q. When Mr. Brandes was talking to you in North Carolina at that time acting as Boston University's agent on the patent, did he talk to you about a secondary purpose of doing business between Cree and Everlight?

MR. SHORE: Objection. It assumes facts not in evidence. It's not talking for BU.

THE COURT: Yes, it's not talking for BU, it's the exclusive licensee who had authority to talk on behalf of the patent. Is there another purpose for the meeting?

THE WITNESS: The meeting was to show Cree's position on Everlight infringing the IP and then also part of this meeting was the discussion about business solution, how Everlight and Cree can find a business solution.

Q. Meaning a business solution to the infringement charge, correct?

A. Yes.

MR. SHORE: Objection. Leading.

THE COURT: Overruled.

Q. What did he suggest would be the business solution to the infringement charge?

MR. SHORE: Hearsay. Your Honor, may I approach the witness?

THE COURT: Yes. Sustained.

Q. Did he tell you that he thought --

THE COURT: You mean apart from the patent?

MR. VASQUEZ: No, I said as a solution to the charge of infringement, your Honor, directly connected to the patent.

THE COURT: I'll allow it.

A. Can you repeat the question, please.

Q. Yes, what did he say might solve the problem?

THE COURT: Can I just see you at sidebar? I hate to do this late in the afternoon.

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE COURT: What's the answer?

MR. VASQUEZ: Buying some of our chips more or less. He's talking about buying some chips from Cree, and he's talking about the patent problem, and that's what the discussion was, two different pieces that were interconnected.

THE COURT: It was about a royalty rate?

MR. VASQUEZ: It was about compensation in lieu of a discussion. I don't want to testify for him.

THE COURT: I just want to hear what he's saying.

MR. VASQUEZ: I don't know exactly what he's going to say.

MR. SHORE: You know what he's going to say.

THE COURT: Why is this not hearsay? In other words, I'm allowing in the back and forth if it isn't disqualified.

MR. VASQUEZ: It goes to two things. It goes to his state of mind on willfulness for the issue of basically the big picture is that --

MR. SHORE: Can I tell you what he's doing?

MR. VASQUEZ: I don't want to hear it.

MR. SHORE: It's an applied license defense.

(SIDEBAR CONFERENCE WAS CONCLUDED)

THE COURT: I'm going to allow this in as to what Everlight's state of mind was in 2007 and not for the truth of the matter. The reason I say that, at some point, you know, you have to first get through the issue of whether there's infringement, but if you find there's infringement, you have to find whether it's willful infringement.

You'll see when you get this verdict form, and so the state of mind Everlight was in at that time is relevant to one of the issues in this case, and I'm only allowing it in for that purpose.

Q. What was your take-away from that meeting?

A. My take-away from that meeting was that during the meeting, I learned that the IP was chip-related, and so I took the matter serious. That's why I attended the meeting, and the IP was chip-related, so for me the solution was to involve our chip supplier because that's a chip-related problem.

Q. Okay. So let me ask you a couple of follow-ups to that. When you say the IP was related, you meant the intellectual

property, which was the subject of the patent, correct?
A. Yes.
Q. And when you say it was chip-related, Everlight didn't make or sell chips, they made and sold packages, correct?
A. Yes. So Cree really didn't our engineer to package, they accused the chip that we use in our package.
Q. Okay. What did you do in response to that meeting?
A. Right after the meeting, I asked our legal department to get in the touch with Epistar, who was the chip supplier for the accused products, and to get their opinion.
Q. Okay. And did you talk directly to Epistar or did you work through subordinates?
A. I worked through our legal department.
Q. Okay. So, do you recall who you worked with in the legal department?
A. I don't recall the name.
Q. What were your instructions to the legal department based on the meeting?
MR. SHORE: Objection. Hearsay.
THE COURT: Overruled.
A. My instructions to the legal department were that they get in touch with Epistar, get their opinion, and that we use Epistar's opinion on infringement or non-infringement to explain our position to Cree.
Q. Did they carry out your instruction?

A. They did.
Q. What did you find out after they talked to Epistar?
A. So Epistar's opinion --
THE COURT: From who?
MR. VASQUEZ: From his subordinates who he instructed to talk to Epistar.
MR. SHORE: Objection. Hearsay.
THE COURT: That's sustained.
Q. I'm trying to find out what you were thinking. Did you subsequent to your legal department contacting Epistar, did you get some information that caused you to form a belief as to whether you had responded adequately?
THE COURT: Not attorney-client.
Q. Not attorney-client.
MR. SHORE: Your, Honor it's back door hearsay.
THE COURT: Overruled.
Q. You can answer.
A. Yes.
THE COURT: You can't -- the answer is yes or no. Did you get some information?
THE WITNESS: I got some information back from our legal department.
Q. Okay. And did you learn what Epistar's position was with respect to whether their chip infringed?
MR. SHORE: Objection. Hearsay and waiver of

attorney-client.

THE COURT: Sustained.

A. I heard that --

Q. No, sustained means you don't get to answer. Did you at some point after talking to the legal department instruct your subordinates to talk to Cree again?

A. Yes, so right after we got --

MR. SHORE: Nonresponsive. Yes or no.

THE COURT: Overruled.

A. Right after we got the opinion from Cree, we had another meeting, so we had our attorneys meet Cree's attorneys, so legal department, and I also send my vice-president Dan Troutt to meet Cree again to discuss a kind of business relation or solution Cree would be interested in.

Q. Okay. So after you dispatched your legal people to talk to Cree's legal people and you dispatched Dan Troutt in sales to talk to Cree, did you come to a conclusion whether this problem had been resolved?

A. Yes. Right after the meeting, I got a report from our --

MR. SHORE: Objection. Hearsay.

THE COURT: Yes, as the answer is being phrased right now. You need to rephrase the question.

Q. So the question was did you come to a conclusion after you heard back from legal talking to Cree legal and sales talking to Cree sales?

A. Yes, I came to a conclusion that the problem is solved and I haven't heard back from Cree since the second meeting.

Q. And was that in early 2008?

A. That was early 2008.

Q. So you didn't hear anything from Cree in 2010?

A. No.

Q. Did you hear anything from Boston University that year?

A. No.

Q. What about 2010?

A. Nothing until 2012.

Q. And what was the form of notice or information that you got in 2012 that caused you to understand this problem had come back after four years?

A. Can you repeat?

Q. What did you learn when you say not until 2012?

A. I learned in 2012 from our legal department that we've been accused from Boston University.

Q. Okay. And Cree never came back to you after 2008; is that right?

A. No, they didn't.

Q. Did that cause you to believe that the problem was festering or that the problem had gone away?

MR. SHORE: Objection. Leading.

THE COURT: Overruled.

A. It made me believe the problem has gone away.

MR. VASQUEZ: No further questions. Thank you.

CROSS-EXAMINATION

BY MR. SHORE:

Q. Mr. Kammerer, we never met before, correct?

A. We didn't.

Q. Did you supply your attorneys in this case with a copy of this report from the legal department?

A. No, I didn't.

Q. Did you supply your attorneys in this case with any of these reports that you got back from Dan Troutt?

A. That was a verbal report.

Q. The instructions to the legal department that you gave, are those by e-mail? How did you give those instructions?

A. I was on a business trip to Taiwan, and I did this personally in Taiwan.

Q. Okay. 2008 to 2012, obviously that's less than six years, correct?

A. Yes.

Q. And are you aware of any way that this case would have been defended any differently if it had been filed in 2008 instead of 2012?

A. I'm not the expert.

Q. So you don't know of any?

A. I don't know, no.

MR. SHORE: Okay. Thanks. I pass the witness.

MR. VASQUEZ: No further questions, your Honor.

THE COURT: Thank you.

MR. VASQUEZ: So at this time, your Honor, we have video clips that will fit inside the time window that we have, but we also have the ability to start the direct of a witness that would probably go over.

THE COURT: Start the direct.

MR. VASQUEZ: No problem.

MR. STEINBERG: Your Honor, the defendants call Ewing Liu.

EWING LIU, having been duly sworn by the Clerk, testified as follows:

THE CLERK: Could you please state your name and spell your name for the record.

THE WITNESS: Sure. The my name is Ewing Liu, first name is E-w-i-n-g, last name is Liu, L-i-u.

DIRECT EXAMINATION

BY MR. STEINBERG:

Q. Good afternoon, Mr. Lieu. Who do you work for?

A. Currently I work for Everlight Electronics Company Limited.

Q. And what's your title there?

A. My title is head of LED lighting for our marketing team.

Q. And Everlight Electronics is in New Taipei City, Taiwan, correct?

A. Yes, sir.
Q. How long have you worked there?
A. I worked there since June 1st of 2009.
Q. And where did you work before that?
A. I worked at our American subsidiary, Everlight Americas in Dallas, Texas.
Q. How long did you work there?
A. Since 2005.
Q. Okay. So you worked at Everlight Americas from 2005 to 2009, and you've been at Everlight Electronics since then; is that right?
A. Yes, sir.
Q. What was your role when you were at Everlight Americas?
A. Actually at Everlight Americas I started as an intern while I was a senior in university, and then that rolled into a full-time position as an FAE, and then after FAE --
Q. Can I interrupt for one second. You used the word "FAE." Can you explain what that is?
A. Oh, that's field applications engineer, so it's basically a technically supporting role for our sales guys in the field, also working with the customer to help them understand how to implement our LEDS inside their applications.
Q. Okay. So after you were an FAE, what position did you have next?
A. Then it became more of an outward facing sales role, so I

was a strategic account manager for Everlight Americas.
Q. How did your role change when you joined Everlight Electronics?
A. At Everlight Americas, I was strictly responsible for the North American market, but when I moved over to Taiwan, it became a marketing responsibility for global operations.
Q. Do you engage in sales and marketing activities in the United States still?
A. Yes, I support our Everlight Americas business office as well as I visit some of the top customers here quite often.
Q. And do you meet with customers elsewhere in the world?
A. Yes, I do, China, Europe, Japan.
Q. Okay. Did you grow up in the United States?
A. Yes, sir, I was born in Lubbock, Texas. My dad moved there from Taiwan to get his Ph.D. in chemistry at Texas Tech.
Q. And what's your educational background?
A. I have a bachelor of science in electrical engineering.
Q. Where is that from?
A. University of Texas at Dallas.
Q. Okay. What year did you get that?
A. I graduated 2005.
Q. All right. Let's talk about Everlight sales data because Boston University and its counsel have raised some questions about it?
MR. SHORE: At the sidebar.

THE COURT: Strike that.
Q. Do you recall reviewing Boston University's initial list of Everlight products that it and its counsel were accusing of infringing the '738 patent back in 2013?
A. Yes, I do.
Q. And what did you see on that list?
A. It was basically a list of 1400, almost 1500 different part numbers, including lots of different colors, blue, green, white containing I guess GaN chips and then also red, yellow, orange part numbers containing AlAnGaP chips.
Q. Did you say AlAnGaP?
A. Yes.
Q. What is that? Is that an acronym for something?
A. Yes, it's an acronym for four metal compound chips, so four compounds are aluminum, indium, gallium and phosphide.
Q. I'm sorry.
A. Those are used to make red, orange, yellow LEDS.
Q. And in Everlight's marking materials is that often abbreviated as A-l-A-n-G-a-P?
A. Yes.
Q. Okay. So Boston University at the start of this case accused numerous AlAnGaP red, orange and yellow products of infringing the '738 patent; is that right?
MR. SHORE: Leading.
THE COURT: Sustained.

Q. Okay. So you reviewed that list from Boston University of what it was accusing of infringement, right?

A. Yes.

Q. And you said it included numerous AlAnGaP red, orange and yellow chips?

MR. SHORE: Objection. Leading.

THE COURT: Let it go. What color chips did it include?

THE WITNESS: Everything, blue, green, red, orange, yellow, lots of different colors.

Q. Does Everlight use gallium nitride or GaN chips, as we've been calling them, in any of its red, orange or yellow LED products?

A. No, we do not.

Q. Let's take a look at some examples.

MR. STEINBERG: Can you, Mr. Mortensen, pull up DTX 454, please. I think he needs to be connected. Thank you.

Q. So up at the top of the screen is an excerpt from Boston University's list of Everlight products that it was accusing of infringing. Do you see AlAnGaP on this part of the list?

MR. SHORE: Objection. It calls for an expert opinion.

THE COURT: Overruled.

A. Both these parts, I mean, red and yellow, so these are using AlAnGaP chips.

Q. How do you know that?
A. I mean, just from my understanding of these products, I've seen the bill of materials and whatnot.
THE COURT: I can't hear you.
THE WITNESS: I'm sorry, I've seen the bill of materials for these products before, and, I mean, at the bottom in the catalog 2012, it says, "color, red and yellow," and for Everlight products, we only use AlAnGaP chips for red and yellow.
MR. SHORE: Objection. Best evidence rule --
THE COURT: Overruled.
MR. SHORE: -- he's referring to other documents, and hearsay.
THE COURT: Overruled.
Q. Sir, at the bottom of that slide, we see an excerpt from Everlight's 2012 catalog; is that right?
A. Yes, sir.
MR. STEINBERG: At this time, your Honor, I'd like to move to admit DTX 296, that is the Everlight catalog that this is excerpted from, and my understanding, there's no objection from the plaintiff.
MR. SHORE: No objection.
(Defendant's Exhibit No. 296 was admitted into evidence.)
MR. STEINBERG: Let's take a look at more examples,

Mr. Mortensen. Can you go to DTX 455.
Q. So, again, over on the left is an excerpt from Boston University's list of Everlight products that it accused of infringement. Do you see any products there that are AlAnGaP products?
MR. SHORE: Objection. Foundation.
THE COURT: Overruled.
A. These are all AlAnGaP products.
MR. SHORE: Objection. Personal knowledge.
THE COURT: You need to lay a foundation how he knows that.
MR. STEINBERG: Sure. That was going to be my next question, your Honor.
Q. How do you know that?
A. I've sold most, if not all of these products before, and I've seen the bill of materials for these products.
MR. SHORE: Objection. Best evidence rule.
THE COURT: Overruled.
Q. What do we see on the right there? Is that another excerpt from Everlight's catalog?
A. Yes, sir, it's listing the same part numbers you see generally on the left, and it lists what colors they are.
Q. All right. Let's look at some more examples.
MR. STEINBERG: Let's go to DTX 456, please, Mr. Mortensen.

Q. So, again, up in the upper left-hand corner, this is an excerpt from Boston University's list of Everlight products that it accuses of infringement, and do you see any AlAnGaP products there?

A. Yes, I do, all three of those part numbers are --

MR. SHORE: Objection. This document is hearsay, your Honor.

THE COURT: I don't know what the document is.

MR. STEINBERG: Your Honor, that is an excerpt from Boston University's infringement contentions. It's their document.

MR. SHORE: Can I respond to the objection?

THE COURT: Yes.

MR. SHORE: Down in the lower left, it says, "publicly available data sheets," and then it purports to say what they show. Those have never been produced in the case.

THE COURT: Sustained. Take down the slide if it's never been produced.

MR. STEINBERG: Okay. Can I have the witness see it, at least?

THE COURT: I don't know. I don't know what you're going to ask him.

MR. STEINBERG: I'm just going to go through additional examples.

THE COURT: You can't rely on documents that have not

been produced in discovery.

MR. STEINBERG: Okay. Mr. Mortensen, is it possible to put up the top part of the slide and not the bottom that has the catalog and the infringement contentions? Perfect. Thank you.

Q. So on the left there, we see another excerpt from Boston University's list of products that they accused of infringing the '738 patent. Do you see any products there that are AlAnGaP products?

A. Yes, all three of these LEDS are using AlAnGaP chips.

Q. How do you know that?

A. I mean, on the right-hand side from the catalog, it's very apparent that it's a brilliant yellow green. Yellow green LEDS at Everlight are using AlAnGaP chips.

Q. Just to be clear, the AlAnGaP chips are not the same thing as gallium nitride or GaN chips?

A. Correct.

Q. All the products we've looked at are not gallium nitride products?

MR. SHORE: Objection, your Honor. Every question is leading.

THE COURT: Every question is leading.

MR. STEINBERG: I'm sorry, your Honor.

Q. Are any of the products we looked at in the last three slides gallium nitride products?

A. No, they are not.
Q. Okay. Everlight, besides the catalog that we see on the right here, does Everlight have any data sheets that talk about these products?
A. Yes, we do.
Q. Are they publicly available?
MR. SHORE: Objection, your Honor, Rule 26.
THE COURT: Sustained, unless they were produced.
Q. Do Everlight's data sheets in general talk about the materials used in each of its products?
MR. SHORE: Objection. Hearsay.
THE COURT: No. Overruled.
A. Yes, they do. They list the part number, what color this LED is.
THE COURT: Did you produce it in discovery?
MR. SHORE: No, your Honor.
THE COURT: I didn't ask you, did I? Come on. Did you produce it in discovery?
THE WITNESS: I don't believe that we did.
Q. Okay. Let's look at some more examples.
MR. STEINBERG: Mr. Mortensen, can you pull up DTX 457, but, again, just put the top part up at the screen. Thank you.
Q. So, again, up in the left-hand part of the screen, this is another excerpt from the list of products that Boston University accused of infringing the '738 patent. Do you see

any products there that are AlAnGaP products and not gallium nitride products?

A. All three of these products are using AlAnGaP chips.

Q. And how do you know that?

A. These are dual color LEDS so you can see like an R6 or a G6, so as verified on the right-hand side with the catalog, it's a red as well as yellow, yellowish green LEDS, so these are using AlAnGaP chips.

Q. Okay. So, again, these products here are not gallium nitride products; is that right?

MR. SHORE: Objection. Leading. Also --

THE COURT: Sustained, leading.

Q. Now, at some point Boston University asked Everlight to produce sales data for all of the products that it had accused of infringement, right?

A. Sorry, can you repeat the question?

Q. At some point Boston University asked Everlight to produce sales data for all the products that it had accused of infringement; is that right?

A. Correct.

Q. Okay. Let's look at that.

MR. STEINBERG: Mr. Mortensen, can you pull up DTX 458, please.

Q. This is an excerpt from Boston University's interrogatories to Everlight?

THE COURT: Nonleading.

MR. STEINBERG: Objection.

THE COURT: What is this?

Q. Mr. Liu, do you recognize this?

A. Yes, I do.

Q. Okay. What is it?

A. This is an interrogatory produced by Boston University.

Q. And it was sent to Everlight?

A. Yes.

Q. Okay. Can you read it?

THE COURT: We had years of discovery before this case, so Boston University sent out this question. Interrogatory is just a question.

Q. Can you read it to the jury, please?

A. Yes.

THE COURT: No, it's up there, don't read it all.

Q. Okay. Sir, reading this, what exactly did Boston University ask for from Everlight?

MR. SHORE: Objection. The document speaks for itself.

THE COURT: No. What did you construe it as meaning?

THE WITNESS: I mean, it was a little bit confusing, but, I mean, it definitely asked for us to provide sales data for accused products as well as other GaN LEDS.

Q. And we looked at earlier accused products included some

AlAnGaP products that we looked at earlier, right?
A. Correct.
Q. All right. So what did Everlight give to Boston University at that time?
A. At that time, I mean, we provided our worldwide visible LED sales data.
THE COURT: Was that red, orange, yellow, everything, right?
THE WITNESS: Correct.
Q. Now, wasn't that overinclusive though? Why would Everlight give more sales data than maybe was called for by this interrogatory?
A. It was probably, you know, a little bit over, but, I mean, we wanted to comply with our legal obligations because in the 1500 or so products that they did accuse us of, it contained a lot of AlAnGaP chips as well as GaN products as well, so it's better to be I guess overinclusive than underinclusive and then get challenged about it later on.
Q. Now, you verified Everlight's response to this interrogatory, right?
A. Yes, sir.
Q. Okay. Let's look at that.
MR. STEINBERG: Mr. Mortensen, can you pull up DTX 460.
THE COURT: Were you the one responsible for answering

this interrogatory?

THE WITNESS: I was the one who signed the declaration.

Q. We're going to read it. Let's pull up DTX 460. So is that your signature there from the verification you filled out on these responses?

A. Yes, sir.

Q. All right. Can you read in the upper right-hand corner what Everlight said about the sales data that it produced at that time?

A. "Subject to and without waiving the foregoing objections, ELT responds by incorporating the document bearing Bates number ELT 1110410."

Q. Is that document the worldwide sales document that you mentioned earlier?

MR. SHORE: Objection, your Honor, and we ask that that document be placed in evidence if it's going to be presented to the jury.

THE COURT: Yes.

MR. STEINBERG: We can pull it up later, if that's okay.

THE COURT: That's fine.

Q. Is that document the worldwide sales data that you were referring to earlier?

A. Yes, it is.

Q. That Everlight produced in response to the interrogatory?

MR. SHORE: Objection. Leading.

THE COURT: Sustained. Leading.

Q. Now, Boston University has said this was a sworn statement that the data that was produced only included gallium nitride or GaN products. Is that what it says?

A. No, that's not right.

Q. Would you have signed the response if that's what it did say?

A. No, I mean, because the list contained AlAnGaP chips.

Q. Did Everlight provide any tools to enable Boston University to tell which products were gallium nitride or GaN and which ones were AlAnGaP?

A. I mean, we provided our catalogs that specify exactly what color these LEDS are. We provided purchasing data. We provided data on what chips are used in these particular products.

Q. And what would the chip data that you just mentioned, what would that have told Boston University?

MR. SHORE: Objection. Best evidence. It calls for speculation.

THE COURT: Sustained.

Q. When was all that produced, those three things you mentioned? I think you said catalog, you said chip purchasing data, and then you said data on what chip was used in each

product. When were those produced?
A. Some time middle or fall of 2014.
Q. And did Boston University later accuse even more Everlight products of infringement?
A. Yes. They provided an amended complaint and added a lot more AlAnGaP part numbers.
Q. So what other information did Everlight provide to Boston University about the products that it had accused of infringement?
A. Well, they had asked for purchase orders and invoices, but then instead they requested full access to our SAP system.
MR. SHORE: Objection, your Honor. That's false. We did not --
THE COURT: Well, don't testify.
Q. You mentioned SAP system. Can you explain --
MR. SHORE: Objection.
THE COURT: There's no objection. That's his answer. You can cross him on it.
How much longer do you have?
MR. STEINBERG: I probably have 15 to 20 minutes.
THE COURT: Give it your best for the next five minutes.
Q. Mr. Liu, you mentioned SAP system. What is that?
A. SAP is an accounting system. A lot of large companies throughout the world use it to track their daily records, sales

activities and things like that.
Q. And does that system include information on each of Everlight's products, including all the ones accused in this case?
MR. SHORE: Objection. Leading.
THE COURT: Overruled.
A. Yes, it does. Using the SAP system, you can pull up any part number that you'd like. You can look up the bill of materials. Using that, you can see what type of chip is inside, how many chips, that type of information.
Q. You mentioned bill of materials. What's that?
A. Basically for any particular product, the bill of materials is all of the components used to construct the device.
Q. Okay. Did Everlight give Boston University access to its SAP system?
A. Yes.
Q. And when was that?
A. That was July to August of this year.
Q. And was that remote or was that on site in Taiwan?
A. It was both actually.
Q. Okay. What about deposition testimony, did Boston University ever take your deposition to ask you about the products that it had accused of infringement?
A. Yeah, they were originally supposed to depose me I think

it was August of last year, but after a lot of cancellations and pushing it back, I finally got deposed July of this year.
Q. And did they ask you any questions about Everlight's part numbers?
A. Yes, they did a few times.
Q. And what did they ask you?
A. I mean, they basically asked me to break down our part numbering system for a few examples to explain how to determine the color or how to determine how many chips are inside any particular LED.
Q. And did Everlight also produce a written version of that naming rule that you were just kind of explaining?
A. Yes. During the deposition, they requested that we provide a more in depth version, and I believe we did that pretty soon after the deposition.
Q. So like in early August?
A. Yeah, three, yeah, three and a half months ago.
Q. What happened when Boston University served its damages expert report later that month in August? What did you see?
A. I mean, we took it, we reviewed it, and we saw that there were still a lot of AlAnGaP products inside.
Q. So, did you do something to help the damages experts on both sides correct that issue?
MR. SHORE: Objection. Leading.
THE COURT: Sustained. On both sides.

Q. So what did you do at that point?
A. I mean, we took the list of accused products from the damage expert's report, and we added a lot more details into there stating how many chips, what the chip part number was, what type of chip it was, if it was GaN or non-GaN, information like that.
Q. And did you produce that document to Boston University?
A. Yes, sir.
Q. And when was that?
A. That was in September.
THE COURT: As in two months ago?
THE WITNESS: Yes, September two months ago.
THE COURT: '15, right?
THE WITNESS: Yes, ma'am.
MR. STEINBERG: Mr. Mortensen, can you pull up DTX 98.
MR. SHORE: I'm not sure this is in evidence, your Honor.
MR. STEINBERG: I don't think we're going to seek to admit it, your Honor. Our expert has relied on it, so we'd like to have the witness give some information about it.
MR. SHORE: Objection.
THE COURT: Objection sustained.
MR. STEINBERG: So, your Honor, I can't show it to the witness?
THE COURT: No.

MR. STEINBERG: Can I have him look at it without publishing it to the jury?

THE COURT: I don't know what you're going to ask.

Q. Let's talk about what information was included in that document. I want you to walk me through how it was created.

MR. SHORE: Your Honor, objection to any reference to this document.

THE COURT: I don't know what it is. I couldn't even tell what it was. What is that document?

THE WITNESS: That document is just a list, left-hand column is stating how many chips for the part number in the second column, and then further columns after that is stating what chip is used for that part number, what brand of chip is used in that part number, whether it's GaN or non-GaN and also if it's an Epistar chip, if it's a certain type of chip.

THE COURT: And had you turned that over to BU before that?

THE WITNESS: We had a more condensed version before, and then we added more details when we saw that --

THE COURT: Had you ever told them before how many chips were in a product or what color it had been, that sort of thing?

THE WITNESS: I mean, during the deposition --

THE COURT: Did you ever tell them whether or not -- how many chips were in each product?

THE WITNESS: After we turned in that document, it has that information.

THE COURT: That was the first time?

THE WITNESS: That was -- no, this time in September.

THE COURT: I think we should probably break. I'll see you tomorrow. Now, let me tell you about the scheduling. We are going to finish the evidence tomorrow. Short of a major breakdown in our commuter train system, the evidence should finish tomorrow at least by all accounts, no more witnesses.

What I can't figure out is my estimate is it will be at least an hour for each side for closing arguments and at least an hour for a charge, so I need at least three hours in there. I can't tell. Maybe we'll just do the closings, maybe we'll do the closings plus the charge, maybe it will all have to loop into Wednesday. I can't tell yet, but it means that you will be getting the cases in its entirety, as I had predicted, mid-week, I just can't tell exactly which day.

Now, on the day, did you check? For how many people is Wednesday a problem if we stayed late? Several people. We won't stay late on Wednesday, but it's a full day tomorrow. It's a full day tomorrow. How about Thursday if we went full days on Thursday? Is that feasible for people? Several people had a problem with that.

It's a full day on Friday for deliberations. I'm just saying at that point, you're going to have the case. When

exactly depends on the Charlie on the MBTA. You might want to think about it. I understand Wednesday may be too soon, but Thursday if you could finish it, you may want to try to organize around it on Thursday. If not, you'll be here Friday. That's the scheduling for the case. Okay. I'll stand in recess.

THE CLERK: All rise for the jury.

(JURORS ENTERED THE COURTROOM.)

THE COURT: Since this production has caused major issue, why don't you please be seated. Your attorneys told Boston University that these were all gallium nitride chips, which has created -- if what you're telling me is true, and the huge numbers of them are not gallium nitride chips, how did this happen? Do you know?

THE WITNESS: No, ma'am, I don't know how this was miscommunicated.

THE COURT: Well, why didn't you tell Boston University when you were sitting in the deposition you've got half of your products there aren't gallium nitride?

THE WITNESS: I believe we did discuss it in the deposition.

THE COURT: You think you told them that they were red, orange and yellow in the deposition?

THE WITNESS: Yes, ma'am, because we talked about these specific part numbers.

THE COURT: Well, there was a major, major miscommunication here, which may amount to how much money?

MR. VASQUEZ: Well, your Honor, the answer to your question is very simple. We were shocked when we saw they included the red. We thought that they would understand that they're not the red. Their position is their position, but I'm telling you I don't believe the lawyer's position is sincere, not one fiber of my being believes their position is sincere.

MR. SHORE: Now you know why I wrote that e-mail.

MR. VASQUEZ: I do not believe -- I would have stipulated now if I were in their position because I don't think it's credible to come to a jury and tell them that one of the elements is GaN, that it's red. That's how I practice. I would have seen there was a correction, and I would have worked out a stipulation to dump the red chips because I don't think it's credible. I think it interferes with the case.

THE COURT: What I would like to understand is why the predecessor counsel represented --

MR. VASQUEZ: I can't speak to that.

THE COURT: -- that they were all GaN chips. It created a mess in this litigation and will result in an adverse inference instruction. I don't know what happened here. It would be useful for me to find out if he's correct that he disclosed during his deposition that these were red and yellow chips.

MR. VASQUEZ: Well you got his testimony on that.

THE COURT: Well, go find it for me.

MR. VASQUEZ: Here's the bigger point, your Honor, it's not a travesty if you overcount and hand it to them because they're not out one dollar. It's a travesty if we undercount it, and your comments are suggesting that there's an enormity to the problem that doesn't exist.

THE COURT: Well, it is, isn't it millions of dollars?

MR. VASQUEZ: It's not millions of dollars, it's millions of phantom dollars. It's called counting your chickens before you confirm they're blue GaN.

THE COURT: It was unnecessary, it was unnecessary for this to have happened.

MR. VASQUEZ: Understood. I agree. It's unfortunate, the resolution to it is not to ask a jury with an adverse inference whether they should award a windfall when Dr. Moustakas' invention did not enable all of the profits associated with the non-GaN chips. That is not the remedy. It's not just.

THE COURT: A, its disputed, and I haven't heard that yet, but, B, it's a problem Everlight created for itself.

MR. VASQUEZ: Understood. The issue is, is it a problem where there's X amount of attorney time that was wasted or is it a problem where the penalty is justice is blind and gives a royalty on chips that are not GaN. That's the issue

that I have, and it's a procedural issue.

THE COURT: I understand you're new counsel. I get it. I'm not faulting you. This was a mess. It took a huge amount of my time, a huge amount of the attorneys' time. It may end up hurting -- let me just say something in your favor. There's no incentive for Everlight to have done this because it pumps up the damages.

MR. VASQUEZ: Well, that's the point, your Honor.

THE COURT: There's no incentive to do it. It was just sloppiness is what it was.

MR. VASQUEZ: Agreed your Honor, and what that means -- Mr. Shore, let me finish. The issue here, there's a mistake that was made. No question. So, what's the remedy for the mistake? The remedy for the mistake is not to compound it by sending to the jury with your thumb on the scale in the form of an adverse inference. The issue is how much time did they waste going beyond a rabbit hole because at the end of the hole, there were no GaN chips. They were not out anything. This is not the circumstance that happens in many of these cases where they undercount the accused product, and I have seen that, and that's a real problem because it suggests you are trying to hide your damages.

THE COURT: It's perverse, if anything.

MR. VASQUEZ: Right. So, therefore, put it in proportion, don't complicate the case by compounding the error.

THE COURT: I'm not doing that because at this point I put the blame -- there was a lot of problems getting the SAP data, just to begin with, they schlepped out to Taiwan, it didn't happen, the magistrate judge gets upset. The whole thing was messy.

I will, if I have to, and I may grant a motion for remittitur or whatever the right word is, but at this point I'm going to leave it to this jury, and I am not sure because I've told you this from the beginning, you're taking a risk here that I'm going to back out that data.

MR. SHORE: Yes. I want to say a couple things. One, this was not just an attorney mistake. We had three mediations, including with the magistrate judge here, where we used --

MR. VASQUEZ: Mediations are not admissible in court, and he should not be speaking --

THE COURT: Let him finish.

MR. VASQUEZ: Objection.

THE COURT: Overruled.

MR. SHORE: Anyway, with their parties here, we used those numbers that they gave us, and those parties at mediation never, at three different mediations, ever corrected those numbers.

MR. VASQUEZ: Your Honor, that's a 408 issue that's actually real, okay. He's trying to show --

THE COURT: All right. I'm not doing this.

MR. VASQUEZ: -- that something was said at a mediation that admitted the truth.

THE COURT: I am deeply troubled about what went down here, and everything else, this is not going to be held against Epistar, it's not going to be held against Lite-On, this is Everlight's problem. Something went really south here, and it was a big mistake, and the reason that's odd here is I will grant the point that it hurt Everlight, it didn't help Everlight, it hurt Everlight.

MR. VASQUEZ: So how is Boston University out other than a waste of time?

MR. SHORE: It may have because here's the deal. You can have red, yellow and orange and even infrared gallium nitride chips, and as a matter of fact, this company has patents on packages to use gallium nitride chips for red, orange, amber and infrared chips, so when they say that we should have known that these phosphorous when phosphorous does not appear anywhere in that catalog. That catalog does not have a single line in it about what those things are made out of.

THE COURT: I'm not saying you should have known, I'm not saying that, what I am saying is it was a colossal problem that was very difficult to unsort.

MR. VASQUEZ: He's trying to take advantage of it by

stating when he's not a scientist, he has no evidence, none whatsoever in this case.

THE COURT: I'm going to take a 10-minute break, and then we'll come back and do the charge conference.

MR. VASQUEZ: Thank you, your Honor.

(Adjourned, 4:12 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

We, Marcia Patrisso, Valerie A. O'Hara, and Lee A. Marzilli, Official Federal Court Reporters, do hereby certify that the foregoing transcript, Pages 8-1 through 4-215 inclusive, was recorded by us stenographically at the time and place aforesaid in Civil Action No. 12-11935-PBA, Trustees of Boston University v. Everlight Electronics, et al, and thereafter by us reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 16th day of November, 2015.

/s/ Lee A. Marzilli
/s/ Valerie A. O'Hara

LEE A. MARZILLI
VALERIE A. O'HARA
OFFICIAL COURT REPORTERS