IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

TRUSTEES OF BOSTON UNIVERSITY, )
)
Plaintiff )
) CA No. 12-11935-PBS
-VS- ) Pages 9-1 - 9-256
)
EVERLIGHT ELECTRONICS CO., LTD., )
et al, )
)
Defendants )

**JURY TRIAL - DAY NINE (REDACTED)**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES CHIEF DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts 02210
November 17, 2015, 8:53 a.m.

MARCIA PATRISSO
LEE A. MARZILLI
VALERIE A. O'HARA
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA 02210
(617)345-6787

A P P E A R A N C E S:

FOR THE PLAINTIFF:

MICHAEL W. SHORE, ESQ., CHRISTOPHER L. EVANS, ESQ., and ALFONSO GARCIA CHAN, ESQ., Shore Chan DePumpo, LLP, Bank of America Plaza, 901 Main Street, Suite 3300, Dallas, Texas, 75202.

ERIK PAUL BELT, ESQ., McCarter & English, LLP, 265 Franklin Street, Boston, Massachusetts, 02110.

FOR THE DEFENDANTS:

RICHARD C. VASQUEZ, ESQ., ERIC BENISEK, ESQ., JEFFREY T. LINDGREN, ESQ., STEPHEN STEINBERG, ESQ., and ROBERT McARTHUR, ESQ., Vasquez Benisek & Lindgren, LLP, 3685 Diablo Boulevard, Suite 300, Lafayette, California, 94549.

SUSAN G. L. GLOVSKY, ESQ., Hamilton Brook Smith & Reynolds, 155 Seaport Boulevard, Boston, Massachusetts, 02210.

I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| EWING LIU | | | | |
| By Mr. Steinberg: | 9-15 | | | |
| By Mr. Shore: | | 9-36 | | |
| By Mr. Steinberg: | | | 9-53 | |
| RUSSELL WALKER MAGNUM, III | | | | |
| By Mr. Benisek: | 9-57 | | | |
| By Mr. Shore: | | 9-107 | | |
| By Mr. Benisek: | | | 9-116 | |
| By Mr. Shore: | | | | 9-121 |
| EDWIN L. PINER | | | | |
| By Mr. Shore: | 9-142 | | | |
| By Mr. Lindgren: | | 9-154 | | |

VIDEOTAPE DEPOSITIONS PLAYED:

Vinit Nijhawan, Page 135
Paul Reidy, Page 136
Meng Chun Kuo, Page 138

| EXHIBITS | RECEIVED IN EVIDENCE |
|---|---|
| Plaintiff: | |
| 40 | 9-51 |
| 39 | 9-52 |
| 1620, 1621 | 9-93 |
| Defendant: | |
| 303, 304 | 9-93 |
| | FOR IDENTIFICATION |
| Plaintiff: | |
| C and D | 9-49 |

| CLOSING ARGUMENTS | PAGE |
|---|---|
| By Mr. Shore: | 9-162 |
| By Mr. Vasquez: | 9-193 |
| By Mr. Shore (Rebuttal) | 9-240 |

P R O C E E D I N G S

THE CLERK: All rise.

(The Court enters the courtroom at 8:53 a.m.)

THE COURT: Good morning. So anyway, I received three 50(a) motions. That was a first for me.

MR. STEINBERG: There's more to be coming, your Honor, to be honest.

THE COURT: No, no, no. There's supposed to be one 50(a) motion with everything in it. You know, it's not a way to exceed the page limits. But in any event, how many more am I getting?

MR. STEINBERG: There's going to be several more on discrete issues.

THE COURT: No, that's one 50(a). Just give me one more brief. That's it. One. One. Within the page limits.

MR. STEINBERG: Okay. Can we get permission to exceed the page limit, then?

THE COURT: No. No. At this point I can't keep up with you. In fact, I had a joke with another judge this morning. I was going to come in here this morning with a white flag. I can't keep up with the volume of paper you're flooding me with. It is -- I've never seen a case like this before. And so one brief. Whatever it is, the next one, one brief within the page limits. You've already given me three.

MR. STEINBERG: Okay.

THE COURT: One.

MR. STEINBERG: And we understand you're not going to hear any argument on them and you're going deny them all. You've already denied them all. We just have to preserve our rights for --

THE COURT: Let me say this: I have a big issue about the red, orange, yellow chips, about what to do with them, and I'm reserving that until later today. That's a really hard issue for me.

With respect to sales, infringement and invalidity, they're going to the jury, so...

I'm also thinking about the issue that I would like you all to -- Mr. Vasquez isn't here, right? Is he here?

MR. STEINBERG: He's not here. He'll be here in a little bit, I believe.

THE COURT: So I don't know if he's prepared for it. I don't know what to do with the request by Mr. Shore about having the damages decided no matter what kind of thing. Validity is a question of law. I'm thinking not having him answer damages on infringement if they say "no" on infringement. As far as I'm concerned, that is as factual a question right now as it gets, and I will uphold whatever jury verdict comes down on infringement.

Validity, though, is a question of law, so I'm thinking of tailoring the Q&A that way, like if there's a "no"

on infringement -- I'll have them answer validity, but I won't have them do damages. But if it is "yes" on infringement but it is not enabled, I may have them do damages, is the current way I'm thinking about it. I will never flip a jury verdict on infringement. It's a much closer call than I expected because your human intuition can't really come into it much. It's really a question of fact. So I don't know how you all thought I was going to deal with summary judgment on it.

But in any event, you have a document you wanted -- someone -- you did, Mr. Steinberg.

MR. STEINBERG: We were objecting. This is a document that we received for the first time last night. It wasn't -- and they've indicated that they're going to use it with either Dr. Piner or Mr. Ratliff on rebuttal.

THE COURT: This is the patent?

MR. STEINBERG: Yeah. It's not in either of Dr. Piner's reports, it's not in Mr. Ratliff's reports, at least as they've shown me. It's never been disclosed to us or produced to us. It wasn't on their trial exhibit list. This is a complete surprise. We also think it's not relevant --

THE COURT: Well, skip irrelevance.

Did you produce it?

MR. SHORE: It's rebuttal. Pure rebuttal. This patent, they've been saying, "You can't have red GaN," "You can't have red GaN," "You can't have red GaN." This is a

patent that Everlight filed where they have a package that allows them to use gallium nitride LEDs not only for red, but orange and yellow and even infrared, the entire spectrum, using GaN. And for them to tell the jury repeatedly, and to tell you, frankly that you can't -- by the way, this patent was filed in 2010.

THE COURT: Yeah, but you can't pop it on them. This issue has been around for a few days. To give it to them for the first time last night?

MR. SHORE: No, your Honor. It's been around since trial.

THE COURT: Excuse me. Did you give it to them?

MR. SHORE: We gave it to them as soon as we found it.

THE COURT: When?

MR. SHORE: Last night. They have a thousand patents.

THE COURT: No. Objection sustained.

MR. STEINBERG: Thank you, your Honor.

THE COURT: Dr. Piner, though, can use his expertise to rebut it. I'm just not allowing this introduced into evidence.

MR. SHORE: So we can do a demonstrative -- we have a demonstrative. We're actually going to build a red device using the --

THE COURT: No, no, you're not going to surprise with this exhibit. Dr. Piner is certainly an expert in this area

and he can give an opinion after he's reviewed patents because this is certainly something an expert can rely on, that you can build a device with a -- whatever it is --

MR. SHORE: Mr. Liu --

THE COURT: That gallium nitride create red.

MR. STEINBERG: But, your Honor, that will be outside --

MR. SHORE: If Mr. Liu --

THE COURT REPORTER: Wait. Wait. One at a time.

MR. SHORE: Excuse me, Mr. Steinberg.

If Mr. Liu gets on the witness stand today and says that you can't have a red LED, then we can get this in.

THE COURT: I don't know if you can get it in, but you can sure impeach with it.

MR. STEINBERG: He didn't say you can't have it, he said none of the products use it.

THE COURT: It's relevant.

MR. STEINBERG: But also, your Honor, what he's proposing would be well outside the report -- of Dr. Piner's reports. Dr. Piner's reports didn't talk at all about what he's talking about.

THE COURT: Excuse me. Everlight -- I said the one issue I am still up in the air on is what to do about these darn red, yellow and orange chips, because I do think it's unjust, what Mr. Vasquez was very upset about yesterday, to

base the royalty on the fact that somebody blew it and Everlight, whether the lawyers or whatever, produced the wrong documents. I do get it. But it's your fault that this issue is arising so late in the game. I'm not going to hold this against Epistar, I'm not going to hold it against Lite-On, but this is a mess. Somebody made a big mistake here and I don't know how to unsort it.

I'm not sure whether I should take the red, orange and yellow out now, hold it, and then push it back in, or whether I should let it go to the jury and then take it back out on remittitur. I mean, that for me is -- if I find the evidence isn't sufficient to create an issue. But the lateness of it at some level is Everlight's fault.

Now, I'm not -- we've known about this issue now three weeks --

MR. STEINBERG: Actually, two months. We raised it in our expert report in September.

THE COURT: That's right.

And I'm not allowing a brand-new patent that they've never seen till last night to come into evidence.

MR. SHORE: It's their patent.

MR. EVANS: It's Everlight's.

THE COURT: I'm not allowing it.

These lawyers can't -- I didn't let it happen to you, the gotcha, and I'm not going to do the gotcha the other way.

So I will allow Dr. Piner to rely on it and to give an opinion on it, but that's different than admitting it into evidence. So that's what we'll do.

Dr. Piner, you can rely on it as something an expert -- and if it's not in his report, it's because this issue came up on -- we were all operating under the presumption, all of us, that these buffers couldn't create red, orange and yellow. This is a new issue.

MR. STEINBERG: But, your Honor, this is --

THE COURT: I've ruled.

MR. STEINBERG: -- what we've been operating under for the entire trial. They've argued that technology related to blue LEDs. They've said Dr. Moustakas invented the blue LED.

THE COURT: I understand it's --

MR. STEINBERG: That's what the whole case has been about.

THE COURT: I understand that it was this discovery snafu that created this issue.

MR. STEINBERG: I understand, your Honor.

There's one other issue we need to bring up, and that's two Lite-On entities: It's Light-On Trading and Lite-On Service. We asked the plaintiff to dismiss them from the case around the pretrial conference and also just immediately before trial. They refuse to do that unless we waived all of our arguments as to damages. So we've gone ahead and done the

trial. They put on no evidence having anything to do with Light-On Trading or Lite-On Service. We asked Mr. Su a few questions about those two entities to make clear that they don't to anything related to --

THE COURT: Is this part of your 50(a) response?

MR. STEINBERG: -- Optima Electronics.

Well, here's the thing: We've asked them to go ahead and dismiss those parties with prejudice. They've refused to do that in general. They want to narrow it to some sort of unclear category of products. So we either want to either dismiss them with prejudice in their entirety or we can move for a judgment on them, but we just need some guidance from your Honor.

THE COURT: Well, I have no guidance because I haven't thought of the issue once in three years. Not once, okay? Of all the papers that you've given me, I've never -- it's never been mentioned. So what are you going to do?

MR. SHORE: Well, first, we -- what he just said is not true. We never told them -- this is why --

THE COURT: Wait a minute. Do you oppose the motion to dismiss them?

MR. SHORE: No, here's what we're offering. This is what we told them, and we'll do it right now orally. I make a Rule 41 motion to non-suit those two entities without prejudice as to any parts that are not involved in the case and without

prejudice to any other things that we don't know about. So if it's any part that's involved in this case, any accused product, any accused product of this case we'll dismiss them with prejudice, we will not --

THE COURT: Well, file the piece paper.

MR. SHORE: And anything that's unrelated, we don't want to do that because we don't know. We don't have any discovery on it. This case is about these accused products; it's not about anything else. So we make the Rule 41 motion --

THE COURT: Well, file it. I'm not winging anything in this case.

MR. SHORE: Okay.

THE COURT: Do you oppose that?

MR. STEINBERG: Well, your Honor, we just request any dismissal with prejudice be as to those two parties in their entirety. I don't fully understand what they're talking about. They've never given us a list of the accused products they're talking about.

THE COURT: If I grant a 50(a) on those parties, it would only be with respect to the issues in this case.

MR. SHORE: Correct.

THE COURT: So I may just -- why don't you just file the 50(a).

MR. STEINBERG: Okay. We'll go ahead and do that.

THE COURT: As part of your big 50(a), not a separate

brief.

MR. STEINBERG: Okay. And can you just, for my own edification, remind me the page limit I've got to stay under?

THE COURT: Well, how many have the three already been?

MR. SHORE: More than 25.

THE COURT: Okay. So it's 20 pages.

MR. STEINBERG: Okay. Thank you, your Honor.

THE COURT: You don't have to repeat the standard for 50(a) every time.

MR. STEINBERG: You're right. Honestly, that will probably help me.

THE COURT: A lot. The headings.

MR. STEINBERG: Okay.

THE COURT: The briefs are excellent. I'm not knocking them. I'm just saying I am only one human being. Maybe -- anybody have a white flag?

(Laughter.)

MR. STEINBERG: I wasn't really expecting you to read them because I know you weren't going to grant any of them, I just wanted to preserve our rights.

THE COURT: I have read every brief you have given.

MR. STEINBERG: Thank you.

THE COURT: Not every expert report and the attachments, which could have meant subsuming my entire rest of

my docket, but I've read every brief you have given me, and I will continue to do so. But it's at a huge cost, like getting here every morning at six and those kinds of things. You have to tamp down on what you're giving me. Thankfully, this case will be over this week.

Is there anything else?

MR. BELT: I just want to say one more thing if I may, your Honor, about the red, orange, yellow issue. Just to suspend judgment, because it's entirely likely, and we believe it is the case, that all of these parts are GaN, and all they're doing is putting on a cover on it that takes the light and makes it red, yellow or whatever, which of course would not avoid infringement. So I'm just asking that you suspend judgment --

THE COURT: I haven't ruled. I just want to make it clear I haven't decided that issue yet. And I'm deeply worried about it because it was so late arising. It was something that took us all by surprise.

MR. STEINBERG: Yeah, and just for your benefit, Mr. Bell, I recommend you look at some of the data sheets that we've sent you links to.

MR. SHORE: No.

THE COURT: Mr. Steinberg --

MR. STEINBERG: Because it clearly states the material. Unfortunately --

THE COURT: You had too much coffee this morning.

MR. STEINBERG: Unfortunately, we're not allowed to use them.

THE COURT: Line up the jury. Is the jury here?

THE CLERK: The jury is here.

THE COURT: Are we supposed to wait for Mr. Vasquez?

MR. LINDGREN: No, we'll get him over here ASAP.

(Discussion off the record.)

MS. GLOVSKY: Your Honor, he's closing and he's preparing for closing, if we may have him away from the testimony for the last bit. Thank you.

THE CLERK: All rise for the jury.

(The jury enters the courtroom at 9:06 a.m.)

THE COURT: Good morning. Anyone speak about the case or hear anything in the press? I'm so glad you're all here. So my judicial assistant called this morning. Her train was stopped because someone left an unattended bag on it, so she's late. So I was, "Oh, my God, if one of you was on that train."

(Laughter.)

THE COURT: So, please, we'll get going.

You may be seated.

EWING LIU, previously sworn, resumed

CONTINUED DIRECT EXAMINATION

BY MR. STEINBERG:

Q. Good morning, Mr. Liu.

A. Good morning.

MR. STEINBERG: Mr. Mortenson --

Q. Or actually, let me ask you a question first.

So I want to turn to a different topic than we talked about yesterday, and that's the LED packages that Everlight sells. What exactly is an LED package?

A. An LED package is a multicomponent device used for many different types of applications.

Q. Okay.

MR. STEINBERG: Mr. Mortenson, can you pull up DTX 451, please?

Q. All right. Mr. Liu, what is this demonstrative intended to show?

A. This is just depicting the size of an LED device, comparing it to scale to a tack and a person's finger. So it's basically saying an LED is very small. In this particular example, the LED is one millimeter in height.

Q. And when you say "LED," you're talking here about -- this is an entire package. Is that right?

A. Yes, sir. It's the entire LED package.

Q. And the LED chip is even smaller. It's inside that package?

A. Correct.

MR. STEINBERG: Okay. Mr. Mortenson, can you pull up DTX 452, please.

Q. Mr. Liu, is this an animation that you helped to create?
A. Yeah, I worked with a graphic designer to create this presentation just to provide a summary -- or like a tutorial to tell everybody what exactly is an LED and what it comprises of.
MR. SHORE: Your Honor, we're going to re-urge our objection to Rule 26(a)(2)(C), expert, specialized knowledge --
THE COURT: Overruled.
MR. SHORE: -- and never disclosed before.
THE COURT: Overruled.
BY MR. STEINBERG:
Q. And, Mr. Liu, so what exactly does this show? What does this depict?
A. This is just a basic cross-section of a very standard LED and shows how everything works together inside an LED package.
Q. And are there any products that Boston University has accused of infringement in this case that look like this diagram here?
A. I mean, yeah, definitely. This is very similar to a lot of our lighting, backlighting, signage LEDs. So it's a typical description of most of the LEDs.
Q. All right.
MR. STEINBERG: Mr. Mortenson, can you go to the next part of the animation?
Q. All right. So can you tell me what are we seeing here?
THE COURT: Would you put a circle around -- what's

the chip?

THE WITNESS: Sure.

BY MR. STEINBERG:

Q. Do you know how to draw on the screen?

A. Is it up there?

THE COURT: That's the chip that we saw yesterday in those little boxes?

THE WITNESS: Yes, ma'am. That's the chip.

Q. All right.

MR. SHORE: Your Honor, we object to everything on the screen as scientific, technical or specialized knowledge.

THE COURT: Do you know what? Overruled. I just overruled that same objection. Overruled.

MR. SHORE: Can I have a running objection to the entire presentation?

THE COURT: No, but you can to that diagram.

BY MR. STEINBERG:

Q. Mr. Liu, can you erase that circle, and then tell us what Number 1 is pointing to?

THE COURT: Is this based on what you've personally seen?

THE WITNESS: Yes, ma'am. In my 11 years at the company I've dealt with a lot of LEDs. I've seen the production processes and everything.

BY MR. STEINBERG:

Q. All right. So tell us what we're looking at there that's being pointed to with the Number 1.
A. Number 1 is basically pointing at the gray parts that you see here. That's pretty much the lead frame. The lead frame is just the backbone of the entire LED package. It's the base on which the chip is mounted as well as all -- a lot of other components of the LED.
Q. And are there different options that customers can choose for the lead frame?
A. Yeah, most definitely. As you can see below, a lead frame can be made of many different material types. It can be iron, copper, aluminum or tin, depending on the price structure that the customer is asking for because different materials have different material costs.
In addition, there's different types of coatings and platings that you can design onto the lead frame for better reflection, to increase the brightness out of the package, or to protect it against corrosion, for example, rusting.
Q. And your --
MR. SHORE: Your Honor, I have an objection based on 26(a)(2)(C) --
THE COURT: Overruled. Just don't keep repeating. Just object. The objection is overruled.
MR. SHORE: I'm making my record --
THE COURT: You're disrupting at this point.

MR. SHORE: I'm making my record, your Honor.
THE COURT: Overruled.
BY MR. STEINBERG:
Q. Mr. Liu, in your experience in meeting with Everlight's customers, is the lead frame something that they ask about?
MR. SHORE: Objection. Hearsay.
THE COURT: Overruled.
THE WITNESS: Sometimes.
BY MR. STEINBERG:
Q. So can you give me an example of a customer or an application where they might ask about the lead frame?
MR. SHORE: Objection. Hearsay.
THE COURT: Overruled.
THE WITNESS: We do have a light bulb customer, one of the top in the world. They sell to lots of different regions in the world. But in the past few years they've been getting failed products back from the market because of --
THE COURT: I will sustain that. That's hearsay.
I'll allow what the customers are asking for, so you can understand what the different -- what's driving the customer demand for this package.
BY MR. STEINBERG:
Q. So can you just tell us that, Mr. Liu, what exactly has this customer been asking for with respect to the lead frame?
A. They want a lead frame that has anti-corrosion material

designed onto the lead frame to prevent decay and corrosion.
Q. Can an LED package work without a lead frame?
A. No, it cannot.
Q. All right.
MR. STEINBERG: Mr. Mortenson, let's go to the next slide, please.
Q. And, Mr. Liu, maybe you can -- thank you.
What are we seeing here that's been pointed to by the Number 2?
A. This here is the wire bond.
Q. And what does that do?
A. The wire bond is the main electrical connection for the chip.
MR. SHORE: Objection. Rule 26.
THE COURT: Overruled.
BY MR. STEINBERG:
Q. And are there different options that customers can choose for the wire bond?
A. Yes, sir. Mainly, wire bonds are made of gold because it's durable, it's malleable. But if customers need lower costs and we're costing down the package, we oftentimes move to copper or an alloy of the gold and the copper.
Q. Can an LED package work without a wire bond?
MR. SHORE: Objection. Rule 26.
THE COURT: Overruled.

THE WITNESS: For standard chips, it cannot.
BY MR. STEINBERG:
Q. And would that include the chips in the products that we're talking about in this case?
MR. SHORE: Objection. Rule 26.
THE COURT: Overruled.
THE WITNESS: Yes.
MR. STEINBERG: All right. Mr. Mortenson, let's go to the next slide.
BY MR. STEINBERG:
Q. And, Mr. Liu, if you could erase your illustration from the prior one. Thank you.
So what are we looking at here that's being pointed to with Number 3?
A. Number 3 is pointing at the chip.
Q. And what does the chip do in an LED package?
A. The chip is just the basic light source in an LED package.
Q. And are there different types of chips that Everlight uses in its LED packages?
A. Yes. I mean, there's different types of chips in terms of sizes and whatnot. But in terms of materials, it's basically GaN and AllnGaP.
Q. Okay. And in Everlight's products, what kind of products does it use gallium nitride or GaN chips in, what colors?
A. GaN is used for our blue, some greens, and white LEDs.

Q. And what about the other one which I think you've been calling AllnGaP. What is that used in?
A. AllnGaP is used for all of our red, yellow, oranges, some deep red products.
Q. In your experience, do customers ever ask about the specific chip in an LED package?
MR. SHORE: Objection. Hearsay.
THE COURT: Overruled.
THE WITNESS: Sometimes.
BY MR. STEINBERG:
Q. And what do they ask for?
MR. SHORE: Objection. Hearsay.
A. When they do ask for --
THE COURT: What is it that consumers are looking for?
THE WITNESS: So when they do ask about the chip, they're usually wondering about the brand or the reputation of the chip that we're using. So chips from different regions typically have different types of reputations. So customers oftentimes want to know where these chips are from or is this an Epistar chip, is this a Lextar chip, is this a Cree chip, whatnot.
Q. What brands do customers ask for the most often in your experience?
MR. SHORE: Objection. Hearsay.
THE COURT: Overruled.

THE WITNESS: In my experience and the industry that I mainly work in, they usually ask about --

THE COURT: No, no, just your personal -- what you personally have heard, not in the industry. What you personally have heard customers ask for.

THE WITNESS: Epistar, Cree.

BY MR. STEINBERG:

Q. Who does Everlight buy LED chips from?

A. We buy from Epistar, we buy from Cree, we buy from Huga, Tecore. A lot of Chinese manufacturers. I mean, there's a whole slew of chips that we can use.

Q. How long has Everlight bought chips from Cree?

MR. SHORE: Objection. Personal knowledge.

THE COURT: To the extent you know. Don't forget, everything here is to the extent you personally know; otherwise, say "I don't know."

THE WITNESS: Well, ever since I started working at Everlight in 2005, I've heard that we use Cree chips.

BY MR. STEINBERG:

Q. And that includes Cree gallium nitride, or GaN chips?

A. I'm not exactly sure what --

MR. SHORE: Objection. Hearsay. He said he heard.

THE COURT: Yes, I sustain that.

To the extent you personally know, where do you buy your chips?

THE WITNESS: We do buy from Cree. I've seen part numbers and bill materials.

THE COURT: Thank you.

BY MR. STEINBERG:

Q. And do you know how long Everlight has bought chips from Cree for?

A. I can't say for sure.

Q. Okay. In the purchasing data, the bills and materials that you've looked at, how far back could you say that Everlight had begun to actively buy chips from Cree?

MR. SHORE: Objection. Hearsay.

THE COURT: Overruled.

To the extent that you've seen, how far back does that go?

THE WITNESS: I believe that's 2007, if I remember correctly.

BY MR. STEINBERG:

Q. Did Everlight produce information on the LED chips that it buys to Boston University in this case?

A. I'm sorry. Can you repeat that one?

Q. Did Everlight produce information on the LED chips that it buys to Boston University in this case?

A. Oh, yes, we did. Last year.

MR. STEINBERG: All right. Let's go to the next slide, Mr. Mortenson. Thank you.

Q. Mr. Liu, what are we looking at there that's being indicated by the Number 4?
A. Number 4 is basically showing different types of -- well, the packaging material for the LED packaging.
Q. And are there different options for packaging material?
A. Yeah, definitely. I mean, there's -- very standard is our, what we call PPA, which is very standard plastic; next we have PCT, which is upgraded plastic, slightly better thermal dissipation, more robust; and then moving away from the plastic type of materials, we have other types of material that comprise of the LED package material. So this one is epoxy, we call it EMC, as well as silicon, which is SMC, and finally, we also have ceramic package material, which is typically rated as the best thermal dissipation material.
Q. And why is the housing material important in an LED package?
A. Well --
MR. SHORE: Objection, your Honor. Rule 26.
THE COURT: Yes, sustained.
BY MR. STEINBERG:
Q. Okay. What does the housing material do in an LED package?
MR. SHORE: Objection. Rule 26.
THE COURT: Overruled. Overruled.
To the extent you know.

THE WITNESS: Yes, your Honor.

The package material basically acts as a housing for all the other components in an LED. It's like the walls on a house. So it's used to dissipate heat, thermal dissipation for mechanical protection. Sometimes it can be used for optical manipulation.

BY MR. STEINBERG:

Q. Now, I think you said something earlier called "thermal dissipation." Is that right?

A. Correct.

Q. And what does that mean?

MR. SHORE: Objection. Rule 26.

THE COURT: Do you know personally?

THE WITNESS: Yes, ma'am.

THE COURT: Overruled.

MR. SHORE: It's still an expert opinion.

THE COURT: Overruled.

THE WITNESS: Basically, I mean, heat is one of the worst enemies of LEDs. It causes brightness to decay, it reduces the lifetime of the LED. So any material you can use to draw the heat out of the LED definitely benefits the LED itself, and that's what different types of packaging materials can assist with.

BY MR. STEINBERG:

Q. In your experience meeting with Everlight's customers, do

they ever ask about the housing or packaging material?

MR. SHORE: Objection. Hearsay.

THE COURT: Overruled.

THE WITNESS: Sometimes.

BY MR. STEINBERG:

Q. Can you give me an example of a customer or an application where they've asked about the material?

A. Yes. We have -- again, it's a light bulb customer where they've done testing on standard plastic materials, PPA, and they've also studied upgraded --

THE COURT: No, that's all hearsay. What do they ask for?

THE WITNESS: They ask me for PCP material to use in the LEDS for LED light bulbs.

BY MR. STEINBERG:

Q. Is there another application where someone asks you about the material and what do they ask you about?

MR. SHORE: Objection. Hearsay.

THE COURT: Overruled. It's not hearsay what somebody asks him and he hears it. Overruled.

THE WITNESS: Customers have also asked me to use standard PPA plastics for the materials because it's slightly lower in cost.

BY MR. STEINBERG:

Q. Will an LED package work without this packaging or

housing?
A. No, it will not.
Q. All right.
MR. STEINBERG: Let's go to the next slide, Mr. Mortenson. Thank you.
Q. Mr. Liu, what are we looking at there that's being pointed to by Number 5?
A. Number 5 is pointing at the encapsulation of an LED, and that basically acts as a cover or the seal for everything, so it's kind of like the roof on a house.
MR. SHORE: Objection. Rule 26.
THE COURT: Overruled.
BY MR. STEINBERG:
Q. And what does that do in the LED package?
A. Well, again, it helps with thermal dissipation. It helps with mechanical protection because it's pretty much the lid on the LED package. And also, it can be used for optical manipulation.
MR. SHORE: Objection, Rule 26.
BY MR. STEINBERG:
Q. What do you mean by "optical manipulation"?
MR. SHORE: Objection. Rule 26.
THE COURT: Overruled.
Do you know personally.
THE WITNESS: Yes, ma'am.

THE COURT: Is this what you use in your selling?

THE WITNESS: Yes, your Honor.

THE COURT: Overruled.

THE WITNESS: For some LED packages, instead of the encapsulation being just straight across, we have some with -- I can't draw it that well here, but with like a dome lens. And the function of that would be to adjust the viewing angle or the light pattern of an LED based on the customer application. So, for example, like a cell phone handheld flash, Everlight has a lot of customers for flash where the LED itself has to project a very uniform, very square type of light output so that when you take a picture there's not any fuzz areas around the side and it's just very uniform.

BY MR. STEINBERG:

Q. Will an LED package work without any encapsulation?

MR. SHORE: Objection. Rule 26.

THE COURT: Sustained.

THE WITNESS: It can --

THE COURT: No, sustained.

THE WITNESS: Oh, sorry.

BY MR. STEINBERG:

Q. Do you know whether an LED package will work without encapsulation?

MR. SHORE: Objection. Rule 26.

THE COURT: Sustained.

BY MR. STEINBERG:
Q. All right. Let's look at Number 6.
MR. STEINBERG: Thank you, Mr. Mortenson.
Q. Mr. Liu, what's being indicated there with the Number 6? It looks like it's pointing to the little orange dots in the encapsulation you talked about a minute ago.
A. Correct. Those just depict phosphors.
Q. And what are those?
MR. SHORE: Objection. Rule 26.
THE COURT: Overruled.
THE WITNESS: Phosphors are used to create white light when paired with blue LED in some of Everlight products.
THE COURT: Is that how you sell them?
THE WITNESS: Yes, your Honor.
BY MR. STEINBERG:
Q. Are there different kinds of phosphors that a customer can choose from?
A. Yes, there are.
MR. SHORE: Objection. Rule 26.
THE COURT: Overruled.
THE WITNESS: Yes, there are. There are silicate, TAG, nitride, KSF, LuAG. All of these have different performance and reliability standards.
THE COURT: I just want to make sure -- this is what you use when you sell a product?

THE WITNESS: Yes, ma'am. We discuss these things sometimes with the customers.
BY MR. STEINBERG:
Q. And I see down there it talks about different colors of phosphor. What's that referring to?
A. Well, phosphors have -- different types of phosphors achieve different color spectrums. So there's yellow phosphors, there's red and there's also green phosphors.
Q. When you say "different color spectrums," do you mean that yellow phosphor makes yellow light or the red phosphor makes a red light?
A. No; we use a combination of these phosphors to make white light.
THE COURT: Is it a combination with the GaN?
THE WITNESS: With GaN chips. Yes, your Honor.
BY MR. STEINBERG:
Q. Are there different kinds of white light, then, that the different phosphors make?
A. Yeah, there's different --
MR. SHORE: Objection. Leading.
THE COURT: Overruled.
THE WITNESS: Just like for every type of color in the rainbow, like green, there's different shades of green, there's different shades of gray, there's also different colors of white.

BY MR. STEINBERG:
Q. And --
THE COURT: So if I understand it, a package might have a GaN chip that's accused here together with a phosphor chip, and it would come up with a red light?
THE WITNESS: No, a white light.
THE COURT: A white light? I'm sorry.
THE WITNESS: Yes, your Honor.
BY MR. STEINBERG:
Q. So in your experience, meaning with customers, do they ever ask about what kind of white light is being produced?
A. Usually when they're looking to buy a white LED, they definitely ask because there's many different types of colors they can select from.
Q. Can you give me an example from your experience where a customer would want a particular kind of white light?
A. It depends on the end application that the customer's manufacturing; for example, lighting fixture for, typically, indoor products like in your house, in your bedroom or your bathroom, you want something that's more warm white, which is more yellowish, it's more -- it gives a more cozy feeling. So to create warm white light we would use a certain combination of phosphors paired up with the blue light to create that warm white light.
On the other end of the spectrum we also have what we call

cool white. So cool white is more toward the bluish type of lighting, where customers would want that type of color, for example, in the office. I mean, just here in the courtroom there's a mix of many different types of white colors. On the edging it's more of a cool white, this here is more yellowish, so it's more warm white.
Q. Now, of the six items that we've looked at here, how many do Everlight make?
A. Five out of the six.
Q. What's the one that Everlight doesn't make?
A. The chip.
Q. Okay. So all the other six components that we've looked at here, Everlight makes those? Is that what you're saying?
A. Yes. I mean, we purchase the chip from a chip manufacturer and then we design and package everything to create this full LED package.
Q. In your experience looking at bills of materials for these LED packages, what percentage of the total cost is accounted for by the LED chip?
MR. SHORE: Objection. Hearsay, best evidence rule.
THE COURT: Overruled.
THE WITNESS: I mean, I've sold a lot of different types of packages from when I started at Everlight to now. I can say a general rule of thumb, maybe 6 to 30 percent, depending on what type of package it is.

BY MR. STEINBERG:
Q. And that's 6 to 30 percent of the cost is the LED chip and the rest is the other components we talked about?
MR. SHORE: Objection. Leading.
THE COURT: Yes, you need to ask that upright.
MR. STEINBERG: Okay. I'll go ahead and ask the next question. I think it was --
THE COURT: Let me just ask: What are you saying?
THE WITNESS: I'm saying the percentage of the chip to all the other package materials inside a full LED package, it ranges from 6 percent to 30 percent.
BY MR. STEINBERG:
Q. Does Everlight have any patents on all these other features that we looked at besides the LED chip?
A. Everlight does have a lot of patents, more than a thousand in the worldwide market.
Q. Does it have any in the United States?
A. Yeah, we do have several in North America as well. Some based on the design of the package, so the external dimensions, how you make it so that it's most efficient in terms of performance and easily manufacturable. In addition, we have some utility patents as well. For example, the encapsulation that I talked about before, we have special ways to create a lens where it gives a very customizable viewing angle that customers can use. But in addition to that, we also have

fabrication process, manufacturing process patents.
Q. Now, you were here for the testimony of Dr. Lebby, right?
A. Yes.
Q. Do you agree with him when he says that all the value of an LED package is in the chip?
MR. SHORE: Objection, your Honor. Rule 26, rebuttal report.
THE COURT: Sustained. Sustained.
BY MR. STEINBERG:
Q. I just have a couple more questions. In your experience meeting with Everlight's customers, have you ever been asked about the buffer layer in the LED chip in an LED package?
A. No, I have not.
Q. Have you ever been asked whether the buffer layer is non-single crystalline by any customer in your experience?
A. No.
MR. STEINBERG: Thank you, Mr. Liu.
MR. SHORE: Your Honor, can we please put the animation back up?
THE COURT: Oh, you want it back up?
MR. SHORE: Oh, I want it back up.
Do you have it? Oh, I'm sorry. We have a copy of it.

CROSS-EXAMINATION

BY MR. SHORE:
Q. Mr. Liu, I don't have a lot of time. I've got to be

quick.

The first time that Everlight ever disclosed this animation to Boston University was Sunday night, correct?
A. I don't exactly remember when it was turned in, but it sounds about the right time frame.
Q. Okay. And when you say that these are the types of things that you talk about with customers -- I believe that's what you told the Court?
A. Yes.
Q. Now, when you go to visit a customer, you're going to visit primarily engineers, correct?
A. No, it could be engineers, purchasing. It could be a whole slew.
Q. But it's people who know what a package is, correct?
A. In general, yes.
Q. It's people who know what materials are in a package, correct?
A. In general.
Q. It's people who know what lead frames are, correct?
A. They might not know the details of the lead frames but they know what a lead frame is.
Q. But anyway, you don't have conversations -- have you ever shown an animation like this to a customer?
A. Yes.
Q. What -- name the customer.

A. Philips.
Q. All right. Philips Lighting needed to know how to make a package?
A. Well, they wanted to discuss how to add details to each of the elements or choose whatever type of materials that they preferred.
Q. All right. You also, I believe -- you'd agree with me that the information in this animation is technical?
A. I'm sorry. Can you repeat --
MR. STEINBERG: Objection, your Honor.
Q. The information in this animation is technical in nature?
A. Yeah.
Q. And the information in this is about -- or is of a -- I'm sorry. Is -- it includes your specialized knowledge that you're trying to impart to the jury?
MR. STEINBERG: Objection, your Honor. Vague.
THE COURT: Sustained.
BY MR. SHORE:
Q. I mean, this is specialized knowledge. A person walking around the street isn't going to know what this means, are they?
MR. STEINBERG: Objection, your Honor. Vague.
THE COURT: Sustained.
BY MR. SHORE:
Q. Mr. Liu --

THE COURT: It's not a person walking around the industry, it's a person in this industry.

MR. SHORE: No, your Honor.

THE COURT: I'm just --

BY MR. SHORE:

Q. Mr. Liu, the reason why this animation was created was to impart specialized knowledge to the jury, correct?

MR. STEINBERG: Objection, your Honor.

THE COURT: Sustained.

BY MR. SHORE:

Q. You didn't provide any report to Boston University, did you, about any of this information that you just sprung on us?

MR. STEINBERG: Objection, your Honor.

THE COURT: Sustained.

BY MR. SHORE:

Q. As a matter of fact, under the rules we're supposed to --

THE COURT: Sustained.

BY MR. SHORE:

Q. You didn't produce a single bill of materials for any of these parts, did you?

A. Not to my knowledge.

Q. Okay. You never provided -- you never provided a list of the accused parts that were not GaN to Boston University, did you? There was never a detailed list of all the parts that were non-GaN. You never produced that prior to the trial?

A. I believe that we did.
Q. You did?
A. Yes, sir.
Q. When, September 15th?
A. Yes.
Q. Months after the close of discovery?
A. About three months ago.
Q. Months after the close of discovery, in July?
A. Discovery close was in July? Yeah, July 17th, so...
MR. STEINBERG: Your Honor, I would just object.
THE COURT: Overruled.
BY MR. SHORE:
Q. Now, you've told this jury that we should have looked at the data sheets before July to figure out what was non-GaN, right?
A. Definitely was an option available on --
Q. So what you're telling the jury is even though we didn't find out about this so-called problem until September, in July we should have looked at data sheets despite your swearing that these were GaN products and your lawyer verifying that these were all GaN products?
MR. STEINBERG: Objection, your Honor. It misstates the remittitur response.
THE COURT: Overruled. But you should put the things up on the --

MR. SHORE: Well, I'm just going through the timeline, your Honor.

THE COURT: All right.

MR. SHORE: So the timeline --

THE COURT: Overruled.

BY MR. SHORE:

Q. Boston University, can they rely upon you, what you say under oath?

A. Yes, sir.

Q. All right. Can Boston University rely upon what your attorneys tell us as verifying what you said under oath?

MR. STEINBERG: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Sorry. Could you repeat the question?

BY MR. SHORE:

Q. Could Boston University --

THE COURT: Well, actually, I'll sustain.

BY MR. SHORE:

Q. Can Boston University rely upon what your attorneys tell us?

MR. STEINBERG: Objection, your Honor.

THE COURT: Sustained.

BY MR. SHORE:

Q. You're aware that an attorney for Everlight in an e-mail verified that all of the parts that had been disclosed to us

were gallium nitride parts. You're aware of that, correct?
A. No, I'm not.
Q. You're not?
A. No.
Q. All right. Well, that's in evidence.
So when we took your deposition in July of this year -- correct?
A. Correct.
Q. -- we had no reason to know that you're going to, in September, tell us that any parts were not GaN parts, right?
MR. STEINBERG: Objection, your Honor. Asking for the state of mind of Boston University.
THE COURT: Yeah, sustained. Sustained.
BY MR. SHORE:
Q. How are we supposed to know -- we were criticized on direct that we didn't ask you about non-GaN parts. Do you remember that?
THE COURT: Well, let me put it this way: Did you ever tell anyone in this litigation that these were non-GaN parts?
THE WITNESS: I mean, in my deposition there's, I think, twice where we talked about part numbering, we went through lists where I said, This is white LED --
THE COURT: Oh, no, these are red, orange, yellow.
THE WITNESS: I believe we talked about different

colors as well in the deposition.
BY MR. SHORE:
Q. Did you ever tell us that there were non-GaN parts included in the accused devices? Did you ever state that in your deposition?
A. I never stated it exactly like that, no.
Q. And when we were given access to the SAP system, that was in July and August, correct?
A. Yes, sir.
Q. Before anybody told us there were non-GaN parts. That happened in September.
A. I believe so.
Q. Now, you have talked to the Court and the jury about what customers have asked you about, what customers have demanded, et cetera. Is there one e-mail from a customer in this case that corroborates what you said?
MR. STEINBERG: Objection, your Honor.
THE COURT: Overruled.
THE WITNESS: There should be quite a few, if I remember correctly, where certain customers are asking for specific packaging materials.
BY MR. SHORE:
Q. Then why weren't they put in evidence? If they exist, why aren't they in evidence?
MR. STEINBERG: Objection, your Honor.

THE COURT: Overruled.

Did you produce them?

THE WITNESS: My laptop was available for what's called discovery.

BY MR. SHORE:

Q. Did you produce them to Boston University. Not whether you claim you have them, did you produce them to Boston University?

A. My e-mails were given to Boston University to my knowledge.

MR. SHORE: Your Honor, that's not true.

MR. STEINBERG: I object to that comment, your Honor.

THE COURT: I strike that.

BY MR. SHORE:

Q. All right. Why haven't your attorneys to your knowledge -- if this is true that this is why the customers want things, this is why the customers demand things -- why has not a single document, not a single e-mail, not a single customer specification been offered into evidence?

MR. STEINBERG: Objection, your Honor. Completely misstates the record and mischaracterizes.

THE COURT: Well, I'll have to deal with this at sidebar. Sustained as argumentative.

BY MR. SHORE:

Q. Why are there no -- customers issue what are called

specifications, correct?
A. I'm sorry?
Q. Customers issue specifications that tell you what kind of parts that they want, correct?
A. Some are official, some are non-official.
Q. But they have to communicate it somehow, either by an official document or an e-mail or somehow, correct?
A. Correct.
Q. Are you aware of any specifications of customers being offered into evidence by the defense?
A. I do not know.
Q. Well, don't you think the best evidence of what a customer wants and why would be information from the customer?
A. Yes.
Q. Are any of your customers going to come and testify about why they demand your products or why they want your products?
A. Not that I'm aware of.
MR. SHORE: May I approach the witness, your Honor?
THE COURT: Yes.
BY MR. SHORE:
Q. You testified on direct about all of the packaging patents that Everlight applied for. Do you remember that?
A. Yes, sir.
Q. You also testified about how Everlight uses phosphors to affect the color of LEDs, correct?

A. Yes, sir.
Q. That was even part of your animation, wasn't it?
A. Yes.
Q. In Exhibit --
MR. SHORE: We offer Exhibit 1623 into evidence, your Honor. It's a patent application by Everlight Americas -- or by Everlight.
MR. STEINBERG: Your Honor, we object for the reasons stated before trial.
THE COURT: Well, I'll let him ask about it.
BY MR. SHORE:
Q. As a matter of fact, that is a patent application, sir, where Everlight Americas uses gallium nitride LEDs to make light across the entire spectrum all the way into the infrared zone, isn't it?
MR. STEINBERG: Objection, your Honor.
THE COURT: Overruled.
THE WITNESS: It is, but I don't think we sell any of these.
THE COURT: Excuse me. Excuse me. Is this you?
THE WITNESS: I'm sorry?
THE COURT: Are you the named inventor here?
THE WITNESS: No, your Honor.
THE COURT: Somebody -- another Mr. Liu? Okay.
MR. SHORE: Now, we would offer --

THE COURT: Are you familiar with this process?
THE WITNESS: I mean, I've never seen this patent before. But, I mean, all the different color LEDs that Everlight sells is -- like the red, yellow, oranges, are not using phosphor ever since I started working at Everlight.
MR. SHORE: And again, we would object. Best evidence rule, beyond his personal knowledge.
THE COURT: Overruled.
BY MR. SHORE:
Q. All right. Mr. Liu, I'm going to show you Exhibit 39 and 40. Those are two license agreements, one between Everlight and Philips and one between Everlight and I believe another company named Emcor. Now --
MR. STEINBERG: Your Honor, we object to these exhibits.
MR. SHORE: I haven't even offered them yet, your Honor.
THE COURT: Let me just -- I don't know what they are so why don't you ask a question.
BY MR. SHORE:
Q. Mr. Liu, are you familiar -- you were actually designated as Everlight's corporate representative on licensing aspects, correct?
A. Correct.
Q. All right. Now, are you aware of a single license between

Everlight and any other company where the royalty rate is not based upon the entire value of the entire product chip and package both?

A. Sorry. I'm not aware of the details.

Q. So in other words, you can't tell this jury as the corporate representative, the person who is designated with the most knowledge of Everlight's licensing, of a single license that Everlight has ever entered into with anybody where the chip and package combined were not the royalty base?

MR. STEINBERG: Objection, your Honor.

THE COURT: Overruled.

Do you personally know of any?

THE WITNESS: I mean, my understanding is that most of these royalties were based off of a package.

BY MR. SHORE:

Q. Like the package and the chip, correct? Licensed products is defined as the package and the chip in every Everlight license agreement, isn't it?

MR. STEINBERG: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: I mean, I would have to read over all of these again to --

THE COURT: To your knowledge. You're the head of sales, right?

THE WITNESS: To my knowledge, that's the case.

MR. SHORE: Okay. We would offer Exhibits 39 and 40 into evidence, your Honor, for the purpose of showing what they base -- what they pay their royalties on. It's on the entire product.

MR. STEINBERG: Your Honor, we object. There's been an insufficient showing that these licenses are in any way comparable --

THE COURT: All right. I'll mark them for identification and deal with it later.

THE CLERK: So it will be C and D.

(Plaintiff's Exhibits C and D marked for identification.)

THE COURT: Have you seen these licenses before?

THE WITNESS: I've seen them before but I'm not the person responsible for writing it or -- so I can't remember all the details in them. But to my knowledge I think -- yeah -- well, no, I'm not fully aware of all the details in these.

MR. SHORE: Your Honor, he's our designated corporate representative on the topic.

MR. STEINBERG: Your Honor, there's no designated corporate representative --

THE COURT: No, no, wait. Someone testifies in court.

Let me just ask you this: But it is the basis for the royalty, the chip and the package together. Is that right?

THE WITNESS: I'm sorry. I would have to look through all the --

THE COURT: Well, look.

THE WITNESS: Okay.

BY MR. SHORE:

Q. The definition of "licensed product," Mr. Liu, it's highlighted, I believe.

MR. STEINBERG: Mr. Shore, can you give the witness the time to read --

THE COURT: No, no, he's helping him. So he doesn't have to read the whole thing. It's highlighted. We don't want to sit here while he reads an entire small-print license.

(Pause.)

THE WITNESS: Well, here it says, "The licensed patent is for light-emitting semiconductor, die, wafer or finish package."

BY MR. SHORE:

Q. In other words, you're paying royalties on all of it, aren't you?

A. For this particular case, yes.

Q. All right.

MR. SHORE: We'd offer that into evidence, your Honor.

THE COURT: Yes, I'll allow that.

MR. SHORE: Could you give the exhibit number for the last one, please?

THE WITNESS: Exhibit No. PTX 40.

MR. SHORE: All right.

(Plaintiff's Exhibit No. 40 received into evidence.)

MR. SHORE: And may I ask 39 be put up on the screen to save some time?

THE CLERK: 39 and 40?

MR. STEINBERG: Your Honor, I think -- was your ruling only related to one of the license agreements?

THE COURT: Well, yes, because he's familiar with it and confirmed the package was the basis for the royalty.

MR. STEINBERG: Your Honor, I just want to make sure which one we're talking about.

THE COURT: 40 was just offered and admitted in.

BY MR. SHORE:

Q. And then 39, the license between Everlight and Osram, LED product is defined. "Light-emitting device comprising at least one LED chip as defined above in combination with electrical leads which are electrically connected with said LED chip, and further comprising a housing, whether made from one single piece or not which encapsulates and seals the LED chip, which housing may include primary optical elements integrated in the said light-emitting device and/or means providing for electrical connections and/or mechanical connections and/or thermal paths to the external mount."

Licensed products is defined as the entire thing, chip and

all the packaging, correct?
A. Well, I mean, this licensing, it seems like it was in regards to the total LED package, right. But this BU litigation is just for the chip, isn't it?
MR. SHORE: Your Honor, object as nonresponsive.
THE COURT: Yes, sustained. Strike it.
So now listen to his question.
BY MR. SHORE:
Q. The way the products that are being licensed are defined is the entire product, chip and package, even though Everlight doesn't make the chip, right?
A. Correct.
MR. SHORE: We'd offer Exhibit No. 39 into evidence.
THE COURT: All right.
(Plaintiff's Exhibit No. 39 received into evidence.)
MR. STEINBERG: Can I get copies of those agreements, your Honor? They have not -- Chris is refusing to provide those.
MR. EVANS: I don't have copies.
MR. SHORE: We pass the witness, your Honor.
THE COURT: No, show it to him.
MR. SHORE: I'm sorry?
THE COURT: Mr. Evans, you should give it to him.
MR. EVANS: I am. I'm looking for additional hard copies.

MR. STEINBERG: These were not disclosed last night.

MR. SHORE: Your Honor, they produced them.

REDIRECT EXAMINATION

BY MR. STEINBERG:

Q. Mr. Liu, I just have a couple of quick questions. Mr. Shore asked you about bills and materials and whether they were produced in this case. Are those available through Everlight's SAP system?

A. Yes, they are.

Q. And access to that was provided to Boston University over two months --

MR. SHORE: Objection, your Honor.

THE WITNESS: Correct.

THE COURT: Hold on. You're going faster than I am. Slow down.

MR. STEINBERG: I'm sorry, your Honor.

THE COURT: So he objected.

MR. SHORE: We received no codes for bill materials, no SAP codes.

THE COURT: So why don't you ask it with respect to the coding.

MR. STEINBERG: Okay.

THE COURT: There was a last-minute discovery flurry, let's just put it that way, so you need to be accurate about what was produced and what wasn't produced. This past

September, as in two months ago.

MR. STEINBERG: I think to be fair, the SAP access was provided through the month of July and also August by Everlight.

THE COURT: All right. All right.

BY MR. STEINBERG:

Q. Is that correct, Mr. Liu?

A. Correct.

THE COURT: Now, what did you give?

MR. SHORE: Your Honor, personal knowledge.

THE COURT: If you know.

THE WITNESS: Well, I mean, to my understanding we gave them full access to our SAP --

THE COURT: No. Excuse me. Do you have personal knowledge of what exactly was in the production?

THE WITNESS: Yes, ma'am, for what we produced in September.

THE COURT: All right. In September. What did you produce in September, your personal knowledge?

THE WITNESS: I mean, from SAP we pulled chip count, the part number, what chip part number it was, if it was GaN or non-GaN, who manufactured the chip.

THE COURT: To your knowledge, was that the first time that was ever produced?

THE WITNESS: To my understanding, yes.

MR. SHORE: Move to strike the testimony, your Honor.
THE COURT: Overruled.
BY MR. STEINBERG:
Q. Mr. Liu, in your knowledge of Everlight's SAP system that Boston University was provided access to in July and August of this year, could they have accessed bills and materials using standard transaction codes?
MR. SHORE: Objection.
THE COURT: Sustained. Sustained.
MR. STEINBERG: I can't ask them what was in the system that was accessible?
THE COURT: Sustained.
BY MR. STEINBERG:
Q. Okay. I want to go back to these two license agreements. Do these two license agreements include any patents related to the LED package?
MR. SHORE: Objection. Personal knowledge.
THE COURT: If you know.
THE WITNESS: These are -- it's just licensing agreements between two companies. I don't think any specific patents are mentioned, if I remember correctly.
BY MR. STEINBERG:
Q. Do you want to take another look at it?
A. I mean, yeah.
(Pause.)

Q. If I can, I can direct your attention to the second page of Exhibit 39. It's Section No. 4 headed "Osram patents."
A. Yeah, but did you ask a specific patent? I don't remember specific patents; this is more overall.
Q. So it looks like this license applies to all of Osram's patents that are listed in the agreement. Is that right?
A. "Shall mean all patents, utility models, designs, applications" -- yeah, it seems so.
Q. It's not just patents related to LED chips. Is that right?
A. Correct. It's all patents.
Q. Okay. Thank you. No further questions.
MR. SHORE: Pass the witness, your Honor.
THE COURT: Thank you.
MR. STEINBERG: Your Honor, may Mr. Liu be excused?
THE COURT: Yes, he may.
MR. STEINBERG: Thank you.
(The witness is excused.)
MR. STEINBERG: At this time the defendants call Dr. Russ Mangum.
RUSSELL WALKER MANGUM III, duly sworn
THE CLERK: You may be seated. Would you please state and spell your name for the record.
THE WITNESS: My name is Russell Walker Mangum III, R-U-S-S-E-L-L W-A-L-K-E-R M-A-N-G-U-M, and "the 3rd" I use III.

MR. BENISEK: Ms. Molloy, can you activate Mr. Mortenson's --

THE CLERK: Yup.

MR. BENISEK: Thank you.

DIRECT EXAMINATION

BY MR. BENISEK:

Q. Good morning, Professor Mangum.

A. Good morning.

Q. Professor Mangum, can you explain what your role here today is for the jury?

A. Yes. I was asked to evaluate the issue of damages that are being claimed in this case and to form my own opinion about the damages related to the alleged patent infringement.

Q. So is your role similar or the same to Mr. Ratliff who previously testified for the plaintiff?

A. Yes; that's correct.

Q. Now, we're short for time, so I'll see if I can speed through this a little bit for you, Professor Mangum. The first thing we're just going to touch on is your professional experience. So I have the next slide up in front. Can you just walk us through your educational background first?

A. Sure. I have a Ph.D. and a master's degree in economics from the University of Southern California, and I have a bachelor's degree with honors from California State University Fullerton also in economics.

Q. And what is your current -- what do you do today for work?
A. I've been an economist for about 20 years. Right now I'm a professor of business and economics at Concordia University in Irvine, California. And I also work for -- when I do consulting work like what I'm doing now, I work with a company call Nathan Associates, Incorporated.
Q. And what did you do prior to becoming an economist?
A. I was in law enforcement for a few years. I was a police cadet at Newport Beach Police Department and then a police officer at Huntington Beach Police Department, both in California.
Q. That's quite a change in professions.
A. Yes, I would agree.
Q. Let's talk a little bit about some of your experience. Now, you mentioned you're also a consultant. When you say that, do you mean a damages expert?
A. Correct. Oftentimes what I'm asked to think about and give opinions on relates to damages in litigation matters.
Q. Okay. And have you been designated an expert before?
A. I have, over 100 times.
Q. Okay. And were those cases related to patent infringement?
A. Yes. Many of them, maybe even most of them, were.
Q. Okay. And in any of those cases did you render opinions on what a reasonable royalty would be?

A. Yes. Many times.
Q. Okay. And on the slide here is just a list of some of the cases that you have recently testified on the issue of reasonable royalty?
A. Sure. I've got Nike mentioned. I worked for them involving patents, involving the technology of making clothing and the way the clothing operates. I've also worked with Netgear involving network interface cards. I've worked for Microsoft involving some of their computing products involving the dot-net framework. I've also worked for Kingston in the case against SanDisk involving flash memory.
Q. Have you ever worked specifically in the field of LEDs?
A. Yes, I have.
Q. Explain.
A. I worked for Everlight earlier this year on a case opposed to Nichia, another manufacturer of packages and chips.
MR. BENISEK: Your Honor, at this point we would proffer Professor Mangum as an expert in patent damages.
MR. SHORE: Your Honor, we continue the objection we had in our previous *Daubert*.
THE COURT: I don't know what you're referring to but I'll let him render an opinion.
MR. BENISEK: Thank you, your Honor.
BY MR. BENISEK:
Q. Now, before we dive into your assignment in this case,

Professor Mangum, I just want to touch on a couple of things really quick. Now, do you do work for one side in the case? Do you do just plaintiffs' or just defendants' work?
A. No, I work for both plaintiffs and defendants, probably equal amounts.
Q. Okay. And, Professor Mangum, have you ever had your opinions challenged before in court?
A. Yes, many times.
Q. Okay. And how common does that occur?
A. It's quite common, especially in the past five or ten years, it seems to happen almost every case.
Q. Okay. Now, have you ever been excluded from testifying before?
A. Yes, one time.
Q. Okay. And what case was that?
A. It was a case called *ePlus v. Lawson*.
Q. And did your challenged opinions you gave in that case, do they have any relationship to the opinions you're going to render in this case?
A. No. The methods and opinions at issue there are not types that I've used or formed here in this case.
Q. Now, in fact, did plaintiffs challenge your opinions in this case?
MR. SHORE: Objection, your Honor.
THE COURT: Overruled.

THE WITNESS: Yes, they did.

BY MR. BENISEK:

Q. And were they successful?

MR. SHORE: Your Honor --

THE COURT: No, sustained.

MR. SHORE: That's asking for an endorsement.

THE COURT: Sustained. Sustained.

BY MR. BENISEK:

Q. All right. Professor Mangum, let's talk about your assignment in this case. What was your assignment in this case?

A. I was asked to review the opinion by the damages expert for the plaintiff in this case. I later learned that was Mr. Ratliff. So I was asked to comment on his opinions and also to form my own opinion about damages related to the alleged patent infringement.

Q. Okay. And what materials did you review, what did you consider to come to your opinions?

A. I reviewed documents that were filed with the court; I've reviewed various documents that the parties exchanged with each other such as patent license agreements, internal e-mails and communications; I've reviewed financial data, so data about sales; things about chip identification and chip type, source of manufacture and where the products were sent.

I've also looked at industry publications that were

produced by the parties. I've also read the report, as I mentioned, of Mr. Ratliff, also of Dr. Lebby. I've reviewed quite a bit of deposition testimony and the exhibits from those depositions in this case. I've had interviews with several personnel from the defendants' firm, from Epistar, Lite-on and Everlight, and there was a certain amount of publicly available information that we were able to find through the Internet.
Q. Now, is there any difference in the materials that you're relying on for your opinions and the materials that Mr. Ratliff relied on?
A. My understanding is the same set of materials were available as far as all of what's in the discovery, and I've relied on that material. I do know there's a dispute about certain information that identifies chips. I used all the information I believe that Mr. Ratliff doesn't use, part of the information that's at dispute in this case.
Q. Okay. So are you going to present all the information? Strike that. Let me move on.
So the next slide, I believe, Professor Mangum, you've sort of set your opinion and sort of where you differ with Mr. Ratliff. Can you explain to the jury your overall opinion here and the key distinction between your opinions and Mr. Ratliff's opinions?
A. Sure. And this doesn't relate on this slide to a dollar amount, but it identifies some difference in the methods, if

you will, of the opinions. There's two sections. One has to do with the royalty rate. And one difference is Mr. Ratliff has settled on a running royalty rate at 4 percent, and what I'll describe in a few minutes is that I settled on a royalty rate structure where it could be that it's a lump-sum payment, like a one-time payment for the use of the patent, or it could be a running royalty rate as identified there.

The other big difference between our opinions has to do with what we use for the royalty base, that is, the dollar amount that would feed into the damages calculation. I look at the value of the chip in conducting my analysis; Mr. Ratliff looks at the value of the full package when that comes up. So, for example, for Everlight or for Lite-On, their products, or -- in a part of his opinion he calls "unique inducement." He also looks at the chip value and -- correction -- he looks at the package value but I look at the chip value.

Q. Okay. So at the highest level, Mr. Ratliff on the right is 4 percent, you have an option of a lump sum of $500,000, running royalty of 1 percent or a hybrid --

THE COURT: I can't even hear you. You have to speak up.

MR. BENISEK: Sorry, your Honor.

BY MR. BENISEK:

Q. So underneath "royalty rate lump sum," Mr. Ratliff is 4 percent?

A. Correct.
Q. And you are one of three: The lump sum of $500,000, a running royalty of 1 percent, or half a percent and $250,000?
A. Yes; that's correct.
Q. Okay. Now, did you just come up with that rate on your own or does that -- did you derive that rate from somewhere?
A. That royalty structure comes directly out of a license agreement between Boston University and Cree.
Q. Okay. Thank you, sir.
Now, on the royalty base, I just want to make sure that it's clear for the jury, your position is that it's based on the LED chip?
A. That's correct.
Q. And Mr. Ratliff's opinion is that it's based on the LED package?
A. That's correct.
Q. Okay. Thank you, sir.
Professor Mangum, did you perform --
THE COURT: I'll be giving you extensive jury instructions. If you get to the issue of damages, you're going to be making these decisions. So is it the chip, is it the package, what's the rate, should it be a lump sum, that's a jury call, so that's why you're hearing all of this now.
MR. BENISEK: Thank you, your Honor.
BY MR. BENISEK:

Q. Professor Mangum, did you perform a *Georgia-Pacific* analysis in this case?
A. Yes, I did. There's a large set of economic factors that I've considered, but I am aware of a case that's referred to as *Georgia-Pacific*, a court case, where a number of factors, in fact, 15 different factors are identified. I did evaluate those 15 factors.
The slide I've prepared here takes those factors and collapses them down into some general categories. And I did include all those factors. So I think it's fair to say that my opinion comes from a *Georgia-Pacific* analysis.
Q. Okay. And I know you have the various factors listed here. Is there one factor in particular where there's a lot of action in this case, at least in your opinion?
A. Yes, in this case it's the upper left-hand entry there, the licenses for the '738 patent.
Q. Do you want to circle it?
A. Sure. Is it with my finger?
Q. Yeah.
A. There you go. Right there. In this case there's quite a bit of evidence of actual market outcomes, when people have agreed to license the '738 patent. And that's somewhat uncommon. We oftentimes don't have this much information in patent infringement cases about what parties have already agreed to pay.

Q. Okay. And if you just tap up in the -- twice -- there you go. Perfect.
Now, do you remember this slide from Mr. Ratliff's presentation?
A. I do. I know I modified it with some red letters there, but if you take away the red letters, I do remember this.
Q. Okay. And I think -- well, my understanding, the gist of this slide is to show where the two of you are in agreement?
A. That was my understanding of Mr. Ratliff's slide, yes.
Q. Okay. And do you agree with that statement? Let's walk through the factors. How about the first line, the hypothetical negotiation date. Are you in agreement with Mr. Ratliff on that point?
A. Yes, we are. We both agree that the hypothetical negotiation date is in early 2000. The hypothetical negotiation is this construct of -- it's a fiction so it's not real, but if we imagine that we could go back in time and have an agreement between the parties and an actual agreement resulted, we wouldn't all need to be here. The idea is if we go back to some date, what would the value be at that date, what would the royalty rate be so we wouldn't have to be here.
That negotiation, as I said, it's not real. But we imagine we go back in time and we'd put -- you might have mentioned putting parties in a room and they can't leave. They have to agree before they come out. And one might say, "Well,

I demand this much," the other one might say, "No, we're not going to pay that much." They can't walk away. They have to agree.

That's the hypothetical negotiation. You assume at that time that infringement is known, validity is known. But when an agreement has to come up, we both agree that's in early, I think, March 2000.

Q. All right. Great. Now, the second line item is the BU/Cree license is relevant. You agree with that point?

A. Yes, I do. Both Mr. Ratliff and I have looked at the agreement to learn information about the regional royalty in this case.

Q. Okay. And how about the last two points?

A. I'll jump from there to the last. I think we both agree on that last row about the topics to consider. I think the disagreement that we have is that although we both talk about a running royalty rate, Mr. Ratliff only comes up with a damages number based on a running royalty rate. And as I'll explain later, I think that a lump-sum royalty is perfectly applicable in this case, in fact, that's -- almost all the time that's what licensees have agreed to, is lump-sum royalty rates as opposed to running royalty rates.

Q. Okay. Well, let's take a look at that point. Now, this is a chart you created. Can you explain to the jury the relevance of this particular graphic?

A. Yes. I added up the dollar amounts from the evidence I was aware of as far as what was received by BU, and I said, Well, how much of it was received when the licensee was paying a lump-sum amount, and how much was received when they were paying a reasonable royalty? And as you can see, hardly any of the money received flowed from a reasonable royalty, but rather, it was from a lump sum.
Q. Okay. So it's fair to say that the licensing history of Boston University on this patent -- let me start again.
It's fair to say that the licensing history of this patent shows that it has been mostly lump-sum agreements?
A. Yes; that's correct.
Q. Okay. Thank you.
Now, we just briefly mentioned that you and Mr. Ratliff agree the Cree/BU license agreement is sort of the benchmark agreement, it's the one that you both believe is relevant to this analysis.
Why don't you explain a little bit more why you find it particularly relevant.
A. It's relevant because the agreement is fairly close to the time of the hypothetical negotiation, the hypothetical being in early 2000 and the BU license agreement with Cree had to do with -- it was in 2001 and then a change in 2002, shortly thereafter.
It's also relevant because in that agreement there's a

discussion of what BU believed it wanted to receive at a minimum for providing its intellectual property, and it also identified what that amount would be when you were talking about a nonexclusive license like the hypothetical negotiation for rights that are not sublicensable, like the hypothetical negotiation.

And the BU/Cree agreement also identified that these rates were applicable for all companies, right, all levels of volume, so whether it was U.S., whether it was foreign, large company, small company, all those were included in these terms in this BU/Cree agreement.

Q. Great. And in the BU/Cree agreement, Professor Mangum, is it just for the '738 patent?

A. No, there's many other patents included. I think there's ten more. My recollection is that at the time when BU and Cree first made the agreement in 2001, there was three U.S. patents including the '738 patent, and I think there were four foreign patents. At the time of the amendment, about a year and a few months later, the parties agreed to change the terms, and also, four more patents were added in addition at that time.

Q. Okay. Now, you just mentioned the amendment. Let's go to that. And can you explain how -- well, let me start again. Is the amendment where your royalty structure came from?

A. Yes; that's correct.

Q. Okay. And can you explain on the slide where the royalty

structure is that you're relying on?

A. Sure. This is a couple of clips from part of the agreement. It was a multipage document. The top line there that's highlighted says "For sales by licensee," and it says 1 percent. Now, the licensee in this case is Cree, right? So they're the exclusive licensee and they have the sublicense right, so they can go and try to go make money reselling the technology. That's not what I'm relying on so that's not what we're talking about in the hypothetical negotiation. It's not an exclusive sublicensable right. We're looking for something different.

In the area below it talks about what a sublicensee would pay. If you look at the second line there it says, "For sales by a sublicensee," and then it goes down to describe what those rates could be, right, what BU is saying "This is what we want."

So the first one says 0 percent for fully paid sublicense. So that's the lump sum, right? And it says, "Issued pursuant to Section 2.03." It's not on this slide here, but that dollar amount was at least $500,000. That's where it came from. Then if you go to the next line it says, "50 percent of the sublicensee royalty rate with a minimum sublicense royalty ate of..." and it lists two numbers below that. Do you see that 2 percent and the 1 percent? So 50 percent of 2 is 1 percent. 50 percent of 1 percent is half a percent. But notice that if

you pay that half a percent, right, it says "and a $250,000 lump-sum license fee." This is the area where I got the terms that I mentioned earlier.
Q. Okay. And besides the Cree/BU license first amendment, is there anywhere else in the materials you reviewed that suggest this is the type of structure or rate that BU is willing to pay or willing to accept for a license to the '738 patent?
A. Yes, I've seen terms similar to this from a document a couple of months before this.
MR. BENISEK: Mr. Mortenson, can you pull up DTX 160, please? If you could just blow up the body of the e-mail for me.
Q. So is this the document you're referring to, Professor Mangum?
A. Yes, it is. I think if you scan a little bit higher, you'll see there was a date. I think it was April of 2002.
Q. Okay. So it's an e-mail from Michael Pratt. Who is Michael Pratt again?
A. My recollection was his title is interim director of the office at -- Boston University Office of Technology Development, OTD, I think he called it.
Q. Okay. And what about Mr. Pratt's e-mail and the attachments you found relevant to discerning what Boston University would have been willing to license the '738 patent for back at the time of the hypothetical?

A. I found three things relevant about this document. The first one, I think we have to go to the last page, and there is a paragraph in the middle where some royalty terms are -- yeah, that paragraph. And about halfway through we see a sentence that starts, "A reasonable up-front fee."

So a reasonable up-front fee for a sublicense to the '738 patent is $250,000 to $500,000. The next sentence says a reasonable royalty is .5 percent to 1.5 percent, then it goes on to talk about a sublicensing strategy. So this is another source of what I saw a license term similar to those I talked about in the agreement. So that's one of three things that I thought were relevant for this document.

Q. Okay. And what else did you find relevant about this document?

A. I think if you go one paragraph up, if you expand what's being shown there, you can see there's a discussion about who would be the obvious infringer, who might be parties that could be approached for licensing. And as you see, there's a mention -- if you go through, many of these are foreign. So it wasn't the case that BU was saying, "We want U.S. licensees." They mention mostly non-U.S. licensees. And there's no differentiation about rate. So there's not a statement that says, "Now, the rates would have to be higher if it's not U.S." There's nothing like that. That's the second thing that was relevant for this document.

Q. Okay. Now, let me stop you there for a second. You recall testimony from Mr. Pratt, the author of this report, and also from Mr. Ratliff where they both said that in their view, back in 2000 Boston University would have sought a royalty of at least 4 percent from non-U.S. companies such as Epistar and Everlight and Lite-On versus what they sought from Cree. Do you recall that testimony?

A. I do.

Q. And do you find the statements in Mr. Pratt's e-mail in any way consistent with what he testified here?

A. No.

Q. Okay. Thank you.

And you mentioned there was a --

MR. SHORE: Objection to using the term "testified here." This is not testimony; it's a draft letter.

THE COURT: Yes. Sustained.

You want to rephrase that?

MR. BENISEK: Sure.

BY MR. BENISEK:

Q. Let me ask it a little bit differently. Did Mr. Pratt's contemporaneous writings back in 2002 in your view support the idea that Boston University would have been seeking much higher royalty rates from foreign companies?

MR. SHORE: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: The statements in this document are not consistent with what I remember Mr. Pratt testifying to in court.

BY MR. BENISEK:

Q. Thank you, sir.

And I think you had one other point you wanted to make with respect to DTX 160?

A. Yes. It's on the front page, or the first page, if you will. And if you remember the context, this is an April 2002 document. So this is about a year and three months after BU first entered into an agreement with Cree, and it's about two months -- about two months and a day before there was going to be an amendment to that first agreement. And although there was already a license agreement between BU and Cree, you can see here on the second sentence at the very beginning it says, "We could use a report like this to motivate Cree to seek sublicenses to our patents."

So based on what the license agreement had been up to now, Cree was still saying -- correction -- BU was still saying: Cree needs to be motivated. To go forward, we have to do something to affect what they're doing with the sublicenses. I feel that reveals here part of the process and the timeline of the changes in the agreement between BU and Cree.

Q. Okay. Thank you, sir.

MR. BENISEK: Mr. Mortenson, can you just go back to

the PowerPoint?
Q. All right. So we've been talking about the BU/Cree agreement. Did you look at other license agreements in this case for the '738 patent or even other patents?
A. Yes, I did. And as I mentioned earlier, there were quite a few other license agreements. I don't think they're quite as spot on, if you will, or were quite as directly relevant as the BU/Cree license agreement mainly because of the timing involved, but there were many other agreements by which licensees obtained rights to the '738 license.
Q. And in your opinion, generally how were those relevant to your opinions on the reasonable royalty rate?
A. Well, it reflects amounts that people agreed with with BU either directly or agreed through Cree what they were going to pay for the '738 patent, for use of the '738 patent. There were many that were reached as part of seminal litigation, so that's relevant to keep that in mind.
Q. Okay.
A. If we could go back to the last slide for a second?
Q. Sure. I'm sorry. I didn't mean to cut you off.
A. Also, I've mentioned that there were many that were very small dollar amounts. So although there was an agreement, it was a very small dollar amount that actually changed hands. But all of these reflect not only what licensees actually paid, but also BU's willingness to accept that amount.

Q. Okay. Thank you. So have you seen the next slide on the screen --
A. Yes, I have.
Q. -- Professor Mangum? Okay.
And can you just -- what do you understand this slide depicts?
A. Well, it's a graph or a chart, and there's -- I call this a bar graph, so we have bars of various heights. The heights represent dollar amounts. And all the green represent actual agreements out there in the marketplace that relate to the '738 technology.
MR. SHORE: Objection, your Honor. 540, there's not a single actual agreement for 540. False --
THE COURT: Why don't you lay a foundation for that.
MR. BENISEK: Sure.
BY MR. BENISEK:
Q. Professor Mangum, could you describe -- counsel just mentioned the reference to the $540,000. Do you see that on the right-hand side of the slide?
A. I do.
Q. Can you explain what that's a reference to?
A. Yes, I can.
Q. Okay. Please do.
A. You might see that there's a $540,000 number, but down below there's a bracket, so it incorporates -- there's about 25

different small green squares, if you will, or bars. The $540,000 represents taking a dollar amount that RPX paid to BU for 25 different companies. So it reflects the average amount that parties paid and BU accepted for license to the '738 patent. That's what's shown there.

MR. SHORE: Objection, your Honor.

THE COURT: Overruled.

MR. SHORE: There's no --

BY MR. BENISEK:

Q. Professor Mangum --

THE COURT: You can cross on it.

Q. -- what does the red bar on the right-hand side depict?

A. The red represents -- at least the top number represents what Mr. Ratliff is claiming is an appropriate level of dollar damages in this case. The 9.9 was an amount that -- this was before Mr. Ratliff testified, and it was expected that that might be one of his numbers. I don't think it was. But the red represents Mr. Ratliff's opinion, if you will, the height of that red bar, as opposed to the green, which is the actual dollar amounts paid by individuals for the '738 patent.

THE COURT: As opposed to the what, the green?

THE WITNESS: The green, which represents actual dollar amounts.

THE COURT: No, no, no, on the horizontal axis.

THE WITNESS: Along the horizontal axis, right. So

the height is the vertical axis, represents the dollar amount. So the higher the bar, the higher the dollar amount.

BY MR. BENISEK:

Q. So, Professor Mangum, besides the green bars that show the magnitude of payment on this graphic, what else is relevant to you in this history that's shown here?

A. It's important to keep in mind which one of these was a lump-sum agreement, or represent payments under a lump-sum agreement, versus which of these represent payments through a running royalty. And there's hardly any that reflect a running royalty, and of those, they're very small dollar amounts.

So, for example, if you look at -- there are several spots that it seems like there's no green bar. It's just that it's such a small dollar amount, it doesn't show up on the graph, but there are the actual dollars written there. So for Eastman Kodak, for LEDLight.com, Touchstone Systems, you see the dollar amounts. Also, if you look to CompUSA and Farris Marketing over towards the left, the dollar amounts -- also Super Bright, those were running royalty agreements, but when there were running royalties in the record, they were very, very small dollar amounts. So that's an important thing to notice about this chart.

Q. Okay. Thank you, sir. All right. Let's move off of licensing agreements and on to some of the other *Georgia-Pacific* factors.

So, Professor Mangum, did you consider some of the other factors such as commercial relationship and financial factors at issue in this case?

A. I did. In fact, I considered all the *Georgia-Pacific* factors, so I looked at the evidence surrounding all of them.

THE COURT: Just to remind you, *Georgia-Pacific* is a case, nothing to do with this case, except I'll be reading it to you. You'll be bored listening to it. When I read you the factors, these are the things you'll think about when you get to that issue, all right?

MR. BENISEK: Thank you, your Honor.

BY MR. BENISEK:

Q. So did you consider commercial relationship between the parties?

A. Yes, I did. As I mentioned earlier, I knew about the '738 license agreement between BU and Cree. And in thinking about other factors, other *Georgia-Pacific* factors, other economic factors, I wanted to know, does it seem like an adjustment needs to be made. And that was part of the process of going through other factors. I considered the commercial relationship and what was inherent in the BU/Cree agreement and decided there wasn't any adjustment necessary for commercial relationship. The same thing is true for thinking about financial factors. Although they could be relevant, I believe that's already included in the terms we see in the BU/Cree

license agreement.
Q. Okay. And how about the factors of extent of use and non-infringing alternatives?
A. I also considered those factors, those economic factors. And similar to the two I just mentioned, although I went through the evidence surrounding these factors, I don't believe it suggests any adjustment or change to the rate I found in the BU/Cree license agreement. All of the terms that I've got listed here on the slide, thinking about the extent of use, thinking about non-infringing alternatives, they're relevant, but they're already included in the BU/Cree agreement, so no further adjustment is necessary.
Q. Okay. So we're about to move on, but I want to make sure you had a chance to just summarize one more time what your opinion is with respect to a reasonable royalty rate in this case.
A. Sure. So the structure I believe applies is one of the three you see on the screen now. So these are alternatives. It could be a 1 percent royalty on the accused sales base, or it could be a half a percent with a $250,000 lump sum, or it could be just a lump sum of $500,000. So that's the structure of -- maybe you could think of it as a three-tier structure.
Q. And how would that actually work in this case?
A. These terms come from the BU/Cree agreement, so it's what was stated what BU would get. BU would receive one of these

three. So it really was out of their hands. And license agreements are negotiations, what actually happens. So all three of these, given what was in the license agreement, if it was reported back to BU, they would basically say, "Well, all three were possible and we already pre-approved what those would be."

The determination would be in the negotiation. So, for example, when Cree went out and negotiated, they also talked with licensees before the agreements came up. What we see is what actually happened is a mixture of both. Almost always it was a lump-sum agreement. There were a few times when it was a running royalty rate. But it ends up that when the large companies made an agreement, they paid the lump sum as opposed to a running royalty. And when they were small dollar amounts, small entities, those ended up choosing the running royalty rate.

So I chose to use this structure, but it would be the minimum of those three as I've seen in the actual marketplace.

Q. Okay. And then are you confident that your proposed structure is consistent with the licensing history that we've walked through?

A. Yes, I am. In fact, as I've described these terms here, this is what was stated as a minimum, if you will, for BU to receive. It actually agreed to receive a lot less than this. So even though they had a stated minimum, they agreed to

receive amounts lower than this in many instances.

Q. Okay. Thank you. So let's touch on Mr. Ratliff's conclusion. We know that he reached an opinion that a 4 percent running royalty is reasonable in this case. Why don't you just quickly summarize how you understand he gets there.

A. Yes. He started with a 2 percent, and this was a rate that was in the BU/Cree license agreement. The first edition, so before the amendment, there's a reference to a 2 percent rate. He uses that rate. And then he makes a couple of adjustments, each about a percent. One had to do with the issue of known validity and infringement in the hypothetical negotiation, and then the other adjustment, if I recall, accounted for issues such as the value of sublicensing, it was this issue of the preference for U.S. manufacturing as opposed to non-U.S. I also think the exclusivity was an issue he thought that would adjust to -- would relate to an adjustment to that rate of the extra percent.

Q. So let me ask you about the 2 percent. He starts at 2 percent. Do you think that's the correct place to start?

A. I do not.

Q. Okay. And why is that?

A. A couple of main reasons. As I mentioned earlier, that 2 percent was in the first agreement, right, the first BU and Cree agreement. And both parties agreed to change that relatively quickly, to move it from the 2 down to the 1

percent. It dropped down to 1 percent.

In addition to that, extra IP was added. So on top of dropping the rate, the parties agreed that BU would contribute more intellectual property and drop the rate. But I think maybe a bigger issue is that rate, whether it's the 2 percent or the one that's changed to 1, that relates to Cree receiving exclusive rights to the patent and sublicensable rights. So the exclusive nature matters because that's not what's in the hypothetical negotiation, and the sublicense rights really matter because that's the ability for Cree to go out and make money with someone else's IP to go and sell. So Cree would provide licensing services but not the technology. That comes from Cree.

So instead of using the rate from the Cree/BU agreement that relates to Cree, I think it's more important to look in that agreement where it talks about the rates related to sublicensees when it's nonexclusive and non-sublicensable.

Q. Okay. And what about Mr. Ratliff's adjustment, sort of -- maybe we'll call it the U.S. preference adjustment. Do you think that's an appropriate adjustment -- appropriate upward adjustment?

A. I do not.

Q. Okay. And why not?

A. I learned about this from a couple of sources. So in Mr. Ratliff's report he makes reference to a clause in the

BU/Cree agreement that talks about a non- -- or a U.S. manufacturing preference. I also heard Mr. Pratt testify at trial about it.

But I think two things were important: One, if we look at that BU/Cree initial agreement, the one that was changed fairly shortly thereafter, they changed the nature of that clause in the agreement. So in the first agreement in January 2001, there was a reference to a preference for something like that for substantially U.S. manufacturing, but when they agreed to change the terms about a year and four months later, they added the word "exclusive." So there was a preference for substantially U.S. exclusive licensing, which means it carves out all of the nonexclusive. That's the hypothetical negotiation we're talking about. So even if you look to the BU/Cree agreement, they decided to change this idea that nonexclusive licensees would have some preference for U.S.

Q. And what actually happened when we go forward and you look at how BU actually licensed, or how Cree and BU actually licensed the '738?

A. Going forward there were many licenses for foreign companies.

Q. Okay.

A. For big foreign companies.

And there's also reference that -- even to begin with, before BU agreed with Cree, the first place BU went, thought

about, was Nichia, a Japanese company. So I see what actually happened in the marketplace in other documents as being more indicative of this existence of a preference, and I've determined there's not really a need to make an adjustment for this supposed U.S. preference.

Q. And what about Mr. Ratliff's validity and infringement adjustment where he increases the rate by 1 percent? What do you think about that?

A. I don't agree with that either.

Q. Okay. And why is that?

A. The concept here is a bit subtle. When we're thinking about the hypothetical --

THE COURT: A bit what?

THE WITNESS: It's a bit subtle. Sorry.

When we're thinking about the hypothetical negotiation, this is what we talked about earlier, and it's a fiction created to try to help out determining the royalty rate or the royalty payment. It didn't exist. But one thing we can go back -- we can take back to that hypothetical negotiation is a knowledge of infringement and validity, so we're taking that information back. That wouldn't exist in real agreements. I mean, we wouldn't have absolute certainty, right?

So the idea is, Well, if the actual licenses in the marketplace don't have that actual certainty about infringement and validity, maybe they should be adjusted, right, because

they could reflect uncertainty. I think it's possible that could apply. But there's an issue. How big of an adjustment do you make, and in reality, this would have to be a case-by-case analysis. Because in some instances you may have that -- the parties realize it's a good patent, it's likely valid, we probably infringed, but, you know, maybe we have to be in this lawsuit or not. Other instances it might be that there's a lot of uncertainty. So unless you had facts saying what were the beliefs of the parties, you wouldn't know how much to adjust for this.

A second thing that's important is that this concept that there needs to be an adjustment is that in the real world licenses, if somebody accepted a payment, if somebody with a patent accepted a payment and somebody who wanted to license that patent agreed to pay, and there was some uncertainty, the idea is there was maybe a discount because the party licensing is giving up its ability to find the truth. If they went further, maybe it wouldn't be infringed or maybe it wouldn't be valid.

But in this instance, that's not what happened with BU and Cree. Cree retained the rights to challenge the validity or infringement. So it wasn't as if the rate coming from the BU/Cree agreement was a forever rate that we might expect had a discount, because they still had the ability to challenge it.

And the final thing I'll say is we have to remember --

and this gets to the subtlety -- we're going back to a hypothetical negotiation where because we can make up the situation, we can say the parties have to agree, we say there's known infringement and validity, because of that in this judicial fiction, in this thing we've made up, there's no trial. There's no litigation costs. You don't have to if you know infringement and validity. So you would also have to say, Well, all of the licenses in the marketplace, they reflect what the costs could be for litigation, what the costs could be.

So if you believe there needs to be some type of an upward adjustment for known infringement and validity, there should definitely be a downward adjustment that in the hypothetical negotiation there isn't trial costs, there aren't litigation costs, because you know the answer. To try to gauge how to weigh those two, I think you'd be guessing to come up with some amount. And I certainly don't think that a rule of thumb like Mr. Ratliff used and said, "Well, let's just raise it by a percent," I don't think it's based on the facts in the case.

Q. Okay. Thank you, sir.

Let's change subject matters but within your reasonable royalty opinion, and let's talk about the royalty base. Now, do you recognize what's on the screen in front of you, sir?

A. I do.

Q. Okay. And can you tell the jury what is depicted here?

A. Yes. These numbers come from Mr. Ratliff. If you recall, his opinion on damages relates to taking a percent running royalty rate and applying it by a royalty base. These are the three bases that he applies in coming up with damages.
Q. Okay. And why is the royalty base relevant to the royalty analysis?
A. Well, it's only relevant if you believe that the royalty structure that's applicable is a running royalty. If it's a lump-sum royalty, by definition you don't look at the base because it's a fixed dollar amount, right? The royalty payment under a lump sum doesn't depend on the volume of sales.
Q. And, Professor Mangum, what are some of the main differences of opinion you have with Mr. Ratliff on the royalty base?
A. Numerically, he uses -- as far as the base, I mentioned this earlier, he uses the value of the packages, the LED packages, so the product that is made by Everlight and Lite-On. I look at the chip value. The patent in this case relates to the chip. It's something that's sold in the marketplace. And I looked at the chip value, and that leads to a large difference. As you can see, under some of the analysis that's been presented that I've looked at and heard testified to, maybe a five-to-one ratio. It depends on which products you look at, but that's one of the big reasons why there's a difference between the base Mr. Ratliff would use and what I

would use.

Q. Okay. Now, is there a particular economic principle that guides you towards selecting chip revenue in this case over the package revenue?

A. There is, and it relates in the context of what I understand to be a legal rule, if you will. And it relates to a phrase that's been used, the basis of demand, or what drives demand.

Q. Okay. And can you explain what you did with this point in terms of deciding which to use, the chip revenue or the package revenue?

A. Sure. It's my understanding that in deciding what base to apply in a calculation of damages, that there should be a close connection between what royalty you end up with and the value of the intellectual property. And in a case like this where the intellectual property, the '738 patent, relates to the chip, there's a question of, Well, where do we find our royalty damages? Do we look to the item where the IP is used, the chip, or do we go to something more broad or maybe further down the chain of commerce, right? Do we go to the chip?

And there's a reference of something that's the smallest salable patent practicing unit. It means where can you go and say, Well, this thing practices the patent. So the question arises here, Well, do we go to that chip level where the patent is practiced or do we go higher up? And there's something

referred to as the entire market value rule that I'm aware of, and the idea is when can you use the entire market value as opposed to just where the IP is used.

It's my understanding that the Court has determined that you can use the entire market value if the patent at issue is the basis for demand, and the definition of "basis of demand" is that it's the only intellectual property element or the only feature that drives choice.

MR. SHORE: Objection, your Honor. Restates the law.

THE COURT: Sustained.

I'll give you the law. I'll give you the law. But it is true, because you're going to have to decide whether to base the rate -- you know, the basis on the chip value or the package value, and I'll tell you how to think about that.

BY MR. BENISEK:

Q. Professor Mangum, what types of evidence do you look at to try and determine why customers demand a particular product?

A. What's relevant in this case would be to know what customers do, right? When customers make decisions, what features or what elements of the product matter?

There's two levels of customers you could ask about. You could look at the end consumers. I've bought LED lights for my house so I would be an end consumer. If these lights -- I think I've heard them testify there's LED lights in this room, so the government would be an end consumer.

So one of the elements you can look at is, Well, what do consumers look at to make a decision on buying the product? You could also look at a different level of demand, and that would be, for example, companies that are buying LED packages from Everlight or Lite-On. What are they looking for? What things do they take into consideration when they're deciding what input to buy?

And, of course, we see in economics they have derived demand. So if it's GE, they have a demand but it's because they think they can sell it to someone else. But that still could be an element of demand you could ask about and say, "What evidence is there of what drives the demand for companies like GE?"

Q. Now, let me ask you this: In your review of the evidence in this case and in coming to your opinions, did you identify any customer-based evidence that would suggest customers were purchasing any of the accused LEDs because of the '738 patent?

A. No, I'm not aware that evidence has been provided to establish that or highlight that; rather, it's the end-use customers or, rather, it's customers like GE, an intermediate customer.

Q. Now, have you seen evidence that would suggest the opposite is true, that they're not purchasing accused LEDs because of the '738 patent?

A. I have.

Q. Okay. And explain what you mean.
A. When customers choose products, for example, myself, if I'm walking at Lowe's or Home Depot and I'm looking for an LED light, it's my understanding from the evidence in this case that you could have a chip that's made by Cree which is sold through Carbide, or it could be a chip from Epistar that maybe is through Everlight. I don't know. I can't see that. I look at the brand, GE might mean something to me.
MR. SHORE: Objection.
THE COURT: Sustained. Sustained.
MR. SHORE: That's not the customer.
THE COURT: Right. Sustained.
BY MR. BENISEK:
Q. Let's shift gears a little bit and get to our last topic here, Professor Mangum. Let's talk about the specific defendants in this case and their accused royalty bases and the rates applied to those bases. So up on the screen is Lite-On. And can you describe for the jury what's depicted in this slide?
THE COURT: Can I just say if you have notebooks, you might want to -- we're going to hopefully give you some of these numbers so you don't have to memorize it, but these are chalks. You don't get these in the jury room.
MR. BENISEK: Your Honor, at this time we are going to do that. And I guess for the record, defendants are going to

submit DTX 304, which are these summary slides the jury are about to see, as well as --

THE COURT: You're one step ahead of me then. And you have yours for the plaintiff.

MR. SHORE: We've agreed that we're not objecting to theirs and they're not objecting to ours.

THE COURT: Otherwise, you would need to be speed-writers, so -- all right.

MR. BENISEK: With that said, that's DTX 304 and DTX 303, and for plaintiff it's --

MR. SHORE: DTX 1620 and PTX 1621.

(Defendants' Exhibit Nos. 303 and 304 received into evidence.)

(Plaintiff's Exhibit Nos. 1620 and 1621 received into evidence.)

BY MR. BENISEK:

Q. Okay. So, Professor Mangum, what are you illustrating here with respect to Lite-On's revenue base?

A. The top row on this chart shows a dollar amount that Mr. Ratliff used for his accused sales, and what I'm showing here is the effect -- if I do go and take that initial number, when I make an adjustment and I move from looking at the package down to just the chip, that it does make a substantial adjustment, a downward. It's a larger deduction, about 8.7 million, to move from the package down to the chip.

Q. Got it. So if you just take the chip revenue instead of the package revenue, you would subtract 8.6 million from Mr. Ratliff's?

MR. SHORE: Objection, your Honor. Lite-On has no chip revenue.

THE COURT: Why don't you rephrase it.

MR. BENISEK: Sure. Let me try it again.

BY MR. BENISEK:

Q. So if you take the value of the chip and use that figure instead of the revenue received from the package, you end up subtracting about 8.6 million from the Lite-On revenue base?

MR. SHORE: Your Honor, objection. There are no sales of packages by Lite-On.

THE COURT: Overruled. Overruled.

THE WITNESS: Correct. What I've done is I've looked at the products that are sold by Lite-On and I've matched that with information about the chips that are used and I've looked at the average price that Epistar was charging for those chips, and that's what's reflected as the chip revenue reflected in Lite-On sales.

MR. SHORE: Your Honor, this is the objection of the September 15 information, Rule 26.

THE COURT: No, this is Lite-On. No.

MR. SHORE: Same objection, your Honor.

THE COURT: Overruled.

BY MR. BENISEK:

Q. Okay. And next slide, Professor Mangum, this is your ultimate royalty opinion with respect to Lite-On?

A. That's correct.

Q. Okay. And please explain the numbers.

A. Yes. So what I've got is two rows here. The top row is before I made a change to the value of the sales base from the package to the chip. That's the second one. So before I do that, and I look at the amount of Lite-On's revenue for the time period identified in that right column, that's from December 2012 through November 2014, using that royalty base, and if I apply it to my royalty structure, which is either 1 percent or half a percent plus $250,000 or $500,000, whatever is lower, it's the 1 percent rate. And so that's what I've got shown there. Under a 1 percent running royalty rate, the damage is $103,479.

If I go to the next row, I make that adjustment and I say, Well, now let's move it from the value of the package and insert the value of Epistar's chips, the average price, that brings the royalty base down quite a bit, as I mentioned in the previous slide, and that gives me a lower amount of reasonable royalty damages for Everlight -- correction -- for Lite-On, and that's $16,628.

Q. Thank you, sir. Let's move to the Everlight adjustments. Now, can you explain the adjustments you make to the Everlight

royalty base?
A. Yes. As I mentioned a moment ago for Lite-On, also for Everlight, I do make an adjustment for the difference between the value of the package and the value of the chip. That's one of the adjustments. Something else that I do is I make an adjustment from using all of the data to using data that I received that allows me to identify, well, which of the products sold by Everlight are GaN or non-GaN.
Q. Okay. And on this GaN/non-GaN question, do you provide both data sets, what the data set looks like with the gallium nitride chips included as well as a data set without the gallium nitride chips?
A. I used both those data sets, and I provided a royalty figure using both of those.
Q. And are you here to tell the jury which data set they should use?
A. No, I understand that's a jury question, but I'm trying to be helpful by giving both numbers. So whatever they decide, they have a number.
Q. Okay. Thank you. Now, let's go to --
MR. SHORE: Your Honor, this is our same objection, Rule 26.
THE COURT: Overruled.
BY MR. BENISEK:
Q. This slide is entitled -- well, strike that.

What is this slide for, Professor Mangum?

A. This relates to Everlight, the revenue base. What I've got listed, similar to what we talked about a moment ago for Lite-On, I've looked at the top row, what Mr. Ratliff has identified as the royalty base that's applicable to that time period in the top of the right column. So we're looking at April 2007 through November 2014.

He had a revenue that he used a royalty base of $142,164,807. What I show in the two rows below that is what the effect would be of making the adjustments identified a moment ago. So if we go and use the data set that I have that allows me to identify GaN and non-GaN, making that adjustment, that would mean a reduction in that royalty base of about 80 million. So it's listed there $80,433,900.

If instead separately I say, Well, what if I go and instead take that top row that Mr. Ratliff uses for accused revenue and say, Well, let's shift from the package value down to the chip value, again, moving from the sales of Everlight's products down to the average prices of the Epistar chips, that alone would be a deduction of $103,079,500 in royalty revenue. So these are fairly big adjustments that lead to some of the large differences in my opinion and Mr. Ratliff's opinion.

Q. Thank you. Let's take a look at your ultimate opinion with respect to Everlight. And again, can you explain -- can you walk us through each of the three lines and how you get

there?
A. Sure. So the top line, or the top row, rather, with a number, that's before I make an adjustment for the GaN or non-GaN question.
Q. Okay. So let me just stop you there. The top line in this slide uses Mr. Ratliff's entire royalty base?
A. Correct.
Q. There's no dispute between you and Mr. Ratliff on the top line here?
A. Correct.
Q. This is just the application of your royalty rate to Mr. Ratliff's royalty base.
A. Correct.
Q. Okay. Thank you. Continue.
A. And what you see is my opinion on the royalty there is $500,000. That flows through the royalty structure I've described there that I think is appropriate, as is most common in the marketplace, companies pay lump sums. That means you didn't use as an input to the calculation, you didn't use their sales volume; it was just the lump sum. That's what I've got shown there on the top row, the $500,000 royalty.
Q. Okay. And what about the second row?
A. If I go and make an adjustment and use the data set that I have on chips to identify the GaN only, as you can see, it actually doesn't change royalty that I've come up with because

even though it's a large adjustment, it would still result with a payment of $500,000, that lump-sum royalty. That would still be the lowest of the three royalty tiers identified.
Q. Okay. So even if you take out the Everlight chips, it's disputed whether they're gallium nitride or not, under your opinion, the royalty rate is the same?
A. Correct. But that's the only adjustment I make from that top row to the second row.
Q. Understood. And one more time, why is that the case?
A. The royalty structure I think is relevant, means that once you have a base, you take a look and say, Well, what would the rate be if it was a 1 percent royalty -- what would the dollar royalty be if it was a 1 percent, what would it be if it was a half a percent plus the $250,000 lump sum, or what would it be if it was a lump sum of $500,000 and you choose the lowest. And whether I take the revenue related to the top row or the second row, in both those instances you end up with the $500,000 royalty because that's the lowest.
Q. Okay. Great. And the last row, please explain your calculation there.
A. In the last row I make one more adjustment after dealing with the GaN or the non-GaN, and that is I move from the package value level down to the chip value level -- again, that's moving from Everlight's sales of the package down to using the sales by Everlight in units using the Epistar value.

And when I do that, it brings down the royalty base large enough that now it's the 1 percent royalty which would be applicable, so my royalty in that scenario for Everlight would be $128,576.
Q. Thank you, Professor Mangum. All right. One more defendant: Epistar. Please explain the adjustments you made to Professor -- excuse me. Please explain the adjustments you made to Mr. Ratliff's royalty base with respect to Epistar.
A. Yes. One thing I've made and it's not really an adjustment, because as you'll see in a minute there's two different columns. I understand there's a disagreement between the parties on whether or not there was notice at an earlier date, meaning whether damages could start earlier, or if there would be a later date for damages to start. And so I've identified two alternatives. You'll see there are two columns of royalty numbers in a minute, but those relate to different notice periods.
Q. Okay. Great. Let's take a look. So here's the Epistar revenue base. And why don't you explain the top line, the Ratliff accused sales.
A. Sure. So using the top line that has the row header of "Ratliff accused sales," if you use the time period that goes back to 2006, that's under the presumption that it will be found that effective notice was applicable back then, you've got the larger royalty base, which is the $178 million figure.

If you move one box over to the right, that's the far right column, you'll see in an alternative time period that I understand is being offered or argued is a time period for damages that starts at the end of 2012.

If I look at that time period, then under Mr. Ratliff's -- without making the adjustments on the second and third row I'll talk about in a minute, going back up Mr. Ratliff's accused sales, if you limit it to that shorter time period, then you've got the $43,021,900 figure which represents the accused revenue.

Q. Thank you. Now, what is foreign sales removed? That's the middle row.

A. I understand there's a dispute about what constitutes a foreign sale, if you will. I'm aware in the database that I have, and I can identify where chips were made, where they were shipped to, where they were received, but there's a dispute --

THE COURT: And that's going to be a fact question for you: Were these U.S. sales or not?

MR. SHORE: Your Honor, he's referencing the document you excluded.

THE COURT: I don't know what you're referring to.

BY MR. BENISEK:

Q. Professor Mangum, do you have an opinion about whether these sales are U.S. or foreign?

MR. SHORE: Your Honor, you excluded --

THE COURT: I'm sorry? I'll have to see you at sidebar. I have no idea what you're talking about.

(Discussion at sidebar and out of the hearing of the jury:)

MR. SHORE: DTX 89.

THE COURT: I don't know them by heart.

MR. EVANS: It was that litigation spreadsheet.

THE COURT: I don't know them by heart. I didn't exclude anything. So I didn't allow somebody to talk about it.

MR. SHORE: Titus Chang was put on the witness stand to try to prove up this document so that he could get into evidence that this is the document he relied upon. I took him on on cross and I went over all the ways, it was created purely for litigation, it wasn't a business record, everything else. You excluded it and said it could not be offered into evidence.

THE COURT: That's a different issue than whether an expert can rely on it. I'm not allowing it to come in now. It does not qualify as a business record but as we all know an expert can rely on things if it's viewed reliable in the field. I'm not allowing it in now.

You're not offering it, are you?

MR. BENISEK: No, no, your Honor. We both agreed to exchange the summary of --

THE COURT: Can I tell you how confused I am on damages? God help this jury. God help this jury.

Let me say this: How much longer do you have?

MR. BENISEK: Two minutes.

THE COURT: Okay. Then we'll take our morning break. How much on cross?

MR. SHORE: Five or ten minutes.

THE COURT: Maybe I should --

MR. SHORE: I'm ready to get into it. I'll be done, I guarantee you, by five or ten minutes after 11.

THE COURT: That might be worth it. Who do you have next?

MR. BENISEK: I think that's it.

THE COURT: Really?

MR. BENISEK: Really.

THE COURT: We may go this afternoon.

MR. SHORE: Made her happy.

(In open court:)

BY MR. BENISEK:

Q. Professor Mangum, just again on the foreign sales removed, what are you trying to do here -- what are you trying to show the jury?

A. I wanted to provide a calculation. I wanted to see what would be the effect on Mr. Ratliff's accused revenue if I went into the data that I had and I said, Well, if we have chips that are made in a foreign location and shipped to a foreign location, if those were considered foreign, what that would do

to the royalty base. And, in fact, it would subtract a very large number, just under 175 million out of the almost 179 million in accused revenue.
Q. Thank you. And for the last column, the Bridgelux license, what calculation are you giving to the jury here?
A. I understand that another area of dispute is whether or not the Bridgelux -- any sales to Bridgelux were licensed already.
Q. Those are Epistar sales to Bridgelux?
A. Correct. Epistar sales to Bridgelux are licensed already. I haven't got an opinion about that. But if they are, then the reduction in accused revenue would be all of the revenue because it's already licensed to the '738 patent.
Q. Okay. So let's take a look at your ultimate opinion with respect to Epistar and the amount of royalties. So why don't you explain the top line again, the reasonable royalty and how your calculation works there?
A. Sure. And I'll focus first on the center column. So that top row relates to using the accused revenue --
Q. Just --
A. -- so if I'm looking at this top row here, I'm just taking the accused revenue from Mr. Ratliff. And if I take that and apply it to my three-tiered structure, what I find is for -- and I'll do it here. If I'm talking about the time period that's the longer time period, using my three-tiered structure,

that means that a reasonable royalty would be the lump sum of $500,000. If I instead take the shorter time period, then I find that, Well, that's a reduction in the royalty base that's just enough to get us below the fixed lump-sum amount and, therefore, you would have a reasonable royalty amount of $430,219.

Q. Okay. And what if the jury finds that a portion of the Bridgelux sales are foreign sales?

A. If, in fact, we make the adjustment for the foreign sales, which I described before, you may recall it was a very large adjustment to the accused revenue. And I've got the two numbers here listed. The $34,000 is a reasonable royalty if it's the longer time period because there's not a very large accused revenue base left if you take out the foreign sales. Alternatively, if we use the shorter time period, we'll see that the reasonable royalty would be $8,204 based on that adjustment for foreign sales.

Q. Okay. And then the final column, the reasonable royalty on the Bridgelux license sales, no dollar amounts there?

A. Correct. That's because if the sales from Epistar to Bridgelux are licensed, then there isn't any remaining accused sales, so there wouldn't be any royalty due.

Q. Okay. One last slide, and it's a permutation with respect to Epistar. Can you explain what this one last issue is with Epistar damages?

A. Yes. There's a category of damages that Mr. Ratliff identified, and if I recall, he called it a unique inducement. And understand it has to do with the idea that some of Everlight sales and some of Lite-On sales that occurred before damages can apply to them -- so if you remember, there's an issue of either notice or how far back damages can go. I mean, Mr. Ratliff has identified that, Well, there may be a date that before that Everlight and Lite-On damages don't apply, but if it's found that Epistar induced the infringement, then it may be that Epistar could owe during that time period.

So he looks at this earlier time period and comes up with a dollar value. I looked at that same time period and came up with my calculation of what that induced infringement amount would be. I have looked at the chip revenue, I talked about that before, as opposed to the package revenue. And when I do that, I find that for Everlight that extra amount of damages for that pre-period, if you will -- and again, this will start on Epistar, the argument goes -- for Everlight sales that would be $17,530, for Lite-On sales, the dollar amount is $52,281. If you add those both together, my calculation of this unique inducement concept is $69,811.

Q. Thank you, Professor.

MR. BENISEK: Pass the witness.

THE COURT: So what we decided to do, you'll be excited to hear, is we're going to do the cross now, which

should be no more than maybe ten minutes, maybe 15, depending on -- and this is the last live witness. So there may be a few deposition clips. Is that right? But we are going to get the case to you today. Whether I can get you the instructions plus the arguments I'm not positive about because -- well, I'm not positive about, but we're definitely going to finish the evidence, and certainly get you the closing arguments.

All right. Thank you.

CROSS-EXAMINATION

BY MR. SHORE:

Q. Mr. Mangum, I've just got a few questions for you. First, you're not a certified public accountant, correct?

A. Correct.

Q. And you're not a certified internal auditor?

A. Correct.

Q. And you never conducted or defended a royalty audit?

A. Correct.

Q. And you're not --

A. I'm not quite sure what is meant, but I think I should say no then since I don't know what that means.

Q. So you don't know what a royalty audit is?

A. Well, I've heard reference to it, but if somebody said do I have an opinion about what a royalty audit is, I'm not an auditor, I'm not an accountant. So I don't do that kind of work.

Q. So then for all of the financial figures that you've used, you depended on them to be supplied to you by the defendants, correct?
A. Correct.
Q. You have not verified by going to Taiwan and doing any work to verify or audit any of the numbers they gave you?
A. Correct. I've relied on what I've received.
Q. And the only thing you received was from the defendants or their lawyers?
A. Actually, all from the lawyers. So I didn't get it directly from the defendants, correct.
Q. Now, you assumed for your analysis that BU would have treated Epistar, Everlight and Lite-On in 2000 as the first licensees of the '738 patent the same as they would have treated Cree or better?
A. Not the same as Cree. Cree got a very different set of rights, so they would have treated them differently.
Q. And as a matter of fact, the rights that Cree -- the royalty rate that Cree paid was on worldwide sales, wasn't it?
A. It's my understanding that the agreement between BU and Cree was for worldwide --
Q. Worldwide?
A. -- but there were foreign patents.
Q. Well, they certainly weren't patents that covered the world, were they?

A. I don't think there are such things as worldwide patents. Foreign patents and U.S. patents.
Q. And also, you depended on -- now, the royalty base and the Cree/BU sublicenses were all worldwide as well, correct?
A. Can you -- I'm thinking.
Q. You don't know?
A. I'm trying to remember.
Q. Okay.
A. My recollection of the agreement was Cree did not have to give a worldwide license. That wasn't a requirement. So the agreement from BU's point of view was Cree could decide to if it wanted to or not.
Q. Every sublicense that was actually granted was based on a worldwide basis, correct?
A. That is my recollection.
Q. And every sublicense that was ever granted was based upon the value of the entire product, chip and package combined, correct?
A. I don't think that's true.
Q. Which one wasn't?
A. Actually, if you said sublicense. I'm thinking of Cree, because Cree's payments, even though they made only a minimum, was based on chips.
Q. Well --
A. The BU/Cree agreement. The royalty rate applied to a

chip, if a chip was what was at issue, or a package, if a package was sold.
Q. Every single sublicense was based upon worldwide sales of chips and packages, correct?
A. Actually, that's not true, because as I mentioned, the vast majority, 97 percent of the licenses, were a lump sum. So they're actually not based on sales. So it doesn't make sense to ask is it the chip --
Q. Instead of arguing with me, sir --
A. I'm not done.
Q. -- why don't you answer this question: Was there a single license, sublicense or licensee, where the entire chip and package were not licensed?
A. Yes.
Q. Which one?
A. As far as the payments --
Q. No, I want to know what was covered, the covered product, the licensed product as defined in every single agreement, was the licensed product chip only or chip and package, do you know?
A. I do know. My understanding is that what was -- the rights that were granted did cover the entire -- I forget if it was the chip or if it was a package.
Q. All right. Now, I believe you said -- you didn't consider the value of the cross-licenses that Cree received, did you?

A. I did.
Q. That's in your -- that's in your charts that were submitted to the jury? There's a dollar value placed on the cross-value rights?
A. I talked about being aware of that and fully incorporating that into my opinion.
Q. Does anything on that chart put a dollar value on the cross-license rights? Anything?
A. I'm not understanding your question. I don't know what I would do with a cross-license. Cree was entering into an agreement that would allow it to make a lot of money, so it might have had obligations, but it could make a lot of money selling sublicense rights. It's not as if --
Q. To benefit Cree.
A. I'm trying to still answer a question you asked before.
MR. SHORE: Your Honor, he's being completely unresponsive. I object.
THE COURT: I strike that comment. What's the question?
BY MR. SHORE:
Q. The question is: On your chart, yes or no, is there a dollar value placed on the cross-license rights that Cree enjoyed that enabled it to participate in this industry?
A. I don't know that there is a value to those. I think you're asking --

THE COURT: Do you know what? He's got limited time. Is there or is there not anything about the cross-licenses on the charts?

THE WITNESS: I don't believe the value of cross-licenses is relevant --

THE COURT: Yes or no?

THE WITNESS: It's not on my chart, your Honor.

THE COURT: Thank you.

BY MR. SHORE:

Q. Now, the royalty structure that you used did not come from the original Cree/BU agreement closest to the hypothetical negotiation; it came from an amendment that was later, correct?

A. Correct.

Q. Now, you talked a lot about what you believe BU was willing to accept. You do understand to the hypothetical negotiation there's somebody on each side?

A. Correct.

Q. Did you tell the jury or is it anywhere in your handout to [redacted] only three U.S. patents?

A. That was not on my slides.

Q. [redacted] anywhere?

A. It's not on my slides, no.

Q. Is it on your slide anywhere that after, in 2015 when you talk about what BU accepted from RPX, did you tell the jury [redacted] tell them that?
A. That's not on my slides, no.
Q. Did you tell them Everlight for a lump-sum royalty has [redacted] what that is in dollars, but did you put that on your slide?
A. That's not on my slides.
Q. As a matter of fact, did you do any analysis of what Everlight, Epistar or Lite-On would be willing to pay as opposed to your one-sided analysis about what you speculate BU would be willing to receive?
A. Yes, I did.
Q. But that's not on your slide?
A. Oh, yes, it is.
Q. Now, your slide that you had up about the RPX members paying an average of 540,000, do you remember that slide?
A. I do.
Q. Do you have any knowledge about what the royalty base was for any of those members?
A. I do.
Q. The royalty base? All right. When were each of those members put on notice of the patent, do you know?
A. I don't have that information.

Q. All right. So if you don't know when they were put on notice, you have no idea how many sales would be attributable to post-notice royalty, do you?
A. No, that's incorrect.
Q. All right. And as a matter of fact, not only do you not know when they were put on notice, do you know how many parts they bought from unlicensed vendors that would have required them to get a license?
A. I think I follow your question but I don't have information about that volume of sales.
Q. Now, as a matter of fact, you also don't have information about how much extra Samsung paid over their normal subscription to RPX, do you?
A. I do know that.
Q. They paid $5.5 million, didn't they?
A. I don't know what you're talking about.
Q. Samsung paid RPX, in addition to their normal subscription to RPX, their normal annual payment to RPX, they paid an additional $5.5 million to get a license to the '738 patent for a period of only 18 months. Were you aware of that?
A. I don't think what you're saying is accurate.
Q. And Sole Semiconductor paid a little under $5 million in addition to its normal payments to RPX to get an 18-month license to the '738 patent. You didn't tell the jury that either, did you?

A. I don't think it's accurate.
Q. And you also, I believe, said to the Court that -- I believe you were asked whether or not BU --
MR. SHORE: I need the ELMO, please.
Q. BU challenged your opinions here, and that you said they had and the challenge was unsuccessful. Well, let's look at the order.
MR. BENISEK: Objection, your Honor. Could he put this in context?
MR. SHORE: Your Honor, this is cross-examination.
THE COURT: No, take it off.
MR. BENISEK: Thank you.
BY MR. SHORE:
Q. In fact, some of your opinions were struck by the Court, weren't they?
THE COURT: You know, I struck that line of questioning. Move on.
MR. SHORE: All right.
BY MR. SHORE:
Q. Let's talk about -- has a district court ever said about you, "Dr. Mangum used a dubious royalty base and the marginally useful litigation settlements to arrive at the conclusion that the hypothetical negotiation would produce a baseline royalty rate"? Has a district court ever said that about you?
A. I think that's the *ePlus* case I mentioned.

Q. So the answer to that is yes?
A. Yes.
Q. Has a district court ever said about you, "Taken as a whole, Dr. Mangum's opinions are speculative, not based in sound economic precepts that are explained so that a jury can understand why it's reasonable to award such a royalty rate as that called for in Dr. Mangum's conclusions"? Has a district court ever said that about you?
A. Yes. I think that's the *ePlus* case.
Q. And "Dr. Mangum's testimony is neither relevant nor reliable." Has that ever been said about you by a district court?
A. I think that's also the *ePlus* case.
Q. As a matter of fact, that district court was affirmed by the federal circuit in an appeal, weren't they, based upon exclusion of your unreliable, irrelevant expert testimony?
A. Yes, that's my understanding.

MR. SHORE: Pass the witness.

MR. BENISEK: Just a few questions, your Honor.

REDIRECT EXAMINATION

BY MR. BENISEK:

Q. Professor Mangum, on the Epistar and Everlight license agreements that counsel asked you about, are those agreements in evidence?
A. Not to my knowledge.

Q. Okay. Is it your -- are you trying to rely on license agreements that are actually in evidence?

MR. SHORE: Those agreements are in evidence.

THE COURT: Well, now I'm confused. Are you talking about agreements that are different from the ones that were put into evidence?

MR. BENISEK: I'm just talking about the ones that he cross-examined Professor Mangum on.

THE COURT: They're already in.

MR. BENISEK: Several of them are not put into evidence.

BY MR. BENISEK:

Q. So Professor Mangum, are you relying on agreements that you expect to come into evidence?

A. Yes.

Q. Okay. Because you want the jury to see the agreements you're talking about?

A. Correct.

Q. Okay. Now, why is it that you put more emphasis on the BU and Cree license agreements than you did on the Epistar, Everlight and Lite-On agreements? What's the difference in the patents?

A. Well, the BU/Cree agreement has to do with a patent in this case, so we know we're talking about the same thing. Whenever you move on to some other type of technology and it's

not the same, there's an issue of, Well, should I look at the price of that different thing and say it's applicable to the patent in this case? I don't think it's reliable or appropriate to use agreements on other patents and make an inference about this case.

Q. Right. Whether they're even comparable from a technology standpoint?

MR. SHORE: Objection. Leading.

THE COURT: Yes. Sustained.

BY MR. BENISEK:

Q. Is there a reason why you don't use other technology license agreements?

A. There's an issue of whether or not they're comparable. And there could be a question of technical comparability, but there's also economic comparability. You'd have to establish that with evidence before you could even look at those licenses and say that the amounts paid for those would be applicable.

Q. Have you seen any evidence with respect to the licenses that counsel referred to that relate in any way to gallium nitride?

A. I have not.

Q. Thank you. Now, counsel asked you a couple of questions about RPX, and I think counsel testified that a bunch of parties paid millions of dollars. Let me ask you this: When someone signs up for RPX, they get a license -- in this case

when someone signed up with RPX, they got a license to the '738, right?

MR. SHORE: Objection. Personal knowledge and incorrect.

THE COURT: Overruled.

THE WITNESS: It's my understanding from looking at the evidence in this case that the RPX agreements would grant to its members rights to the '738 patent and other IP that was granted by --

BY MR. BENISEK:

Q. Right. They got rights to a lot more than --

MR. SHORE: Hang on. Best evidence rule and incorrect.

THE COURT: Overruled. Overruled.

BY MR. BENISEK:

Q. They got rights to not just the '738 patent but a lot more patents?

A. Yes; that's correct.

Q. In fact, they got access to RPX's entire portfolio.

A. Yes; that's correct.

Q. And how many patents is that based on the deposition testimony of Mr. Reidy which you reviewed?

MR. SHORE: Objection, your Honor. Not in evidence, hearsay and --

THE COURT: Excuse me. This is an expert.

Did you review the RPX license?

THE WITNESS: Yes, I did.

THE COURT: Overruled.

THE WITNESS: It's my understanding through the evidence in this case, including the deposition, that RPX holds thousands of patents, and what it does is it tries to get --

THE COURT: Never mind what they hold, but what did they license in this agreement?

THE WITNESS: One agreement is whereby -- or is a vehicle for BU to license its intellectual property to RPX. Another agreement, your Honor, is when the members were paying RPX to get much more than just what BU gave to RPX.

MR. SHORE: Your Honor, objection.

THE COURT: Overruled. You can recross.

BY MR. BENISEK:

Q. Okay. Now, counsel sort of picked on you about the *ePlus* case. Do you recall that testimony?

A. Yes, I do.

Q. Okay. And how many times have you been qualified and testified on the issue of reasonable royalty damages?

A. 24, 25 times.

MR. BENISEK: Thank you, sir. No further questions.

MR. SHORE: Very quickly, your Honor.

RECROSS-EXAMINATION

BY MR. SHORE:

Q. RPX does not grant -- you do not get a license to the RPX portfolio by becoming an RPX member. Is that your testimony, that that's what happens?

A. My understanding from the evidence is that what RPX is selling to its members is access to its patent portfolio.

Q. What they're selling is an option to make an additional payment on top of their normal subscription. That's what happened in this case. You're not aware of that?

A. I disagree with how you've construed that from my review of the evidence.

Q. What evidence? What evidence could you possibly have reviewed that's different from the actual facts?

A. I'm referring to the facts -- I'm referring to the Reidy deposition, the person speaking for RPX. And in the RPX agreement there was the discussion about Samsung and there was a discussion about two other companies. And two of them were not already members.

Q. Yes. And they had to become members and sign a five-year deal and pay $3.5 million a year. You were aware of that?

A. Correct, for a very large amount of IP, not just the '738 patent.

Q. No, sir. Is that how you read that? The RPX --

THE COURT: You're not testifying.

Q. The RPX agreement is in evidence and we'll see it, but did you not understand that all the deal with the RPX did was give five manufactures -- actually, four manufacturers -- the option to pay several million dollars more than their normal subscription fees, and that option would have covered all their downstream customers who are the other 23 people? Did you not understand that was the structure?
A. I have a very different understanding than you do about the facts in this case from my reading of the deposition and review of the documents.
Q. Have you read the contract and the options in detail?
A. I have.
MR. SHORE: Pass the witness.
THE COURT: No, it's done.
MR. BENISEK: May Professor Mangum be excused?
THE COURT: Yes, he may.
MR. BENISEK: Thank you, your Honor.
(The witness is excused.)
MR. LINDGREN: Your Honor, at this time the only thing remaining for our case are some deposition clips, and I'm not sure what time you were taking your morning break.
THE COURT: We'll take our morning break and then I'll figure out what the timing is.
THE CLERK: All rise for the jury.
(The jury exits the courtroom at 11:14 a.m.)

(Discussion at sidebar and out of the hearing of the public:)

THE COURT: I know you all need a break but I'm going to try to understand. You're going to put in how much in terms of deposition clips?

MR. BENISEK: Oh, my gosh. 15 minutes maybe? Ten? Not more than 15.

THE COURT: And are you playing any of this? Because you can't -- I'm not putting those in.

MR. BELT: No. No.

MR. EVANS: No.

MR. SHORE: Hang on a minute.

We're going to play Meng Kuo.

THE COURT: Meng Kuo is not in here.

MR. SHORE: I don't know what that is. Oh, the corporate representatives? No, no. If you don't put in -- yeah.

THE COURT: You're going to play a little Meng Kuo?

MR. SHORE: A little Meng Kuo.

THE COURT: Okay. So how long, five minutes?

MR. EVANS: I think it's five minutes or less.

MR. SHORE: And then we're also going to -- we hopefully don't have to do this on our time, but the parties have stipulated facts that we would want to offer into evidence.

THE COURT: You've got it written down, right?
MR. SHORE: Yeah.
THE COURT: Just offer it. You're not going to sit and read it, are you?
MR. SHORE: No, I was hoping we could offer it as an exhibit.
THE COURT: Absolutely.
And then that's it. Evidence closed.
MR. SHORE: We're going to have one rebuttal witness.
THE COURT: Who?
MR. SHORE: Dr. Piner.
THE COURT: Okay. And how long will he be?
MR. SHORE: Seven minutes max.
THE COURT: Okay.
MR. SHORE: I like to --
THE COURT: Then I lied to the jury. I didn't realize that there was going to be another live witness. But in any event, we will finish by lunch.
MR. SHORE: And if I can get a clarification -- Alicia, what is our time?
MS. CARY-HOWELL: I have 57 minutes.
MR. SHORE: If I use five minutes on the Meng Kuo deposition and seven minutes on Dr. Piner, can I have an hour for the close?
THE COURT: Yes. Closing is -- I'm going to give you

each -- you probably more than that, if you want it.

MR. VASQUEZ: We probably do.

THE COURT: So let's say -- how long would you say your closing is?

MR. VASQUEZ: Not more than an hour and ten, 15. I'll try to do it in an hour, give myself a little time for --

THE COURT: So let's say we come back at quarter to, we're done with the evidence by quarter past.

MR. VASQUEZ: 12:15.

THE COURT: 12:15 sound right? We could go till 1:15 in reverse order so -- that's a little hard to do in a patent case. So you would be first, you second, and --

MR. SHORE: I'm sorry. I'm lost.

THE COURT: Typically, here in Massachusetts the person with the burden of proof goes last.

MR. SHORE: Oh, really?

MR. BENISEK: That would be opposite, I think, of how the parties are prepared.

THE COURT: Now, it's a little complicated here because there are shifting burdens. If you both want to go the other way, I don't care.

MR. BENISEK: I assume you thought you were going to go first?

MR. SHORE: I would like to go first and reserve ten minutes for rebuttal.

MR. BENISEK: That's fine.

THE COURT: It's interesting, different jurisdictions do it differently, and since you both don't practice here that regularly, you may have died of shock if I told you to get up first, so I thought I would mention it.

We are not going to say there's only one place -- there could be more than one place of sales because at least our review of case law says it's an unsettled question. So if the federal circuit has declined to rule on it, I decline to rule on it, but it's multifactorial.

Now, here's the elephant in the room. I will allow -- this is what I think we're going to do. And Ann isn't here. I'm hoping they -- if they answer "no" to infringement, I will ask them to do validity, but I'm not going to ask them to do damages. That seems like too much work because I'm not going to ever reverse whatever they say on infringement. It's never even going to come close. I think it's a very, as I said before, appropriate jury question, and there's evidence to support both sides.

If they say yes, infringement, but it's invalid, I understand plaintiff's position would be since that's ultimately a question for me, that the jury get to the damages issues. That's what you told me yesterday, right?

MR. SHORE: Yes, ma'am. Yes, your Honor.

THE COURT: And you didn't really say much.

MR. VASQUEZ: We disagree. We think if it's invalid, the case is over.

THE COURT: And why? Because here's the issue --

MR. SHORE: She has to rule.

THE COURT: I asked for his position.

MR. SHORE: Yeah. Well, they can't say the case is over.

MR. VASQUEZ: Well, it doesn't make sense to do it because if it's invalid, you've got these other issues that are damages also, so you would only be getting to an impartial. Are you telling me if they said it was invalid, you would then conduct a *Daubert* hearing next month, and then the next trial the next month? It doesn't make sense.

THE COURT: I don't know what to do on that. I've been thinking about that.

MR. VASQUEZ: You can't give a partial verdict which means you have to --

THE COURT: If they say it's invalid, then ultimately I have to decide, and what if I disagree with the jury? Then I don't have a damage figure. That's his best argument. That's originally where you were.

MR. SHORE: Because if you do that, we need --

THE COURT: Let me just say also -- can I just say it's a difficult enablement issue on the amorphous buffer layer. Whether it's clear and convincing is another story, but

it's -- I think that's -- I think they're both difficult issues. And both infringement -- I think everything here is hard, actually, unlike some of the cases I do. I think everything in here is hard. And so I don't know, let me think about it. I'll tell you before you close so that we can -- my biggest concern actually is none of the above; it's this red, orange, yellow thing. I just want to make sure that if -- I haven't been able to follow the charts quickly enough. I think if they put down the base --

MR. VASQUEZ: If they put down the lump sum, they don't get there, number one. Number two, if they --

THE COURT: Right. If they put down the base, I'll be able to subtract out the numbers and then multiply by the royalty rate. And I have all the evidence to back it out?

MR. SHORE: No.

MR. VASQUEZ: You have an opinion from both counsel as to what the numbers are if any of the particular arguments are successful or unsuccessful.

THE COURT: I am worried about the red, orange, yellow. I didn't hear -- let me say I'm thinking about that issue still. Why do you say --

MR. SHORE: They have never put a document into evidence under oath saying these particular chips in the accused products do not have gallium nitride and for each of those chips this is the amount of sales. That has never been

provided.

THE COURT: Excuse me. Excuse me. That may be true or not true. I will leave this alone for a minute. I just want to know if I disagree with you and I want to grant a remittitur -- because I've also never received any information that those red, orange, yellow catalog numbers involved the patent invention, that that's my biggest problem. It may be that the documents are unclear. I've never said anything to the -- heard anything to the contrary either.

I mean, so if I back them out, I just want to make sure that what you're saying is that the experts' number is not so clear.

MR. BENISEK: Our expert gave two numbers. If you accept the proposition that Everlight is properly identified, which are gallium nitride and which are not, you have that number. You have that exact number.

THE COURT: I don't --

MR. SHORE: I'm sorry. I --

THE COURT: I'm going to -- the instructions specifically say to the jury, even with the adverse inference, that it's your obligation to find what the number is. So that's -- I don't know what to do with it but I am likely to, since it's never been attacked frontally, take just -- if I think there's -- a remittitur is appropriate, just back out the $8 million figure or something like that. Isn't that what it

was?

MR. SHORE: Your Honor --

MR. BENISEK: It's 80 million. If you apply their 4 percent, it becomes a $3.2 million issue.

THE COURT: What is the amount attributable to the red, orange, yellow?

MR. BENISEK: 80 million.

MR. SHORE: Your Honor, the only evidence of that is purely for a litigation created, unaudited document from them.

MR. VASQUEZ: It's already in evidence, counselor.

THE COURT: It is not in evidence.

MR. VASQUEZ: The testimony of the witness is in evidence.

THE COURT: The testimony is.

MR. VASQUEZ: And the testimony of the expert --

THE COURT: No, the expert relied on it. Excuse me. Excuse me. The expert relied on it, which they're allowed to use. I don't remember. Did Mr. Chang use that number?

MR. BENISEK: No, that's Epistar.

THE COURT: Liu used that figure?

MR. SHORE: No, he did not. They didn't even try to put it in through Mr. Liu.

THE COURT: Who put it in?

MR. BENISEK: Professor Mangum in the exhibits that were just entered as part of our stipulation have the summary

opinions of gallium nitride and non-gallium nitride, summarizing his schedule.

THE COURT: Who does?

MR. BENISEK: Professor Mangum.

MR. SHORE: In his summary chart --

THE COURT: Excuse me. Would you let me finish just one sentence?

Did any percipient witness put in that number or is it only coming in through the expert?

MR. BENISEK: It is only coming in through the expert. He only testified to the foundation of how the information was created.

MR. SHORE: No, he didn't.

MR. VASQUEZ: Can you not interrupt?

THE COURT: I didn't remember that he --

MR. VASQUEZ: This is a question for the defense so tell him not to interrupt and go ahead and explain.

MR. BENISEK: I wasn't here for his testimony yesterday, but it's my understanding since I sat through all --

MR. VASQUEZ: He testified that he used the SAP system and he was crossed on it. He was crossed on how he accessed it. He testified to that.

THE COURT: Well, I'm going to deal with that afterwards. But I left --

MR. VASQUEZ: It is afterwards.

THE COURT: I'll deal with it through remittitur. But I just want to make sure if I accept Liu's testimony and I accept the expert's, the figure is $80 million, and then by 4 percent or whatever the figure is.

MR. VASQUEZ: If they went 4. If they went 1, it's only 800.

THE COURT: 800,000.

MR. VASQUEZ: We don't know where they're going to come out. The reality is it's the chip --

THE COURT: I continue to be worried about that issue, which is most unfortunate, but only affects one client.

MR. SHORE: And we're worried about it too because you're basing your thought process on unaudited, unverified numbers that are solely provided in a made-for-litigation report by a defendant who has every interest in the world in minimizing the number. We spent half a million dollars doing an actual audit of all the parts that were accused. We looked through thousands of tables, thousands of XLS. Before they get to take $3.2 million away from us based on nothing, we think they should have to hire an independent big four accounting firm chosen by us to go do an actual royalty audit.

THE COURT: That may be a good way --

MR. SHORE: -- and to pay us back for all the money we spent for having to deal with it.

THE COURT: Excuse me. That's a separate issue which

may be spot on with respect to Everlight.

MR. SHORE: Thank you. Yes, ma'am.

THE COURT: I'm now getting senile.

That is an issue with respect to one of the clients because that is a mess, at least as to that issue. And that may be a good way of resolving it afterwards, but maybe through settlement.

MR. VASQUEZ: It's very contingent at this point.

THE COURT: I'm sorry?

MR. VASQUEZ: It's very contingent at this point. They can rule.

THE COURT: I know. I know.

MR. VASQUEZ: There's a million ways they don't get there.

THE COURT: God help them on the damages.

MR. SHORE: We're happy to submit lump sum only. We're happy to submit lump sum only to the jury. Let them just do a lump sum and this whole problem goes away.

THE COURT: By the way, I'm saying either/or, not both.

MR. VASQUEZ: Yes, the jury is going to choose.

THE COURT: All right.

(A recess was taken, 11:26 a.m.)

(Resumed, 12:04 p.m.)

THE COURT: I've decided to instruct them on damages,

even if they declared it invalid, but not if they said no infringement. I'm doing that for two reasons: One is, as plaintiffs pointed out, ultimately invalidity is my decision; but second is, I know that fifty percent of all cases are reversed in the Federal Circuit for some reason or another. It also puts a settlement value on the case and sort of instructs us all on where they're going with things like percentages and bases and that sort of thing. So I'm going to do that, but I just wanted to make sure you knew that.

They're upstairs and rewriting the instructions and the verdict slip, which is like this and this and not this. I'll give you that before I charge, but I just wanted to make sure that you knew that before you closed.

I'm planning on going right into the closings as long as we're done by 12:30. Otherwise I'm going to break early for lunch because they have to get downstairs in order to get to the cafeteria by 2:00.

MR. VASQUEZ: We thought you had said you were going to break around 12:15 because that's how long it's going to take to do the rest of the case.

THE COURT: If I understand, it's going to take you about a half an hour to do the rest of it.

MR. VASQUEZ: Right.

THE COURT: If I can do the first closing in an hour, I will do that, but I need to get them downstairs by about

1:30.

MR. LINDGREN: Understood.

THE COURT: Or they can't eat.

MR. VASQUEZ: Sure.

THE COURT: And I think we all want to eat. The other possibility is, if it goes too far beyond that, I'll send them down for lunch, and, you know, we'll just not have the typical 1:00 o'clock schedule, kind of thing.

All right, why don't we bring the jury in.

THE CLERK: All rise for the jury.

(Jury enters the courtroom.)

THE COURT: Okay, thank you.

MR. LINDGREN: All right, I guess good afternoon.

THE COURT: So they're playing a few deposition clips. And I was wrong; there's a brief rebuttal case, but you're still getting the case today.

MR. LINDGREN: So good afternoon, ladies and gentlemen of the jury, your Honor. At this time we'd like to play the deposition clip of Vinit Nijhawan, who is BU's former director of the Office of Technology and Development.

(Videotape deposition of Vinit Nijhawan played.)

MR. EVANS: Objection, your Honor. This e-mail is not in evidence, and you sustained our objection to it.

MR. VASQUEZ: No, that's not correct, your Honor.

THE COURT: Overruled. I said it was all right if Ted

Moustakas was the author.

(Videotape deposition of Vinit Nijhawan resumed.)

MR. LINDGREN: Your Honor, at this time we'd like to play the deposition of Paul Reidy, who is a representative of RPX Corporation.

THE COURT: All right.

(Videotape deposition of Paul Reidy played.)

MR. LINDGREN: Your Honor, at this time defendants are done with their case.

THE COURT: You rest?

MR. LINDGREN: We rest.

THE COURT: Do you have a rebuttal?

MR. EVANS: Yes, your Honor. Your Honor, we move the stipulated facts into evidence as PTX 1626.

THE COURT: Yes.

(Plaintiff Exhibit 1626 received in evidence.)

MR. SHORE: Your Honor, we'd like to make an oral motion under Rule 50 on the license defense for both the Cree license --

THE COURT: Well, Rule 50 motion denied, so let's --

MR. EVANS: We're going to play a short deposition clip from Meng Chun Kuo as the corporate representative. She's testifying as a representative of the entire corporation, not as an individual.

THE COURT: That's the woman who -- I think she's

still in the courtroom.

MR. BENISEK: Your Honor, just one quick question. On the Rule 50 motions, we're back to shorting the page limits.

THE COURT: Well, I'm not dealing with this now.

MR. BENISEK: No, I just want to make sure we haven't used our time in terms of --

THE COURT: What are you doing? Are you moving?

MR. BENISEK: Yes, we want to move Rule 50(a). There are ten separate motions filed electronically --

THE COURT: Let me see you right now at sidebar.

SIDEBAR CONFERENCE:

THE COURT: Excuse me, excuse. You don't have ten separate motions. You have a Rule 50 --

MR. VASQUEZ: Ten separate arguments.

THE COURT: Separate arguments.

MR. BENISEK: I just wanted to make sure we didn't miss --

THE COURT: You guys, really, in 20 years I've never seen someone do a separate motion for every issue. All right, thank you.

(End of sidebar conference.)

THE COURT: Who are you calling?

MR. SHORE: Ms. Meng Chun Kuo. Actually, we're calling Epistar Corporation through their corporate representative, Meng Chun Kuo.

THE COURT: Yes.

(Videotape deposition of Meng Chun Kuo played as follows:

"Q. So, from your memory, Epistar paid Philips
[redacted]
intellectual property portfolio for LEDs.
Is that your memory?
A. For LED dies.
Q. LED dies.
A. Yes.
Q. [redacted]
portfolio to Philips, correct?
A. For LED dies, yes.
Q. Were you aware that there were only three patents that were asserted in that Philips lawsuit?
A. Yes.
Q. Well, in other words, that license didn't include the entire Philips portfolio; it only included those three patents -- correct? -- plus their counterparts?
A. 2009 agreement, yes.
Q. So even though these patents were only United States patents, Epistar agreed to pay the royalties on a worldwide basis, correct?
A. That's the article says, worldwide.

Q. All right. So this license, the total minimum
[redacted]
A. Yes.
Q. Well, during this time period, in 2009, the best evidence that we have of Epistar's attitude towards licensing is the license that was actually entered into at that time with Philips, Exhibit 2, correct?
A. I'm not sure.
BY MR. SHORE:
Q. Well, what would be better evidence of Epistar's attitude towards licensing LED patents than an actual 00037:01 license for LED patents at that time? What would be better evidence?
A. The product is different.
BY MR. SHORE:
Q. It's an LED, correct?
A. It's red chip.
Q. Right. Red chips are actually -- have lower margins than 11 blue or green chips, don't they?
A. I don't know.
Q. Do you know any reason why Epistar would approach licensing red chip technology differently than blue or green chip technology?

A. This one is the settlement -- settlement agreement. It's for litigation. Yes.

BY MR. SHORE:

Q. And Boston University and Epistar are in litigation, correct?

A. Yes.

Q. And my first question for you, Ms. Kuo, is, April 28th, 2008, were you part of the negotiating team for Epistar that negotiated this license agreement with Gertrude Neumark?

A. Yes.

Q. Now, the patents that are listed -- the only patents that are listed in this license agreement are two United States patents. One is the '618 patent, which is a process patent for doping crystals of wide bandgap semiconductors. And the second is a United States Patent 525,499, wide bandgap semiconductor having low bipolar resistivity and method of formation, the '499 patent? Are you aware of any patents -- specific patents, other than the '499 patent and the '618 patent, that Ms. Gertrude Neumark was licensing?

A. No.

Q. And both of those are U.S. patents, correct?

A. Yes.

Q. Did Epistar have any idea that Ms. Neumark existed, before

she came to them in 2008?
A. No.
Q. Okay. Now -- so you're -- you also -- if you take a look at this Neumark -- I think this is Exhibit 4 -- 4 -- which was executed in 2008 -- these two patents by Ms. Neumark were either expired or about to expire, weren't they?
A. According to the filing date, yes.
So in a --
A. I'm sorry. Issue --
Q. -- one-day --
A. Sorry. Issue date. Sorry.
Q. Issue date, yes.
A. Yes.
Q. Okay. So when you decided to pay Ms. Neumark [redacted] were about to expire, or had expired, do you know what the royalty base was, how much sales would be covered, from the time Epistar received notice of the patents to the time the patents would expire?
A. No.
Q. So when Epistar decides what royalty rate to agree to in a license agreement, it does not consider the profitability of the products. Is that your testimony?
A. In my experience, the profitability has never been in the discussion.")

MR. EVANS: Your Honor, Boston University would now like to conclude its case by calling Dr. Piner.

THE COURT: This is the rebuttal. Remember, I mentioned early on that there might be a rebuttal. You put him under oath again, I think, Dr. Piner.

EDWIN L. PINER

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. SHORE:

Q. Dr. Piner, you were here for the testimony of Dr. Redwing, correct?

A. That's correct.

Q. Would you like to give a brief statement to the jury about your reaction to Dr. Redwing's testimony?

A. Yes, I would.

Q. Please do so, and if at any time anyone on the jury would like to ask a question or interrupt, just feel free to do so.

A. So actually I have several notes that I've had to condense down here because of time, a lot of notes, but mainly what I'm offering here today is some clarification, I think, for the jury.

MR. LINDGREN: Your Honor, objection.

THE COURT: Sustained. There needs to be a question.

Q. What is your first comment you'd like to make about Dr. --

THE COURT: No. Ask him a question about something.

It can't be a running narrative.

Q. What is your first criticism of Dr. Redwing's testimony to the jury?

A. So the first problem has to do with validity, and specifically the comments that she made, one in particular, and I'll quote: LED crystals are made through the process of epitaxy, which is what the '738 patent is about, and I'm here to tell you that is incorrect. The '738 patent -- in fact, I think we have -- yeah, if we put it up on the screen here, this is straight out of the pattern that you have in your documents. This is Column 2 starting around Line 30. And clearly the patent teaches the deposition of a film that is amorphous. And as we heard throughout the trial, in order to have epitaxy, you have one crystal structure, and on top of that you have another crystal structure, one single crystal, on top of that, another single crystal. So right here from the patent we can clearly show that the patent teaches -- what the patent teaches is not epitaxy.

Q. What is your second criticism of the testimony you heard --

THE COURT: So what is it teaching? Is it different form?

THE WITNESS: Exactly. It's non-epitaxial. I mean, just to use a different form, epitaxy has a specific connotation, again, having to do with a single crystal

substrate in this case and then a single crystal layer on top of it. That's the specific definition of epitaxy. And here the patent is clearly showing us that that is not epitaxy, that it's teaching us how to do an amorphous film -- in fact let's just use a general term here -- we just use "film" in that case -- we don't call it epitaxy -- on top of the sapphire substrate, or any of the crystalline substrates.

Q. Okay, Dr. Piner, what is your next thing that you'd like to explain to the jury?

A. Well, there were several questions that were presented by the jury over the last -- well, yesterday and several days, and I'd like to respond to those questions as well.

Q. Go ahead, please, respond to the first.

A. So to help this move along, we actually -- so there's nine total, if I recall, if my count was correct, and the first one is: Is there any way of knowing the probability of the amorphous buffer layer being polycrystalline or monocrystalline? And the answer to that specifically in the context of this patent, having to do now again with a sapphire substrate and a gallium nitride layer on top of that is, because of the differences in the lattice constants that Dr. Fitzgerald talked about, as well as the surface structure that my physical models showed you, you know, many, many days ago now, two weeks ago now, because of those different characteristics, the structure that you're going to achieve is

going to be a polycrystalline, specifically in the case of gallium nitride on sapphire. Again, you can talk generally about other material systems that don't matter here. What matters here is gallium nitride on sapphire.

So the second questions -- actually, there were two, but they were basically the same: Is a grain synonymous with a crystal? Is a grain a crystal? The simple answer there is "yes," a grain is a crystal. A grain is one crystal. Many grains with different orientations or many crystals, that would be a non-single crystalline material.

The third question: Must a grain boundary form a closed surface to separate grains? A simple question. Yes. If you have a misoriented crystal and a rounded or other misoriented crystals, the closure, the surface, what we call the grain boundary encompasses that whole grain, and that distinguishes it from all its neighbors.

Question four: Can a cross-section of a buffer be polycrystalline adjacent to the substrate but monocrystalline adjacent to the growth layer? Now, this question, generally speaking, would be "no," but we've got to be careful because in the context again of gallium nitride on sapphire, we have this special case where we start with this polycrystalline or non-single crystalline buffer layer. And the analogy that I gave was "survival of the fittest," where a few of those that are preferentially oriented, a few of those crystals are

preferentially oriented in the buffer layer will start to dominate, and they will become what is eventually the monocrystalline gallium nitride growth layer on top.

Q. And to interrupt you there for a minute, when we talk about the definition of "layer," it means a defined thickness with common characteristics. So is it true or not that you can have a polycrystalline area, and then when it transitions to monocrystalline, that's a different layer because it has different physical characteristics?

A. Right. We use two terms in the definition of "layer." I think it's in your glossary. It has a specific physical and/or chemical characteristic. So in that case, that would be a different physical characteristic.

Q. All right, next question.

A. So, again, we're still on the jurors' questions: How many defects can a single crystalline layer have before it can be considered polycrystalline? Generally speaking, I will agree with the testimony yesterday that there's no specific answer to that question. However, in the case that we have before us, gallium nitride on sapphire, because it's polycrystalline, we have a lot of these defects, and I'm referring specifically now to the dislocations. And so to give you a feel for the numbers, in those monocrystalline layers at the top, we're talking in a square centimeter area about 100 million defects, dislocations, 100 million. That's in the monocrystalline part.

Down in the buffer layer where it's non-single crystalline, we have one trillion per square centimeter. So on the hand, we've got a trillion; on the other hand, we have 100 million. That's about a ten thousand times difference, so there's a very big difference in terms of the difference.

The next question: Does TEM imaging remove all contrast from TEM images, including dislocations? I think the answer to that was "no," and I agree with that; you can see some defects in there.

So the next question: If you have a crystal with a long-range order with a fully enclosed separate crystalline side, is that single crystalline or polycrystalline? That's polycrystalline. If you've got a crystal that's misoriented, whether the crystal around it has its orientation across the round completely, the fact that the one inside is misoriented means that you've got two crystals; and if it's two crystals then you've got a multi-crystalline or polycrystalline material.

THE COURT: What does long-range order mean again?

THE WITNESS: Long-range order means that the orientation of your atoms goes on for a very, very long distance. In fact, I think it was testified --

THE COURT: Nothing seems very long in this context, but you mean --

MR. SHORE: Across the entire layer.

THE WITNESS: Across the entirety of the layer.

THE COURT: Of the layer.

THE WITNESS: I think there is a question, your Honor.

THE COURT: Yes, go ahead.

A JUROR: So this is, I think, sort of related, but it's more about the Fourier analysis done on the TEM and the diffraction patterns. The diffraction patterns, are those like a two-dimensional version of like a -- sort of like a double-slit experiment that, you know, we might have seen in high school? Is that a reasonable analog? What I'm trying to understand with the diffraction patterns is, is there -- what's being shown in terms of the light and dark? Is that a peak? Is it a trough? And if so, how much would have to show up before it would be visible to our eyes as opposed to, you know, depending on how big the sample is? How much does it tell us whether things are monocrystalline or polycrystalline?

THE WITNESS: Excellent question, excellent example, and I'll give you the answer, and then you can perhaps explain to the rest of the jury when you're deliberating. "Yes" to your analogy. That double-slit experiment, a classic experiment in physics, is exactly applicable here. And what happens is, as you have these electron waves moving through the crystal interacting with the atoms, they start to interact -- let's just use a general term -- and that interaction causes constructive and destructive interference. And where you get

that constructive interference, you get the bright spots; and where you get the destructive, they are gone, you don't get anything. Okay?

A JUROR: Well, what I'm really asking is, you know, we've seen, like, diffraction patterns done over large portions of the sample. We've seen Fourier analysis taken from sections. We've seen nano beam diffractions taken from smaller portions.

THE WITNESS: Right.

THE JUROR: What I'm trying to understand is, I don't know whether the bright parts or the dark parts are where, you know, the sort of particles in the structure are, but irrespective of that, you know, like, how bright or dark would something have to be, how many of these -- if there are any other grains, how many would have to be there before we actually see them in that sort of picture?

THE WITNESS: Hold had a question. Actually I have an answer for you very shortly.

Q. Let's go to Slide 3, the nano-beam. Can you tell us or sort of show us about why nano-beam does not work.

A. Okay, here we go, so actually to your question, what I'm showing here, these are the data that the defendants presented yesterday. It's the same sample. Again, notice at the top we're looking at the Venus series, and they represented these parts or these images to come from the same areas of the part,

so the same part on the left that you're looking at on the right. And what they're showing you here are two different -- remember, there were two different characterization techniques that they employed. On the left is just regular TEM. And if I go to the figure on the right, though, and what we've done here is just blown up that top left image. And if you recall the testimony, in this region right down here, there were aluminum nitride, if I'm recalling correctly; there was aluminum gallium nitride; there was gallium nitride; and then there was sapphire. There were four different materials that were identified and that are identified in this image. This is their analysis, not to say I agree with it or disagree with it. I'm just identifying for you that they said there were four materials in this region right through here. Okay? Each of those materials, because it has a unique lattice structure, will have a unique diffraction pattern, and that was testified to. They agree to that.

If we look over here now, this is the same sample again, and in this case they're using TEM. And over here was STEM, and over here is TEM, two different techniques in the same area of the same sample.

In the TEM analysis, if we look at the diffraction pattern, what was identified for us by the defense? Two diffraction patterns. One was gallium nitride; one was sapphire. So my question would be: If there are four

materials in one set of data and there's only two diffraction patterns in the other set of data, where do the other diffraction patterns go? There should be four diffraction patterns in the TEM because these are the same sample and the same regions.
Q. Is this why you would not use diffraction patterns in areas of this size?
A. This is exactly why we did not use diffraction patterns in the areas of this size, because it does not give you a reliable interpretation and analysis of this very thin region right here, when even when you're drawing, this red circle that the defendants identified, which is the region that's being interrogated by this pattern right here, and there's only two spot patterns, which is the same region just blown up in this image over here where they have identified four materials. Diffraction, spot pattern, and the analysis with this technique does not work to interrogate these types of layers. You don't get enough signal, is a simple way of thinking about it, from that layer versus what you're getting from the GaN above and the sapphire below.
Q. Very quickly, let's go to your last opinion about their use of nano-beam.
A. Okay. So nano-beam, you heard a lot about that yesterday. And nano-beam, as the name implies, is a beam on a nanometer scale. And so what does it mean? Well, let's look. This is

actually again their data, and if we look carefully -- let's orient ourselves -- so over here is the sapphire. This dark in the bottom is the sapphire. Up here is the gallium nitride, and in this region in between is the buffer layer. Okay? And so let's look at -- the scale down here gives us an indication as to the size of this image that we're looking at. If we now take the 50-nanometer and represent a 5-nanometer part of it, which is the size -- now, this is the size of the nano-beams that they were using to interrogate or to analyze this region, supposedly, of the material. So if we take that 5-nanometer and place it in the buffer layer, and we can put a few more up just showing different, what they were interrogating were individual crystals within the buffer layer. Their spot size was so small relative to the size of the crystallites that they were interrogating, they were getting data from one crystal. Well, if you're looking at one crystal with nano-beam, you're going to get one spot pattern because it's one crystal; one crystal, one spot pattern.

Q. And, again, if you look at this, we have it right here -- here's the scale -- here are the crystal sizes -- did any defense expert ever explain that you heard that they were taking 5-nanometer diffraction patterns from 50-, 15-, 12-, 10-nanometer crystals?

A. No. In fact, in their data and in their testimony, they identified their nanometer spot size was 5 nanometers or less.

Q. In fact, was some of the data only 2 nanometers, taken from areas of only 2 nanometers?
A. That's correct.
MR. EVANS: Your Honor, unless the jury has any other questions, we'd pass the witness.
A JUROR: So if you ever get spot patterns from just those regions, would you see them rotated if they had different crystal orientations, or would it be sort of --
THE WITNESS: Yeah. Now, there's two types of rotations, and we've talked about this, so this is a reminder, I hope. There's twist and there's tilt. And so if there's a tilt, the pattern will tilt with the crystal orientation. If it's twist, probably not so much because you're still having that relative orientation of the electron beam and the interaction with it. And let me just give you a feel for the size of these.
THE COURT: No, no, we're out of time. Thank you. Any cross?
MR. LINDGREN: Yes, your Honor, just a few. Mr. Mortenson, could you pull up PTX 1, which is a copy of the patent, and if we could go to the abstract, if you could highlight the first sentence and blow it up, please. Can you blow up the first sentence or highlight it.
MR. EVANS: Your Honor, this is the specification for the '703 process patent, misleading under Rule 23.

MR. LINDGREN: Your Honor --
THE COURT: I haven't heard a question yet. Is this -- which patent is this?

CROSS-EXAMINATION BY MR. LINDGREN:

Q. Okay, so, Dr. Piner, is this the '738 patent?
A. Yes, it is.
Q. Now, can we pull that up. Now, we've highlighted the first sentence of the abstract here, and it's correct that it describes that the GaN single crystalline films are grown in a molecular beam epitaxial growth chamber, correct?
A. That is correct because that is a process, and that is not discussing the structure that is being created here. They're separate things.
THE COURT: You know what, let him ask his questions, all right? So what's the next question?
MR. LINDGREN: All right, if we can go to Column 2, Line 11, if you can highlight the word "MBE," please, on Line 11.
MR. SHORE: Your Honor, objection. This goes to the method claims, which are not at issue.
THE COURT: Overruled, overruled. This is part of the patents that you have in front of you.
Q. And yes or no, MBE stands for molecular beam epitaxy?
A. That is correct.
Q. Okay, if we can go down into Line 15 through 18, it starts

with "The film is epitaxially grown." So in those lines it states that "A film is epitaxially grown in a two-step process comprising a low-temperature nucleation step and high-temperature growth step," correct?

A. You read that correct.

Q. Go down to Lines 44 through 47, please.

A. And that part of the patent was talking about the two-step --

THE COURT: There's no question in front of you.

Q. Okay. And if you start highlighting at "Preferably," it says, "Preferably 600-900 degrees Celsius results in the epitaxial growth of monocrystalline near-intrinsic GaN film." Did I read that correctly?

A. You did, and that's the monocrystalline near-intrinsic GaN film of the growth layer, not the buffer layer.

Q. Now, you mentioned in your testimony just a moment ago that it was your belief that the nano-beam diffraction spot sizes that were taken by the defendants were all taken within individual crystals, correct?

A. That's correct.

Q. So they took 12 different spot size, and each time they hit exactly inside a single crystal, correct?

A. Are you asking? I don't know what they did.

Q. But it's your position that every single nano-beam diffraction spot pattern that they took was from an individual

single crystal?

A. That's what it appears, but they could select that if they chose to do so; in other words, the location where they were looking at the spot.

Q. Do you have any evidence to suggest they did that?

A. That they did what?

Q. That they selected particular spots, or is that just your speculation?

A. They showed where they were selecting specific spots. They would circle them on their images to identify where the data was coming from.

Q. Okay.

A. So they chose where to take the data from.

Q. Now, with respect to your Fourier analysis diffraction patterns, it was your testimony that the boxes along the buffer layer were approximately 10 nanometers high.

MR. SHORE: Objection, your Honor. This is beyond the scope. We didn't ask anything about that.

THE COURT: Yes, you did. I heard about Fourier.

MR. EVANS: Not about Fourier analysis.

THE COURT: Overruled.

Q. You said the boxes that you took your data from were approximately 10 nanometers high and up to 100 nanometers long. Do you recall that?

A. I do.

Q. So the diffraction patterns that you created using Fourier analysis would have included data from that entire region in that yellow box, correct?
A. Yes.
Q. And that entire region is what's demonstrated in the actual spot patterns shown from the Fourier analysis, correct?
A. That's correct.
MR. LINDGREN: I don't have any further questions, your Honor. Pass the witness.
MR. SHORE: No further questions, your Honor.
THE COURT: Thank you.
(Witness excused.)
THE COURT: Do you rest?
MR. SHORE: Yes, your Honor, we rest.
THE COURT: Any surrebuttal?
MR. BENISEK: Well, your Honor, just at this point we would raise our 50(a) --
THE COURT: But that's a different issue. No more evidence?
MR. LINDGREN: No more evidence.
THE COURT: Evidence is closed. All right, now, I have a question for you. I've got to let you go to eat. As much as I regret letting you eat, I think we need lunch; and if you go downstairs, the fastest this can happen would be half an hour. I mean, that's just the fastest to get in and out of the

line. Maybe some of you brought lunch. The question I have is, if I go this afternoon, I can get the closing arguments done. They're each in the vicinity of about an hour, an hour and fifteen, something like that. But unless you're willing to stay past 4:00, I won't finish the closing instructions of law. I'd have to do that tomorrow morning.

So the question I have is, are people narrowly confined to the 4:00 o'clock, or could you stay till 5:00? For how many people would staying till 5:00 be an issue?

And something that you can't adjust at this point?

A JUROR: I've got to pick up my kids.

THE COURT: What time?

A JUROR: At 5:30. It takes me an hour to get home and 30 minutes.

THE COURT: So I could go till 4:30. All right, I'm bargaining for every minute. I don't know. Let's see how this goes, okay? If I can do it, I will do it. I won't make your kids be -- and especially, oh, the traffic is so terrible that time of night. Are you driving?

A JUROR: No.

THE COURT: Let me see what I can do. I'm going to let you go right now. I want you to get back as soon as you can and have lunch by 1:30. They need to eat too. I mean, I'm not into starvation. And then, if I can, I will. If not, we'll just do the closing arguments this afternoon, and I'll

give you the charge first thing tomorrow morning. Okay? All right.

(Jury excused.)

THE COURT: At some point, do you have something in writing you want to hand me?

MR. BENISEK: We just filed it, your Honor.

THE COURT: Oh, you did file it.

MR. BENISEK: Yes.

THE COURT: Did you file anything?

MR. SHORE: Your Honor, we're going to wait till the case is over.

THE COURT: It's over. It's over.

MR. EVANS: We filed it.

THE COURT: You filed it, okay. I just wanted to make sure.

MR. EVANS: I had no idea.

THE COURT: It just means, as you know, under law, you have to set forth the reasons. You filed it. I don't know whether it was timely before now, but as of right now, you need to set forth all the reasons. I'll leave it to an appellate court as to whether you preserved it before, but at least as of right now, you both filed your briefs, right?

MR. BENISEK: Yes.

MR. SHORE: We filed one.

THE COURT: One, right, but they by definition have

already filed three, so I'm only expecting a fourth one, right?

MR. BENISEK: Correct.

THE COURT: All right. Now, I have for you the revised instructions and the verdict form. The verdict form is like a puzzle: If this, then that; if that, then this. I'm hoping to hand this out to them before you do your closing arguments, just to help them understand the questions that will need to be answered so at least you can be addressing that.

I think you also probably need to -- here's my concern: You need to grab lunch, but you may be in the line at the same time as the jurors, so please be extra careful. And I would like to start at 1:30. I've mapped it out, so if 1:30 to 2:30, 2:30 to 3:30, I maybe can finish my instructions by 4:30. If we go beyond that, I'll do the instructions tomorrow morning. Okay?

MR. SHORE: I'm going to reserve some time for rebuttal.

THE COURT: Right, right, I'm saying, so all together, right, I think two hours and fifteen minutes. I don't know if I can do the instructions today. Let's just put it that way. He has to pick up his kids. I think it's a long instruction, not a shortish one. I think an hour is the minimum; it could go an hour and a half, especially since you all agree I should read the *Georgia-Pacific* factors. So at this point you'd better run down and get lunch. I'll see you at 1:30.

(Noon Recess, 12:56 p.m.)

(Resumed, 1:40 p.m.)

THE CLERK: All rise.

THE COURT: Let me ask you all, were there any changes in the verdict form? I was going to hand them out. We may not have time to do this. We actually don't have time. I want to make sure before we kill another forest.

MR. SHORE: I have no idea. We don't, Boston University does not.

THE COURT: You didn't look at?

MR. LINDGREN: We'll let you know.

THE COURT: It's too late.

THE CLERK: All rise for the jury.

(Jury enters the courtroom.)

THE CLERK: You can all be seated.

THE COURT: This is the way it goes: There will be a closing argument by Boston University, roughly an hour, but I understand that Mr. Shore is going to reserve a certain period of time for rebuttal, then I think Mr. Vasquez, are you going to do it?

MR. VASQUEZ: Yes, I am, your Honor.

THE COURT: They both have been practicing up. He goes next for an hour, hour and fifteen, whatever, and then the rebuttal. Now, I'm just sort of always an optimist, but I'm not feeling optimistic about getting the closings to you today,

so I think as a practical matter, we'll have to swing over till tomorrow morning to do the closings, so I'll talk to you about that in a minute.

Remember, the closing arguments are not evidence, so if you take notes on them, they're designed for you to make inferences and make findings in their clients' favor, but it's not evidence.

Also, there is a certain etiquette, for the most part, people don't pop up and object every time they disagree with the other side's versions of the facts, or we'd never finish this. So, in general, you will not be hearing objections, but I can guarantee you that doesn't mean they agree with it, they probably disagree with most of it. That's the working order here.

Mr. Shore.

CLOSING ARGUMENT

MR. SHORE: May it please, the Court, ladies and gentlemen of the jury, thank you very much for being here for three weeks. It's a good thing we're finished. As you can probably tell, I was up late last night. I got up this morning, rushed to court, forgot to shave. I'm on my last shirt, and I'm past my last pair of underwear.

THE COURT: Called TMI.

MR. SHORE: So we're going to get through this together, and I'm going to try now to summarize the evidence or

what I believe the evidence showed us. I'm going to start out by telling you how I believe the verdict form you're going to receive should be filled out, and then we're going to go over the reasons why I believe it should be filled out that way, so feel free to take notes.

We're going to start off with the idea that the damages in this case are designed where you are given the testimony of what the minimum damages under the statute, and what the Court's going to instruct you, that the damages owed to Boston University are not less than or not below what would be called a running royalty or reasonable royalty.

And Mr. Ratliff in Plaintiff's 1620 is going to run through those, and this is what he found to be the minimum, and one of the things, you'll have this back, and one of the things that you'll see is his minimum totals out to about $14.8 million.

I'm going to go over first a few things why I think the royalty rate that he used, 4 percent, was low. You're free to accept it, disregard it, go below it or go above it, and I'm not going to tell you what to do, I'm going to try to lay out for you why I think that royalty rate is too low.

Why do I think there needs to be some upward adjustments to this? First of all, all of the license agreements that you're going to see in this case, the 3 to 6 percent that Bridgelux agreed to play, the 2 percent that Cree

plus all the other obligations they agreed to take on, all of those were based on a worldwide base, and the reason why every agreement in this industry and every agreement that you're going to see in this case, every single license agreement that's going to go back with you to the jury room as an exhibit, they're all done on a worldwide basis.

Why? Because nobody wants to get pencil-whipped by somebody who claims that this sale was in Kazakhstan and this sale was in Russia and this sale was here and this sale was there, where you have to go back and try to catch me if you can, where I'm going to funnel sales through a subsidiary, I'm going to funnel sales through this thing. No one does that in this industry because these parts fly around the world, so what everyone does is they do it on a worldwide basis.

We can't do that here. The Federal Circuit Court of Appeals and the Supreme Court says you have to base it on a worldwide rate, and so what we have to do is we have to adjust -- sorry, U.S. rate, so what you have to do is you have to adjust the rates that you see in the industry and adjust them upward based upon U.S. coverage, and you heard testimony that the United States in this particular type of product represents about 20 percent of the industry, so when you see license agreements involving U.S. patents that have a 2 percent or 3 percent rate, that's worldwide, that effectively is a much higher rate because effectively what happens is they are

discounting the U.S. rate to provide the worldwide coverage for accounting convenience, so that's one reason.

Another reason why I think there needs to be an upward adjustment is because in 2000, Boston University had not yet licensed the '738 patent to anybody, so, in other words, if they had licensed to these defendants in 2000, hypothetically, that would have eliminated, destroyed Boston University's ability to exclusively license to anyone else.

It would have completely destroyed their ability to take a U.S. company or to help U.S. industry or Massachusetts industry and do one of the primary things that they are commissioned to do, so what you have to ask yourself is what would Boston University have required in order to basically eliminate one of the primary bases and reasons for their policy?

Now, the Trustees of Boston University are trustees. They have a duty, a fiduciary duty to Boston University. So, of course, there's some amount of money that they would take or they would say to the U.S. industry or to anyone else, these guys are offering me an amount of money that I have to exercise my fiduciary duties, and I have do what is best for Boston University in these circumstances.

So, yes, they would be a willing licensor as is required by the statute, but they would only be a willing licensor to the extent that their fiduciary duties would have

required them to be. They would not have been a willing licensor to overcome their policies for a foreign company that does nothing for domestic industry, that does nothing to contribute to the research and development in the United States or elsewhere. And, by the way, Epistar, you didn't see any evidence that anybody in the world pays Epistar anything for their technology because, frankly, they are not a technological innovator.

So, there's a couple things I want to talk to you about when we go into the Cree license, and you're going to hear a lot about the Cree license. What Mr. Ratliff said, the Cree license is relevant. He didn't say it was controlling. What their expert is going to tell you to do is not even that the Cree license is relevant, not even that the Cree license is controlling, that the amendment to the Cree license covering the sublicensees, that's what's controlling. That is ridiculous.

Now, you also saw, I believe, towards the end of the case, there was a letter from Dr. Moustakas where he says he thought exclusively licensing to Cree was a mistake, and I think we all heard why. Cree took the license, and instead of sublicensing and helping Boston University and having money flow back to Boston University, they almost exclusively used it as a trading chip to keep themselves from having to pay tens, if not hundreds of millions of royalties to Nichia, to Philips,

to Osram and to the others.

Now, it's absolutely fine. Boston University wanted to help the Cree, they didn't want to help industry, but they didn't want to help Cree and other industries to the point that they got nothing because Cree only used the patent to help Cree, and that's what happened. That's why we have it back because the last few years of the patent, Cree has helped, they're established, they got the full benefit of those rights.

We helped them, but now it's time instead of letting Cree basically take all the benefits of the value of the '738 patent, Boston University took it back, and you heard that.

The next upward adjustment I'm going to talk to you about is the '738 patent is a fundamental patent and recognized as a key component in the development of the industry.

Now, you saw objection after objection after objection. They didn't want you to see that Dr. Nakamura recognized this patent. Their own expert on damages and their own employee who says that they have a relationship with Dr. Nakamura, they're happy to tell you that Dr. Nakamura supposedly does research with them without one shred of proof, but when we wanted to show what Dr. Nakamura thought about this patent, man, it was objection, objection, objection, objection.

They know this is a fundamental patent, and they tried to hide that from you. One of the things you're going to be asked when you look at the charge, what are the things that

they didn't want you to see? What are the things that they did not show you? Evidence is just as much what they hid from you as what they gave you.

Number 4, the '738 patent is presumed valid and infringed by the defendant. Now, Mr. Ratliff had a 1 percent upward adjustment for this. He said it could be as many as 2. Whether it's 1 or 2, that's part of the upward adjustment that we're going to have for you.

Now, their expert, again, I don't know how much credence you gave, and I don't want you to belabor the point, but he actually said that he doesn't consider that because if you consider that, you have to offset it with the savings in the litigation.

Look at the *Georgia-Pacific* factors. The savings from litigation are not the *Georgia-Pacific* factors. There is nothing about litigation in the *Georgia-Pacific* factors. He made that up, just made it up. And that's one of the reasons, frankly, he made it up. Other courts have rejected him out of hand for that exact same type of conduct, just making stuff up. That's not what we do here. We're supposed to follow the rules.

And you see me jumping up and down like a jumping jack sometimes objecting. I'll admit, I'm Swiss, okay. My family is Swiss. We are rule-followers, we show up on time, we do things a certain way. My dad is a maniac about doing

everything according to the rules, and that's how I was raised, and, I'm sorry, but sometimes I get crazy when I think someone is doing something that is against the rules, and I apologize if that made any of you think less of me, but please don't think less of Boston University. I, please, hope you didn't have that feeling.

The fifth thing you're looking at here is motivation of the defendants. This is interesting. Now, this is back in 2000 we're talking about. These companies were relatively new, not so new. They still had very high sales, but as far as the LED industry, they were trying to break out of being a contract manufacturer for people to build their own brands, to do their own thing, to basically build up the industry in Taiwan.

As a matter of fact, I think you heard that the Industrial Technology Research Institute, which is a group in Taiwan founded by the Taiwanese government that is to support Taiwanese industry, picked the LED industry as one that Taiwan was very interested in trying to bring up and support and make Taiwan a world power in this area.

So ask yourself this: If they could not import samples, if they could not use samples to do the design process in the United States for companies like HP, Apple, every major brand that you think of that does design, could that industry have ever taken off in Taiwan? No, they had to have a license of this patent in 2000. If they believed it was valid and

infringed to participate in this market, they absolutely had to have a license, and that's something you need to consider.

Now, I want to bring up, I thought it was strange that they played the deposition cuts of Mr. Nguyen last in the case. I thought that was very interesting. A couple things that I think hopefully you brought out of that. He wasn't there in 2000. He wasn't at the Boston University in 2000, 2001, 2002, 2003, 2004, 2005, 2006, all the way, he didn't get there until 2008. He had no involvement with the '738 patent of Dr. Moustakas until they took the patent back from Cree.

So as far as his knowledge of what Boston University was thinking in 2000 or what they wanted to do in 2000, you saw one witness who was there from 2000 all the way to the end.

Michael Pratt, what was the one piece of evidence that they asked Mr. Nguyen about in his deposition? A draft letter that was never sent. That's their evidence. That is their only evidence about what Boston University would have done is from a witness who wasn't there, didn't get there until ten years, later referencing a draft, and the reason why it was never sent: Why are drafts are not September? Because the opinions in the drafts are not adopted.

So think about in your own work in all the things you've done, the first drafts that you've ever done that you threw away, how much they've changed between the first draft and the last, and what you would think if someone brought up

your first draft and said, oh, this is what he thought and this is what he should be bound to, he or she should be bound to forever. That's why it's called a draft.

All right. Let's go next to notice. This is in evidence. It's Plaintiff's Exhibit 1617. This is the merger agreement between Epitech and Epistar, and you'll see that it says in Clause 14 that: "They are absolutely take upon them all of the rights and obligations, all notices, everything related to patents, patent rights, copyrights, trademarks, agreements possessed by the dissolved company shall be inherited by the survivor."

You're also going to hear or you've heard that if Epitech got notice, Epistar inherits the notice. Even more interestingly is people at Epistar, and I got the wrong guy on the chart, but people at Epitech who received the notice continued to work for Epistar and kept working for Epistar. It's a different name on the document, but you can look at this document and the names are the same.

Let's talk about Julio Garceran about notice. All right. So Mr. Chen, that's Mr. Chen, and that's also Mr. Chen, by the way, whose names you'll find in this merger agreement. So Mr. Chen was providing industry standard evidence and an industry standard claim chart to put him on notice of what? To put him on notice of the infringement of the '738 patent by the products. Which claim? Claim 19.

So not only were they put on notice, they were put on notice of the same claim that you're going to be considering, the same claim. That's important, so let's talk about Epistar. We're going to ask you for a 6 percent rate. Now, there's one thing that I want to tell you about here that I think is also very important.

You're going to see a lot of evidence of how do you calculate the royalty base? Is it this, is it that, and the running royalty determination is kind of based upon what we call after the fact analysis.

So we know in 2015, we know what their sales were, or we think we know. We kind of have to trust them, but we kind of think we know, but if you go back to 2000 and you say, look, I'm not sure what I should or should not include in the royalty base. You are jurors. I'm not sure, I'm not absolutely, you know, I'm not comfortable with doing that type of analysis.

The other way you can do it, and, by the way, the word on the screen is "or." You'll get a choice. You can do ongoing royalty or a lump sum.

[redacted]? Three reasons: The deposition or the testimony of Meng-Chun Kuo that we played. Now, Ms. Kuo said, and this is only one example, there are several more in the record, a license with Philips, not for the entire Philips portfolio, three patents, just three. U.S. patents. Just three,

fundamental patents, no. Important patents, yes; fundamental, no. [redacted] agreement, well, for five years, sorry, you'll see the agreement. It's in evidence. That's what they paid. That's what they were willing to pay.

This is a fundamental patent -- strike that. Not only did they do that, they had to give Philips the rights to their entire patent portfolio, so what they gave Philips was a [redacted] their entire portfolio. What's that worth? They would have you -- remember, they've been telling you the whole time, we've got so many patents, we do so much research, we're such a high tech. company. Philips got everything in exchange for a license to three patents.

So, going back to 2000, they're desperate for the ability to import, they're desperate for the ability to use in the United States. They want to build this industry in Taiwan. You had the closest comparable license to this where they paid [redacted] worry about calculating the base. I think a very reasonable number here is $20 million.

Now, let's talk about the Bridgelux sales that they

want you to take out. Remember, the Bridgelux license, and you'll be instructed on this, you only take out Bridgelux sales if you have evidence that the parts that were sold to Bridgelux, sold to Bridgelux were substantially designed by Bridgelux or that the design of the parts was substantially controlled by Bridgelux.

There is no evidence of that, none. If you were going to prove this, this is where we talk about what did they not show you? If you were going to prove this, what would you have? You'd have e-mails from Bridgelux, you'd have design documents with Bridgelux property written on them, stamped Bridgelux property, Bridgelux intellectual property. Semiconductor match sets would have Bridgelux on them. Think of all the things.

All of you who are in engineering or technical fields, think about this. If someone makes a design and they give it to somebody, there's a record of that, and if you're trying to shave millions of dollars off your obligations to Boston University and you're going to ask a set of jurors to take all that money away from Boston University, wouldn't you say, here, ladies and gentlemen of the jury, here's the actual designs by Bridgelux with Bridgelux's name on them, here's an e-mail from Bridgelux engineers saying here's our design or we control this design or anything like that?

Wouldn't you have a Bridgelux engineer, one of your

big customers that you're making things for show up here at trial and say, hey, folks, there's been some kind of a mistake, we designed these, these are our parts?

How about the last three years? Wouldn't you have designated a Bridgelux person to go take the deposition of? This is their burden of proof. We don't have to prove anything. We don't have to prove they're not licensed, they have to prove to you they were. They're not. They didn't even try.

And, anyway, the only testimony we have here is they actually -- I showed them the match sets or the process flows, and I say, These were highly confidential? Yes. And those were created in Taiwan entirely by Epistar engineers, correct? And they're not shared with anybody because they're so highly confidential, correct? Why did they even allege a license defense on this? There's no evidence of it.

The only witness they brought you here was a person who said -- Titus Chang, he said that he could only speak to the subject from 2012. This is the guy who brought no e-mails, no design documents, no Bridgelux, nothing. He said I can only speak to it from personal knowledge from 2012, then the Court said, all right, well, then he can only speak from his knowledge beginning in 2012. That's their deal.

Now, here's another crazy thing. They started selling Bridgelux parts in 2006, and you'll see that in Mr. Ratliff's

schedules. The Bridgelux-Cree license didn't even exist until the end of 2008. How could they have been selling parts designed by Bridgelux covered by a license that didn't exist yet.

This is the kind of thing that you've got to kind of think about and say what were they trying to pull over on me? Damages for Everlight. Now, this one I got to tell you, I honestly believe for Everlight, you absolutely have to find a lump sum, and here's why:

If you want to use Mr. Ratliff's numbers, you can. We had no idea what they've done. We have no idea. They swore to us under oath for two and a half years that a schedule that they gave us was their sales of gallium nitride products. We sent their lawyer an e-mail because we got the schedule. We said wait a minute, we think your numbers are off.

Instead of saying it in thousands, they basically gave it to us in millions. We said, you said you had a trillion dollars in sales last year. We told them that. Now, would I have loved if they had trillion dollars in sales? Absolutely. But we, we, the guys that they criticized said you made a mistake. Is this right? Please correct it because we're going to forward in this case, and we want to go forward on good information.

What happens? They write us back and they said yes, these are all, a-l-l, these are all gallium nitride products,

all of them. That's what they are, then they corrected the numbers about a week or so later because we told them to correct the numbers.

Then for two and a half years, they know we're relying upon this. They know that the entire case we've done is based on these numbers, and then, unbelievably, you hear them get up and criticize us saying why didn't you go look at the data sheets?

If someone swears to you under oath that the numbers are correct, why would you go and look at all the data sheets? Are we supposed to assume that everything they say is a lie? Is that what we're supposed to do? Then they say, oh, well, you could have looked in our catalogs. Go look at their catalog, 2012 catalog.

Remember, they said, oh, the catalog, you can tell what the material is. You can't. It's not there. Go look. It is not there. The catalog has no disclosure of the material in the devices.

Then you remember the Judge said, well, you need to bring the other catalogs because the only catalog they brought was 2012, so the only evidence in the record about what part numbers they were referring to is a 2012 catalog. They didn't bring you anything from 2006, 2007, 2008, 2009, nothing.

So we're just supposed to believe that those numbers for seven years correspond to some numbers that may or may not

be in the 2012 catalog, and I guess they want you guys to go through the catalog and make the determination what color. Well, guess what? Then now we know that you can't go by color. They lied about that. They sit there and said that you can tell just from the color. You can't.

You can have gallium nitride LEDS that are yellow, that are infrared, that are red because it depends on how you house them and the filters that you take the light through. They didn't tell you that either.

When we tried to put in their patent application where they actually claimed patents on packaging that would make a gallium nitride LED yellow, blue or yellow, red, infrared, what did they do? They went nuts. Dr. Piner was allowed to talk about it, but they wouldn't let it come into evidence. What are they hiding from you?

Then the other thing about Everlight I want to tell you, and this is half my objections that I would object to, that slick little animation that you got, they gave us that on Sunday. The numbers that they wanted you to rely upon, they gave us those September 15th. Discovery in this case closed in July. Our expert reports were due in August, and then they want to spring on us this mistake.

It wasn't a mistake. Let me tell you exactly what they did. They wanted us to come into court and they wanted us to go to the jury and they wanted the jury to have in front of

them the idea that there were some unidentified, unknown quantities that were not gallium nitride because they know we have the burden of proof on damages, and if we have the burden of proof on damages and we can't tell you which were gallium nitride and which weren't because they lied to us repeatedly, then we can't prove our case on running royalty because we can't prove a royalty base because we can't tell if 10 million comes out, 5 million comes out or 20,000 comes out.

We don't have any way to know, so then what can they do? They can say Boston University, you're stuck. You can't prove your case because you can't tell what is and what is not GaN because we tricked you, so here's your choice:

You either get nothing, or you have to accept our number, which is a $75 million, 50 percent discount that you can't verify, that you can't check, that there's not a shred of evidence or documents to support, so we're putting you to that choice, Boston University. It's nothing or it's our numbers. That was a litigation tactic.

But this Court is going to instruct you it didn't work. She's going to instruct you that you should resolve any inferences about the number of parts in Boston University's favor because these, this defendant, Everlight, not Lite-On, not Epistar, misled us, misrepresented things to us, and is that the kind of company that you can believe about anything?

But I'm telling you to make this an absolutely clean

case, the best way to handle that is to do a one-time payment, lump sum of $8.5 million, and then we don't need to worry about whether or not they were or were not right about the numbers.

All right. For Lite-On, Lite-On, you use either one, it, frankly, is not a huge amount of money. Pick whichever one you want. I'm not going to be terribly concerned either way. That's Lite-On is frankly here, they're sort of like they are truly the tail not wagging the dog.

Let me go into the top 10 reasons that Boston University deserves your decision. I'm going to start since we have Dr. Moustakas, we're going to start with a little greek, "Dignity goes not consist in possessing honors but in deserving them." We're asking for some dignity, we're asking for your attention and your time, and I know you're going to give it to us, but let's go through these reasons quickly.

Reason Number 10, being there, being there matters. You heard, this is related to their invalidity defense. You heard Dr. Fitzgerald say he was relying upon his invalidity about what Dr. Moustakas intended. He was relying entirely on articles and reading of the patent out of context, but if you want to know what people were thinking in the lab, ask the people in the lab.

Who was in the lab? Thing Lei, Richard Molnar, Ted Moustakas. There were lots of people in the lab. Did they bring you one person who was in that lab to testify about the

thinking in that lab? No, of course not because when they took the deposition of these people, they got testimony like this.

By the way, these questions are not from us, these questions are from the defense lawyers: "But you wanted your buffer layer to be single crystalline?" The answer: "We never intended because you know you cannot achieve that." "What do you mean you cannot achieve that?" "If you can achieve a buffer layer in a single crystalline, then there's no need to do a buffer layer, just call it that's what you want to grow."

By the way, that is going to be an overarching piece of common sense. What's the reason for a buffer layer? It's to enable you to grow a single crystalline growth layer on top of a mismatched substrate. If you could grow a single crystalline buffer layer, why would you need a buffer layer? You don't need it because if you can grow the single crystalline on the sapphire, you don't need a gallium nitride buffer layer because you would just grow a gallium nitride growth layer.

This is the most insane defense I have ever seen. It doesn't make sense from the very beginning, and this testimony from Ting Lei lays that out perfectly: "Were you endeavoring to grow a monocrystalline gallium nitride buffer layer?" Dr. Moustakas: "No, I was endeavoring to grow a polycrystalline or amorphous or combination of both." He was there. He knew what he was doing.

And then here's the other thing that's nuts. Dr. Fitzgerald, there are lab notes that thick from that lab. Dr. Fitzgerald never looked at them. He didn't want to know what they were doing in that lab, and he certainly didn't come in here and tell you that I read their lab notes and I looked at their notes and I tried to figure out what they were doing.

I mean, if you want to know what they are doing in a lab, wouldn't you want to look at the lab notes? This is their burden of proof by clear and convincing evidence.

Consistency instills believability. Dr. Fitzgerald, when he was hired by another entity that had a different theory about how they wanted to defend the case, he said, oh, I can read this patent, and I understand immediately that non-single crystalline means polycrystalline, amorphous and a combination of polycrystalline and amorphous. It's clear to me, I can read that, clear to me, got that, perfectly understood that, swore to that under oath.

Then what does he do when that company settles, takes a license? What does he do? He gets hired by somebody else. What does he say? "Well, when I read this patent, I just don't think that a non-single crystalline buffer layer is supported. I don't think polycrystalline, amorphous or a combination of polycrystalline and amorphous is supported," signs that under oath.

Consistency, Reason Number 8, substance over process.

Dr. Fitzgerald limits it to epitaxy. You are actually going to be instructed by the Court that Claim 19 and the things that are in Claim 19 are specifically not limited to any process. You will be instructed by the Court that process is not a part of these claims, and they knew it.

This started out as a process patent that at the end of the patent had claims for apparatus, and that's why the specification has a lot of stuff about process because that's what it started off being, and in the patent office made them separate it. This is in the prosecution history. It says you can have a process patent but then you can have a separate apparatus patent. That's the '738 patent. That's what we're talking about. They've tried to mislead you in thinking that this is a process patent. It absolutely is not and never was.

So, here's the instruction the Court is going to give you, If so, if you find infringement, if so, then the exemplar products infringed Claim 19 regardless of the method or process by which the exemplar products are made.

There is nothing in any claim about the process. So when you ask yourself why, why did they waste time in our precious lives pounding on this idea of process? Why? Because they don't have anything. There is no -- they have normal invalidity case, never did, never will.

Reason Number 7. You get lost without a map. Fitzgerald violates the Court's claim construction. He says

grown on is formed indirectly or directly above. That's what you're going to be instructed. He leaves out the "or." So he says, "To enable the full scope of the claim, you only have to enable an amorphous layer with a single crystalline grown on, directly on or indirectly on." It's disjunctive, it's not conjunctive, and he tries to tell you you have to do both. Again, you can read, we all can read, this is the trick, this is the half truth, this is the half claim.

Reason Number 6, words matter. Dr. Fitzgerald comes in and he tells you, "Oh, it must be crystallized." No, the patent said it can be. It says, "You can have a film, it's deposited with an amorphous at the low temperature of the nucleation stip, the amorphous film can be crystallized by heating to 600 to 900 degrees or a sufficient period of time."

If you don't heat it for a sufficient period of time or if you reheat it at a lower temperature, it will not fully crystallize. He knows that, but what he does is he takes a word "can be" and he comes back and he says "must be."

By the way, going back to the other point, this is a process disclosure, a process disclosure. Invalidity fails. They say it requires an epitaxial process. It's wrong. The Court's going to tell you that's wrong. Defendant's invalidity requires Dr. Moustakas not to have known what he wanted to invent.

And remember the original claims as filed, where they

showed you the first page where it says, it just says "a buffer layer" but they didn't show you the second page where it says "amorphous," "amorphous and crystalline" and the different kinds.

Again, when someone is not telling you the whole truth, there's a reason for that. Wrong. Defendant's invalidity requires you to disregard the Court's claim construction of the term "grown on" indirectly or directly and requires "can" to mean "must." It is wrong.

Dr. Fitzgerald is wrong. Dr. Moustakas is professor emeritus, the highest honor a professor can get.

Number 5. This goes to infringement and willfulness, the Cree trick. The testing conducted by Dr. Redwing was on the wrong layer, and we heard this. Remember, we heard this before. They tried to pull this before.

If you look down here at the instructions, left and middle, it says, "The Z contrast conditions in the flat region near the film substrate interface." We saw that's the aluminum nitride part, so they took the test at the wrong place, and they did it on purpose.

In fact, you heard, and we're going to get to this again, but you remember Dr. Redwing didn't even know where the buffer layer was, and she told you that this was a non-single crystalline buffer layer that included aluminum nitride, indium gallium nitride and gallium nitride.

Now, think for a second. Single crystalline with three completely different compounds. That is how nuts that opinion is. She says, "It's a single crystalline buffer layer but it's three different compounds." You cannot have three different compounds and have it be one crystal. They have different structures. They are different things. They are atomically different. This is the craziness that we have been dealing with in this case.

Let's talk about what they did with Dr. Redwing is the same thing they've done before. Let's kind of remind you about what they did before.

(Videotape played as follows:

"We didn't analyze the gallium nitride layer in the device?"

"No."

"You focused instead on an aluminum nitride layer?"

"Yes."

"Exclusively?"

"Yes."

"Because that's what your client told you to do?"

"Yes.")

MR. SHORE: Same client, they're directing Dr. Redwing to do things not to show whether or not the buffer layer is single crystalline but to try to design tests to make sure they don't show it's non-single crystalline.

Related to infringement and willfulness. Somebody does not willfully do tests in the wrong place who doesn't know -- if they believe they didn't infringe, they wouldn't have tried to trick Cree, and they certainly would not have tried to trick us by using the wrong kinds of tests, and we're going to try to talk about that some more, but the other amazing thing is if they didn't think they infringed, why did they actually have the CEO of Epistar and the CEO of Everlight sign an agreement to make sure that Everlight's name was never disclosed to Cree? Why did they not tell Cree that these were Epistar chips?

I mean, they claim, hey, we didn't infringe, it was so clear and obvious, et cetera. Well, if that's true, how come they went to great lengths to hide the source of those chips all the way to the point of the CEOs of the companies signing an agreement to make sure that Cree would never find out where those chips came from.

All right. Let's go to this is a question that one of you folks asked, and I think it's great, the testing that Dr. Redwing conducted or chose to conduct is on the wrong scale.

Let's take a look at this. This little -- this is a nano-beam diffraction, and if you take a look down, and I believe that's DTX 135, the little circle, if you look on the picture, the little circle is right in the middle of the

crystal, and if you look at all of those nano-beam diffractions where they have the little circles where they show you where they took them, they took them right in the middle of a crystal.

These crystals are anywhere from 15 to 50 nanometers wide, so if you take a 5 nanometer view, you are not going to see more than one crystal, and they knew that. How do we know they knew that, because we have multi-crystal structures on a different picture with a scale that shows 50 nanometers. It's obvious that they're bigger. They can look at them and see them. Here it is. Here's the 50 nanometer scale down on the right. Look at the crystals. Let's take the 5 nanometer, and let's move that 5 nanometer into the crystals that are on this picture.

They did this on purpose. They chose this test on purpose. This is a test not designed to reveal the truth. It was a test intentionally designed to mislead. That is what this was, and then every bit of that is a gallium nitride, and look down at the lower left. You have aluminum, you have sapphire, and you have gallium, and she tried to tell you, oh, well, there's some other color. Do you see any other legend down there for any other color? Of course not.

Reason Number 3, and I like this one, 99 out of 100 microscopists recommend. You know, David Smith came in and he said, look, this guy is recognized as probably the most

preeminent microscopist in the world. He has the Titan 3, whatever. Why did he not use the Titan 3? Because the Titan 3 does exactly what you don't need to do. He used the tool best suited for the job, the tool that will show the width of a nice wide view of the buffer layer so that you can see the varying contrasts across a large section of the buffer layer so that you can see the multiple crystals, and to give you an idea, they are little 10 micron views that they were using.

Let's say this is a 10 micron jury box. If you lined up the amount of jury boxes that are in one of these devices end to end, you would have a line of jury boxes to Cleveland, Ohio, so now what we have is they are saying based upon this jury box and only this jury box, we want you to conclude that this structure that goes all the way to Cleveland, Ohio is single crystalline.

So what instead does Dr. Smith do? He shows you a section of the jury boxes that's spread basically from here to New York City, an area that you can actually see the different crystalline structures and the different shading and the different color, the preeminent expert in the world. He used the right tool. He used the tool that fits the job.

And, amazingly, Dr. Wang, they brought Dr. Wang in here, their microscopist. Do you remember what happened when we went up to him, laid an exhibit in front of him and tried to ask him whether that showed a polycrystalline material? They

went nuts. They jumped up and down, No, no, don't let our microscopist -- I can't even say the word -- don't let our guy, don't let him say anything, don't let him say anything, it's beyond his report, it's beyond his report, so the person who actually did the testing.

And in their opening statement Mr. Vasquez told you that Mr. Wang was going to tell you that those parts didn't infringe, and then he wouldn't let him answer the question. Why would you not let the guy answer the question? Because he would not have said what he wanted them to say.

Reason Number 2, truth or consequences. This was telling to me. This goes to willfulness. These defenses are nonsense, but when she was asked, Ming Kuo was asked, "Why didn't you take a license from Cree in 2010," did she say because we don't infringe? No, she didn't say that. Did she say because the patent is invalid? No, she didn't say that, and this is questioning from their lawyers. The only reason she gave for not taking a license with Cree in 2010 was that Cree wanted too much money they wanted 6 percent and an upfront fee. That's the only reason.

Now, do you think that if they thought the patent was invalid, they would have told Cree, hey, we're not taking a license, it's invalid? They didn't even bother to tell Cree in 2010 that they didn't infringe. They did not even bother to say that they didn't infringe. None of these enablement

defenses that they brought up in this trial, none were presented in the Bridgelux, in the presentation --

THE COURT: You should take down the slide.

MR. SHORE: Absolutely. None, they weren't presented in the proposal to Cree on behalf of Everlight, none, nothing.

Can we go to the next slide, your Honor?

THE COURT: I haven't seen the next slide.

MR. SHORE: Epistar and Everlight worked together to intentionally mislead Cree into believing the buffers were aluminum nitride intentionally presenting misleading testing. The Epistar president and CEO signed a contract that prevented Epistar's name from being disclosed to Cree or known to Cree. They litigated for three years but did not produce their expert's reverse engineering that proved their infringement until October 27th, 2015, in which they dumped mountains of data on us a week before trial.

They produced no internal reverse engineering. Think about that, not a single internal TEM image, not a single internal diffraction pattern. He testified under oath, Of course, we made production parts, we test our production parts, and we test TEM images, and we test them with whatever else they tested with. Never produced any of that, none, zero in this case.

Now, the reason Number 1 why Boston University should prevail, good guys do finish first sometimes. We have been

misled, lied to, we have been run through the gauntlet in this case. If they really believe they didn't infringe, if they really believed this patent was invalid, why on opening statements did they get up and tell Dr. Moustakas that his life work was useless, a white elephant and nobody would want it?

Why take that extra step of outright maliciousness? Why? The reason why, ladies and gentlemen, is they want you to hopefully avoid a finding of willfulness because if you don't find willfulness, then they avoid some bad consequences, so what they want to do, even though we all know they infringed, and we all know that's going to be the finding in this case, I hope, what they're trying to do by denigrating Dr. Moustakas and putting up these defenses that maybe you'll find that they had some sort of good faith belief that they didn't infringe the patent. That's what this whole case is about.

We were here for two weeks, three weeks almost, not because they don't infringe. It has nothing do with it. All these defenses of invalidity and non-infringement were for one reason and one reason only, to avoid a finding of willfulness. That's it. Don't let them get away with it. They infringed. They've known it. They hid it. They've taken active steps to hide it.

This patent is absolutely 100 percent enabled, and as far as clear and convincing evidence goes, the only evidence they have is Dr. Fitzgerald; in the face of Dr. Piner,

Dr. Moustakas, the lab records, the students in the lab, all the people who licensed it, all the people who have used it.

Go back there, and I'm going to get a couple minutes to talk to you later, about 15 minutes to talk to you after they talk, go back there and every time you hear from the defendants, ask yourself when he tells you this is a fact, ask yourself: Why didn't you bring the evidence that you could have brought me to prove it if it's true? Why didn't you bring the people from Bridgelux? Why didn't you bring me the reverse engineering? Why did you play such games with discovery? Why did you play such games with the reverse engineering? Why did you get the reverse engineering on October 27th?

I hope that you will look at them and make them prove to you that this was nothing more than an exercise in avoiding willfulness.

THE COURT: All right. Do you want to stand and stretch for a minute?

CLOSING ARGUMENT

MR. VASQUEZ: Okay. First I want to thank you. This has been a long trial for you, long trial for us. It's really important that we have the jury system in the United States. In Taiwan, the Judges decide the case, these cases on patents actually go before Judges. I don't know if that's good news for you because I don't know whether you've enjoyed it.

Some of you asked some great questions, the Judge

asked great questions, so we've had a little different trial than I'm used to. Usually questions are asked through the witnesses, you listen, if you're confused, we don't know it, and so that is very useful trying to get some insight into maybe where we were getting ahead of you.

Obviously, the lawyers, the lead lawyers, aren't scientists. It took us a long time to learn this science, and we're going to -- I'm going to try and show it to you a little bit here.

So in addition to thanking you for your service, my clients want to thank you. So before I begin, I want you to get the right frame of mind. We're the defendants in the case. We didn't get to speak first, and so in order to do that, what I'd like you to do is to do this exercise real quickly.

Imagine that your family was left with a home on the Cape, and this was a place where you had gone as a kid. Your grandparents paid for it and built the home, and you had fond memories of it, and then you inherit it, and you rent it out when you were not using it. You put the money away for your college savings for your kids, and one day, you get a phone call from your spouse, and your spouse tells you, hey, I just got this crazy letter. It says that our property is not built on our own land and that we've been trespassing all these years, and it claims we owe them a million dollars.

Imagine how you'd feel if that happened, and then

imagine if you did the responsible thing that you'd probably do, which is you'd go check your deed, you'd go talk to your real estate agent, and if you had any doubts, you'd go to the county assessor's office, and you'd say, Here's my deed, is my property built on the right thing? I might be in trouble, and the assessor will probably tell you, I can give you the short answer, but the long answer is you'd have to probably get a private surveyor who will survey your property, and that can be your proof.

So you'd pay the money and you'd get the surveyor, and you come back and you calm down, talk to your real estate agent, and you write a letter back, and you write a letter back to the person demanding the million dollars, and you say we don't -- we're not trespassing on your property, here's the proof, and they go away for five years, and you never hear from them again.

Then you get a second call five years later from your spouse and your spouse says, Oh, my God, a federal marshal just showed up on our doorstep, and he handed us a lawsuit, and it says we owe him $3 million.

That's the position that my clients are in this lawsuit. The difference is most of them, their native language is chinese. They had to come halfway around the world, and they've had to engage in what you've heard around the fringe of this case is a very expensive and time-consuming lawsuit.

Not only that, they've had to put up with the nonsense put forth by counsel for the plaintiff that they're lying over a business case where the issue is not about money, the issue is whether or not Dr. Moustakas' patent is valid, and, secondly, whether or not the M.I.T. professor and the Fulbright Scholar, who signed on for the defense, are misleading you. That's what you just heard.

You've heard that those people who have high stature in their scientific community are misleading you because if you believe the plaintiff's evidence, then you believe that you only have to do one test. All you have to do is the eyeball test. You don't have to do any corroborating science, and you don't have to rely on the textbooks which say the opposite of what the lead lawyer is saying, so that's what this case is about.

I'm going to address this case in three portions, but before that I'm going to remind you -- if you go to slide Number 604. I liked seeing this every day when I walk into court. I've never been in this courthouse before until this case, and it says, "No instrument has been devised for arriving at the truth than to give a person in jeopardy of serious loss notice of the case against him and the opportunity to meet it." That's by, who the lawyers all know to be, Felix Frankfurter, a very esteemed Judge, and he said that more than 65 years ago.

One other is 620, if we could show you that. I like

this one every day when I saw it. It says, "We live in a community, and each is not an atom -- " I thought that was a little bit of a pun on our case "-- of self-interest, what each one of us does has an impact on the rest of us, and, therefore, the need for a thoughtful judgment, and a wise counsel is always paramount."

So I find distaste in trying to rile you up to be angry at somebody in this case. You don't need to be angry at anybody in this case. You have to use your thoughtful judgment. If you use your thoughtful judgment and you concentrate on the evidence and you remember the No. 1 rule for this trial, the statements of attorneys are not evidence. If you get that one right, you're going to get this case right.

So let's go to Slide 603, and this is the theme of the talk I'm going to give you. I've tried to talk to my wife and daughter about this case because they're not lawyers, and they're smart people, but they're not scientists either, and every time I talked to them about it, it gets too complicated, right. You spin off into the business aspects, you spin off into the patent law, which is complex for anybody that doesn't know it, and it's complex for those of us who do know it.

So what this case is really all about in three parts is overclaiming, right, in every sense of the word. Okay. So I'm going to talk about three aspects of overclaiming. They all relate to the three big issues in this case, so Item

Number 1 is the technical claims in Claim 19 are a classic case of overclaiming, and the consequence to that under the validity rules that I told you in the opening statement, "Every defendant has the right to challenge in the case," it demonstrates a classic case of overclaiming, and why is that?

Well, as you're going to see, you know this case is all about his claim, Dr. Moustakas' claim, for "non-single crystalline," and those words were claimed late, which is allowed in patent law.

You bring your application in, and it's called the "specification," and then for the succeeding period of time, even as far as what he did, six years later, you have the right to walk back in and say, oh, here's another version of my original specification. The original specification is the invention, and the claims are the claimed aspects of the invention, so you can do this late claiming, but there is a rule because you could see there's a possibility of abuse.

The possibility for abuse if you keep coming back is that you expand your invention beyond what the law allows, and what the law says is you can't expand the claim beyond the scope of the specification, okay.

So six years later anybody that's a little bit wise says maybe this is an overclaiming situation, so you apply the rules, and we're going to get into the rules and they're called "written description" and "enablement," and if you can't pass

those two rules, it's the law's way of saying you're overclaiming, so we're going to talk about that first, but, second, I just want to set up part 2 is infringement.

So, Boston University's counsel has overclaimed the infringement evidence. The experts, Dr. Piner and Dr. Smith, have overclaimed the infringement evidence, and both of them, I was very sad to see, overclaimed the science.

They said things that were flat out not the science, and you're going to have to decide whether what I just said is true, but it's not going to be very hard because either the M.I.T. professor and the Fulbright Scholar are trying to mislead you or the expert, who's been a professor for a few years at a Texas State San Marcos, he's trying to mislead you. There is no other way to decide this case. Somebody is trying to mislead you in the scientific community that you've heard.

Okay. Now, let's go next to damages. So the point there is he spent most of his time on damages. That's because he doesn't want to talk about this evidentiary problem he has. I'm going to talk to you about it. I'm going to cite the facts, I'm going to ask you to write in your notebooks when I cite evidence because that's what counts.

All this nonsense about objections, that doesn't count. The whole point of an objection is if the Judge says "sustained," you're supposed to ignore that part. You're not supposed to guess what it might have been. Dr. Nakamura didn't

come in here to testify. There's no evidence that Dr. Nakamura even knows the inventor, let alone that he credits him with the Nobel Prize, which is the implication that you're getting.

Let's go to the next page, please. So, we start with the Court's claim construction, which you've seen repeatedly, but the point here is this is what the Court says Dr. Moustakas claimed in 1997 in his attempt to extend the specification, and the legal issue for you to decide is did he overclaim or did he claim something within the specification?

So, you have to look at what happened slightly before to be able to separate out from counsel's loose talk about what he claimed. You just heard loose talk in the plaintiff's closing statement about the buffer layer. He didn't patent the buffer layer. He is not the inventor of the buffer layer. He's the inventor of a narrower claim.

Don't believe me. Look at the government record. It's the claims examiner, and he told him, and Dr. Moustakas agreed, reject it on the buffer layer. Why? Go to the next page. You can see the rejection on the next page, and then if you go to the next page, 678, you see the actual excerpts of what the examiner said.

When he said he rejects the claim because it's obvious over Amano, that's one of the Nobel Prize winners. When he says it's obvious over Boulou, that's another person from 1977 or Carter. Those inventors were first.

And let me say something about Dr. Moustakas. He appears to be a nice gentleman, he appears to be an accomplished man, he appears to be someone who is able to satisfy the requirements to be a professor at BU and become a professor emeritus. Nobody is knocking that.

It's one thing to be a teacher, a learned science person, it's one thing to be a good researcher, but to get a patent, you've got to be first, and if you're not first, then you're not the inventor of the buffer layer, and that's what's being said here by the patent office.

He thought he was the inventor of the buffer layer, otherwise he wouldn't have in good faith asked for this patent, so I believe he thought he was first, but here you have guys in Asia who beat him to the punch, okay.

Maybe he didn't know it then, but he knew it thereafter, and if he ever said he was the inventor of the buffer layer thereafter, then he was having selective memory, which people do sometimes when they don't get a goal they want to attain, so his life's work was rejected by the patent office on the buffer layer. His life's work was rewarded at the patent office on the non-single crystalline buffer layer. He got the reward for the '738. I congratulate him for getting the '738.

The question before this Court is, is the '738 a valid patent? Do the defendants use it? Does anyone use it? And if

no one uses it and if the defendants don't use it and if other people told him it's not worth that much, then to put it in proper proportion, it was one of those white elephant inventions.

So, white elephant could be an interesting invention that has scientific merit, it has research merit, but it was not adopted by industry, therefore, it didn't sell well, therefore, figuratively speaking, it ends up in the bargain bin or in the warehouse as something that did not sell, and that's the defendant's position.

It's nothing like the defendant's don't like Dr. Moustakas or they're putting him down. To the extent that Dr. Moustakas thinks that he invented the ability to have LEDS around the world and it's because he invented the buffer layer. He's clearly wrong. That's what the PTO said.

So now let's go to the next thing he didn't invent because the PTO told him although you think you invented it, you didn't, others were first. That's on page 679. That's the defective buffer layer, so he's trying to suggest that he invented a class of buffer layers that were the defective buffer layer, and you've heard a lot of testimony that you saw evidence from both sides that there were defects in what the defendants contend was single crystalline material. If.

You find that there were a lot of defects in the defendant's single crystalline material, this is what the

defendants are practicing. The defective buffer layer patent, which they wouldn't give him because you can see on the next page it's rejected, because it wasn't first, which means he didn't invent it, which means that the second thing that his '738 invention is not is a defective buffer layer, right, so now we're down to the nub of it, the question you heard all the testimony about, which is the non-single crystalline buffer layer, and that's 682.

That's what the patent office gave him credit for. The patent office makes mistakes, as the video said. Every defendant gets to challenge the validity. We've done so, and so let's go to the test for that that you're going to see in jury instructions. That's at 606.

So the Judge is going to give you this test. You're going to read about it. You've heard each expert recite it, and I've summarized it here on the left.

The enablement test is that it must be enabled. Both experts agree that because 1991 is when he filed the specification, that's the time of judgment, okay, and the test is was it sufficiently full and clear to teach a person skilled in the art.

Both experts agree that the person skilled in the art is a master's degree in material science with two years of experience, so the question is if we bring that person in, and Dr. Fitzgerald testified that was him in around 1990, if you

bring that person in, can he tell because Dr. Moustakas taught the lesson in this patent specification how to make and use the full scope of the claimed device? Okay. So the full scope, as you know, from the Court's instruction, three things:

Turn to the next page. A non-single crystalline buffer layer, according to the Court, is all three of these, which means the full scope is all three, which is why you heard all this testimony and controversy by the experts about whether Dr. Moustakas in 1991 in the specification taught a person skilled in the art the master's degree guy with two years of experience how to make a single crystalline growth layer on top of an unstructured amorphous buffer.

That was the question, and that's the question presented, and the key thing in the instruction is without undue experimentation, so undue experimentation would be a situation where the person skilled in the art, what the lawyers call the PHOSITA, that's just the abbreviation, would that person have to work at it real hard because you didn't explain it very clearly or because you didn't explain it at all or because someone with your skills wouldn't have the resources already built into his education and experience that he could figure it out without undue experimentation.

Okay. So this PHOSITA, this person skilled in the art, would have a relatively low level of skill compared to, for instance, the experts in this case, right, it's just two

years experience, no Ph.D.

Now, epitaxy was denigrated in the closing statement of the plaintiff as not being involved in the patent, but you saw in the cross-examination of Dr. Piner that it's every bit involved. Take a look at the patent yourself.

What's the question we're talking about here? It's a device patent, no question, but the question on enablement is how do you make a device, right? So you have to teach somebody how to make a device, so he has to teach him how to make it through the process described in the patent, which is epitaxy, epitaxially. That's this deposition of chemicals on top of the substrate.

So, if he says, oh, somebody could have figured that out by not using an MBE or MOCVD, doing something that wasn't talked about in this courtroom, that's not good enough. It has to be done so that the person reading it could figure it out. Why would they go away from epitaxy? Why would that person think I'll try something else.

Okay. So if we look at the patent, there's this concept of teaching away. If what Dr. Moustakas taught that person skilled in the art through the specification with something that would never result in the ability to grow a high-growth single crystalline growth layer on an amorphous buffer layer, if the teaching didn't point that way, then it's called teaching away, and it literally means the patent

suggests go left, and if you go left, you never get to the answer.

That's what happens here because he discusses the high temperature growth step, and in this case, the highest temperature growth step is stated to crystallize the amorphous, and if you remember the amorphous lecture, amorphous materials and structured atoms, high heat takes amorphous material, crystallizes it.

Once you've done what he told the person skilled in the art to do in the specification, it becomes crystallized, and, therefore, he's teaching away from using the amorphous buffer to grow single crystalline on top. That's the point here.

Go to the next page. So this is to remind you that the atom structure of amorphous would look like the bottom, that epitaxy requires the template. The whole lesson of why do you use a sapphire substrate? Sapphire is a gemstone. That's what you and I thought crystal was before we heard about epitaxy, right. It's a gemstone, so he used a gemstone with perfect order on the bottom. It becomes a template. This is what all the experts testified to, and then you grow these layers on top of it, right, how can you do that if you substituted a gemstone for a blob without any structure. You can't do it.

Next page. So, applying the enablement test with

undue experimentation, you wouldn't be able to heat the amorphous buffer layer, crystallize it and then achieve the completed device on an amorphous buffer layer, and the completed device is critical. The fact that he talks about starting in an amorphous condition isn't the issue, it's the device patent, and so if the device at the end, the stack of chips sitting on the table that he's going to put in the box and sell, if those devices don't have an amorphous buffer layer, then it's not done with his teaching.

Let's go to the next page. And you heard testimony from Dr. Fitzgerald about that. There was testimony by Dr. Moustakas in the first sequence, and he says, "I've done it, your Honor, and published it," and Fitzgerald was crossed, and he said, "I don't agree."

Next page. And the critical part is this doesn't take scientific understanding, this takes application of the statute, application of the rules that both sides have to apply.

If a person skilled in the art couldn't do it in '91 by looking at spec, then it couldn't be done, and the enablement test has been failed, and the patent is invalid, and this establishes that when he said I did it, your Honor, it's in a paper. That paper occurred in 1998, seven years after the fact.

If a person skilled in the art with the limited range

of experience and education that is agreed upon by both experts would have to experiment for seven years before he figured out how to do it, that's undue experimentation.

Next page. Okay. Second invalidity argument is very straightforward. This is the overclaiming lesson 1 that I expressed. If the '738 patent doesn't describe the claimed invention with all the claimed limitations, then it's going to be invalid for lack of written description.

This is the key. There's no non-single crystalline description in the specification, right, so the specification everybody agrees doesn't mention non-single, doesn't come up until 1997, six years later, they don't match, he's overclaimed. He's extended it, okay.

Next page. So we're now turning to the infringement proof, right, so this is -- these are the slides that the plaintiffs tried to show you showed a polycrystalline material, and these are what all the experts agreed were low resolution photographs.

They're taken from a distance, and the plaintiff didn't show you any other confirming tests. They basically eye-balled it and said, "I know I am an expert. This is characteristic of poly, that looks like poly to me."

Go to the next page. But on cross-examination, they had to admit that, well, other things can cause the shading. Their testimony was the shading or the contrast in the images

looks to me, to my eyes, like polycrystalline, but they had to admit defects can cause shading in these types of images. That is true.

Next page. Now, what the evidence showed, this is the textbook, when you have poly, you have rings. That's the confirmation test of a diffraction pattern, an electron microscope, and when you have single, you have spots. That is the science that everyone agrees exist in this industry.

Go to the next page.

So to me, Dr. Moustakas wrote about this contemporaneously. He knew this to be the truth. It is fundamentally dishonest of Boston University to come to you and suggest that the science behind the tests that were done is not accurate because he wrote about it. He said, "This is a polycrystalline image on the right, and it's rings, okay."

So we don't have -- we have a situation where counsel doesn't agree, but we don't have a situation where the inventor doesn't agree, and you have to ask yourself, it's their burden of proof to prove infringement. They're trying to prove this is non-single poly material, and they weren't able to show you a test result, which is the same as the test results that the inventor wrote proved the existence of poly, okay. That's a fundamental truth that will not go away.

Go to the next page. Second fundamental truth that will not go away, Dr. Moustakas wrote in his research papers

that the fundamental test that proves single are the spots in a TEM diffraction pattern. That's his words.

Now, one of the tests in trial is does the talk match the actions? Okay. Repeatedly, when you hear a witness say something, did their actions do something different, right? So the talk was these are unreliable. The actions were he wrote to the scientific community. Again, competent science that no one is contesting. It proves they don't have a case. They don't have rings. They admit spots, which is all the evidence, their evidence and our evidence shows that the material that's on trial, those four exemplars, are all single crystalline material.

Go to the next page. These are the plaintiff's own proof. They keep running away from this. They only want to take you back to one image. They want to take you to those cloudy images and then say the dark spots means it's poly. What are the tests that Dr. Moustakas agreed with the research community means "single"? They all prove single. None, not one prove poly.

Go to the next one. So let's talk about the TEM. So I heard talk about a world-renown microscopist. He took the stand for nine minutes, and he said he used the machine on the left. He said it was delivered to his door in 1984. 1984, that's a long time ago. That's before DNA evidence even existed, okay, so could you image, he called himself the crime

scene inspector. He'd show up and he'd tell you who did it.

DNA was invented in 1985 when the following happened: An inventor in England came to the conclusion about DNA profiling, and in the first case where a man got off for murder, because it was proved by DNA evidence that he didn't do it, two women were strangled in England, and the local was fingered for having done it by the policemen.

He went on trial, and when the trial was over, they heard the DNA evidence, and he didn't have to be put to death. That is how important it is when science comes out, and when it's able to corroborate or denigrate the existing proof, eyewitness proof, you should use it and you should rely on it.

The testimony was that the Titan 3 was state of the art. The testimony of plaintiff's expert was, yeah, that's just the one, he didn't know how to operate it, he had seen it, he understood it, he chose not to use it. Why? Because he was 100 percent sure, probably just like that policeman in England.

Okay, let's go to the next page. So, they took their pictures at 500 nanometers, and so in order to test the theory that what was eyeballed by Smith and Piner and Moustakas was poly and try and find out if it really was using the Moustakas rule that "rings" mean "poly" and "spots" mean "single."

You heard Mr. Wang took the pictures, and he worked with Joan Redwing regularly, and she analyzed this, and she's an expert in this. It's not very complicated. I'm not going

to show you a single picture, and I'm going to show you at least 30 that shows up with rings, and I'm not going to show you a cherry-picked picture, like he suggested, that we were aiming the lens at different points.

First of all, in order to believe that, you would have to believe that Joan Redwing, who has won awards, been selected by the State Department, selected by Judges to be the independent expert. That's where the Judge relies on one, and, most importantly, she's Cree's expert in other cases. That's what she testified to.

Now, put that thinking cap on for a moment. Cree was the licensing agent on this patent. Cree's the one that talked to Epistar. Cree is the one using Joan Redwing, yet we have a situation. Cree stopped being the agent in 2012. Lawyers got brought in at that time for Boston, not Cree.

Boston, all of a sudden, five years after the file was dead for Cree against Epistar picks up the file. Who did they hire? They go hire Joan Redwing's subordinate, somebody who has not accomplished in the academic field, and why is that?

Well, I think we all know what Joan Redwing would have testified to had Cree gone to their go-to scientist, Joan Redwing. She would have testified truthfully the same way she did in the courtroom today, and that would explain why Cree never brought this lawsuit.

So keep that one in your mind because when you decide

that one of these scientists is not telling the truth or misleading you about the science, it's not Joan Redwing.

So let's go to the next page. So, what they did was they went and used the real CSI evidence, the equivalent of the DNA, the stuff that got you down to the very level where you can see the atoms, and that's basically in the hunt to find poly, and they didn't find it. They found through the Moustakas test all spot patterns all the way over. They didn't cherry-pick the sample. You can see them high, low, to the left to the right, at the interface, slightly above the interface, higher than the interface.

Let me take a moment to talk about what the Judge asked Dr. Redwing and what Dr. Redwing said. Counsel did not represent that testimony accurately. If at any point you disbelieve counsel's representation of the evidence of a witness, you get to ask to go read it again, okay.

So I'm going to just tell you you need to do that when you hear a different story from one of the witnesses for the defense and one of the witnesses for the plaintiff. Go look at it. She testified that she used the Court's construction, everything from the interface. The interface is the line at the substrate.

Now, we have two types of terminology, real science and court science. Court science is you superimpose the Judge's construction on top of the science, and so what

Dr. Redwing said was I'll tell you exactly what this is. You define the buffer layer in the Court language as the substrate all the way up, and she said above the top of this picture. That's a very large area. You can see she inspected that entire area. So she said, Under your construction, the buffer layer is substrate to the first undoped or to the first doped layer, and she said that it's everything above the line to the top of the picture, and if you look at your screen, you'll see, she's not cherry-picking, she's basically telling you what the yellow circle, that that's the substrate, which tested out as single, which makes sense because you use the gemstone for the template, and at the interface level, and I call it the interface level because counsel wants to call one level the aluminum level and one level the GaN level, but the testimony was we have the ability to tell exactly what chemicals are there by the next test we're going to show you, so you can decide which level belongs to which chemical. The important part is they tested the entire sample, okay.

Next slide. Fourier diffraction. This was a tough one for me to understand. I still don't understand it completely, but what I do understand is the testimony. The testimony was that, as you see these boxes, these oblong, horizontal boxes, the Fourier would allow a computer program would take a sample and then tell you if there's long-range order across that whole section.

So, this is what I think of as a check against the possibility of the plaintiff's hypothesis. A hypothesis is an unproven theory, and that's what their science is. It's a disproven theory by the defense witnesses, Redwing and Wong, and it's disproven because not only do we have the selected spots from the previous image, but we have Fourier, which looks and attempts to look all the way across to determine what is the definitive test for single vs. non-single, long-range order, in other words, does the crystal pattern repeat all the way across? What you see when they do the Fourier, pull out the data, do the test, spots, all spots.

Next page. This is the defendants did the same thing on their own samples, and you see the same thing, right. The boxes go all across the image. They've tested the entire image with this modeling technique.

Now, go to the next page. This is the one that was not done at all by the plaintiff, and that's the high-resolution TEM image, and your Honor commented at one point in this case that the pictures on the lower resolution looked like clouds, right.

So the way I think of this image, it's going behind the clouds to determine what's really going on here, and what you can see, you can see the lattice fringes, and it doesn't look like alligator teeth, like the low-res. image. You can see the atomic structure. This is at 5 nanometers.

Go to the next page. The scanning TEM, STEM, is the one that removes, that removes the contrast, right, and the importance of that is that the contrast is apparently based on the tests that have happened, what was causing the darker images. In other words, it's disproving the notion that dark images equals poly.

Go to the next page. EDS or energy spectroscopy results. This was the last test. This will tell you, if you look at the little chart, where the aluminum is, and it kind of answers the Judge's questions if you want to go from the top to the bottom and figure out what the chemical composition is, this told you, right. I don't think that is a big issue.

All right. So you remember this picture. This appears to be important to plaintiff's arguments. Now, if you look at the two answers on the right, you'll see that both experts addressed this. I think that's why this came up so late in the case. It's Plan B for the plaintiff, and what it is is, it's an image that was taken by the defendant, and you see two different explanations, but they're both the same.

On Piner's opening testimony, he testified that there are damage that occurs to the surface region of the substrate right at the interface, which is the closest to the next layer, and he says right here, "Damage," right, he made a big deal about it in his testimony, and that was agreed to by Redwing. She said, "This is representative of the roughness of the

substrate." It is not like the animation that is not direct evidence.

The animation in my mind was an argument to try and tell you, oh, this is what it looks like. The images are what it looks like, and this particular image, if you remember what Redwing testified to, she said that's aluminum, which if you remember the chemical symbol for sapphire, it's aluminum oxide, AIO2, right.

So the aluminum, and it was tested as such with the EDS, so the EDS showed you aluminum, and it did have a symbol, contrary to counsel's suggestion, for aluminum, so you could actually see the color and you can see red imposed with blue at this lump area where the arrow is, and that shows you that that's right at the interface, and that's the aluminum coming through.

The next page. Here you see it. So a line like the one on the right was drawn by Redwing on the stand yesterday, and if you see right at the interface layer of the colors, you see this purple color, and you see the "A" down here. That means it's aluminum, right.

Go to the next page. So you have a decision to make about where is the junk science in this case? Is it coming from MIT? I asked myself, how is it possible that we're going on a case brought by BU and they didn't go across the street to MIT and try to get an opinion? Why did they have to go to

Texas State San Marcos?

I already talked to you about Dr. Piner vs. Dr. Redwing, but at the bottom, I sculpted what I think is the important language. You're going to get an instruction, and it tells you in considering expert testimony, you have to consider the soundness of each opinion, the reasons for the opinion, and the witness' motive, so the soundness is important because that's on whether they're relying on real science.

Now, I'm not going to say much about grain boundaries because they are a total red herring in this case. Why are they a red herring? Because Dr. Piner admitted that a low-angle grain boundary can occur within a crystal. Why did he admit it? Because he was confronted on cross-examination with a BU undergraduate textbook, so think about that.

The defendant's expert's explained the same concept to you, and on cross, Piner had to admit that that's true, but then he gave a long-winded explanation that didn't explain why that isn't the case in this case.

It defies logic that if a low-angle grain boundary can be inside a single crystal, that you would base your whole case on the existence of a low-angle grain boundary, let alone do something I've never seen, which is argue that in a long motion hearing a lawyer in the case made a statement trying to explain the science to the Court and trying to take that statement and say, "That gave away the case." That's a joke. It doesn't

happen in this industry.

Go to the next page, please. So, I said the soundness and the reasons for are the two things you're supposed to pay attention. I do not want you to use impulse or bias to decide this case. Don't try and figure out who's good, who's bad. That's silly. We did not try that. This is a science case. One of the reasons patent law is so fascinating is that you get to apply the legal skills in a scientific form, right, and so base your reasoning on science, and think about the following:

Who did low-resolution TEM images? Well, they all did. Who did high-resolution TEM images? Only Redwing. Who did STEM images, scanning TEM? Only the defendant. Who did select area diffraction? Only the defendant. Who did nano-beam diffraction? Only the defendant. Who did EDS mapping? Only the defendant. Who did animation?

So, I was going to tell you this at the beginning. It kind of makes more sense now. The first trial I ever did, the senior partner says be in my office at 6 a.m., we've got a new case, we've got to go to trial in two weeks. I said, Great. I read the papers. I said, Well, what do you think? What should be our angle and what should we emphasize?

He said, well, there's an old saw, it's older than me, and he was 60 at that time, and he says in every case, you have to decide what favors your case. He said, if you've got the facts, argue the facts, if you don't have the facts, argue the

law. And I said, Well, what do we do if, you know, neither position favors? He says, well, most lawyers just yell loud and wave their arms around.

Okay. So the point here is animation is a forum of confusion when it's not tied to textbooks, when it disagrees with the type of instrumentation that should have been done by the plaintiff on this case.

It wasn't done for one reason only, that when it was done, it just proved their case according to their own inventor's litmus test, and his litmus test is "rings" means "poly," and he can't prove "poly" with the "rings," and so they resorted to the animation.

Next page. Okay. So we're down to the third topic. There is no infringement case. You only get to this case, seriously, if you find infringement, but because this is a situation where we need to know everything today, you're going to be asked to fill in all the boxes, so you're going to be asked about damages, and you're going to be asked.

I've got a verdict form right here. This is a draft, but I don't think this part changed, and you're going to be asked three sets of questions, one for each defendant, right. So remember I told you that we were going to have three defendants.

It's important that you consider them separately because the legal theories are different against them and

because one of them Epistar makes the chips, and the chips are what's accused of the direct infringement by the plaintiff, and two of them buy the chips. That's Everlight and Lite-On. So conceptually you've got to look at them separately because it's a different math equation, it's a different economic equation, and it is a different proof equation, and this is where it gets kind of excessively complicated, and I apologize for the state of the law for people that don't know it and have to come in and make these tough decisions.

So what you're going to be asked for Epistar is would you give one of the two things if you find infringement, would it be a royalty rate, or would it be a one-time lump payment, right, and then I'm going to address how I think the evidence fits so you can make that decision. That is the basic damages question, so let's go.

Go back to the first slide. You heard from two experts, you heard from the Houston attorney, Mr. Ratliff, on behalf of BU, and you heard from the professor, Dr. Mangum, on behalf of the defendants, so they have different credentials, and they have different emphasis, but they both understand Rule Number 1 for their particular profession, which is the *Georgia-Pacific* factors.

So the *Georgia-Pacific* factors are just a way that in the patent law, they decided this is how damages should be figured out, so I'm giving you their conclusion opinion, and

kind of the most important thing so you can think big picture, and then we'll drill down.

So Ratliff says 4 percent reasonable royalty, and he says you should base that for Everlight and Lite-On on the entire value of the package, and what Mangum says, well, there's no 4 percent royalties in the case on the '738, and they both agree that the most thing to base this on is what's the licensing history for the '738?

Because in *Georgia-Pacific,* sometimes you have a case where it's never been licensed before, and it's more complicated for the jury. You look at outside licenses, right, so then you have the problem of comparing the technology, right, so you say, well, are they licensed in Orange for 4 percent, but they licensed in Apple for 10 percent, and I'm going to change it, and I think you should downgrade it 2 percent. Way too subjective a process.

So what *Georgia-Pacific* says is, and this is going to be in your jury instruction, the license history on a patent is the Number 1 factor, and so the good part about this case is you can screen out all the stuff that doesn't matter. You have a licensing history, and what's the licensing history? BU gave a license to Cree, and for this one, the experts don't disagree. They say the license between Cree and BU is the license, so screen out all the other licenses. They call that the benchmark license in both of their reports.

What did the evidence show? It showed that for about a year, BU took a minimum royalty rate from Cree and then Cree and BU decided to change it. They gave them more cash, which exceeded the minimum royalty, and then they got a lower rate, but they got more cash, and then they gave them sublicense rights.

Sublicense rights are the crucial comparable in this case because the sublicense rights were the rights of Cree to go out and make deals with all of the competitors of the defendants, okay.

So you heard about the Nichia license was used pursuant to the sublicense rights, you heard about Philips, the Dutch company, you heard about Osram, the German company, so Philips and Osram were around selling incandescent lighting, and they dominated the world market for lighting, and then when LED came in, they dominated that.

They have tons of patents, right, so those two companies were allowed to get a sublicense for $275,000, and they were allowed to get that from BU, and that is the most significant activity that occurred because it's the exact same patent. It's parties in the same field. They are much larger, undisputed, than the defendants, and it is undisputed that BU thought that the fair value for those two giants to get licenses for the '738 and perhaps as many times as they wanted, wherever they wanted, no restrictions and never be sued, full

practice rights, 275,000.

Now, that's the most comparable circumstance in this case, okay, and we'll get to the idea of why.

So let's go to the next page. So here's the slide that you saw about the hypothetical negotiating table, so counsel told you that 2000 was the date, so we don't look at 2015 when a couple of BU witnesses on videotape and Mr. Pratt said, oh, the technology is worth more now today. Well, that's not the standard, and they admit that. The standard is back in 2000, and the contemporaneous events around that, right, so the real question is what do you think the evidence shows BU would have accepted at the hypothetical negotiation table, right?

So let's go to the next page. Next. So you just heard Mangum. You probably remember, he told you, Look, we've got licenses for the '738, so we don't go to the extraneous licenses because we don't have to argue about whether or not Philips red LED technology is comparable to the GaN technology. That's the whole point of *Georgia-Pacific,* and we look at Bu.'s licensing policy, so that's what was important, so we look inside the next page.

So this is Vinit, Vinit Nijhawan was the boss of Pratt, and he was the guy who testified here, and he's being shown e-mails, internal e-mails. These are the things that BU objected to. These are the things that are in evidence. These are the things that show what they were thinking at the time,

so they're very important, and what they heard was the same thing you heard from Garceran. Cree's general counsel came in. The IP counsel came in. He was the guy running the licensing program, and he said in letters to BU, yeah, in answer to your question, BU, about whether we tried to get more money from Philips, we did, but they don't think they need a license.

Next page. And Bu.'s pointing out, you've got an obligation to try and get more money.

Next page. So BU was asked, "Do you think Cree was maybe sandbagging it? Do you think they were telling a white lie? Do you think they were not telling you the truth?" And he says, "No, I believed him."

Next page. Now, this one is really interesting because it involves Dr. Moustakas, and so what did Dr. Moustakas think his patents were worth?

So what happened is the university agreed that the two, that the blank -- I called it the blank check. "Blanket" is the word I should have used because the word "blanket" appears in these e-mails.

So, a blanket sublicense is kind of like a blank check in that they didn't know in advance who Cree was going to give those licenses to, which means that they ran the risk that those licenses went to the biggest competitors who if they infringed would potentially yield the biggest damages, right.

So, here's Dr. Moustakas criticizing his own

university for agreeing to the deal with Cree, which the university states they think is fair, and he says the latest agreement to offer them the sublicenses for 275 is by far the biggest mistake.

Now, Cree literally had the ability to give Epistar this license and pay zero more dollars. That's what BU gave them when they gave them blanket licenses. They gave one to Philips. They got the blanket rights. They gave one to Osram. They didn't give one to Epistar. They didn't give one to anybody else. Maybe nobody else would pay Cree. I don't know.

Next page. So there's two types of royalties on this damage sheet. It says one type is a lump sum and one is a running royalty. So you pick. If you pick the lump sum because the evidence shows that BU would have agreed at the negotiation table to a lump sum, then you don't have to engage in the math games, and I think that's definitely the best case unless you have a clear view of the base and the royalty, which are contested items.

Let's go to the next page. So here's what the two experts agreed to. The hypothetical negotiation date was 2000. The BU/Cree license was the license, lump sum is acceptable, and the relevant comparable licensing topics include sublicensing.

Go to the next page. Continue, please. Yeah, so what this shows, if you look at the deal, you don't have to look any

farther than that 2000 amendment, BU would have accepted a 1 percent running royalty or they would have accepted a $500,000 lump sum royalty or a combo. And what you see if you look further than the evidence, they never got the $500,000 lump sum royalty, so they had a choice.

If they demanded 500 from the market and told Cree we want to hold you to this 500 deal, they might have gotten zero because the market didn't accept the value they chose, but instead BU wanted the money, whatever they could get for the patent. What they could get instead of 500 was 275 for three blanket licenses.

Next. We know that, we know that when they went into this, they thought about it. And how do we know? Because Pratt, Pratt testified that he wrote this 13 years ago. He wrote an internal memo, and he agreed he wrote it. He agreed he thought this at the time, and his boss who testified said I agree that that's the value on behalf of BU, and it says .05 to 1 and a half percent. That's 1 percent.

That's why Mangum's opinion is based on a simple admission by Bu.'s head of licensing and repeated by their only witness from the licensing department in this courtroom.

Next. So on the amendment, why did they go down in price? Well, we know why they went down. The testimony showed that they couldn't get an uptake, which means there was no market for this license, and so they lowered the amount, right.

They lowered it to 50 percent of 1 percent or 50 percent of a half percent, and what this says, if you read it carefully, it says for sales of a sublicensee, BU gets 50 percent of the below rates.

Go to the next page. So what's the licensing history of BU on this patent, which is what's relevant. 97 percent of the dollars received by BU on this patent came from lump sum payments. That's what Mangum testified to.

Next page. And here's the licensing history in a timeline. I found this device useful because you don't have to remember all the details, you just go right down, you go to the left, you see what the first license was. The only person that paid $1 million was Nichia, and we know why -- well, strike that.

The only license for which they received $1 million was when Cree gave them 1 million. Remember the deal. It's a stark contrast to what plaintiff's counsel told you in the opening when he told you in the opening he was going to prove that the world beat at path to Dr. Moustakas' door to get access to the '738. That's just not true.

The world didn't care about the '738, didn't know about the '738. When they heard about the '738, they said we don't need it, and when they were asked to pay for it, they didn't want to pay much for it at all relative to what counsel is suggesting, and so Greek -- BU knew in advance. In the

original deal, you heard them testify, Cree and BU, Nichia was picking on Cree. They were the big incumbent Number 1 company. Cree was the smaller upcoming company. They were in the battle for their life. They came to BU, they said can we get access to your patent because we did a patent search, and it looks like it might be relevant.

$350,000 was what BU agreed in advance would be their cut of the license if the license of the '738 was put on top of all the Cree licenses and traded to Nichia to try and get Cree out of that lawsuit. $350,000 was what they thought, that's the first time they thought the patent was worth anything, and they were going to give it away for $350,000 to the biggest competitor in the industry. That's the biggest one. That's the biggest deal that we have.

The next one that we have is 61,000. That was from AXT, a U.S. company. Then we have deals that were not comparable because they were super small, CompUSA, Kodak, Super Bright LEDS, 1300, $250 for Kodak. You're going to award a royalty based on that. It's clear those were signed in order to avoid litigation.

Then Bridgelux would be $250,000, then Philips and Osram were paid for by Cree under the 275. That's it until you get to what Mr. Redi testified about on the penalty. It's the last clip before the last clip, and Redi's a guy from a company called RPX, and RPX is trying to basically squash litigation

costs by going after patentholders and paying them money at the front end of the case on behalf of a large group of people, and so the testimony is that Samsung paid a bunch of money.

They called RPX on the phone, and they said, look, we're in the middle of this case with Apple computer, and it's costing us a fortune, and what can you do to that get us out of this case? They put together a pool of people that were willing to get out of the case, and then he threw money at them to get out 23 defendants, including Apple and big name companies, and get licenses for 100 plus more members, so you have to take in context what happened.

The license was given to close to 150 people, and the $13.5 million truly should be considered to be no more than $100,000 per head for the people that got rights to that patent, and it was in a litigation context where you saw, not lawyers talk about it, you saw the guy who clearly had contemporary lawyers saying I don't want to waste a bunch of lawyer fees, I didn't even look at the patent.

I put up a number knowing that these corporations, all 150 people that I'm going to save are going to be happy to participate in this split deal so they don't have to pay lawyers for a couple years to defend against the patent. He said we didn't even consider the validity.

Now, next page. Now I want to go through the final part, which are the adjustments to the license, chip revenue

vs. package revenue. This only comes up if you decide to ignore 97 percent of the deals for lump sum. If you do lump sum, you don't have to get involved in the math. There's a dispute on royalty, there's a dispute on base.

Next one. Mangum used the chip revenue. These chips that are allegedly infringing sell for a penny to Everlight and Lite-On. Ratliff tried to say, oh, the entire value of the package that the chip buyers are using, that's the base.

Next page. Ewing Liu showed you the chip is the blue item in the middle. It's valuable, no question. Dr. Lebby, plaintiff's witness, said on cross-examination yeah, I agree, it's probably worth about one-sixth of the bill of materials, and that's what Ewing Liu told you that on average, it's the minority of the cost, and he told you all the engineering that goes into this and why it sold for substantially more.

It is fundamentally unfair, and the instructions will tell you you cannot award the royalty base based on the value of the package when they haven't proven that everything is worthless and that only the chip has value.

Next. The question was asked by the economist is there any evidence that the '738 drives customer demand. Well, there wasn't any in this trial. They didn't bring a single customer who buys packaging to say we don't care about the packaging, we only care about the chip.

You heard the opposite from the sales people, you

heard the opposite from Sander Su, you heard the opposite from Ewing Liu. You heard Ewing explain people don't ask us about the chip very often. They certainly don't ask us about the buffer layer or the non-single buffer layer.

Next. This is fundamental rule. It's not enough to do what plaintiff tried to do in opening. It's not enough to show that the patented feature is valuable so the chip is valuable, it doesn't matter. If it's important, it doesn't matter. If it's essential to the use of the LED package, it doesn't matter, and it's not enough to show that an LED package wouldn't work without the chip. That's their argument, which is legally insufficient.

Next. So a little bit about Cree. Cree sold chips that they believed were non-infringing. They were called silicon carbide substrate chips. Bernd Kammerer said that's what they buy.

Next. Cree said those are a substitute for the devices that are the Epistar chips.

Next. The consequence of that is if you can buy a silicon carbide chip for a package, then the '738 did not enable the package. You can have a non-infringing chip which makes the package work, and that's proof that you can't use the entire value. So the base issue is real simple.

Counsel flashed all these big numbers of what he claimed the base is, and these numbers are computed based on

the value of the package. He's multiplying times a nickel, which is an untruth to the extent of 500 percent. It is untrue that the royalty base is beyond the chip of a penny, so this number has been multiplied by five. If you apportion it, it's less than five, clearly.

Next. So but the royalty once you reduce the base, if you don't believe anything the witnesses said about the base and you think the entire market value has been satisfied and nobody buys the packaging, the package, they only buy it for the chip, despite that evidence, it's $103,000 final verdict on running royalty. If you do believe it should be limited to a chip, it's $16,600 for Lite-On.

Next. Everlight adjustments. Again, there's two basic adjustments. There's the red chip issue, which is only for Everlight, and there's the package issue, which I just explained to you.

Go to the next page. Dr. Mangum explained if you don't cheat and you don't use the entire value of the package, the revenue isn't 142 million, like Ratliff says, it's 39, and if you remove the red chips, which Ewing Liu testified about, which fundamentally do not satisfy the requirement that you have to infringe by using a gallium nitride chip. It says gallium nitride chip, it does not say an AlAnGaP chip. If it an AlAnGaP, it was aluminum, indium, gallium and phosphide. It's a different material, and so there would be a fundamental

injustice if this jury listened to Mr. Shore and did not take into account that there are red chips that don't infringe the patent in the royalty base.

Next page. So what royalty should there be? Well, the best way to Everlight is pretty simple, and it's the same you should do with all of them. Lump sum means no accounting, no royalty, no accounting of any kind. Once the licensing history on this patent, the most that BU ever asked for in a lump sum.

This$20 million thing, it makes me want to go home and quit the law. It's fantastical, okay. It's not in your instructions. Talk about late notice. The first time that figure ever came up was during my notes from my opening, right, and he said you can ignore the law, you can ignore the experts.

Well, why would you do that? You're in a court of law. This is a solemn duty to use the evidence. You're going to get instructions that tell you to do that. It's outrageous. I would have objected but for the tradition that your Honor told you about, and I think it's a good tradition. It allows you to finally hear, no arguing in the room, hear one guy, judge on its merits, right, so I didn't object, but it is my chance to call him out on it, and he's being called out big time.

500,000 is the most BU ever asked for, right. That's the maximum number you can award as a lump sum based on the

evidence. If you go to a royalty and you don't cheat by using the package revenue, which they haven't proven the entire market value, and if you do the apportionment appropriately and if you agree with Dr. Mangum, it's $128,000.

Next. Epistar. Epistar is a little different. They're the chip maker, and they have special attention needs to be to the three critical requirements that were not proven by the plaintiff, okay. So these get slightly technical. So there's a basic rule that says -- it's called Section 287 of the patent law.

It says, In order to collect damages before you sue somebody, so if you want to collect for the period before you sue them, you've got to prove that they marked the chips. That's why they call it the marking statute.

It's undisputed that BU knew they had a marking requirement, failed the marketing requirement, delegated the marketing requirement to Cree, Cree failed it, and BU didn't police it, right, so basically everybody on their side of the table laid down and did the market.

What's the consequence? The consequence is the world didn't see Cree chips saying patent pending, '738, right, so you don't get the protection, you don't get to sue people for presuit damages.

There's one back door to that rule, and that back door is that the plaintiff can prove that they sent a specific

letter to the defendant identifying the specific parts accused of infringement, in that case and in that case only do they satisfy the requirement to recoup presuit damages.

Okay. So, what's the evidence in this case? Undisputed that Epistar did not get such a letter. Undisputed, okay. The onus is on the party going through the back door, the one that violated the market requirement. That's BU, which BU agrees they had the requirement, no dispute about that, so they have the onus to show.

They sent a letter to Epistar identifying one of the parts in this case. They failed. It didn't happen. They have a second excuse. They said, well, we didn't send a letter to Epistar, but Cree sent a letter to Epitech. Well, Epitech did not become part of Epistar until 2006.

The evidence, which is PTX 1520, is a series of letters between Cree's lawyer and Epitech, and if you look at those letters, the first letter, says, oh, hey, Epitech, you make this lamp and here's the model number. It's got 12 LEDS, you infringe.

The president of the company writes back and says, I'm not sure what you're saying here, we don't make lamps, we make bear chips. Here's our website. You can go to our website and tell us if you still think we infringe, right, so it's not go to hell, it's tell us where we infringe.

So then they send back another letter, and they send

the letter talking about a package, and then they send a letter that references a chip. It uses the word, "chip." It doesn't have a model number, a part number or a description. That letter is written by a lawyer that lives locally. It's Cree's lawyer. He could have came to this trial, and he could have said this is what we photographed, this particular chip.

Instead, there's images, but there's no evidence that it's an Epitech chip, and so the letter sequence peters out. Now this is a legal requirement that they have. They have the burden of proof. I asked Garceran. He's the Cree client, right. This letter is being written on behalf of Cree. I said, "Do you have the chip?" He said, "No."

BU had an obligation in discovery to produce it if they had it, but the fact is they don't have it. It's their burden of proof. It's marking. They didn't do it. This is a technical issue, but I don't want this to escape. The consequence of this issue is that there's no damages against Epistar for before the lawsuit was served.

There's this second defense for Epistar that is unique. It's called the foreign sales issue. So the Judge's instructed you. I think you're going to be instructed again. If the sales occurred outside the U.S., the U.S. laws don't cover them. That's because the United States Supreme Court said if BU wants to get a patent in another country where they have different laws, different standards, different burden of

proof, no jury trial, then you have to go sue on those sales in the other country. They also may judge that your patent is invalid in that country in a different way. There's really good reasons for this, so you're not allowed to put foreign sales in the damage question. I was stunned when the damages expert after the case was done with discovery put the Bridgelux China sales into this case.

So, I'm going to show you the numbers here. Go to the next page. 175 out of $178 million in claimed U.S. sales all occurred overseas, and this is how they occurred. This is what the proof says. Bridgelux, which is in California, and they're a chip designer, they sent a purchase order to Taiwan.

The purchase order states on a point blank, you can ask for this, the purchase order says this is an offer. Now, an offer in contract law is not a contract. It's an offer which can be accepted only by shipment, and what do the facts show? Everlight received it in Taiwan, they chipped it over after they built it in Taiwan, it landed in Asia, and when it landed in Asia on the doorstep, then Bridgelux had an obligation to pay for it.

That entire transaction took place outside the borders of the U.S. The law is super clear. There's only one place of sale. It's where the contract of sale was made, and when you have a purchase order, it's there. Don't listen to counsel's mumbo jumbo about California law applying to the transaction.

California law is no different. The sale takes place where the delivery is made. That's the rule, simple. That knocks out all these damages which never should have been in there in the first place. They're not damages, if you think about it, they are only damages if they were imported in the United States. They weren't.

Nobody is taking any money out of Bu.'s pocket. If you remember the slide, BU didn't make any money on this. BU didn't make any products. He filed a patent. It's a patent that most people don't practice. It's a patent that's proven not to be practiced in this court. It's a patent which MIT says is invalid.

He's not out any money. He's still grousing today that they cut the deal with Philips and Osram, the biggest companies in the world on lighting, and they gave away his patent rights for $275,000. That's a beef he has with the university, not with these defendants, and it can't be redressed by hiring a lawyer and bringing them into town and having him tell tall tales about $20 million demands.

Next. So Epistar would have got the$500,000 deal, no higher. I think it would have been 90,000 because if you look at the $275,000 deal, there were three available licenses. If you want to say it's half of that, that's what it is, but I think that's the lump sum reasonable royalty for Epistar.

Next. Skip. I'm done. Thank you for your attention

and good luck in your deliberations.

THE COURT: Why don't we stretch. Can I see counsel for one minute.

(SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

THE COURT: There should be no discussion of Dr. Nakamura. I excluded that evidence.

MR. SHORE: I didn't object because you made the statement.

THE COURT: No, I understand. You're a man of rules. I excluded it.

MR. SHORE: Can you give an instruction?

THE COURT: No, right now I'm excluding it all. I'll deal with it later.

(End of sidebar conference.)

REBUTTAL

MR. SHORE: May it please the Court, whoa, that was hard to not object.

THE COURT: I can't even hear you.

MR. SHORE: I said that was hard not objecting, but I hope you listened to the evidence and found about 95 things I don't have time to go into that were just 100 percent wrong.

For those of you who are technical and have a technical feel for this, look at DTX 004. That's the one where they said that Dr. Moustakas said that you had to have a ring pattern if you're looking at it. Two things about that. That

was not a side view of a buffer layer. It was cubic gallium nitride, and what they did was they shaved off the entire substrate and took a planer view of the buffer layer, so instead of looking at something that was a tiny little side of the type of gallium nitride in these chips, they removed the entire buffer layer and took a planer view so you had a huge gigantic non-single crystalline structure all the way across.

Defense counsel knows that. He flat out lied to you about what that shows, and that will be apparent to any of you who bother to read it. Also, he stated that they delivered, they proved that they delivered all of these Bridgelux chips to Asia, not true.

The only person who testified on the topic was Titus Chang, and the Court specifically instructed you that he had no personal knowledge of anything until 2012, and so nothing until 2012 did they have any evidence on, and they didn't bring you any evidence about any shipping receipts or where things were shipped to or anything.

We brought you an entire thing of purchase orders, invoices and payment records, and you'll see that U.S. law applied to the transactions, the purchase orders issued from here, the invoices were sent here, payment was made from here. You'll be instructed that substantial activities related to the transaction can cause the sale to be in the United States.

If a purchase order is issued from here, under U.S.

law, an invoice is sent here, payment is sent from here using a U.S. bank. I think that's substantial transactions. There's no evidence to the contrary to any of that.

When they talk to you about Bridgelux, he keeps saying Bridgelux only paid $375,000 for these sublicenses. Not true. Bridgelux agreed to pay 2 percent of its worldwide sales. 2 percent of worldwide sales is the equivalent of, remember, the U.S. is 20 percent of the world, so when you agreed to pay on a worldwide basis 2 percent, what you are effectively agreeing to if you're a U.S. company, you manufacture in the U.S., you only have U.S. patent rights, that's the equivalent of 10 percent. We're not asking for 10 percent, we're asking for less than the equivalent of what Cree agreed to.

He also said that Bridgelux only paid $250,000, not true. Bridgelux paid Cree -- it's what Bridgelux paid Cree for the rights, it's not what Cree paid BU. You're not being asked in the *Georgia-Pacific* factors or anything else what would Boston University take within the Cree deal for a sublicense because the Cree deal didn't exist in 2000, the Cree deal wasn't there in 2000, so the relevant inquiry is what did Bridgelux agree to pay Cree for the rights? 3 to 6 percent plus an upfront payment. It's in the license.

You were also told that the number that we provided for Bridgelux sales, he was surprised to see it. It was in the case from day one. He's trying to make you think that we

pulled the same kind of dirty tricks they did so you won't be so hard on them. We haven't pulled any dirty tricks, none. We have disclosed everything. We've given up everything. Every witness that they've ever needed has been made available to them that we control. Every one of the people in the lab that was made available to them. Every single person at BU has been made available to them.

Dr. Moustakas, I think he was deposed two times, our experts were deposed four times, some of them. It's amazing. He also tells you that for invalidity, you have to enable every single possible imaginable permutation of the invention. Not true. He leaves out "or." Think about that, how crazy that sounds.

Comprising. "Comprising" means "includes but is not limited to," so if you have to enable everything that could have been included, could have been included, which is basically what he's saying that means, that's nuts. That's not the law. You're going to be instructed on the law. Follow the law the Court gave you.

Man, you heard the Court say a couple of times that Dr. Moustakas is absolutely the inventor, and then what does he do, he gets up on closing and he tells you that the patent office told him he wasn't the inventor. That's not what the patent office said.

Then he put up this picture of the claim that had a

line through it. That's how the patent office works. Until the final claims are done, every single claim, as the negotiation goes through, they mark through claims so the examiner knows which of the active claims that are being considered.

It doesn't mean that just because a claim is marked through, doesn't mean it was rejected. That's just false, and you'll see in some of the claims in Claim 19 if you compare it to the prosecution history, some of these claims that are marked through are word for word in the patent.

Again, it's just intentionally misleading. He also told you, I thought it was kind of silly, he put that e-mail up where it said -- where Cree is writing Boston University and they want Boston University to please let us do this cross-license with Philips.

"Please, let us include the '738 patent," and Boston University says, Well, come on, man, you guys are using up our patents rights. We understand we need to support U.S. industry, we understand that we're helping you, but, come on, you need to pay us something. We're giving you all this aid and all this help.

So they say oh, well, Philips says Cree, because Cree didn't want to pay them anything extra, oh, well, Philips says they don't need it. Read that e-mail. What does it say in the very next sentence? Philips won't do the deal unless the

Boston University patent is included, so Philips says they don't need it, but, forget it, Cree, you're not getting a cross-license to all of our patents, you're not going to be able to do business unless you include it.

What kind of negotiation would it be, remember, Cree is at that point negotiating with BU trying to keep BU from getting more money from Cree than what Cree already has to pay them, and they're trying to get Bu.'s permission.

And what does BU end up doing to the detriment of Dr. Moustakas, to the detriment of a lot of other people, they end up saying, okay -- now, by the way, not to Dr. Moustakas because he granted his rights to the Photonics Center for his lab, so he's basically criticizing the university for doing so much to support Cree in its efforts to get all those rights to Osram patents, Philips patents, Nichia patents, these other patents. That's what's going on.

Now, in 2000, do you think BU would have had the same attitude towards these defendants who had no patents worth anything to give back, who would not have been supporting U.S. industry, who absolutely in no way, shape or form or fashion fit into the policies and procedures, absolutely not.

And there is no one, no one who has come in here and testified that three Taiwanese companies, who literally were going to be taking away American jobs and American industry and competing directly with American industry, who would have been

treated the same way as Cree, who was supported precisely to build the American industry. It's ridiculous on its face.

And, again, he can't help himself. I think he mentioned "white elephant" twice, he actually said the patent office rejected Dr. Moustakas' life work. I mean, it's just over the top, over the top.

Then he says another thing, and this reverse engineering, he said this was our Plan B. He's right. We got it on October 27th after three years of litigation, so if getting that reverse engineering that you saw that proved all the stuff they've been doing is Plan B, I sure wish it had been Plan A.

If they had produced that three years ago, we wouldn't have spent millions of dollars and time and money to try to get them to give us the most basic information possible. So, yeah, I guess it's Plan B.

Then this one, I think I had a little heart palpitation. I may have lost a couple years off my life. He said it's a joke that what their lawyers told the Court in open court was their position.

By the way, their lawyers at the time were one of the largest, most prestigious law firms in the United States for intellectual property rights, Finnegan, Henderson, Farabow, Garrett & Dunner. I don't know where they are now, but, for whatever reason, they're not here, but that lawyer at that

firm, a 25-year litigator got up, and he told the Court honestly what the case was about, and the Court said -- and you're going to get it in your instructions -- the Court said you're bound, the defendants are bound, and, frankly, I think the defendants were happy to be bound until they figured out that by telling the truth about what the case was really about that they're going to have to pay some money.

And then they said, wait a minute, we no longer want to talk about the truth, we want to back off. We want to run away, we want to call what our attorneys said in open court a joke. So what do they do, they get new lawyers now. I guess those lawyers don't want to stand behind the statements of Finnegan, Henderson.

THE COURT: I strike that.

MR. SHORE: The other thing is he talks about Cree and how they used the Cree license. They don't use the Cree license. They use an amendment to the Cree license that was done precisely so Cree could go out and get some other cross licenses to help them fight off Toyoda Gosei, Philips, Osram, and what did Cree get for that?

Cree got hundreds of millions of dollars in patent rights to enable them to stay in business. That's what Cree got. Why did they get that? They got that because of Boston University's patent. Boston University let them do it for years. Now they said that's enough, Cree, you've gotten all

the benefit you need, we're taking back and we're going to go out and we're going to seek the payments we need to seek.

Oh, my gosh, then the draft, the draft letter that they keep bringing up about 1 percent. First of all, that's 1 percent of worldwide sales. It's not 1 percent. It was a draft. It was never finalized.

That recommendation was never accepted, and, of course, they don't tell you it was a draft, they try to tell you that that was Boston University's position. It was a draft, and even if it was Boston University's position, 1 percent worldwide sales in a market in which the U.S. is 20 percent, that equates to a 5 percent U.S. royalty. They never converted. Notice that they always talk about worldwide rates, but they never convert it to the U.S. market.

Then the other thing, which I said I think is bizarre, they said that, oh, well, we could have bought these parts somewhere else. Zero proof of what capacity was available at any given time ever. Zero proof of about what the price would have been if they went somewhere else to buy parts, talk about Everlight and Lite-On, if they had gone somewhere besides Epistar. No proof.

You can't just say, oh, we could have bought it somewhere else. You can't take the third largest manufacturer of LEDS off the market and say that we just could have gone and got that somewhere else. You have to have proof that someone

else could have supplied it, you've got to have proof about what the price would have been, you've got to have proof that whatever you bought wouldn't have violated some other patent that you had to pay royalties on.

If you look at that table and look at the proof, I'll tell you, if we put all of it on one side for BU and whatever is on the other side for them, the table would fall over. They put on nothing. They put on no evidence, no witnesses that are credible, and they've absolutely put on -- and let me talk about the whole Redwing thing.

And he said MIT is here. MIT is not here. Dr. Fitzgerald is not MIT. In fact, I asked him in his deposition, "Are you here on behalf of MIT?" He said, "Absolutely not." He is here as a paid expert who has flip-flopped depending on who is paying him.

There are about three or four thousand professors at M.I.T. You take three or four thousand of anything -- you take three or four thousand of any group in the world, you're going to have some that are -- in fact, I think on his resume', he calls himself an innovator. If you look at his -- just look closely.

He is a germanium expert, we agree. He is not a gallium nitride expert. He is a material science guy, but he is a material science guy in the broad sense. He is not a gallium nitride expert.

Joan Redwing did exactly what she was told to do. She was told to look at the parts of the device that were tiny and look at every one of those things, you'll see every one of those, she looked at the parts that were tiny, and her whole idea was I can't say and I won't stay that there are not grain boundaries, all I'm going to say is that we can make an argument that they didn't prove it, even though statistically in every other way, shape or form, I have to admit there are grain boundaries, which is why their lawyers stood up in court and admitted there were grain boundaries, absolutely admitted it there are grain boundaries.

So there is no doubt about infringement, there is no doubt about validity, the only question in this case is damages. So you've got to ask yourself in 2000, when no one had licensed this patent before, the patent gets issued, has been recognized as an incredible breakthrough in the industry, and the very first person who comes through the door and asks for a license is a Taiwanese company that is desperate to be able to import, desperate to use the market, and the entire Taiwanese government has come through and tried to set up this industry in Taiwan, what would they have been willing to pay?

And I think it's really interesting, really interesting that the defense lawyer never mentions a word about all the things that they did pay, all the people they did pay and how much they did pay.

All he wants to tell you is that in the context of helping set up a U.S. industry through Cree that Boston University did these types of things, and, therefore, you should just think that if a Taiwanese company came over, not Cree, not American, not helping U.S. industry, came over, they would have gotten not the same deal, not the 2 percent of worldwide sales that Cree agreed to, not the obligation to enforce the patent and spend millions of dollars in legal fees that Cree agreed to, not the obligation to continue the licensing or the prosecution of patents agree that Cree agreed to, no, Boston University wouldn't have wanted them to pay what Cree paid, Boston University wouldn't have wanted all those other benefits, Boston University would have wanted a fifth of that or a fourth of that, or in one case, I think it was zero.

It's insane. It is insane. This case is all about the dignity and the respect that this patent has, that this man has and that these people have willfully, knowingly infringed, taken active steps to hide, to obfuscate and to escape.

It's time for you guys to go back, thoughtfully consider everything and render a justice and true verdict. Thank you very much.

THE COURT: Well, as you imagine, there's no time to do this charge this afternoon because it will take maybe an hour and a half to get through all of that, so I'm going to send you home. I want to remind you not to talk about the case

when you come in tomorrow morning. The only reason I say that, it's going to be so tempting. You've heard almost everything, but you really haven't heard almost everything because you haven't heard what the law is yet, and you haven't seen the verdict form, so I'll see you tomorrow morning at 9:00. Here's crossing fingers for the commuter trains.

THE CLERK: All rise for the jury.

(JURORS ENTERED THE COURTROOM.)

THE COURT: Maryellen is saying that one juror has mentioned to her that he may want some of the transcripts. He's putting it in writing so we do have, am I correct, daily copy?

MR. LINDGREN: Yes. We don't have today's yet, but we've had everything up to yesterday.

MR. VASQUEZ: They're doing a great job.

THE COURT: Thank you. By the way, I have heard the paralegals are phenomenal. There's a problem, which is they have to be edited to get rid of the sidebars, et cetera. We haven't had that many day, but every day there were a few. That will have to be edited out. Maybe what I should just do, although I'm reluctant to, is just give them all the transcripts. They could spend the rest of their life in minutia. I really don't want to do that. We'll have to make a judgment. I don't know that you need to stay for this. You all can be seated.

MR. VASQUEZ: One process, specify which witness, give them a piece rather than bury them in stuff.

THE COURT: Well, I think they're specifying the witnesses. The problem is once I give them a part of something, I give them the whole thing, direct, cross.

MR. VASQUEZ: I like it when the jury takes notes and pays attention to the evidence.

THE COURT: Right. I'll give it to them.

MR. SHORE: I don't know what the notes are going to say. The only way I've seen it done, it's a witness at a time.

THE COURT: Well, no, I'll give it to them.

"Can we have two full copies of the whole transcript?" Post instruction for tomorrow. Can I go off the record for a minute?

(Discussion off the record.)

THE COURT: I'll see you tomorrow morning. Let me just ask you this. I'm not going to sit for two hours as you all object to my charge. I think I've dealt with most of your serious objections, and there may be just a couple of things we've agreed to disagree on, so what I would like to have happen at the risk of -- I don't need a brief.

In fact, I order you not to give me a brief. Tonight you all have a nice dinner out. All I want is any objection where we will agree to disagree, for example, the adverse inference, possibly, for example, I don't know how I did

apportionment.

MR. VASQUEZ: How would you like that presented?

THE COURT: In other words, I'm not going to stand for two hours as you explain your objections. There may be something I misread, tell me about it because I can fix it right then and there. It could be something we all agree didn't come out clearly, but I just -- it would be useful to have just literally one page, I object to jury instruction blah, blah, blah, because adverse inference, I forget what number it is, an adverse number shouldn't be given here or I object to apportionment, I think. I don't even know if you do anymore because I figured a lot of it, but you get the point.

MR. VASQUEZ: So we do one page, we're going to walk up and hand it at sidebar?

THE COURT: I'm warning you that I'm not going to stand there and listen to long narratives about each objection.

MR. VASQUEZ: Sure.

MR. SHORE: I'm doing it.

MR. VASQUEZ: Could I suggest the following, your Honor, which is that one time before you finish with the charge, you say at this time would the lawyers approach, and then you say do you have objections to the charge, and then we hand you the paper?

THE COURT: Right. What I want you to flag for me, however, is anything new like I read it wrong or it came out

obfuscated.

MR. VASQUEZ: Got it. So we can go to sidebar if you read it wrong.

THE COURT: If it's something that you shared with me the other day.

MR. VASQUEZ: And we just put it on the list.

THE COURT: Well, no, just I don't want anything new, but I think you've all had ample opportunity to object to this charge, not new stuff, but if there's something that you ask for and I didn't give it, just put it down, right.

MR. VASQUEZ: Okay, fair enough.

MR. SHORE: Okay. Can we please have it in Word form, the charge and verdict?

MR. VASQUEZ: That would be assistance to all of us, yeah.

THE CLERK: We gave you instructions.

THE COURT: We've given them to you.

MR. SHORE: We're getting a Word and the verdict form?

MR. VASQUEZ: Could we get a Word and then we'd be able to make it out quick?

THE COURT: Listen, let me really be clear, don't do what you did to me last time with the spider webs.

MR. SHORE: We're not doing that at all.

MR. VASQUEZ: It will allow us to isolate the words. Thank you, so I will come back in tomorrow. It's actually a

fairly long charge. I'll handle the verdict form, and I think they'll be -- it's a bad day because they only can sit, I think, half a day.

THE CLERK: They can only sit to one tomorrow.

THE COURT: No lunch, if they're not here, they don't get lunch. They get lunch on Friday, when they stay full days. What I want you to do tomorrow, I'm asking Maryellen to try and twist arms to see if we can get a full day on Thursday. It's a very dense case.

MR. VASQUEZ: Your Honor, it's a half day tomorrow and Thursday is full?

THE COURT: No Thursday is still half.

MR. VASQUEZ: I understand it's two halves in a row, and then if they're still at it --

THE COURT: Friday is a full day. Do you remember I tried to get them to agree to sit to five, and people had issues?

MR. VASQUEZ: Right, they had issues.

THE COURT: Maryellen, go in there and say I know today is bad, tomorrow can you stay till four?

Who are the paralegals there? First of all, bravo, Maryellen sings your praise. Dan Hohler is going to help, and we're going to put them all into JERS.

MR. VASQUEZ: Do we come in at 8:30 or 9:00?

THE COURT: 9:00. I think this is pretty

straightforward. I'll see you at 9:00.

(Adjourned, 4:06 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

We, Marcia Patrisso, Lee A. Marzilli, and Valerie A. O'Hara, Official Federal Court Reporters, do hereby certify that the foregoing transcript, Pages 9-1 through 9-256 inclusive, was recorded by us stenographically at the time and place aforesaid in Civil Action No. 12-11935-PBA, Trustees of Boston University v. Everlight Electronics, et al, and thereafter by us reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 18th day of November, 2015.

/s/ Marcia Patrisso
/s/ Lee A. Marzilli
/s/ Valerie A. O'Hara

MARCIA PATRISSO
LEE A. MARZILLI
VALERIE A. O'HARA
OFFICIAL COURT REPORTERS